No. 09-20024

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

IN RE LARRY RAY SWEARINGEN,

MOVANT.



U.S. COURT OF APPEALS
RECEIVED
JAN 2 0 2009
NEW ORLEANS, LA.

## MOTION FOR ORDER AUTHORIZING
## FILING AND CONSIDERATION OF
## SECOND PETITION FOR WRIT OF HABEAS CORPUS
## UNDER 28 U.S.C. § 2254

COURT OF APPEALS
FILED
JAN 2 0 2009
CHARLES R. FULBRUGE III
CLERK

### THIS IS A DEATH PENALTY CASE

### EXECUTION SCHEDULED January 27, 2009

Respectfully submitted,

HILDER & ASSOCIATES, P.C.

by:

Philip H. Hilder
Texas Bar No. 19620050
James G. Rytting
Texas Bar No. 24002883
819 Lovett Boulevard.
Houston, Texas 77006
(713) 655 9111 - Telephone
(713) 655 9112 – Facsimile

No. _____

## IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

IN RE LARRY RAY SWEARINGEN,

MOVANT.

---

## MOTION FOR ORDER AUTHORIZING
## FILING AND CONSIDERATION OF
## SECOND PETITION FOR WRIT OF HABEAS CORPUS
## UNDER 28 U.S.C. § 2254

---

## THIS IS A DEATH PENALTY CASE

## EXECUTION SCHEDULED January 27, 2009

Respectfully submitted,

HILDER & ASSOCIATES, P.C.

by: _____

Philip H. Hilder
Texas Bar No. 19620050
James G. Rytting
Texas Bar No. 24002883
819 Lovett Boulevard.
Houston, Texas 77006
(713) 655 9111 - Telephone
(713) 655 9112 – Facsimile

1

# I. Introduction

Movant, Larry Ray Swearingen, is on death row in Texas. He moves, pursuant to 28 U.S.C. § 2244(b)(3)(C), for an order authorizing the filing and consideration of a second petition for writ of habeas corpus, a copy of which is attached as Appendix 'I'. Mr. Swearingen's application is based on the Fourteenth Amendment's requirement of due process, on the Eighth Amendment's requirement that capital proceedings adhere to a heightened degree of reliability, and on the Sixth Amendment's guarantee of effective assistance of counsel.

This is a case of actual innocence supported by striking forensic evidence that definitively proves that the victim, Melissa Trotter, was killed and left in the East Texas woods while Mr. Swearingen was incarcerated in the Montgomery County Jail. **The analyses and opinions of a forensic entomologist, and four forensic pathologists, including three former or current Chief Medical Examiners,[1] unanimously support the conclusion that it was impossible for Mr. Swearingen to have committee the offense in this case .** *See, App. I, Exh. 'A-E'.*

---

[1] Former Harris County, Texas, Chief Medical Examiner, Joye M. Carter, who testified for the State at trial, but has reversed her conclusions; current Harris County Chief Medical Examiner, Luis Sanchez; former Nueces County, Texas , Lloyd White, forensic pathologist, G. M. Larkin; and forensic entomologist, James Arends.

2

Internal organs photographed at autopsy appear as if they were dissected out within hours of death. *See, especially, App. I., Exh. 'C', commenting on App. I., Exhs. 'W' and 'X'.* The descriptions in the autopsy report are of tissues from a recently deceased person. *Id.* The State's only theory of guilt, which was that Mr. Swearingen killed the victim and left her body in the forest on December 8, 1998, twenty-five (25) days before the corpse was recovered on January 2, 1999, is not just implausible, it is impossible. **Mr. Swearingen was arrested on December 11, 1998, only three days after the victim disappeared.** *Tr. Transc., vol.* 25, at 115, 122. He has been in custody ever since. He did not, and he could not have, killed the victim.

## II.    Jurisdiction

This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 2254(a). Mr. Swearingen is under a judgment and sentence of death entered in the Criminal District Court No. 9 of Montgomery County, Texas.

## III.    Procedural History

On December 11, 1998, three days after Trotter's disappearance from the Montgomery County Community College campus, deputies arrested Mr. Swearingen on unrelated charges. *Tr. Transc., vol.* 25, at 115, 122. On June 28, 2000, a Montgomery County jury convicted Mr. Swearingen of capital murder. *Id.*

3

vol. 34, at 102. On July 11, 2000, the jury answered special issues in a manner that compelled the 9th District Court to impose the penalty of death. *Id., vol.* 38, at 91-92.

Appeal was taken to the Texas Court of Criminal Appeals, which denied relief on all claims in *State v. Swearingen,* 101 S.W.3d 89 (Tex. Crim. App. 2003). Judges Johnson and Price dissented from the majority's decision to uphold the factual sufficiency of evidence supporting convictions on aggravating felony offenses of kidnapping and sexual assault. *Id.*

On September 12, 2002, Mr. Swearingen filed his initial application for a writ of habeas corpus pursuant to Article 11.071. Mr. Swearingen raised an actual innocence claim and raised an ineffectiveness of counsel claim based on counsel's failure to challenge the date of death using forensic evidence, particularly entomological evidence. On May 21, 2003, the Texas Court of Criminal Appeals denied Mr. Swearingen's initial application for a writ of habeas corpus.

On May 21, 2004, Mr. Swearingen filed a petition for writ of habeas corpus in the United States District Court for the Southern District of Texas. *Swearingen v. Dretke,* no. 4:04-cv-02058, Dkt. Entry [19]. On September 8, 2005 the District Court denied relief.

On February 13, 2006, Mr. Swearingen appealed the federal district court 's decision. On July 31, 2006, the Fifth Circuit denied appellate relief in *Swearingen*

4

*v. Quarterman*, No. 05-70055 (5th Cir.). On August 14, 2006, Mr. Swearingen filed a motion for rehearing which was denied. On September 5, 2006, the Fifth Circuit issued its mandate. On November 22, 2006, Mr. Swearingen filed a petition for writ of certiorari in the Supreme Court of the United States. On February 20, 2007, certiorari was denied.

Before Mr. Swearingen filed his petition for a writ of certioriari, the 9th District Court of Montgomery County, Texas, on October 17, 2006, set an execution date ordering Mr. Swearingen executed on January 24, 2007. On January 22, 2007, Mr. Swearingen filed a subsequent writ pursuant to section 11.071 of the Texas Code of Criminal Procedures based on the entomological analyses of Dael Morris and Dr. James Arends. Exh. 'F' and 'G'. On January 23, 2007, the TCCA determined that six claims met 11.071 § 5 standards, vacated the execution date and remanded the claims for and evidentiary hearing in the trial court. The State filed an answer, and Mr. Swearingen, with leave of court, filed a reply supported by the opinions of Dr. White and Dr. Larkins. App. I, Exhs. 'I' and 'J'.

After an evidentiary hearing convened on July 2, 2007, the trial court recommended that relief be denied. On January 16, 2008, the TCCA adopted lower courts findings and conclusions and denied relief. That same day, January 16, 2008, Mr. Swearingen filed a second successor containing six claims for relief

5

including claims based on actual innocence, ineffectiveness of counsel and violations of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). The TCCA found that claims based on the latter two theories, *Brady* and *Giglio*, met successor standards and remanded the case for a second evidentiary hearing in the trial court.

On June 20, 2008, the trial court conducted an evidentiary hearing. On June 8, 2008, undersigned counsel filed a motion to recuse Judge Fred Edwards,[2] which went to a hearing but was denied. On November 19, 2008, the trial court signed findings of fact and conclusion of law recommending that relief be denied. On December 17, 2008, the TCCA adopted the trial courts findings and conclusions. That same day, the outgoing Montgomery County District Attorney, Michael McDougal, personally signed and had filed a motion to set an execution date. On December 18, 2008, the Court set a second execution date of January 27, 2008. The Court filed the order on December 22, 2008, and counsel's office received it on or about December 24, 2008.

On January 6, 2009, Mr. Swearingen, assisted *pro bono* by the Innocence Project, filed a motion in the 9th District Court, Montgomery County, Texas, ("convicting court") for DNA testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure. The motion supplemented *pro se* motions that Mr.

---

[2] Judge Edwards had allowed friend and family members of Ms. Trotter to sit in the jury box during the evidentiary hearing. The family emerged from chambers to take their seats. Mr. Swearingen pointed out that this would raise a storm if allowed even in routine civil proceedings with much less at stake.

Swearingen filed on May 12, 2008, and in June 2008, in which Mr. Swearingen sought testing and appointment of counsel to pursue this avenue of relief. Simultaneous, with the January 6, 2009, DNA motion Mr. Swearingen file a motion to vacate the execution date in the convicting court.

On January 14, 2009, Mr. Swearingen filed a petition for writ of certiorari to the Texas Court of Criminal Appeals in the Supreme Court of the United States; simultaneously, he filed a motion for stay of execution in the Supreme Court.

## IV. STATUTE OF LIMITATIONS

In *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005), the Sixth Circuit determined that the petitioner had filed outside the one-year statute of limitations that Congress established in 28 U.S.C. § 2244 for filing a federal habeas petition. However, Souter "argued that because he has made a credible showing of actual innocence, equitable tolling should be applied to allow a court to consider his constitutional claims." *Id.* The Sixth Circuit agreed, stating that,

> Souter has presented new evidence collected over the past several years that does raise sufficient doubt about his guilt and that undermines confidence in the result of his trial. The only evidence which directly ties Souter to Ringler's death is the bottle. At trial, the State relied on three pathologists, Drs. Graeser, Bauserman, and Cohle, all of whom testified to varying degrees of certainty that the bottle was the cause of Ringler's wounds. Since that time, Dr. Bauserman, who performed the autopsy and who was the only one who actually viewed Ringler's body, has retreated from his trial testimony and stated he was only speculating when he testified that there was strong evidence that the bottle caused the injuries."

7

Equitable tolling should also be applied to Mr. Swearingen's second federal petition. He too developed evidence of actual innocence over the years. The conclusions of five forensic scientists, including three former or present Chief Medical Examiner establish that Mr. Swearingen was in jail when the crime the state accused him of committing occurred. App. I, Exhs. 'A-E'. Former Harris County Chief Medical Examiner Joye M. Carter has recanted her testimony. *Id.*, Exh. 'A'. At trial, she testified for the State that the victim was killed and her body left in the National Forest on the day she disappeared. Dr. Carter's testimony, therefore, gave essential credence to the theory that the State absolutely had to prove, which was that within the narrow window of time before Mr. Swearingen was incarcerated he killed Ms. Trotter and disposed of her body in the woods. Dr. Carter now says that the forensic evidence is **incompatible** with death and disposal of the body while Mr. Swearingen was free. *Id* , Exh. 'A', at 2-3. Instead, the earliest this crime could have occurred is one week after Mr. Swearingen was incarcerated. *Id.* Drs. White, Larkin, Sanchez and Arends all strongly support this timeframe, proving Mr. Swearingen's innocence. *Id.*, Exh. 'B-E'. Mr. Swearingen, like Souter, should be allowed to proceed out of time.

## V.    PETITIONER'S CLAIMS ARE PROPERLY BEFORE THIS COURT

In general, absent a showing of cause and prejudice, a habeas court will not entertain a claim that has been defaulted in state court as a result of an adequate

and independent state court bar. *Dretke v. Haley*, 541 U.S. 386, 388 (2004). However, there are several narrow, but critical, exceptions to this general rule. First, the court requires that the rule must be adequate and independent – that is, it was firmly established, regularly followed, and consistently applied at the time of the alleged default. *Ford v. Georgia*, 498 U.S. 411 (1991). Second, there is "a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense or, in the capital sentencing context, of the aggravating circumstances rendering the inmate eligible for the death penalty." Id.; see *Schlup v. Delo*, 513 U.S. 298 (1995). Third, there is an exception in claims of *Brady* error, where the elements of the substantive claim itself mirror the cause and prejudice inquiry and proof of one is necessarily proof of the other. *Banks v. Dretke*, 540 U.S. 668 (2004).

## V.  Mr. Swearingen's Claims Satisfy the Prima Facie Showing Necessary For Authorization Under §2244(b)(3)(C).

Mr. Swearingen seeks authorization to file the following claims in a successive federal habeas corpus petition:

1.  Mr. Swearingen is actually innocent of capital murder; therefore, his confinement and death sentence violate the Due Process Clause of the Fourteenth Amendment and violate the Eighth Amendment of the Constitution.

2.  Mr. Swearingen is actually innocent of aggravated sexual assault and

9

actually innocent of kidnapping and actually innocent of aggravated sexual assault; therefore, his confinement and death sentence violate the Due Process Clause of the Fourteenth Amendment and violate the Eighth Amendment of the Constitution.

3. In violation of *Giglio v. United States,* 405 U.S. 150 (1972), the State sponsored false and misleading forensic testimony regarding the critical issue of when the crime was committed.

4. In violation of *Brady v. Maryland*, 373 U.S. 83 (1963) the State prevented the development of exculpatory entomological evidence by withholding insect material collected at the crime scene.

5. In violation of *Brady v. Maryland*, 373 U.S. 83 (1963), the State withheld material, exculpatory evidence that another man, not Mr. Swearingen, had made serious, credible threats on the victim's life near the time of her disappearance; alternatively, the trial court in violation of due process refused to release exculpatory evidence based on the State's misrepresentations.

6. In violation of the Due Process Clause of the Fourteenth Amendment and in violation of the Sixth Amendment of the Constitution Mr. Swearingen was convicted of capital murder under instructions that did not require the jury to agree on one of four alternative theories – aggravated sexual assault, attempted aggravated sexual assault, kidnapping or attempted kidnapping.

**A.** **The evidence on which Mr. Swearingen's claims depend qualifies as newly discovered evidence.**

    **1.** **State habeas and federal habeas counsel diligently tried to develop evidence of actual innocence before the termination of initial habeas proceedings in the state and federal systems.**

**State Habeas Proceedings**

Mr. Swearingen's state habeas counsel retained and expert entomologist. He retained an investigator who inspected crime scene evidence and identified larva material in a petri dish (State's Trial Exh. 218, not admitted into evidence). He filed motions for the release of the evidence and argued orally that he was entitled to it and that it was necessary for the presentation of a claim challenging Mr. Swearingen's conviction on the basis of actual innocence. The State opposed the request on the ground that the insect evidence had not been properly collected and therefore insect evidence did not actually exist. The State also argued that counsel was obligated to retain an expert to inspect the material in Exhibit 218 and that the Court could ignore the investigators lay representation that the exhibit contained what appeared to be dried insect larvae and pupae. The convicting court accepted the State's reasoning and denied state habeas counsel's motion. State habeas counsel nonetheless filed a claim of actual innocence based on a report that the forensic entomologist made without the benefit of analyzing insect evidence.

The convicting court explicitly found that there was "no proof that there may

11

be insect material among the evidence in this case," *Ex Parte Larry Ray Swearingen*, no. 99-11-06435-CR, [2002] Findings of Fact, ¶ 12. It found that samples were not sufficient for entomological analysis. *Id.*, ¶¶ 18-22. The convicting court went so far as to recommend denying relief based on the finding that Mr. Swearingen's "entomologist has never seen the alleged insect specimens in this case," and had to base her calculations "on an assumption." *Id.* ¶ 23. In short the convicting court refused to let Mr. Swearingen's expert analyze basic evidence, then criticized Mr. Swearingen for doing the only thing left during state proceedings, which was to make an educated guess. State habeas counsel also attempted to develop forensic evidence of innocence other than entomological evidencer. His investigators contacted the Tennessee "body farm,"[3] which did not offer assistance. State habeas counsel also consulted with Dr. Lloyd White about Dr. Carter's diagnosis of vaginal bruising.

### Initial Federal habeas proceedings

In federal proceedings, undersigned counsel continued to develop forensic entomological evidence as part of an actual innocence claim. Habeas counsel reviewed the autopsy report and photographs, the police reports, and crime scene photos. He sought and received funding to retain entomologist Dael Morris, and

---

[3] The "body farm" is operated by the University of Tennessee's forensic anthropology department. There are two similar programs in Texas, one at Southwest Texas State University in San Marcos and one at Sam Houston State University in Huntsville. Undersigned counsel has contacted forensic anthropologists at both Texas institutions. He was informed that they focus on skeletal remains, and not on early stages of decomposition involving soft tissue.

provided her with this material for her review. At Ms. Morris' direction, undersigned counsel placed data loggers at the crime scene to collect temperature data and obtained whether data from the National Oceanographic and Atmospheric Administration. *See, App. I, Exh. 'T'*.

Federal habeas counsel also filed a motion requesting that the Federal District Court order Montgomery County release the entomological evidence that State habeas counsel's investigator had identified in State's Exhibit 218. *Swearingen v. Dretke*, 4:04-cv-02058 (S.D. Tex.) (Doc. entries ## 17, 18). The exhibit contained hundreds of insect samples taken from the crime scene. App. I, Exh. 'G' (January 2007, Entomological Report). Through microscopic and DNA analysis of specimens in State's Exhibit #218, C. Cadaverina in the third "instar" stage of development (about to emerge as an adult fly) was positively identified as one of the species colonizing Ms. Trotter's corpse. *App. I, Exh. 'G'*, at 4.

Ms. Morris compared hourly temperatures at the crime scene, whichwere recorded by the data loggers set at the scene, to hourly temperature data collected at the Conroe Airport by NOAA. *App. I, Exh. 'G'*. The comparison revealed that there was no statistically meaningful difference in temperature at these two locations. *Id.* Ms. Morris therefore used hourly NOAA readings from the Airport for December 8, 1998 to January 2, 1999, to calculate the "degree days" at the crime scene. Using known rates of fly development at various temperatures, Ms.

13

Morris calculated the time it would take to for an egg laid by C. cadaverina to develop to the third instar stage under temperature conditions that the 1998 hourly Airport data indicated prevailed in the National Forest. *Id.* Ms. Morris then calculated the day ovipositing would have occurred. *Id.* On the assumption that ovipositing takes place soon after a dead body is exposed, the date of ovipositing represented as well the date on which Ms. Trotter's corpse was left exposed in the National Forest.

The initial pre-petition results reported by Dael Morris in 2005 did not support a claim of actual innocence claim or an ineffectiveness of counsel claim (the initial results did not show prejudice under *Strickland*) based on entomology or trial counsel's failure to utilize this science. However, Mr. Swearingen, himself, poured over hourly temperature data and noted that the readings for the Conroe, Texas station that Ms. Morris had relied upon differed markedly on at least one day from readings in nearby Huntsville, Texas. When edited data, which only contained daily highs and daily lows, was obtained from NOAA, the discrepancy had been corrected. There was also a handwritten notation from the individual responsible for taking reading that remarked on an apparent equipment failure on the day in question. *App. II.* Federal habeas counsel, therefore, asked Dael Morris to recalculate the date of ovipositing based on the new temperature data. In January of 2007, Ms Morris produced a report based on the

hourly NOAA temperature data in which she estimated that Trotter's body had not been colonized by blow-flies until December 18, 1998, one week after Mr. Swearingen was taken into custody. App. I, 'G'.

Because of the unusual developments with the entomological evidence, undersigned counsel sought the opinion of a second entomologist, Dr. James Arends, before filing a subsequent application for habeas relief in the state system. Dr. Arends reviewed crime scene and autopsy photos, Dael Morris's report, the corrected NOAA weather data and Dr. Carter's Januar 3, 1999, autopsy report. In January 2007, Dr. Arends provided an affidavit in which he agreed that the body was not exposed in the woods before December 18, 1998, based on Morris entomological findings and on the other evidence. App. I, Exh. 'H'.

Dr. Arends, in fact, was the first person to address the significance Dr. Carter's **internal** findings. *Id.* In coming to his conclusion that Trotter's body was not left in the woods until well after Mr. Swearingen was incarcerated, Dr. Arends relied on his observation that the weights of the internal organs that Dr. Carter described during autopsy were all within normal range. *Id.* The leakage and desiccation that invariably occurs when corpses are exposed for three weeks, as the State contended in this case, had not occurred. *Id.* Dr. Arends also emphasized the biology and ecology of the forest environment in which Ms. Trotter's body was found, stressing that far more scavenging by large animals would have occurred

15

over a 25 day interval. *Id.*

After the TCCA remanded Mr. Swearingen's actual innocence and ineffectiveness of counsel claims for a hearing, undersigned counsel consulted with Dr. Larkin and Dr. White, and requested that they specifically address Dr. Carter's internal findings. He sought and received leave to reply to the State's answer, and supplemented his actual innocence claims with affidavits supplied by these pathologists. *App. I, Exhs. 'I' and 'J'.* At the time, there was still considerable uncertainty about the reliability of the January 3, 1999, autopsy report. Dr. Larkin in particular suspected that the report might contain "boilerplate" because the internal findings indicated that Ms. Trotter's body had been exposed in the woods for a considerably **shorter** time than the December 18, 1998, date of ovipositing that Ms. Morris had calculated. For similar reasons, Dr. White also thought that there was a possibility that that report was not an actual description of the autopsy findings.

On June 25, 2007, undersigned counsel consulted with Dr. Luis Sanchez at the Harris County Medical Examiner's Office. One of the reasons was to determine whether Dr. Carter's autopsy report was fabricated. Dr. Sanchez assured undersigned counsel that it had not been, and that the internal findings were reliable description of the conditions in which the internal organs and other tissues were found at autopsy. Photos of several internal organs, including the

16

spleen and heart, (*See, App. I, Exhs. 'W' and 'X'*) confirmed this conclusion, and confirmed that Ms. Trotter's body could not have been in the woods until well after the December 11, 1998, date on which Mr. Swearingen was incarcerated.

Based on Drs. Sanchez's, White's, Larkin's and Arend's opinion, undersigned counsel requested that the convicting court consider pathological evidence as well as the entomological evidence in determining whether to recommend granting relief on the six claims that the TCCA had remanded. App. I, Exh. 'K'. The state opposed the request. On June 18, 2007, the 9th District Court ordered a hearing for July 2, 2007, for the purpose of considering the following issues confined to "entomological evidence" only:

> 1.    Whether the entomological evidence is favorable and material evidence showing that Applicant did not commit murder.

> 2.    Whether the entomological evidence shows that Applicant is actually innocent of capital murder.

> 3.    Whether the entomological evidence shows that Applicant is actually innocent of the aggravating felony charges [of kidnapping and sexual assault].

> 4.    Whether the entomological evidence presented in these successor proceedings is favorable and material evidence showing that Applicant did not commit or attempt to commit kidnapping.

> 5.    Whether the entomological evidence presented in these successor proceedings is favorable and material evidence showing that the Applicant did not commit or attempt to commit sexual assault.

*App. I, Exh. 'L'.*

Although the trial court had narrowly confined the evidentiary hearing to entomological issues, undersigned counsel subpoenaed Dr. Sanchez to the hearing. *App. I, Exh. 'B'*. The State's objected to the any testimony that was not concerned with entomological evidence. *Id.* at 15. The Court confined testimony to this narrow issue. *Id.* Dr. Sanchez nonetheless reversed the opinion that his predecessor, Dr. Carter, gave at trial. Dr. Sanchez stated, "that body most likely was not in that forest for more than two weeks." *Id. at* 17. According to Dr. Sanchez, "[I]t probably was some place else before that, but not in that forest." *Id.* Under cross-examination by the convicting court, Dr. Sanchez affirmed that "based on the evidence I have reviewed, it is unlikely that the body was in that field for over 10 to 15 days." *Id.* Dr. Sanchez then noted that Dr. Carter had removed and "sectioned" (that is dissected) the pancreas. *Id.* at 18. He confirmed that the pancreas autolyzes completely within a few days. *Id.* He explained that a completely autolyzed pancreas is liquefied. *Id.* Removal and sectioning cannot be done in that event. *Id.* Dr. Sanchez supported his estimate of no more than a ten to two week exposure with testimony about other tissues , such as liver, and mucosal linings, which were found intact by Dr. Carter, but which ordinarily autolyze completely in far less time than the twenty five or twenty two day period that the State's theory of capital murder presupposed. *Id.* at 18-20.

Dr. Arends also testified about the significance of the pathological and

18

ecological evidence. *App. I, Exh. 'E'.* Based on the pathologists' conclusions about the state of the internal organs, the lack of scavenging documented in photographs and in the autopsy report he concluded that "I don't think that body was in the woods probably more than a week." *Id.* at 74.

Dr. Arends based his opinion on his personal experience in the Texas woods and on National Forest Service publications that confirmed the rather obvious point that there are "vultures, crows, ... , as well as coyotes, and evidently a fairly significant population of wild pigs," in the Sam Houston National Forest. *Id.* at 43. The State objected to testimony "about different types of animals outside of insects" and the Court sustained the objections. Undersigned counsel argued for the admission of this testimony,

> Mr. Rytting: ... he's a biologist, and he explained that he – that as part of his, as work as an entomologist, that .... This type of information is important to making his forensic conclusions. And it's regularly done."

*Id.* at 44. The Court, however, was bent on excluding evidence of innocence.

> The Court: Where you at the crime scene.
>
> Dr. Arends: No, sir.
>
> The Court: Sustained. *Id.*

Dr. Arends also pointed to the astounding fact that Ms. Trotter's body at autopsy was the same as her reported weight on the day she disappeared, and only four pounds less than she weighed at her doctor's office two weeks before she

19

disappeared. *Id.* 67. Dr. Arends stressed that the body would have lost far more mass. *Id. at* 72.[4] Dr. Arends based his conclusions on his training as a biologist and his experience studying the decay and decomposition of animals. *Id. at* 69. In violation of the Supreme Court's directions in *House v. Bell*, 547 U.S. 518 (2006), which requires habeas courts to consider all evidence supporting actual innocence claims without imposing strictures that ordinarily result in the exclusion of some kind of evidence, the convicting Court refused to consider this testimony, insisting that Dr. Arends' was an entomologist, and not a specialist in these areas. *Id.* at 68-70.

Importantly, Dr. Sanchez's opinion was not contradicted by the State's entomological expert, Dr. Jeffery Tomberlin, who steadfastly maintained he was not even competent to comment on the forensic pathology in the case. *Id.,* at 97. Tomberlin also failed to contest Dr. Arends' assessment of important forensic evidence, such as the fact that the body did not suffer any scavenging below the neck, or of the limbs. Tomberlin failed to address the striking fact that the body weighed the same at autopsy as the living person did when she disappeared 25 days before. Tomberlin said he could not testify whether a body would bloat if left in the wood for 25 days. *App. I, Exh. 'E.1', at 93.* He professed he did not have

---

[4] In his October 2007 report Dr. Larkin also explained the bodies left in an environment in which the State maintained the body had remained lose up to 90% of their body weight in less than 25 days. App. I, Exh. 'D'.

20

the expertise to say whether a body left in the forest for 25 days would be scavenged by animals. *Id.* at 93. He testified that he was an expert in entomology only, so, for example, the presence of the pancreas at autopsy in this case did not have any significance to him. *Id.*

Despite Dr. Sanchez's reversal of Dr. Carter's trial testimony, and uncontested testimony by Dr. Sanchez and Dr. Arends regarding the significance of the facts that there was no bloating, there was no animal scavenging of unprotected torso and limbs, that there was no loss of body mass, and organs that liquefy were present and capable of being dissected, the trial court denied relief. In doing so, it relied on the opinion that Dr. Carter provided eight years ago. *See, 2007 Proposed Findings of Fact and Conclusions of Law, at* 9. Undersigned counsel therefore resumed previous efforts to locate Dr. Carter.

Dr. Carter left the Harris County Medical Examiner's Office in 2002, and stopped practicing pathology.[5] The Medical Examiner's Office was not aware of Dr. Carter's location. Before the July 2, 2007, evidentiary hearing, undersigned counsel's staff found several work addresses for Dr. Carter. *App. III.*[6] Dr. Carter was not at these locations. *Id.* After the June 2, 2007, hearing undersigned counsel

---

[5] See, "Former medical examiner probes different career," Houston, Business Journal, Jan. 9, 2004.

[6] The State makes various allegations in this motion to dismiss about undersigned counsel forging an affidavit that proved incorrect at the June 20, 2008, hearing where the Affiant, Roberts, testified, and which the State subsequently retracted.

learned from Tina Church[7] that Dr. Carter had recently been appointed to be the Chief Forensic Pathologist for Marion County, Indiana. Undersigned counsel contacted Dr. Carter at her Marion County office and asked her to review her autopsy findings, photos, and trial testimony. Upon review of her autopsy result, Dr. Carter completely reversed the opinion she gave at trial. According to Dr. Carter, the autopsy evidence was **"incompatible"** with her previous testimony that Ms. Trotter's body had been in the woods 25 days. At most, she stated, the body had been in the woods for two weeks. *App. I, Exh.* 'A', at 2-3.

Also after the July 2, 2007, evidentiary hearing, a witness, Lisa Roberts, who had worked with Ms. Trotter some weeks before she disappeared, came forward with information that Ms. Trotter had received serious phone threats from an unidentified male, but not Larry Swearingen. *App. I, Exh.* 'M' and M.1.. The caller had threatened to rape and kill Ms. Trotter. *Id.* Roberts also stated that Ms. Trotter was extraordinarily scared of one her suitors, but again, not of Mr. Swearingen. *Id. Exh.* 'M.1.* Roberts stated she had informed police, however, her name and information did not appear in any of the police reports that State had provided to trial counsel or to Mr. Swearingen's initial state habeas counsel. At the June 20, 2008, hearing on this matter, Roberts testified consistently with her

---

[7] Court appointed investigator during Mr. Swearingen's initial federal habeas proceedings.

affidavit regarding the threats to Trotter.[8]  Cora Grigsby also testified that she had telehone the Sheriff's office and reported the threats that Ms. Trotter had been getting.

On January 16, 2008, the TCCA denied habeas relief on Mr. Swearingen's successor application.    On that same day undersigned counsel filed a second successor application containing Dr. Carter's retraction of her trial testimony and the statements of Drs. Sanchez, White, Larkin and Arends supporting this reversal. He also submitted two claims based on *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), related to Roberts' information.

> **2.    State and federal habeas counsel diligently attempted to develop the evidence underlying allegations that the State suppressed favorable, material evidence.**

### *Brady claims based on entomological evidence*

For reasons explained above state habeas counsel cannot be faulted for failing to develop expert entomological evidence that demonstrates his clients' innocence.  State action prevented state habeas counsel from providing his expert with the basic material necessary to conduct a forensic entomological investigation into the date of death.  In federal proceedings unforeseeable problems with weather data and entomological testing meant that federal habeas counsel was unable to

---

[8] The state questioned whether Roberts had told the police and whether Mr. Swearingen's state habeas counsel could have located the witness using due diligence.    The State did not undermined Roberts description of the lurid threats to rape and kill that Ms. Trotter received.

23

present entomological evidence exonerating his client to the federal courts in Mr. Swearingen's initial federal petition.

## *Brady claims based on suppression of threats to the victims life*

State habeas counsel cannot be faulted for not discovering Roberts. At the June 20, 2008, hearing the evidence showed that State habeas counsel hired an investigator, and sought investigative assistance from the University of Houston innocence project. The investigation was intense and thorough. State habeas counsel's investigators attempted to contact individuals who appeared from police reports to have information about harassing phone calls. One, Jamie Irvin, was a close friend of the victim since childhood. The other, Nickie Maines, apparently was Ms. Trotter's immediate supervisor. Neither provided the investigator with any more information than was in their police reports or reported that anyone else might have different information. Futhermore, there was testimony that Lisa Roberts moved to Tennessee near the time Mr. Swearingen's first state habeas attorney investigated the case.

Due diligence does not require the maximum feasible diligence, but only "due," or reasonable, diligence. *See Wims v. United States*, 225 F.3d 186, 190 n. 4 (2d Cir.2000). Due diligence therefore does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts. *Aron v. United States*, 291 F.3d 708, 712 (11th Cir. 2002).

24

State habeas counsel pursued leads regarding the threatening phone calls and came up empty. To continue down that trail would not have been diligent, but a waste of time and money that state habeas counsel had in very limited quantities. If Irvin or Nickie Maines had named someone who might have known more, then the courts could fault state habeas counsel. They did not divulge information at the time state habeas counsel investigated beyond what they told police, and they had nothing to add years later when undersigned counsel and his investigators contacted them after Roberts came forward.

During initial federal habeas proceedings counsel reviewed state habeas investigators files and Montgomery County police reports, including the statements police took from Trotter's League Line co-worker. Federal habeas counsel hired Tina Church to re-interview witnesses and try to develop new evidence. Federal habeas counsel's investigator was experienced with federal habeas corpus cases and travelled to the Conroe area in 2005 from Indiana to research Mr. Swearingen's case. She did not locate Roberts or discover information comparable to what Roberts disclosed in 2007.

The June 20, 2008, evidentiary hearing also established that the police were informed about the threats to Ms. Trotter. Roberts' said she talked to two officers about the threats, but Robert's allegation could not be confirmed. On the other hand, Cora Grigsby, who also worked with Ms. Trotter as a telemarketer at the

same time as Roberts, called the Sheriff's department right after Trotter

disappeared and reported that Ms. Trotter had received threats that Robert's had

heard. In a case such as this, unquestionably the Sheriff's department would

dispatch officers to conduct interviews as a matter of basic police protocol and

practice. Grigsby, moreover, would have lead state habeas counsel to Roberts.

**B. The Facts Underlying the Actual Innocence Claim Establish by Clear and Convincing Evidence That, but for Constitutional Error, No Reasonable Factfinder Would Have Found the Applicant Guilty of the Underlying Offense.**

*i. Evidence Showing Actual Innocence of Murder*

In this case, that extraordinarily high threshold has clearly been met by

forensic evidence provided by witnesses of the highest credentials. There is

unanimous agreement amongst the forensic pathologists who have reviewed this

case that Trotter could not have been killed and left in the woods before the date on

which Mr. Swearingen was incarcerated. *App. I, Exhs. 'A'-'E'*. Upon review of

autopsy descriptions of fragile tissues called mucosa, for example, Dr. Larkin

stresses that,

> In Trotter's case, the conditions in which the mucosa were
> preserved allowed Dr. Carter to identify them, examine them for
> pathology, and subject them to mechanical processes such as
> dissection and rinsing. It is a medical certainty, that these tissues
> would not have retained the integrity seen at autopsy unless the
> body had been left in the Sam Houston National Forest less than
> ten days prior to the date of recovery. Indeed, it is very unlikely,
> that Dr. Carter would have found these tissues in the condition
> described at autopsy unless the body had only been exposed in

the woods for substantially less time – a matter of 3 to 4 days. A similar conclusion follows from Dr. Carter's description of the mucosal lining of the gall bladder.

*App. I, Exh. 'D' at ¶ 12.*

Trial testimony by Dr. Carter in which a different date of exposure in the forest is diagnosed from the external appearance of the body is also refuted. As Dr. Larkin points out, the State's reliance on the external appearance of the body is completely misplaced. What the State fails to understand is the total lack of changes normally seen in a body exposed for 25 days under conditions prevailing in the Sam Houston National Forest during December 1998,

> Positive findings by autopsy establish that Trotter's body was not left exposed in the Sam Houston National Forest until December 23, 1998, at the very earliest. Besides positive findings, the absence of expected decompositional changes indicates exposure well after the date on which Mr. Swearingen was incarcerated. Bloating, for example, normally occurs after two or three days. It distorts breast and genital tissues, causing them to inflate grossly out of proportion. It also causes perforation of the stomach and intestines. However, Trotter's body did not exhibit any of the distorting changes caused by bloating and her gut was intact.

> In wilderness areas, such as the Sam Houston National Forest, considerable scavenging by birds and mammals take[s] place, but the body from the neck down did not exhibit any insults that could clearly be attributable to animal activity even though crime scene photos show that the body was found with torso exposed, as were the upper extremities, which again, did not exhibit any scavenging at all.

> The following forensic conclusion is therefore not reasonably debatable amongst competent forensic pathologists: Without question, Mr. Swearingen was not the person who left Ms.

Trotter's body in the Sam Houston National Forest.

*Id.* at ¶¶17-19. Indeed, it is clear that Dr. Carter has retracted her trial testimony. As she recognizes in her October 31, 2007, affidavit (App I, Exh. 'A', at 2-3),

> **Several other findings pursuant to the internal examination are consistent with a date of exposure in the Sam Houston National Forest within fourteen days of discovery, <u>and incompatible with exposure for a longer period of time.</u>** For example, the breast tissue was firm and intact, and the gallbladder mucosa is described as yellow-green and velvety in appearance.

In response to Dr. Carter's reversal of the opinion that she gave at trial, the State can only complain that "Dr. Carter does not explain in her affidavit how she, the Chief Medical Examiner, Harris County, could have been **so dead wrong in her testimony at trial.**" *App. IV, Ex Parte Swearingen, March 1, 2008, State's Motion to Dismiss Applicant's Third Application for a Writ of Habeas Corpus,* at 8 (emphasis added). However, Dr. Carter did explain. She explicitly states in her 2007 Affidavit that she was not asked to address the significance of her internal findings at trial and she was not provided with temperature data until 2007 that makes it clear that the delicate tissues which she found intact would not have been present at autopsy, and that internal organs would have liquefied, if Mr. Swearingen had killed the victim and dumped her body in the forest before he was incarcerated. *App. I, Exh.* 'A', at 2. To this may be added July 2, 2007, testimony of forensic entomologist, James Arends, PhD, on the basic biology of the East Texas forest: the body was found lain out partially nude and exposed to the

28

elements; the corpse, as Dr. Arends stresses, would have been eaten and its remains scattered by scavengers in the East Texas woods if Mr. Swearingen had killed the victim and left her to rot in the forest on December 8, 1998, as the State's theory of guilt absolutely requires. *App. I, Exh. 'E' and 'H'*.

The only way out, for the State, is to show that someone else in league with Mr. Swearingen stored the body so it would not decompose and then disposed of it the woods while Mr. Swearingen was incarcerated. The State has never even floated this hypothesis, let alone produced a scrap of evidence for it. To the contrary, the State has persistently maintained that "there is no other killer. All roads lead to Larry." *Tr. Transc. vol.* 34, at 93, 96. The State therefore strained mightily to show that Mr. Swearingen disposed of the body in the National Forest. It stressed Mr. Swearingen's familiarity with the forest, *id., vol.* 34, at 89. It videotaped the route it insisted Mr. Swearingen used to get from his trailer home to the forest, and introduced the tape at trial. *Id. vol.* 28, at 46-48. It introduced voluminous cell phone records from December 8, 1998, that it alleged traced Mr. Swearingen's movements to and from the forest. *Id., vol.* 27, at 50-105.

Indeed, in order to secure a conviction, the State had to convince the jury that on December 8, 1998, Mr. Swearingen took advantage of a very narrow window of opportunity between approximately 1:45 and 5:30 p.m. on that date to kill the victim and dispose of the body in the forest. That is because "at 1:37 p.m."

29

on December 8, 1998, Melissa Trotter "signed on to her E-mail" at the community college. *Id., vol.* 25, at 168. She was also seen on campus around this time by a number of witnesses. *Id.,* at 88, 183. No later than 5:30 p.m., Mr. Swearingen showed up at his father's worksite where he speaks with Officer Carl Jones. As the State stressed in closing:

> This [cell phone] tower is being used here in a call [from Swearingen] to his step-father ... That tells you he's coming back from dumping the body. That's what he's doing. Then we have Carl Jones putting him at the McDonald's site in Willis about 5:30 PM. We know that from the cell records and testimony. Okay? So he's back in Willis, he's already dumped the body.

*Id. vol.* 34, at 8.

The State has not deviated from the theory of the case it presented at trial. On appeal and in post conviction proceedings it has insisted that Mr. Swearingen, acting alone, killed the victim and disposed of her corpse in the National Forest. Thus, in answer to Mr. Swearingen's January 22, 2007, application (second application) for a writ of habeas corpus, the State argued that "Applicant deposited Melissa's body in the Sam Houston National Forest, at which time he stabbed her in the throat to ensure she died." *Ex parte Swearingen*, no. 99-11-06435-CR-(2), *State's Answer*, filed Feb. 15, 2007, at 8. It is now clear that the evidence on which the homicide conviction depends, along with the inferences that the State maintains could be drawn from that evidence, are thoroughly falsified by the

30

Medical Examiners' analyses and conclusions. *Apps. I, Exh. 'A' - 'E'.*

Finally, the State has argued throughout proceedings that evidence from the crime scene in particular corroborates the narrative in a "Spanish letter" that Mr. Swearingen drafted while in prison. *See, id.* at 94. In this story, Trotter is sequestered, assaulted and murdered in the forest on the day she disappears. *Id.* The unanimous findings of Mr. Swearingen's forensic specialists show the letter for what it is, an absurdity bearing no relation to reality, aside from details that Swearingen pieced together from autopsy reports and news accounts that he had access to while awaiting trial. If Mr. Swearingen had committed the crime described in the letter, Dr. Carter would have found a putrid soup, if that much, leaking from a desiccated and shrunken corpse. *App, I, Exh. 'A'* at 2-3 (noting which organs quickly liquefy); *and see, App. I, Exhs. 'C' and 'D'.* Instead, she found firm breast tissue, fresh organs, and fragile and friable tissues (mucosa and mucosal linings) intact and capable of being dissected, manipulated and examined for pathology. *App. I, Exh. 'B'*, at 4-7(Autopsy report). "The nude body had a weight of 105 lbs" at the morgue, *id.,* at 3, exactly what the living person was reported to weigh, *id., App. I, Exh. 'U',* and only four pounds less than what was recorded two weeks before her disappearance by her physician. *Id., App. I, Exh. 'V'.* This defies common sense, and certainly forensic science. As Dr. Larkin stresses bodies left exposed to the elements in the manner Trotter's was found lose

31

up to 90% of their body weight in less time than 25 days. *App. I, Exh. 'F'*, and *see, id., Exh. 'A.'*

The theory of the offense that the State has insisted upon, without variance, at trial and in post-conviction proceedings, wherein Swearingen killed the victim and left her body in the woods before police incarcerated him, mirrors the "Spanish letter". The forensic evidence Mr. Swearingen presents shows that the State's case for murder is equally absurd. To continue to propound it is not just a mistake; it is to persist in a fabrication.

### ii. Evidence of Actual Innocence of Aggravating Felonies

The same forensic evidence that demonstrates that Mr. Swearingen did not, and could not have, killed the victim, also shows that he did not commit the aggravating felonies of kidnapping and sexual assault. That forensic evidence is therefore re-alleged here as if fully set forth herein. Furthermore, simply imagining an accomplice vitiates the already "weak and tentative" evidence that Mr. Swearingen was guilty of the aggravating felonies of rape or kidnapping. *See Swearingen v. State*, 101 S.W.3d, at 94. The disarray in which investigators found Trotter's garments when they recovered the body was sponsored as evidence that Mr. Swearingen dragged the victim through the woods and attempted to sexually assault her in the National Forest, *Tr. Transc., vol.* 34, at 26, the ligature, the disheveled clothing, the ripped trousers, the tale about Swearingen delivering blow

to the face inferred from greater decomposition one side than another, the bit

tongue, [9] all of this loses what little probative value it ever had.

> 1. **The facts underlying Mr. Swearingen's ineffectiveness of counsel claims shows by clear and convincing evidence that Mr. Swearingen would have been acquitted of murder by every rational juror but for trial counsel's deficient performance.**

Under *Strickland v. Washington,* 466 U.S. 668, 688-92 (1984), petitioners

must show that trial counsel performed deficiently and that the evidence that

counsel failed to sponsor, or failed to exclude, was material. In this case, Defense

counsel chose to defend primarily against charges of aggravated sexual assault and

kidnapping that made Mr. Swearingen eligible for the death penalty. App. I, Exh.

'Y'. He did not focus on the date of death and ways to challenge it. *Id.*

Trial counsel clearly did not make a reasonable strategic decision. The

State did not develop evidence of the homicide that was independent of the

aggravated felonies. Rather, evidence for these offenses was intertwined with the

State's circumstantial case for murder. Proving that Mr. Swearingen did not kill

the victim and dispose of the body in the forest would, therefore, have been the

surest way to defeat the aggravating felony charges.

---

[9] See, *Swearingen,* 101 S.W.3d, at 94-96. The idea was that flies had been attracted to a bruise on Trotter's face and laid more eggs at that spot because Swearingen had hit the victim. This is but one reason why the TCCA called the forensic evidence "weak and tentative." *Id.* at 96. We now know why: the pieces of evidence and the inferences from them are all confabulations; Mr. Swearingen was in jail when the crime occurred. *See, App. I., Exh. 'A' – 'E'.*

Mr. Swearingen would have been acquitted of the homicide and of the aggravating felonies if trial counsel had presented the testimony of any of the pathologists who unhesitatingly and unanimously support the conclusion that Mr. Swearingen was not the person who took Trotter to the woods and left her there dead. Moreover, the evidence of innocence that a constitutionally effective defense counsel could have presented is **clear and convincing**.

This is not a close case where the pathology is ambiguous. The internal findings positively exclude dates before December 17, 1998, as dates of the crime. *App. I, Exh. 'A-D'*. With reasonable use of expert testimony, therefore, defense counsel would have clearly and convincingly established that Mr. Swearingen was in jail at least a week before the crime happened. It is patent; it is obvious: Mr. Swearingen would walk out of the courtroom a free man if any jury heard the forensic testimony of Drs. Carter, Sanchez, White, Larkin and Arends. The State's entire case is that during a narrow space of time on December 8, 1998, Mr. Swearingen killed the victim and left her lifeless body in the forest. Were trial counsel to have effectively utilized forensic scientific evidence, every rational juror would immediately see that the State's theory of murder was not just false, it was impossible.

2. **The facts underlying Mr. Swearingen's ineffectiveness of counsel claims shows by clear and convincing evidence that**

**Mr. Swearingen would have been acquitted of the aggravating felonies by every rational juror but for trial counsel's deficient performance.**

The evidence and argument alleged in claim '1' above is re-alleged as if fully set forth herein. The State did not have independent evidence of the aggravated sexual assault or kidnapping offenses it alleged in order to make this a capital case. Forensic proof that Mr. Swearingen was in jail when Ms. Trotter was killed and left in the forest is clear and convincing evidence that he did not rape or kidnap the girl. No reasonable juror would have found Mr. Swearingen eligible for the death penalty. Trial counsel was deficient for not presenting this evidence; the evidence is material under *Strickland*, 466 U.S., at 688-92.

3. **Effective cross examination of Dr. Carter would have resulted in an acquittal of homicide charges; and**

4. **Effective cross examination would have resulted in an acquittal of all alleged aggravating felonies.**

Because of defense counsel's clearly erroneous strategy of defending primarily against aggravating felonies, defense counsel failed to adequately cross examine Dr. Carter about her autopsy findings. Defense counsel failed to ask how breast tissue could be firm and intact after 25 days as Dr. Carter reported after autopsy. Defense counsel also failed to ask how Ms. Trotter's body's weight nude at autopsy could be exactly the same, 105 lbs, (see App. I, Exh. 'F' at 3) as her reported weight the day she disappeared, or merely four pounds less than recorded

by her physician two weeks earlier. *See App. I, Exhs 'U', and 'V'.* Finally, defense counsel failed to ask about the significance of Dr. Carter's internal findings, such as finding a pancreas, liver, stomach, and mucosal linings. *See, App. I, Exh. 'A',* at 1.

Had Defense counsel asked Dr. Carter about gross measurements like the body's weight or about her particular observations of intact organs and delicate tissues, he not only would have called the date of the crime in question, he would have been able to show, by clear and convincing evidence, that his client was in jail when the homicide alleged by the State occurred. *See, App. I, Exh. 'A'-'E'.* No jury would have convicted Mr. Swearingen of killing the victim were counsel to have introduced this clear and convincing evidence of innocence through competent cross examination.

Similarly, effective cross would have resulted in clear and convincing evidence that Mr. Swearingen did not commit the aggravating felonies. Here, too, counsel's performance was deficient and prejudicial. *Strickland,* 466 U.S., at 688-92.

 

 

 

**5.  Mr. Swearingen would have been acquitted had trial counsel utilized entomological expertise; and**

36

**6. Mr. Swearingen would have been acquitted if trial counsel had utilized entomological expertise.**

For reasons stated in section V.B.2, *supra*, counsel's decision not to challenge the date on which Ms. Trotter was killed and left in the woods was deficient under *Strickland,* 466 U.S. 688-90.

Competent forensic entomologists are familiar with the forest ecology including large animal scavenging. They are familiar with how exposure to the elements affects bodies. Dr. Arends' testimony regarding not only the lack of insect activity, but the near complete absence of scavenging by larger animals is clear and convincing evidence that Mr. Swearingen did not kill the victim and leave her body in the woods as the State claimed. *App. I, Exh. 'E'.* Similarly, any reasonable juror would find that Mr. Swearingen did not kill the victim upon considering Dr. Arends' testimony that Ms. Trotter's internal organs at autopsy were within normal weight ranges, along with his testimony that a body left in the woods, even for a far shorter time than the State alleged Ms. Trotter's was, would lose significant body mass. Evidence that at autopsy, 25 days after Ms. Trotter disappeared, the weight of her internal organs were within normal range is clear and convincing evidence that Mr. Swearingen did not commit the crime alleged by the State, as is the uncontestable proof that Ms. Trotter's body weighed exactly the same at autopsy as it did when she was reported missing. Given the conditions

prevailing in the Sam Houston National Forest (or simply the fact that this National Forest is in Southeast Texas, not Minnesota) no reasonable juror – indeed, no sane person – could fail realize that Mr. Swearigen absolutely could not have killed Ms. Trotter and left her body in the woods on December 8, 1998, or December 9th or 10th or 11th, 1998, as the State absolutely had to prove in order to convict. *See App. I, Exh. 'E' and 'H'*.

Surely every reasonable juror – every reasonable person -- would realize that a body that was nude from the navel to above the breasts and left exposed and unprotected in the open forest, after a substantially shorter time than 25 days, would weigh substantially less than when alive. Any reasonable person would realize that in temperatures averaging 50 degrees, with average highs over 60°, and readings on several days in the 70s, (*see App. I, Exh. 'S' and 'T'*) a body lose considerable weight even without the large animal scavenging that Dr. Arends testified normally occurs in a forest environment. *Id.* Dr. Arends' testimony and conclusion that the body was in the woods no more than five or six days would have been clear and convincing evidence in the face of which no reasonable jury would have convicted Mr. Swearingen. Failure to prevent this type of compelling evidence of innocence was therefore prejudiced Mr. Swearingen's defense under *Strickland,* 466 U.S. 690-92.

> **7. Mr. Swearingen would have been acquitted of homicide if the State had not sponsored Dr. Carter's false and**

38

misleading forensic testimony; and

8. **Mr. Swearingen would have been acquitted of all aggravating felonies if the State had not sponsored Dr. Carter's false and leading forensic testimony.**

In violation of Fourteenth Amendment Due Process, the State sponsored false and misleading forensic testimony at trial and has repeated the misleading testimony throughout appellate and post-conviction proceedings. The District Attorney, Mike McDougal, took the highly irregular step of attending the autopsy. Police supplied Dr. Carter with the date of disappearance and filed a report that she arrived at a date of death 25 days before recovery. *Id.* However, the State did not provide the Dr. Carter with crime scene photographs or other data that was necessary for Dr. Carter to arrive at a reliable approximation of the date on which Ms. Trotter was killed and her body deposited in the woods. *See App. I, Exh. 'A', at 1.* For example, Dr. Carter was not provided with photographs showing that the body was left in a relatively open, only partially shaded portion of the forest. *See App. I, Exhs 'N' and 'O'.*

The State was aware of the type of information that Dr. Carter needed to arrive at a reliable calculation. Indeed, at the July 2, 2007, evidentiary hearing the State, and the court, attempted to impeach the conclusions of Mr. Swearingen's forensic experts on the ground that that they were not familiar with conditions in the National Forest at the time the body was exposed. In the State's motion to

dismiss Mr. Swearingen's third application, the State complained, for example, that Dr. Carter's revised opinion was based only on information from Mr. Swearingen's counsel, *App. V,* at 7, even though that information was far more complete than what the State had provided her pre-trial and consisted in crime scene photos and data collected by State investigators and Governmental organizations.

At trial, the State confined its examination of Dr. Carter to questions about what the external appearance of Ms. Trotter's body indicated, particularly the fungal growth and insect activity. *Tr. Transc. vol.* 29 at 40-50. The State, but not Dr. Carter, knew that at the crime scene the body was found with its torso exposed and unclothed from from the navel to above the breasts. *App. I, Exh. 'N' and 'O'.* The State avoided asking the type of questions that Dr. Carter addressed in her October 31, 2007, affidavit regarding the absence of bloating and the absence of scavenging below the cranial region. The assistant district attorneys involved, however, had prosecuted other homicides and other cases involving death and dead bodies; and surely knew that the condition of the body and the description in the autopsy report were highly irregular. Indeed, if the shoe were on the other foot, and the State had to show that the body was thrown in the woods later in order to secure a conviction, these attorneys would have questioned Dr. Carter about autopsy findings that unquestionably show that the body had been in the woods no

more than ten days or so and even for a significantly shorter period of time.

The false and misleading testimony that the State intentionally and recklessly sponsored was essential to the conviction. Dr. Carter's October 31, 2007, affidavit is clear and convincing evidence that no jury would have convicted Mr. Swearingen had the State fulfilled obligations set forth in *Giglio v. United States*, 405 U.S. 105 (1972) to sponsor truthful, accurate testimony.

> **9.    Mr. Swearingen would have not have been found eligible for the death penalty if the jury had been instructed to find unanimously that he committed a specific aggravating felony.**

Trial counsel complained that the charge allowed the jury to convict Mr. Swearingen of an aggravating felony by making a finding from a menu of four alternatives – attempted aggravated sexual assault or aggravated sexual assault, attempted kidnapping or kidnapping.    Subsequent counsel have not raised the issue. The court overruled trial counsel's objections, and permitted the jury to find Mr. Swearingen guilty even if no more than six jurors agreed about any underlying felony (six rather than three, because those who found a substantive offense would also agree with attempt).  This violated Fourteenth Amendment Due Process, and the Sixth and Eighth Amendment of the Constitution.

Under *Ring v. Arizona*, 536 U.S. 584 (2002), however, the aggravating felonies that make a defendant eligible for the death penalty must be treated as

elements or elemental facts.[10] As such, a proper determination of whether a predicate felony occurred is subject to the full panoply of constraints that Due Process and the Sixth Amendment impose. In a death penalty case, the jury, therefore, has to be unanimous with regard to at least one of the felonies that the State alleged in order to find the defendant eligible for the death. The Eighth Amendment's protection against arbitrary and capricious imposition of the death penalty also demands unanimity or near unanimity. Indeed, this court has carefully explained that in any criminal case, in order to satisfy the requirements of proof beyond a reasonable doubt, the jury must find each element of the offense unanimously. *See, United States v. Correa-Ventura*, 6 F.3d 1070, 1076-77 (5th Cir. 1993)(citing William Blackstone's Commentaries). Certainly, after *Ring* the constitution forbids courts from allowing a defendant to be found eligible for death without a substantial majority of the jurors agreeing that he or she committed one particular aggravating felony. Mr. Swearingen's trial court's instructions allowed the jury to find him eligible without even a bare majority agreeing on the essential, elemental fact of whether Mr. Swearingen committed a specific felony. Clearly,

---

[10] *Schad v. Arizona*, 501 U.S. 624 (1991), moreover, does not govern this issue. *Schad* is a plurality opinion. If *Schad* even provides a rule, it must be derived from Justice's Scalia concurrence. *See, United States v. Marks*, 430 U.S. 188 (1968). Justice Scalia disagreed vehemently with Justice Souter and the three other Justices who joined him on why due process allowed a court to instruct a jury in the alternative regarding the aggravating factors of premeditation and robbery. Justice Scalia concurrence confines *Schad* to its facts; *Schad* pertains at most to situations in which premeditation is an alternative theory. Indeed, according to this Court's jurisprudence, *Schad* does not have precedential value on the issue at hand here. *See, United States. v. Eckford*, 910F.2d 216, 219 (5th Cir. 1990).

this violated Due Process, the Sixth Amendment and the Eighth Amendment.

Mr. Swearingen's clear and convincing evidence that he is actually innocent of any aggravating felony means that his unconstitutional conviction for capital murder should not stand.

## CONCLUSION

The State Court's have declined to hear evidence that proves it was impossible for Mr. Swearingen to have committed capital murder. They have ignored sworn statements of the State's key forensic witness retracting trial testimony on which the conviction essentially depended and replacing it with an opinion that shows Mr. Swearingen could not have committed the offenses with which he was charged. This Court should allow him to prove his innocence and contest his unconstitutional trial in a federal forum willing to consider the evidence fairly and impartially.

## CERTIFICATE OF SERVICE

On January 19, 2008, a copy of the foregoing motion for leave to file a second petition for writ of habeas corpus was served upon Assistant Attorney Assistant Attorney General for the State of Texas, Tom Jones, Capital Litigation, P.O. Box 12548, Capitol Station, Austin, Texas 78711, by e-mail or U.S. Mail.

James G. Rytting

43

## CERTIFICATE OF COMPLIANCE

Pursuant to 5TH CIR. R. 32.2.7(c), undersigned counsel certifies that this Motion for Leave to File a Successor Petition complies with the type-volume limitations of 5TH CIR. R. 32.2.7(b).

1. Exclusive of the portions exempted by 5TH CIR. R. 32.2.7(b)(3), this brief contains __10,011__ words printed in a proportionally spaced typeface.

2. The Brief has been prepared in proportionally spaced, serif typeface using Times New Roman 14 point font in text and Times New Roman 12 point font in footnotes produced by Microsoft Word software.

3. Undersigned counsel understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Fed. R. App. P. 32(a)(7), may result in the Court's striking this brief and imposing sanctions against the person who signed it.

James G. Rytting

## CERTIFICATE OF SERVICE

On January 19, 2009, required copies of Petitioner's Motion for Leave to File a Successor Petition were served upon Respondent and filed in the Court of Appeals for the Fifth Circuit by overnight UPS deliver or U.S. Mail; electronic copies were provided by e-mail on January 20, 2009.

James G. Rytting

# **APPENDICES**

APP. I    --    SECOND PETITION FOR WRIT OF HABEAS CORPUS OF
A PERSON IN STATE CUSTODY, WITH EXHIBITS:

'A'    --    October 2007 Affidavit of former Harris County Medical
Examiner, Joye M. Carter, M.D.

'B'    --    July 2, 2007, testimony of current Harris County Chief
Medical Examiner, Louis B. Sanchez

'C'    --    December 2007 Affidavit of Deputy Tarrant County
Medical Examiner Lloyd White, M.D.

'D'    --    October 2007 Addendum Report of forensic pathologist
G. Larkin, M.D.

'E'    --    July 2, 2007, Testimony of Dr. James Arends

'E.1'    --    July 2, 2007 testimony of Dr. J. Tomberlin

'F'    --    January 3, 1999, Autopsy Report on Melissa Trotter

'G'    --    January 2007 entomological report of Dael Morris

'H'    --    January 2007 Statement of Dr. James Arends

'I'    --    March 2007 Affidavit of Dr. Lloyd White

'J'    --    March 2007 Report of Dr. G M. Larkin

'K'    --    Applicant's proposed issues for July 2, 2007, evidentiary
hearing

'L'    --    9th District Court's designation of issues for July 2, 2007,
evidentiary hearing

'M'    --    Affidavit of Lisa Roberts

'M.1.'--   Affidavit of Lisa Roberts (formerly under seal)

'N' --   Crime Scene photo of Melissa Trotter's body in the open forest

'O' --   Crime scene photo of body with torso exposed

'P' --   Autopsy photo of clothing

'Q' --   Excerpt of Montgomery County Sheriff Department incident report describing discovery of Melissa Trotter's body

'R' --   Autopsy photo of torso and limbs

'S' --   Temperature Tables showing average temperatures near the crime scene from December 8, 1998, to January 2, 1999

'T' --   National Oceanographic and Atmospheric Administration temperature data for December 1998

'U' --   Courier Journal article giving Melissa Trotter's weight as 105 pounds when she disappeared

'V' --   Medical records of Melissa Trotter dated November 23, 1998, giving her weight as 109 pounds

'W' --   Autopsy photo of intact spleen of Melissa Trotter

'X' --   Autopsy photo of heart showing red muscle and intact pericardial fat

'Y' --   2007 Affidavit of trial attorney Gerald Crow

'Z' --   Excerpt of Montgomery County Sheriff Department incident report noting Dr. Joye M. Carter's initial impression of date of death

APP. II.    --    TEMPERATURE REPORT WITH HANDWRITTEN NOTATION

APP. III.    --    AFFIDAVIT OF JANE FABER

APP. IV    --    STATE'S MOTION TO DISMISS APPLICANT'S THIRD [STATE] APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS (WITHOUT EXHIBITS)

# APPENDIX "I"

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **LARRY RAY SWEARINGEN,** | ' |
| **Petitioner,** | ' |
| | '     **NO._____** |
| **VS** | ' |
| | ' |
| **NATHANIAL QUARTERMAN, DIRECTOR,** | ' |
| **TEXAS DEPARTMENT OF CRIMINAL** | ' |
| **JUSTICE, INSTITUTIONAL DIVISION** | ' |
| **Respondent** | ' |

## SECOND PETITION FOR WRIT OF HABEAS CORPUS
## OF A PERSON IN STATE CUSTODY

TO THE HONORABLE MELINDA HARMON, U.S. DISTRICT COURT JUDGE:

Petitioner, Larry Ray Swearingen, Texas Department of Criminal Justice Inmate No., is currently confined on death row in the Texas Department of Criminal Justice – Institutional Division's Polunsky Unit located in Livingston, Texas. Mr. Swearingen petitions this Court, pursuant to Title 28 U.S.C. §2254, to issue a Writ of Habeas Corpus and to order his release from confinement on grounds that his custody violates the Constitution and laws of the United States.

## JURISDICTION

This court has personal jurisdiction pursuant to Title 28 U.S.C. § 2241(d) because Mr. Green was convicted in a Montgomery County, Texas, court. Subject matter jurisdiction is conferred by Title 28 U.S.C. § 2254.

## INTRODUCTION

This is foremost a case of actual innocence supported by striking forensic evidence that proves that the victim, Melissa Trotter, was killed and left in the East Texas woods while Mr. Swearingen was incarcerated in the Montgomery County Jail. Internal organs photographed at autopsy appear as if they were dissected out within hours of death. The descriptions in the

1

autopsy report are of tissues from a recently deceased person. The State's only theory of guilt, which was that Mr. Swearingen killed the victim and left her body in the forest on December 8, 1998, twenty-five (25) days before the corpse was recovered on January 2, 1999, is not just implausible, it is impossible.

Mr. Swearingen was arrested on December 11, 1998, only three days after the victim disappeared; he has been in custody ever since. He did not, and he could not have, killed the victim. The analysis and opinions of a forensic entomologist, and four forensic pathologists, including three former or current Chief Medical Examiners, resoundingly support this conclusion. *See, Exhs* 'A-E'.

## PROCEDURAL HISTORY

On December 11, 1998, three days after Trotter's disappearance from the Montgomery County Community College campus, deputies arrested Mr. Swearingen on unrelated charges. *Tr. Transc., vol.* 25, at 115, 122. On June 21, 2000, the State called Dr. Carter to testify regarding hr autopsy findings. Tr. Transc. vol 29, at 12-119; and Exh. 'F' (January 3, 1999 autopsy report) On June 28, 2000, a Montgomery County jury convicted Mr. Swearingen of capital murder. *Id., vol.* 34, at 102. On July 11, 2000, the jury answered special issues in a manner that compelled the 9th District Court to impose the penalty of death. *Id., vol.* 38, at 91-92.

Appeal was taken to the Texas Court of Criminal Appeals, which denied relief on all claims in *Swearingen v. State,* 101 S.W.3d 89 (Tex. Crim. App. 2003). Judges Johnson and Price dissented from the majority's decision to uphold the factual sufficiency of evidence supporting convictions on aggravating felony offenses of kidnapping and sexual assault. *Id.*

On September 12, 2002, Mr. Swearingen filed his initial application for a writ of habeas corpus pursuant to Article 11.071. Mr. Swearingen raised an actual innocence claim and raised

2

an ineffectiveness of counsel claim based on counsel's failure to challenge the date of death using forensic evidence, particularly entomological evidence. On May 21, 2003, the Texas Court of Criminal Appeals denied Mr. Swearingen's initial application for a writ of habeas corpus.

On May 21, 2004, Mr. Swearingen filed an original petition for writ of habeas corpus in the United States District Court for the Southern District of Texas. *Swearingen v. Dretke*, #: 4:04-cv-02058 (Dkt. Entry [19]. On September 8, 2005, the District Court dismissed Mr. Swearingen's petition, but granted a Certificate of Appealability on his insufficiency of the evidence claim. *Id.* (Dkt. Entry [40]). On February 13, 2006, Mr. Swearingen filed an appeal in the Court of Appeals for the Fifth Circuit. *Swearingen v. Dretke*, No. 05-70039. On July 31, 2006, the Fifth Circuit denied relief. *Id.* On August 25, 2006, the court denied Mr. Swearingen petition for rehearing. On November 22, 2006, Mr. Swearingen filed a petition for writ of certiorari in the United States Supreme Court. On March 7, 2007, the Supreme Court denied Mr. Swearingen's initial petition for a writ of certiorari.

On October 17, 2006, before Mr. Swearingen's petition for a writ of certiorari was due, the 9th District Court Montgomery County, Texas, set an execution date for January 24, 2007. On January 22, 2007, Mr. Swearingen filed a second state application for a writ of habeas corpus, pursuant to 11.071 §5, in which he alleged that he was actually innocent, that the State had suppressed exculpatory entomological evidence, and that he had received ineffective assistance of counsel. The petition was supported by the forensic entomological report of Dael Morris and the forensic entomological analysis of Dr. James Arends. Exh. 'G', and 'H'. On January 23, 2007, the Texas Court of Criminal Appeals vacated the execution date and remanded six causes of action for proceedings in the 9th District Court under §11.071 § 6-9.

3

On February 15, 2007, the State filed an answer to the January 22, 2007, state writ. Mr. Swearingen received leave to file a responsive pleading to which he attached the preliminary opinions of Dr. White and Dr. Larkin regarding the significance of the autopsy findings. *Exhs. 'I' and 'J'*. Pursuant to Article 11.071 §§6-8, the trial court ordered the parties to designate unresolved facts. Mr. Swearingen specifically proposed that the trial court resolve whether the evidence and opinions of the forensic pathologists showed that he was actually innocent of the homicide and aggravating felonies for which he was convicted. *Exh. 'K'*. The State objected to the inclusion of these issues. On May 14, 2007, the 9th District Court ordered a hearing for July 2, 2007, for the purpose of considering issues limited to "entomological evidence." Exh. 'L'.

On or about September 23, 2007, the 9th District Court adopted the State's proposed findings, recommended that relief be denied. On January 16, **2008**, the TCCA denied relief on Petitioner's January 22, 2007, successor. That same day Petitioner filed a second successor (his third application), raising claims of actual innocence based on the conclusions of Dr. Luis Sanchez, Dr. Larkin, Dr. White, Dr. Arends and Dr. Joye M. Carter. Petitioner also developed proof that the State had suppressed evidence that the victim had received serious threats from another man close to the time she disappeared. *Exh. 'M'*. This application presented the following claims:

1. Mr. Swearingen was actually innocent of murder and Mr. Swearingen was actually innocent of the aggravating felonies that resulted in eligibility for the death penalty;

2. Trial counsel was constitutionally ineffective because he failed to present forensic evidence that demonstrated that Mr. Swearingen could not have committed the crime charged by the State;

3. Trial counsel's failure to cross examine the Chief Medical Examiner about the significance of her internal findings deprived Mr. Swearingen of his Sixth Amendment right to effective assistance of counsel;

4

4. Trial counsel was constitutionally ineffective because he failed to introduce evidence of the victim's sexual activity and risky behavior;

5. The State suppressed favorable, material evidence that near the time victim disappeared she received serious threats from another man to kill and rape her;

6. The State made knowingly false and misleadingly statements denying the existence of an intimate relationship between the victim and Petitioner.

*Id.* On March 5, 2008, the TCCA remanded the fifth and sixth claim for an evidentiary hearing in the 9th District Court, Montgomery County, Texas.

On June 20, 2008, the convicting court conducted an evidentiary hearing on the *Brady* and *Giglio* claims (claims 5 and 6). On December 17, 2008, the TCCA adopted the convicting court's findings and conclusions and denied relief. On December 18, 2008, the convicting court set an execution date. On July 6, 2009, Mr. Swearingen filed a motion for DNA testing in the 9th District Court, Montgomery County, Texas, and a motion to vacate the execution date. On January 14, 2009, Mr. Swearingen filed a petition for writ of certiorari to the TCCA, along with a motion to say his execution, in the United State's Supreme Court. On January 20, 2009, he filed a motion for leave to file a second petition for habeas corpus in federal court. and a motion to stay his execution, in the United States Court of Appeals for the Fifth Circuit.

## FACTUAL BACKGROUND

On December 8, 1998, Melissa Trotter disappeared from the Montgomery County Community College. On December 11, 1998, Montgomery County police arrested Mr. Swearingen and threw him in jail where he has been ever since. Twenty five days later, on January 2, 1999, hunters, who were looking for a firearm they had lost, found Ms. Trotter's body. It was in the open forest, in a partly sunlit glade. Exh. 'N' (Crime scene photo). The corpse was not in a container; it was not buried. *Id.* The body exposed to the elements, and nude from navel to above the breast. Exh. 'O' (crime scene photo). Ms. Trotter's jeans looked fresh

on the body and after removal. *Exh. 'P'* (autopsy photo of clothing). They were not impregnated with tissue or soaked with body fluids. *Id.* Decay, in fact, was so minimal that he hunters who found it thought it was a manikin. *Exh. 'Q'* (Police Report); *and see Exh. 'R'* (autopsy photo of torso and limbs). There was no odor coming off the body. *Exh. 'Q'*. The woods were not in a deep freeze. Temperatures in December 1998 averaged 50 degrees, with average highs over 60°. *Exhs. 'S' and 'T'*. On several days temperature were in the 70s. At autopsy, Dr. Carter dissected and described internal organs that would have liquefied in a matter of days. Exh. 'A'. She found them intact and rinsed and sectioned them. Exh. 'F' (autopsy report). At the morgue, the nude body weighed 105 lbs (Exh. 'F', p. 3), exactly that same as Melissa Trotter was reported to weigh when she disappeared, *Exh. 'U'* (news article reporting weight as 105 lbs), and only four pounds less than she weighed on November 23, 1998, at her doctor's office. *Exh. 'V'*.

As every pathologist who has looked at this case has concluded, Melissa Trotter's body was not in the National Forest for more than ten or fourteen days, and almost certainly was there a far shorter period of time than that. Exhs. 'A-D'. It follows: Mr. Swearingen did not kill Ms. Trotter and leave her body in the woods as the State argued at trial. Someone else did.

      **A.**      **The State presented a circumstantial case to begin with that critically depended on proof that the victim was murdered and her body left in the forest on December 8, 1998, the day she disappeared.**

At trial, the State conceded that the case against Mr. Swearingen was circumstantial. *Id., vol.* 34, at 21 (stating in closing argument "[t]his is a case primarily of circumstantial evidence." *Id., vol.* 34, at 21.). Moreover, the circumstantial evidence was problematic, starting with the identification of Mr. Swearingen as the person with whom Trotter left campus on December 8, 1998. Swearingen has dark hair and eyes. Eyewitnesses called to place Trotter and Swearingen

at the college campus at first said Trotter was with a "big, blonde-headed" man or else could not identify her companion. *Id., vol.* 25, at 37; *id., vol.* 26, at 6-7.

In the TCCA's words, the State's forensic evidence was "weak and tentative." *Swearingen v. State,* 101 S.W.3d at 96. On appeal, the State felt compelled to rely on a Spanish letter forged by Mr. Swearingen while he was imprisoned as the "clearest evidence of precisely what transpired in the afternoon of December 8, 1998." *State's [2001] Brief on Appeal,* at 30. According to the State, the Spanish letter supported the conclusion that between approximately 2:00 and 5:30 p.m. on December 8, 1998, "Appellant secreted [Trotter's] body in the woods and committed his final act of stabbing her before leaving her to die of asphyxiation." *Id.* at 34. However, the State's own translator testified that the Spanish in which this "clearest piece of evidence" was composed was so badly garbled that it hardly made sense, and that other translators could interpret what it said differently. *Tr. Transc. vol.* XXXI, at 67-68, 71. As the dissent in *Swearingen v. State* noted, "the letter was not a confession or testimony presented by the defendant as the truth, which the jury could believe or disbelieve based on their evaluation of his credibility." *Id.* at 101.

The State traced Mr. Swearingen's activities on December 8, 1998, as precisely as possible in an attempt to show that he had the opportunity to kill and dispose of Trotter's body on that date. Swearingen's landlord, John Harrell, testified that he saw Mr. Swearingen several times on the afternoon of December 8, 1998. Harrell never saw anyone with Mr. Swearingen, and Harrell's testimony about the timing of Mr. Swearingen's departures changed substantially. Harrell initially said he saw Mr. Swearingen arrive at Brandon Road between 11:00 or 11:30 a.m. and he saw him leave "right after lunch". *Id., vol.* 26, at 13, 16. Harrell also said that Mr. Swearingen returned between 3:30 and 4:00 p.m.:

7

Q: Did you see him arrive any time that afternoon, back to the house?

A. It was later on that day. I was out, putting up Christmas lights, decorating my house.

Q. Could you give us an estimate of the time?

A. Oh, I don't know, probably, I'd say between 3:30 and 4:00 o'clock.

*Id.* at 12. Harrell also was not clear, at first, whether Mr. Swearingen came and went from Brandon Road two or three times. *Id.*

Harrell's initial recollections did not fit with the State's theory that Mr. Swearingen picked Trotter up at the community college at 1:30-2:00 p.m., drove her to his trailer, and then took her to the woods. The State was allowed to "clear up" Harrell's testimony, averring under the State's lead that he saw Swearingen leave Brandon Road around 11:00 and leave again between 2:00 and 3:00 p.m. *Id.* at 24. Harrell also changed his testimony about the time he last saw Swearingen at Brandon Road, switching from 3:30-4:00 p.m., which is what he first said, to 4:30 p.m., and finally ending up supposing that Swearingen might have left as late as 5:30 p.m. *Id.* at 22-23.

The State introduced phone records that it said "would be consistent with Applicant driving from his home to the Sam Houston National Forest on December 8, 1998". *State's [2007] Answer,* at 41. At trial, the State sponsored testimony showing that the Willis [cell phone] Tower Site, Sector 2, picked up a call placed at 3:03 p.m. by Mr. Swearingen. *Tr. Transc. vol.* 27, at 67. The State said that this would have been consistent with Appellant heading from his trailer to the Sam Houston National Forest. *State's [2001] Appellate Brief,* at 7 (citing *Tr. Transc., vol.* 27, at 67). The State also put on evidence that at 4:25 p.m., the Willis Tower Site, Sector 1, picked up another call placed by Mr. Swearingen. *Id.* (citing *Tr. Transc. vol.* 27, at 67-

8

68). At trial, the State argued this December 8, 1998, telephone call showed Mr. Swearingen was returning from the forest after having dumped the body. *Tr. Transc. vol.* 34 at 88.[1]

The strongest evidence the State developed was the half pantyhose ligature found around Ms. Trotter's neck. The State matched this to a half pair of hose that Mr. Swearingen's landlord found in Mr. Swearingen's trailer. However, the State recovered the half pantyhose one month after Trotter disappeared and four days after the recovery of the body. Law enforcement had searched Mr. Swearingen's trailer thoroughly on two occasions before Trotter's body was discovered, but did not find the length of hose. *Id., vol.* 27 at 135-37, 140, 150, 152.

Throughout appellate and post-conviction proceedings, the State has insisted that on December 8, 1998, Mr. Swearingen killed Ms. Trotter and disposed of her body in the Sam Houston National Forest. Thus, the State argued that,

> "Harris County Chief Medical Examiner Dr. Joye Carter conducted the autopsy of Melissa's body. Based on the state of decomposition and fungal development present, as well as insect progression the Medical Examiner observed, Dr. Carter estimated that Melissa had been dead for approximately twenty-five days, and testified that a death on December 8, 1998, was consistent with the finding. Of particular significance is the fact that during the internal examination, the Medical Examiner located what appeared to be chicken and a form of potato, like french fries. In Melissa's stomach, along with a small amount of greenish vegetable material."

*Id.* at 26-27. As "a final comment on the evidence proving that Applicant killed Melissa on December 8, 1998", *id.,* at 29, the State "point[ed] out that a note that had been given to Melissa by another student on December 8 was found in a pocket of Melissa's jeans during the autopsy". *Id.*

---

[1] The fact that on December 8, 1998, Mr. Swearingen traveled near enough to the Sam Houston Forest for a cell phone tower located in Willis several miles from the crime scene to pick up the call is not the least bit incriminating in the face of forensic proof that Trotter's body was not dumped in the forest until December 18, 1998, ten days *later*, at the very soonest. It should not have been incriminating in the first place, since Swearingen lived in Willis, Texas within the tower's range, *id., vol.* 27, at 95, his parents living about 4 miles away in Willis, and Swearingen worked in nearby Conroe, Texas. He commuted constantly in the area on business and for family matters.

In Mr. Swearingen's second state habeas proceedings, which commenced on January 22, 2007, the State insisted on its theory of the case without a single variance, despite the opinions of three pathologists, including current Harris County Chief Medical Examiner Luis Sanchez's, all of whom conclude that Trotter's body could not have been left in the woods until around December 18, 1998, ten days after disappearance and a week after Mr. Swearingen was incarcerated. *Exhs. 'A', 'B', 'C', 'D', and 'E'.* In proposed findings of fact, the State again resorted to Dr. Carter's estimation, based on the external appearance of the body, that Trotter's death "occurred twenty-five days prior to the discovery of her corpse." *State's [2007] Proposed Findings of Fact and Conclusions of Law,* at 9. The State contended, further, that "[b]ased on Dr. Carter's credible testimony at trial, the state of decomposition of Melissa Trotter's body, particularly the presence of fungi that take "several weeks' time" to develop, was indicative of a body that had been left in the woods for 25 days." *Id.* at 25.

**B.      Uncontested forensic evidence demonstrates that Mr. Swearingen could not have committed this crime; the State's theory that Mr. Swearingen killed Trotter and disposed of her body in the woods is impossible.**

The State's theory that Mr. Swearingen killed Trotter and left her body in the woods on or about December 8, 1998, is thoroughly undermined by Dr. Carter's re-evaluation of crime scene evidence, weather data, autopsy photos and her own autopsy report. Upon reviewing findings that she made pursuant to her internal examination of the body, Dr. Carter confirms that Trotter's corpse was not in the forest for more than fourteen days, which means that the body was not left there until at least one week **after** the December 11, 1998, date on which Mr. Swearingen was incarcerated. In her affidavit, Dr. Carter carefully explains that,

> Pancreas, spleen and liver tissue is known to autolyze quickly. At room temperature, it is not unusual for these organs to liquefy within days. In this case, the body was found exposed in relatively open, only partially shaded space. Temperature data indicates an average temperature of approximately 50

10

degrees, with high temperatures occasionally reaching the mid-seventies. The presence of these organs in the condition described at autopsy supports a forensic opinion that the body of Ms. Trotter was not exposed in the Sam Houston National Forest until some time after December 12, 1998. Based on these internal findings, a forensic opinion that the body had not been exposed more than two weeks in the forest environment is reasonable.

The description of the gastrointestinal tract also supports the foregoing forensic opinion based on autopsy descriptions of the pancreas, spleen and liver in this case. Mild and moderate decompositional changes were noted in some regions; however, the gastrointestinal system was found intact. Furthermore, gastric mucosa, a fragile tissue which decomposes quickly, was still present and was rinsed and described.

***

The weight of Trotter's corpse at autopsy increases the level of confidence that can be placed in the forensic conclusions drawn from findings made during the internal examination of the body. Whether the process of decomposition results in liquification or in desiccation of body tissues, substantial weight loss will normally occur in bodies left for a three-week period in the type of environment in which Ms. Trotter's body was found. In this case, the weight of the body nude at autopsy (105 lbs) was only four pounds less than her weight at her doctor's office (109 lbs) two weeks before her [dis]appearance. (A newspaper account at the time of disappearance gives her weight alive as 105 pounds). This indicates that Ms. Trotter's body lost less than 4% of its weight from the time the body was left in the woods to the time it was autopsied, and supports a forensic opinion that Ms.Trotter's body was left in the woods within two weeks of the date of discovery on January 2, 1999.

*Exh. 'A'.* Three other pathologists, and a forensic entomologist are convinced that the autopsy and crime scene evidence definitively proves that Ms. Trotter was killed and left in the woods at least ten days after Mr. Swearingen was permanently jailed. Exhs. 'B-E'.

Dr. Larkin, who wrote chapters on dating death based on pathological findings for a well known treatise, reviewed the evidence in this case. *Exh. 'D'*, p. 1 (giving qualifications and material reviewed). Dr. Larkin states without hesitation that autopsy evidence supports the conclusion that,

> December 23, 2007, is the soonest that Trotter's body could have been left in the woods, which is to say 12 days after Mr. Swearingen was incarcerated. Furthermore, it is important to stress that forensic evidence

strongly supports the conclusion that the body in this case was deposited in the Sam Houston National Forest several days after December 23, 1998. Indeed, undisputed forensic evidence, namely, the external appearances and the description of the internal organs and tissues, and photographs of resected organs strongly support a date as late as December 30, 1998, which is to say nineteen days after Mr. Swearingen was incarcerated and three weeks later than the date the State maintains Trotter's body was left in the Sam Houston National Forest.

*Id.,* at ¶2.

As Dr. Larkin points out, the State's reliance on the external appearance of the body is completely misplaced. What the State fails to understand is the total lack of changes normally seen in a body exposed for 25 days under conditions prevailing in the Sam Houston National Forest during December 1998,

> Positive findings by autopsy establish that Trotter's body was not left exposed in the Sam Houston National Forest until December 23, 1998, at the very earliest. Besides positive findings, the absence of expected decompositional changes indicates exposure well after the date on which Mr. Swearingen was incarcerated. Bloating, for example, normally occurs after two or three days. It distorts breast and genital tissues, causing them to inflate grossly out of proportion. It also causes perforation of the stomach and intestines. However, Trotter's body did not exhibit any of the distorting changes caused by bloating and her gut was intact.

> In wilderness areas, such as the Sam Houston National Forest, considerable scavenging by birds and mammals take[s] place, but the body from the neck down did not exhibit any insults that could clearly be attributable to animal activity even though crime scene photos show that the body was found with torso exposed, as were the upper extremities, which again, did not exhibit any scavenging at all.

> The following forensic conclusion is therefore not reasonably debatable amongst competent forensic pathologists: Without question, Mr. Swearingen was not the person who left Ms. Trotter's body in the Sam Houston National Forest.

*Id.* at ¶¶17-19 (commenting on Exh. 'N', autopsy photo of torso and limbs)

Dr. Lloyd White, former Chief Medical Examiner of Nueces County, and currently a Deputy Medical Examiner with Tarrant County, Texas, concurs with Dr. Larkin's conclusions

12

and reasoning. *Exh. 'C'*. Dr. White singles out for comment autopsy photos that corroborate the written description of internal findings made by Dr. Carter. *Exh. 'W'* (autopsy photo of intact spleen). Addressing the significance of the appearance and the autopsy operations that Dr. Carter was able to perform on the spleen, Dr. White notes that,

> The spleen removed from Trotter has been dissected [and] there is a longitudinal incision through the spleen's capsular surface and into the parenchyma. The capsular surface is smooth and glistening. The edges of the incision are sharp. Autolysis appears to be minimal. The photograph of the spleen has the appearance of splenic tissue taken from a recently deceased individual. The spleen obviously has not liquefied and disintegrated as is typical in individuals who have been dead for several days.

*Exh. 'C', ¶ 4.a.* Autopsy photos of the heart reinforce the conclusion that Trotter's body was in the woods for approximately a week at most. *Exh., 'X'*. Considering once more the appearance of the tissue and the procedures that Dr. Carter was able to perform during autopsy, Dr. White points out that,

> Photographs of Trotter's heart show that the muscle is still red and relatively fresh looking. There are several long incisions and several shorter ones. The edges of the incisions are sharp. Pericardial fat is seen in the upper left part of the photo surrounding the aorta. It is glistening and intact. The pericardium, except for the incisions, is otherwise intact and the surface is smooth and glistening. Again, the appearance of the heart is what one would expect to find upon autopsy of a recently deceased individual.

*Exh. 'C', ¶ 4.b.*

The factual basis for the scientific conclusions that Trotter's body was left in the woods well after Mr. Swearingen was incarcerated is not in dispute. As reflected in the reports and testimony of Mr. Swearingen's forensic experts, it consists in Dr. Carter's autopsy report, autopsy photos, crime scene photos and tapes, and temperature data collected by the National Oceanographic and Atmospheric Administration. Faced with confident expert opinions, based

13

on this information, confirming that Mr. Swearingen was in jail long before Trotter's body was thrown in the woods, any reasonable juror would have quickly acquitted Mr. Swearingen.

Furthermore, considerable evidence readily comprehensible to laypersons corroborates the forensic conclusion reached by Drs. Sanchez, Carter, White, Larkin, and Arends. The lack of significant animal scavenging is completely at odds with the State's theory of the crime. Vultures, wild pigs, raccoons and crows inhabit the East Texas woods in which Totter's body was found. Invariably, the extremities, particularly the digits, are subject to small and large animal scavenging, but in this case, Trotter's limbs and fingers were found well preserved and undisturbed. *Exh. 'R'.*

The absence of bloating, which is a regular post mortem phenomena caused by gas producing bacteria in the stomach and gut, is another fact that jurors would clearly understand and find completely aberrant in relation to the State's theory that Trotter's body had lain exposed in the east Texas woods for 25 days. In her October 31, 2007, affidavit, Dr. Carter points to the preserved condition in which she found the gastrointestinal tract as evidence supporting the forensic conclusion that Trotter's body was in the forest no more than fourteen days:

> Mild and moderate decompositional changes were noted in some regions; however, the gastrointestinal system was found intact. Furthermore, gastric mucosa, a fragile tissue which decomposes quickly, was still present and was rinsed and described.

*Exh. 'A'.* Dr. Larkin points out that bloating occurs early on in the post mortem process and leaves an indelible mark,

> Bloating, for example, normally occurs after two or three days. It distorts breast and genital tissues, causing them to inflate grossly out of proportion. It also causes perforation of the stomach and intestines. However, Trotter's body did not exhibit any of the distorting changes caused by bloating and her gut was intact.

14

*Exh. 'D'.* Photographs that show that Trotter's body did not bloat at all, but rather retained a form preserved so well that the hunter who found it thought it was a manikin, graphically confirm Drs. Carter's and Larkin's findings and conclusions. *Exh. 'R'.* To anyone the least bit observant of what happens to carcasses left in a field or the side of a road, this testimony, and the accompanying photographs, would be powerful evidence that Mr. Swearingen did not dump Trotter's body in the woods and that he State was trying to convict the wrong man.

Medical records showed that Mr. Trotter weighed 109 pounds just two weeks prior to her disappearance. *Exh. 'V'.* Newspaper reports give her weight at disappearance as 105 pounds. *Exh. 'U'.* Trotter's weight nude at autopsy was 105 pounds. *Exh. 'F'* (January 3, 1999, Autopsy Report of Melissa Trotter.) Clearly, a reasonably effective attorney would be able to impress upon the jury that a body could not lay exposed in the Sam Houston National Forest for twenty-five days, or twenty days, or two weeks and lose no more than four pounds due to dehydration, desiccation, and animal scavenging.

Finally, at the July 2, 2007, hearing on Mr. Swearingen's first successor, the Chief Medical Examiner of Harris County, Texas testified. *Exh. 'B'.* He was subject to cross-examination by the Montgomery County District Attorney and by the Court. *Id.* According to Dr. Sanchez, the body was in the woods for ten to fourteen days at the very most. He held fast under the Court's examination stating that the internal findings showed the body could not have been in the forest environment for twenty-five days as required by the State's theory of guilt. *Id.*

**C.    The significance of forensic proof showing that someone else killed the victim and left her body in the woods must be considered in conjunction with other evidence exculpating Mr. Swearingen.**

DNA testing of blood found in Trotter's fingernail scrapings excluded Mr. Swearingen. *Id.* at 126-128. At trial and in post trial pleadings, the State argued that the blood found in the

15

scrapings was contamination. It conjured up several strange scenarios to explain how contamination might occur: one of them was that the blood came from a deputy present during the autopsy who said he had cut himself shaving that morning. *Tr. Transc., vol.* 28, at 124-125. Another was that a freshet of blood circulating through the morgue's air conditioning system was spewed out a vent and landed in the shavings. *Id. vol.* 29, at 115-116. In habeas proceedings, and in proceedings under Chapter 64 of the Texas Code of Criminal Procedure that Mr. Swearingen filed *pro se* in order to obtain additional DNA testing, the State suggested that the blood flakes found in the shavings "could have been accidentally introduced at any time by someone at the scene because the fingers of Melissa's right hand were exposed and it was windy in the area".[2] The idea, apparently, is that the wind could have blown droplets of blood up underneath Trotter's fingernails.

Furthermore, after the July 2, 2007, evidentiary hearing, counsel was able to develop evidence showing that in order to convict Mr. Swearingen, the State withheld extraordinary exculpatory evidence that pointed toward the real killer. Days before she disappeared, Melissa Trotter received horrific, life threatening phone calls at her telemarketing job at League Line Resort. *Exh.* 'H'. The caller threatened to choke her, rape her and kill her. *Id.* A terrified Trotter broke down in tears before co-workers. She was also picked up from the Resort by a man of whom she was deathly afraid, but felt she could not disobey nor reveal his name. *Id.* After she disappeared, Trotter's coworkers called police and told them of the threats and the dreaded companion. *Id.* The State never disclosed this explosive information to Mr. Swearingen's attorneys, although police knew Mr. Swearingen was neither the caller nor the stranger.

At the June 20, 2008, evidentiary hearing the State contended that Mr. Swearingen's first state habeas attorney failed to use due diligence when he investigated the case in 2002.

---

[2] *State's [March 29, 2005] Response in Opposition to Defendant's Motion for Forensic DNA Testing*, at 6.

According to the State, Roberts was available for interview, although Roberts appears to have moved to Tennessee, and none of the many witnesses, including co-workers. whom state habeas counsel did investigate, namely, Jamie Irvin, Amber Maines, and an immediate supervisor, named Nickie Maines, ever mentioned Roberts or had information comparable to Roberts'. When contacted to support Mr. Swearingen's January 16, 2008, application, these witnessed did not have anything more to say than they did in 1998 and 1999 when they were interviewed by police. The State also contended that Roberts had not reported the phone calls to police. However, Cora Grigsby, provided unchallenged testimony that she had called the police about threatening phone calls and added that before Ms. Trotter began receiving these phone calls police had arrested a male coworker for making similar threats to customers. However, the fact that someone else, not Mr. Swearingen, threatened to kill the victim near the time she disappeared has not been undermined.

## STANDARDS

### *Manifest Injustice Standards*

Mr. Swearingen is unable to return to a Texas forum for relief based on the evidence in this second federal application. The Texas Court of Appeal has ruled that Mr. Swearingen's evidence of innocence did not meet the threshold for submitting an otherwise defaulted claims in a successive state writ. *Ex Parte Swearingen, June 17, 2008, Order*. However, there is no question that Mr. Swearingen's proof meets the threshold or "gateway" that the Supreme Court established in *Schlup v. Delo*, 513 U.S. 298 (1995).

In *Schlup*, this Court held that prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S.

17

According to the State, Roberts was available for interview, although Roberts appears to have moved to Tennessee, and none of the many witnesses, including co-workers. whom state habeas counsel did investigate, namely, Jamie Irvin, Amber Maines, and an immediate supervisor, named Nickie Maines, ever mentioned Roberts or had information comparable to Roberts'. When contacted to support Mr. Swearingen's January 16, 2008, application, these witnessed did not have anything more to say than they did in 1998 and 1999 when they were interviewed by police. The State also contended that Roberts had not reported the phone calls to police. However, Cora Grigsby, provided unchallenged testimony that she had called the police about threatening phone calls and added that before Ms. Trotter began receiving these phone calls police had arrested a male coworker for making similar threats to customers. However, the fact that someone else, not Mr. Swearingen, threatened to kill the victim near the time she disappeared has not been undermined.

## STANDARDS

### *Manifest Injustice Standards*

Mr. Swearingen is unable to return to a Texas forum for relief based on the evidence in this second federal application. The Texas Court of Appeal has ruled that Mr. Swearingen's evidence of innocence did not meet the threshold for submitting an otherwise defaulted claims in a successive state writ. *Ex Parte Swearingen, June 17, 2008, Order*. However, there is no question that Mr. Swearingen's proof meets the threshold or "gateway" that the Supreme Court established in *Schlup v. Delo*, 513 U.S. 298 (1995).

In *Schlup*, this Court held that prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S.

17

518 (2006) (citing 513 U.S., at 327). This formulation "ensures that petitioner's case is truly 'extraordinary,' while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). A petition supported by a convincing *Schlup* gateway showing "raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error"; hence, "a review of the merits of the constitutional claims" is justified. *Id.* (quoting, *Schlup*, 513 U.S., at 317).

In determining whether a Petitioner has passed through *Schlup's* gateway, the court may consider "new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial," *id.*, at 324. However, the habeas court's analysis is not limited to such evidence. *Schlup* makes plain that the habeas court must consider " 'all the evidence,' " old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." *See id.*, at 327-328, 115 S.Ct. 851 (quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L.Rev. 142, 160 (1970)). Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." 513 U.S., at 329.

While "the court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors," *id.*, the gateway actual-innocence standard is not equivalent to the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), which governs claims of insufficient evidence. *House*, 547 U.S. at 519. When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict.

Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. *See id.* If new evidence so requires, this may include consideration of "the credibility of the witnesses presented at trial." *Id.; see also ibid.* (noting that "[i]n such a case, the habeas court may have to make some credibility assessments").

The evidence that Mr. Swearingen presented to meet *Schlup's* gateway is truly extraordinary, consisting as it does in the testimony of five forensic scientists, three of whom are present or former Chief Medical Examiners, two of whom, Dr. Sanchez and Dr. White, the State of Texas relies on in criminal cases. A third, Dr. Carter, practices as the Chief Forensic Pathologist for Marion County, Indiana, and was called to testify by the State at Mr. Swearingen's trial. The factual basis of their opinion is uncontestable, consisting as it does of autopsy reports and photos and crime scene reports that State investigators collected and State prosecutors introduced at trial.

Against scientific proof that the victim was killed and deposited in the woods well after Mr. Swearingen was incarcerated the State can only marshal trial testimony that Dr. Carter has since recanted. It recites the State's circumstantial case, including fiber evidence to show that Trotter was in Swearingen's truck and trailer, and crime scene evidence that it has always speculated was the result of a struggle. It relies on the Spanish letter. However, under *Schlup* this Court cannot review the evidence in a light most favorable to the verdict. *House,* 547 U.S. at 519. It must reassess the probative value of the State's already "weak and tentative" evidence in comparison to the forensic proof that Swearingen was in jail when Trotter was killed by someone else and left the forest. *Id.* The State's case, when exposed to this evidence under an evenhanded light, simply melts away.

19

Recently, in *House, supra*, this Court reversed the Sixth Circuit's determination that House had not satisfied *Schlup*'s miscarriage of justice standard. The evidence House offered showing that he was innocent of the murder of Carolyn Muncey was far less compelling than the scientific proof of innocence that Mr. Swearingen has presented. House proved in post-conviction proceedings, that the victim's husband was the source of the semen on the victim's clothing, which, at trial, the State argued came from House. 547 U.S., at 519. He also presented testimony from a witness who said Muncey's children told them of a commotion that suggested that the Munceys had been fighting the evening she died. *Id., at* 523-524. Mrs. Muncey's blood was spattered over his pants, but House developed considerable evidence that it was due to mishandling of the evidence. The state had packaged Mrs. Muncey's blood with pants that police had seized from House and the vial clearly had spilled its contents. *Id.,* at 542. However, House clearly could have been at the crime scene during the relevant period. In fact, his car had been parked near the crime scene that evening. *Id.,* at 525. He also lied about his whereabouts telling officers he had been with his girlfriend the entire time, and he falsely stated that the pants he had on during the police interview was the pair he wore the night Mrs. Muncey died. *Id.,* at 526.

In Mr. Swearingen's case, we know for certain, based on the analyses and unanimous conclusions of five forensic scientists, that Mr. Swearingen was not at the crime scene. Instead, he was in jail when Trotter was killed and dumped in the forest. The State's only possible rejoinder is to speculate that Mr. Swearingen had an "accomplice after the fact" who preserved the body and left in the woods more than a week after Mr. Swearingen was arrested and jailed. There is not even a wisp of evidence for this. It is simply guilt by imagination.

20

## CLAIMS FOR RELIEF

### Claim #1

**Mr. Swearingen is actually innocent of capital murder; his conviction and death sentence therefore violates Fourteenth Amendment due process, and the Eight Amendment of the United States Constitution.**

Close review of the decision in *Herrera v. Collins*, 506 U.S. 39 (1993), demonstrates that a majority of the Court found that the execution of an innocent man violates the constitution. *Id.* at 419 (O'Connor, J., joined by Kennedy, J., concurring) ("executing the innocent is inconsistent with the Constitution"); *Id.* (O'Connor, J., joined by Kennedy, J., concurring) ("the execution of a legally and factually innocent person would be a constitutionally intolerable event."); *Id.* at 429 (White, J., concurring) ("I assume that a persuasive showing of 'actual innocence' made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case."); *Id.* at 430 (Blackmun, J., joined by JJ. Stevens and Souter, dissenting) ("Nothing could be more contrary to contemporary standards of decency ... than to execute a person who is actually innocent."). Even Chief Justice Rehnquist left open whether in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim," 506 U.S. at 417, although "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*

### (i.) *Mr. Swearingen is Actually Innocent of Homicide*

In this case, that extraordinarily high threshold has clearly been met by forensic evidence provided by witnesses of the highest credentials. There is unanimous agreement amongst the forensic pathologists who have reviewed this case that Trotter could not have been killed and left

21

in the woods before the date on which Mr. Swearingen was incarcerated. *Exhs. 'A-E'*. Upon review of autopsy descriptions of fragile tissues called mucosa, for example, Dr. Larkin stresses that,

> In Trotter's case, the conditions in which the mucosa were preserved allowed Dr. Carter to identify them, examine them for pathology, and subject them to mechanical processes such as dissection and rinsing. It is a medical certainty, that these tissues would not have retained the integrity seen at autopsy unless the body had been left in the Sam Houston National Forest less than ten days prior to the date of recovery. Indeed, it is very unlikely, that Dr. Carter would have found these tissues in the condition described at autopsy unless the body had only been exposed in the woods for substantially less time – a matter of 3 to 4 days. A similar conclusion follows from Dr. Carter's description of the mucosal lining of the gall bladder.

*Exh. 'D'* at ¶ 12.

Trial testimony by Dr. Carter in which a different date of exposure in the forest is diagnosed from the external appearance of the body is also refuted. As Dr. Larkin points out, the State's reliance on the external appearance of the body is completely misplaced. What the State fails to understand is the total lack of changes normally seen in a body exposed for 25 days under conditions prevailing in the Sam Houston National Forest during December 1998,

> Positive findings by autopsy establish that Trotter's body was not left exposed in the Sam Houston National Forest until December 23, 1998, at the very earliest. Besides positive findings, the absence of expected decompositional changes indicates exposure well after the date on which Mr. Swearingen was incarcerated. Bloating, for example, normally occurs after two or three days. It distorts breast and genital tissues, causing them to inflate grossly out of proportion. It also causes perforation of the stomach and intestines. However, Trotter's body did not exhibit any of the distorting changes caused by bloating and her gut was intact.

> In wilderness areas, such as the Sam Houston National Forest, considerable scavenging by birds and mammals take[s] place, but the body from the neck down did not exhibit any insults that could clearly be attributable to animal activity even though crime scene photos show that the body was found with torso exposed, as were the upper extremities, which again, did not exhibit any scavenging at all.

> The following forensic conclusion is therefore not reasonably debatable amongst competent forensic pathologists: Without question, Mr. Swearingen was not the person who left Ms. Trotter's body in the Sam Houston National Forest.

*Id.* at ¶¶17-19. Indeed, it is clear that Dr. Carter has retracted her trial testimony. As she recognizes in her October 31, 2007, affidavit (*see Exh. 'A'*),

> **Several other findings pursuant to the internal examination are consistent with a date of exposure in the Sam Houston National Forest within fourteen days of discovery, <u>and incompatible with exposure for a longer period of time.</u>** For example, the breast tissue was firm and intact, and the gallbladder mucosa is described as yellow-green and velvety in appearance.

In response to Dr. Carter's reversal of the opinion that she gave at trial, the State can only complain that "Dr. Carter, Harris County Chief Medical Examiner, does not explain how she could have been so dead wrong." *State's Answer to Petitioner's January 16, 2008, application for writ of habeas corpus,* at 8. However, Dr. Carter did explain. She explicitly states that she was not asked to address the significance of her internal findings at trial and she was not provided with temperature data until 2007 that makes it clear that delicate tissues which she found intact would not have been present at autopsy, and that internal organs would have liquefied if Mr. Swearingen had killed the victim and dumped her body in the forest before he was incarcerated. *Exh. 'A',* at 1-2. To this may be added the comments of forensic entomologist, James Arends, PhD, on the basic biology of the East Texas forest: the body was found lain out partially nude and exposed to the elements; the corpse would have been eaten and its remains scattered by scavengers in the East Texas woods if Mr. Swearingen had killed the victim and left her to rot in the forest on December 8, 1998, as the State's theory of guilt absolutely requires. *Exh. 'E'.*

The only way out, for the State, is to show that someone else in league with Mr. Swearingen stored the body so it would not decompose and then disposed of it the woods while Mr. Swearingen was incarcerated. The State has never even floated this hypothesis, let alone produced a scrap of evidence for it. To the contrary, the State has persistently maintained that "there is no other killer. All roads lead to Larry." *Id. vol.* 34, at 93, 96. The State therefore strained mightily to show that Mr. Swearingen disposed of the body in the National Forest. It stressed Mr. Swearingen's familiarity with the forest, *id., vol.* 34, at 89. It videotaped the route it insisted Mr. Swearingen used to get from his trailer home to the forest, and introduced the tape at trial. *Id. vol.* 28, at 46-48. It introduced voluminous cell phone records from December 8, 1998, that it alleged traced Mr. Swearingen's movements to and from the forest. *Id., vol.* 27, at 50-105.

Indeed, in order to secure a conviction, the State had to convince the jury that on December 8, 1998, Mr. Swearingen took advantage of a very narrow window of opportunity between approximately 1:45 and 5:30 p.m. on that date to kill the victim and dispose of the body in the forest. That is because "at 1:37 p.m." on December 8, 1998, Melissa Trotter "signed on to her E-mail" at the community college. *Id., vol.* 25, at 168. She was also seen on campus around this time by a number of witnesses. *Id.,* at 88, 183. No later than 5:30 p.m., Mr. Swearingen showed up at his father's worksite where he speaks with Officer Carl Jones. As the State stressed in closing:

> This [cell phone] tower is being used here in a call [from Swearingen] to his step-father ... That tells you he's coming back from dumping the body. That's what he's doing. Then we have Carl Jones putting him at the McDonald's site in Willis about 5:30 PM . We know that from the cell records and testimony. Okay? So he's back in Willis, he's already dumped the body.

*Id. vol.* 34, at 8.

The State has not deviated from the theory of the case it presented at trial. On appeal and in post conviction proceedings it has insisted that Mr. Swearingen, acting alone, killed the victim and disposed of her corpse in the National Forest. Thus, in answer to Mr. Swearingen's January 22, 2007, application (second application) for a writ of habeas corpus, the State argued that "Applicant deposited Melissa's body in the Sam Houston National Forest, at which time he stabbed her in the throat to ensure she died." *Ex parte Swearingen*, no. 99-11-06435-CR-(2), *State's Answer*, filed Feb. 15, 2007, at 8. It is now clear that the evidence on which the homicide conviction depends, along with the inferences that the State maintains could be drawn from that evidence, are thoroughly falsified by the Medical Examiners' analyses and conclusions. *Exh. 'A'- 'E'*.

Finally, the State has argued throughout proceedings that evidence from the crime scene in particular corroborates the narrative in a "Spanish letter" that Mr. Swearingen drafted while in prison. *See, id.* at 94. In this story, Trotter is sequestered, assaulted and murdered in the forest on the day she disappears. *Id.* The unanimous findings of Mr. Swearingen's forensic specialists show the letter for what it is, an absurdity bearing no relation to reality, aside from details that Swearingen pieced together from autopsy reports and news accounts that he had access to while awaiting trial. If Mr. Swearingen had committed the crime described in the letter, Dr. Carter would have found a putrid soup, if that much, leaking from a desiccated and shrunken corpse. Instead, she found firm tissue, containing fresh organs, with fragile and friable tissue intact and capable of being dissected, manipulated and examined for pathology. *Exh. 'F'*, (Autopsy report). "The nude body had a weight of 105 lbs" at the morgue, *id.*, p. 3, exactly what the living person was reported to weigh, *Exh. 'U'*, and only four pounds less than what was recorded two weeks before her disappearance by her physician. *Exh. 'V'*. This defies common sense, and certainly

forensic science. As Dr. Larkin stresses bodies left exposed to the elements in the manner Trotter's was found lose up to 90% of their body weight in less time than 25 days. *Exh. 'D'*, and *see, Exh. 'A.'*

The theory of the offense that the State has insisted upon without variance at trial and in post-conviction proceedings, wherein Swearingen killed the victim and left her body in the woods before police incarcerated him, mirrors the "Spanish letter". The forensic evidence Mr. Swearingen presents shows that the State's case for murder is equally absurd.

### (*ii*). *Mr. Swearingen is Actually Innocent of Aggravating Felonies*

The same forensic evidence that demonstrates that Mr. Swearingen did not, and could not have, killed the victim, also shows that he did not commit the felonies of kidnapping and aggravated sexual assault that were all in order for the State to seek the death penalty. That evidence in section (*i*), *supra*, is therefore re-alleged as if fully set forth herein. It is clear and convincing evidence that Mr. Swearingen is not eligible for the death penalty and that execution would violated the Eight Amendment of the Constitution.

Furthermore, simply imagining an accomplice vitiates the already "weak and tentative" evidence that Mr. Swearingen was guilty of the aggravating felonies of rape or kidnapping. The disarray in which investigators found Trotter's garments when they recovered the body was sponsored as evidence that Mr. Swearingen dragged the victim through the woods and attempted to sexually assault her in the National Forest. *Tr. Transc., vol.* 34, at 26. The ligature, the disheveled clothing, the ripped trousers, all of this loses what little probative value it ever had.

## Caim # 2

**Trial counsel's failure to sponsor forensic evidence that showed that the State's homicide case was not only wrong, but absolutely impossible, violated Mr. Swearingen's due process and sixth amendment rights to a fair trial and competent assistance of counsel.**

Under *Strickland v. Washington,* 466 U.S. 668, 688-92 (1984), petitioners must show that trial counsel performed deficiently and that the evidence that counsel failed to sponsor, or failed to exclude, was material. In this case, Defense counsel chose to defend primarily against charges of aggravated sexual assault and kidnapping that made Mr. Swearingen eligible for the death penalty. *Exh. 'Y'* (2007 Affidavit of lead trial counsel). He did not focus on the date of death and ways to challenge it. *Id.* This clearly was not a reasonable strategic decision. The State did not develop evidence of rape or kidnapping that was independent of the homicide. Rather, evidence for these offenses was intertwined with the State's circumstantial case for murder. Indeed, proving that Mr. Swearingen did not kill the victim and dispose of the body in the forest would have been the surest way to defeat the aggravating felony charges.

Mr. Swearingen would have been acquitted of the homicide and of the aggravating felonies if trial counsel had presented the testimony of any of the pathologists who unhesitatingly and unanimously support the conclusion that Mr. Swearingen was not the person who took Trotter to the woods and left her there dead. Moreover, the evidence of innocence that a constitutionally effective defense counsel could have presented is **clear and convincing**.

This is not a close case where the pathology is ambiguous. The internal findings positively exclude dates before December 17, 1998, as dates of the crime. Exh. 'A-D'. With reasonable use of expert testimony, therefore, defense counsel would have clearly and convincingly established that Mr. Swearingen was in jail at least a week before the crime the State maintains took place could have happened. It is patent; it is obvious: Mr. Swearingen

27

would walk out of the courtroom a free man if any jury heard the forensic testimony. The State's entire case is that during a narrow space of time on December 8, 1998, Mr. Swearingen killed the victim and left her lifeless body in the forest. Were trial counsel to have effectively utilized forensic scientific evidence, every rational juror would immediately see that the State's theory of murder was not just false, it was impossible.

### Claim # 3

**Trial counsel's failure to sponsor forensic evidence that showed that the State's case regarding the aggravating felonies was not only wrong, but absolutely impossible, violated Mr. Swearingen's due process and sixth amendment rights to a fair trial and competent assistance of counsel.**

The evidence and argument alleged in claim '1' above is alleged herein. The State did not have independent evidence of the aggravated sexual assault or kidnapping offenses it tossed in to make this a capital case. Forensic proof that Mr. Swearingen was in jail when Ms. Trotter was killed and left in the forest is clear and convincing evidence that he did not rape or kidnap the girl. Trial counsel was deficient for not presenting it.

### Claim # 4

**Effective cross examination of Dr. Carter would have resulted in an acquittal of homicide charges; and**

### Claim # 5

**Effective cross examination would have resulted in an acquittal of all alleged aggravating felonies.**

Because of defense counsel's clearly erroneous strategy of defending primarily against aggravating felonies, defense counsel failed to adequately cross examine Dr. Carter about her autopsy findings. *Strickland,* 466 U.S., at 688-90. Defense counsel failed to ask how breast tissue could be firm and intact after 25 days as Dr. Carter reported after autopsy. Defense counsel also failed to ask how Ms. Trotter's body's weight nude at autopsy could be exactly the

same, 105 lbs, (*see Exh. 'F'* at 3) as her reported weight the day she disappeared or merely four pounds less than recorded by her physician two weeks earlier. *See Exhs 'U', and 'V'.* Finally, defense counsel failed to ask about the significance of Dr. Carter's internal findings, such as finding a pancreas, liver, stomach, and mucosal linings.

Had Defense counsel asked Dr. Carter about gross measurements like the body's weight or about her particular observations of intact organs and delicate tissues, he not only would have called the date of the crime in question, he would have been able to convince the jury that his client was in jail when the homicide alleged by the State occurred. *See, Exh. 'A'.* No jury would have convicted Mr. Swearingen of killing the victim were counsel to have introduced this clear and convincing evidence of innocence through competent cross examination. Trial counsel's errors therefore prejudiced Mr. Swearingen's defense. *Strickland,* 466 U.S., at 690-92.

Similarly, effective cross would have resulted in clear and convincing evidence that Mr. Swearingen did not commit the aggravating felonies. Hence, trial counsel's defense against his client's eligibility for the death penalty was constitutionally ineffective. *Id.* at 688-92.

### Claim # 6

**Mr. Swearingen would have been acquitted had trial counsel utilized entomological expertise; and**

### Claim # 7

**Mr. Swearingen would have been acquitted if trial counsel had utilized entomological expertise.**

For reasons stated in section V.B.2, *supra,* counsel's decision not to challenge the date on which Ms. Trotter was killed and left in the woods was deficient under *Strickland,* 466 U.S. 688-90.

Competent forensic entomologists are familiar with the forest ecology including large

animal scavenging. They are familiar with how exposure to the elements affects bodies. Arends testimony regarding not only the lack of insect activity, but the near complete absence of scavenging by larger animals would is clear and convincing evidence that Mr. Swearingen did not kill the victim and leave her body in the woods as the State claimed. Exh. 'E'. Similarly, Dr. Arends' testimony about the normal weights of Ms. Trotter's internal organs at autopsy, along with testimony that a body left in the woods for a far shorter time would lose body significant body mass would have convinced a reasonable juror that Mr. Swearingen did not kill the victim. *Id.*, at see, Exh. 'H'. Dr. Arends testimony about his finding that at autopsy, 25 days after Ms. Trotter disappeared, the weight of her internal organs were within normal range is clear and convincing evidence that Mr. Swearingen did not commit the crime alleged by the State. Simlarly, his finding from autopsy and physicians records that Ms. Trotter's body weighed exactly the same at autopsy as it did when she was reported missing is clear and convincing evidence that Ms. Trotter was not killed and left in the wood on December 8, 1998, under conditions prevailing in the National Forest.

Surely every reasonable juror – every reasonable person -- would realize that a body that was nude from the navel to above the breasts and left exposed and unprotected in the open forest would weigh substantially less than when alive after a far shorter time than 25 days. Any reasonable person would realize that in temperatures averaging 50 degrees, with average highs over 60°, and readings on several days in the 70s, (see *Exhs, 'S' and 'T'*) a body lose considerable weight even without the large animal scavenging that Dr. Arends testified normally occurs in a forest environment. *Id., and see, Exh. 'D'.* Dr. Arend's testimony and conclusion that the body was in the woods no more than five or six days would have been clear and convincing evidence in the face of which no reasonable jury would have convicted Mr.

Swearingen. Failure to prevent this type of compelling evidence of innocence was therefore prejudiced Mr. Swearingen's defense under *Strickland,* 466 U.S. 690-92.

**Claim # 8**

> **The State sponsored false and misleading forensic testimony at trial in violation of Mr. Swearingen's 'Fourteenth Amendment Due Process Rights**

In violation of Fourteenth Amendment Due Process, the State sponsored false and misleading forensic testimony at trial. *See, Giglio v. United States,* 405 U.S. 150 (1972). The State has epeated the misleading testimony throughout appellate and post-conviction proceedings. The District Attorney, Mike McDougal, took the highly irregular step of attending the autopsy. Police supplied Dr. Carter with the date of disappearance and filed a report that she arrived at a date of death 25 days before recovery. *Id.* However, the State did not provide the Dr. Carter with crime scene photographs or other data that was necessary for Dr. Carter to arrive at a reliable approximation of the date on which Ms. Trotter was killed and her body deposited in the woods. For example, Dr. Carter was not provided with photographs showing that the body was left in a relatively open, only partially shaded portion of the forest. *See Exh. 'A'.*

The State was aware of the type of information that Dr. Carter needed to arrive at a reliable calculation. Indeed, in post conviction proceedings that State has attempted to impeach the conclusions of Mr. Swearingen's forensic experts on the ground that that they were not familiar with conditions in the National Forest at the time the body was exposed. Furthermore, in the State's Answer to Mr. Swearingen's successor petition, the State complained that Dr. Carter's revised opinion was based only on information from Mr. Swearingen's counsel. State's March 1, 2008, Motion to Dismiss Applicant's Third Application, at 7. However, that information was far more complete than what the State provided to her pre-trial. The information

that undersigned counsel asked Dr. Carter to review consisted in crime scene photos and data collected by State investigators and Governmental organizations.

The State sponsored testimony that it knew was false and misleading. At trial, the State intentionally confined its examination of Dr. Carter to questions about what the external appearance of Ms. Trotter's body indicated, particularly the fungal growth and insect activity. *Tr. Transc. vol.* 29 at 44. In order to shape Dr. Carter's testimony in favor of the State's case, the State also intentionally withheld from its expert evidence that it realized was relevant to a reliable forensic opinion; the State, but not Dr. Carter, knew that at the crime scene the body was found with its torso exposed and unclothed from the navel to above the breasts, but the State did not disclose this information or the photographs to Dr. Carter. Exh.'A'. Instead, police officers tainted Dr. Carter's ability to make an objective determination of the date of death by informing her of the date of disappearance. Exh. 'Z' (Police report of autopsy). The Montgomery County District Attorney at the time, Michael McDougal, was present at autopsy when Dr. Carter received this information. Exh. 'A' at 3 (listing persons "in attendance at autopsy"). McDougal, as far as is known, has not attended other autopsies and his attendance in this case appears to have been to bias Dr. Carter.

At trial, the State avoided asking the type of questions that Dr. Carter addressed in her October 31, 2007, affidavit regarding the absence of bloating and the absence of scavenging below the cranial region. The assistant district attorneys involved, however, had prosecuted other homicides and other cases involving death and dead bodies; they surely knew that the condition of the body and the description in the autopsy report were highly irregular. Indeed, if the shoe were on the other foot, and the State had to show that the body was thrown in the woods later in order to secure a conviction, these attorneys would have questioned Dr. Carter about

autopsy findings that unquestionably show that the body had been in the woods no more than ten days or so and even for a significantly shorter period of time.

The false and misleading testimony that the State intentionally and recklessly sponsored was essential to the conviction. Dr. Carter's October 31, 2007, affidavit is clear and convincing evidence that no jury would have convicted Mr. Swearingen had the State fulfilled obligations set forth in *Giglio v. United States*, 405 U.S. 105 (1972) to sponsor truthful, accurate testimony. Sponsoring the false and misleading testimony was clearly material under *Giglio*.

### Claim # 9

**In violation of Fourteenth Amendment Due Process and the Sixth and Eighth Amendment of the Constitution, the trial court charged the jury, in the alternative, on four different aggravating felonies; thereby, allowing the jury to find Mr. Swearingen eligible for death without even a majority of the jurors agreeing on an essential or elemental fact.**

Trial counsel complained that the charge allowed the jury to convict Mr. Swearingen of an aggravating felony by making a finding from a menu of four alternatives – attempted aggravated sexual assault or aggravated sexual assault, attempted kidnapping or kidnapping. Subsequent counsel have not raised the issue. The court overruled trial counsel's objections, and permitted the jury to find Mr. Swearingen guilty even if no more than six jurors agreed about any underlying felony (six rather than three, because those who found a substantive offense would also agree with attempt). This violated Fourteenth Amendment Due Process, and the Sixth and Eighth Amendment of the Constitution.

Under *Ring v. Arizona*, 536 U.S. 584 (2002), however, the aggravating felonies that make a defendant eligible for the death penalty must be treated as elements or elemental facts.[3] As

---

[3] *Schad v. Arizona*, 501 U.S. 624 (1991), moreover, does not govern this issue. *Schad* is a plurality opinion. If *Schad* even provides a rule, it must be derived from Justice's Scalia

such, a proper determination of whether a predicate felony occurred is subject to the full panoply of constraints that Due Process and the Sixth Amendment impose. In a death penalty case, the jury, therefore, has to be unanimous with regard to at least one of the felonies that the State alleged in order to find the defendant eligible for the death. The Eighth Amendment's protection against arbitrary and capricious imposition of the death penalty also demands unanimity or near unanimity. Indeed, this court has carefully explained that in any criminal case, in order to satisfy the requirements of proof beyond a reasonable doubt, the jury must find each element of the offense unanimously. *See, United States v. Correa-Ventura*, 6 F.3d 1070, 1076-77 (5th Cir. 1993) (citing William Blackstone's Commentaries). Certainly, after *Ring* the constitution forbids courts from allowing a defendant to be found eligible for death without a substantial majority of the jurors agreeing that he or she committed one particular aggravating felony. Mr. Swearingen's trial court's instructions allowed the jury to find him eligible without even a bare majority agreeing on the essential, elemental fact of whether Mr. Swearingen committed a specific felony. Clearly, this violated Due Process, the Sixth Amendment and the Eighth Amendment.

Mr. Swearingen's clear and convincing evidence that he is actually innocent of any aggravating felony means that his unconstitutional conviction for capital murder should not stand.

---

concurrence. *See, United States v. Marks*, 430 U.S. 188 (1968). Justice Scalia disagreed vehemently with Justice Souter and the three other Justices who joined him on why due process allowed a court to instruct a jury in the alternative regarding the aggravating factors of premeditation and robbery. Justice Scalia concurrence confines *Schad* to its facts; *Schad* pertains at most to situations in which premeditation is an alternative theory. Indeed, according to this Court's jurisprudence, *Schad* does not have precedential value on the issue at hand here. *See, United States. v. Eckford*, 910F.2d 216, 219 (5th Cir. 1990).

## PRAYER FOR RELIEF

WHEREFORE, Larry Ray Swearingen requests that this Court:

1.  Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

2.  Grant him an evidentiary hearing at which he may present evidence in support of the foregoing claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact and of law raised by this petition or such hearing.

3.  Grant undersigned counsel a reasonable period of time, not less than one hundred and eighty (180) days to prepare and file such amendments to this petition as may be necessary to raise all available constitutional challenges to Mr. Green's conviction and death sentence in this proceeding.

4.  Grant such other relief as law and justice require.

Respectfully submitted,

HILDER & ASSOCIATES, P.C.

By:   /s/
       Philip H. Hilder
       State Bar No. 19620050
       James Rytting
       State Bar No. 24002883
       819 Lovett Boulevard
       Houston, Texas 77006
       Telephone (713) 655-9111
       Facsimile (713) 655-9112
       ATTORNEYS FOR PETITIONER

## VERIFICATION

I, James Rytting, state that to the best of my knowledge, the facts alleged in support of the claims in this case are true and correct, under penalty of perjury, as proscribed by Title 18 U.S.C. § 1746; and I hereby sign on behalf of Petitioner, Larry Ray Swearigen

_/s/_____
James Rytting

EXHIBIT "A"

COUNTY OF MARION                    §
                                    §
STATE OF INDIANA                    §

## AFFIDAVIT OF JOYE M. CARTER, M.D.

My name is Dr. Joye M. Carter. The following statements are, to the best of my knowledge, true and correct:

I am presently the Chief Forensic Pathologist for Marion County, Indiana. I previously held the position of Chief Medical Examiner of Harris County, Texas. On January 3, 1999, in my capacity as Harris County Medical Examiner, I performed the autopsy of Melissa Trotter (OC 99 – 2). In June of 2000, I testified in *Swearingen v. State*, cause no. 99-11-06435-CR, in the 9th District Court, Montgomery County, Texas.

At trial in Mr. Swearingen's case I was asked if I had formed an opinion about the date of death in this case. Review of my trial testimony, shows that I testified that I had formed an opinion that the date of death was 25 days prior to disappearance. As reflected in my testimony, this opinion was based primarily on the external appearance of the body, including marked decomposition of the head and neck region, and on the degree of maggot activity in this region of the body. I also remarked on the presence of fungal growth, noting that these organisms thrive in dark, dank and wet environments and are slow growing.

Review of my testimony reveals that I was not asked by prosecutors, or by defense counsel, to address the significance of my internal examination of Ms. Trotter's body. Nor was I asked to address in detail the question of how long Ms. Trotter's body had been left exposed in the Sam Houston National Forest. Instead, the focus of the prosecution and the defense was on whether the forensic evidence indicated a rape or kidnapping had occurred. The majority of the questions from both sides were directed at whether autopsy findings indicated vaginal bruising, blunt trauma to the head, and whether the cause of death was asphyxiation by ligature or a sharp forced entry wound to the neck.

For purpose of making this statement, I have reviewed the autopsy report of Melissa Trotter and autopsy photographs in her case. I have also reviewed several pieces of forensically important information that, to the best of my recollection, were not made available to during trial or pretrial proceedings. This information includes a video of the crime scene dated January 2, 1999, the date the body of Melissa Trotter was recovered from the Sam Houston National Forest, medical records giving Melissa Trotter's weight before she was reported missing, and temperature data showing daily high, low and average temperatures in the Conroe, Texas area for the period December 8, 1998 through January 2, 1999.

The medical record shows that Ms. Trotter weighed 109 pounds at her doctor's office on November 23, 1998, two weeks before the date she was reported missing. The

1

crime scene video reveals that Ms. Trotter's body was found in a relatively open, only partially shaded space in the Sam Houston National Forest, rather than in a dark, enclosed or sheltered space. Her lower extremities were clothed; however, the clothing on her upper body was bunched up around her arm pits leaving her torso nude from just below the navel to just above the breasts. The temperature data shows that the average temperature for the relevant period was 50° Fahrenheit. The average high temperature was approximately 62°, and the average low temperature was approximately 40°.

The forensic opinions, herein, address the significance of autopsy findings made during the internal examination of Ms. Trotter body in the context of the foregoing information. They represent what I would have testified to at trial if I had been provided this information and if attorneys for the state or defense had asked me to address the significance of findings made pursuant to the internal examination of Ms. Trotter's body.

Decomposition in this case was strikingly uneven. The decomposition seen in during the external examination of the body, particularly of the head and neck region, was substantial. The autopsy report and photographs show partial skeletonization of the head and neck region due to decomposition and insect and mammalian scavenging. As stated in the report, soft tissue was absent from the nose and midfacial areas, and the tongue was dark due to decompositional changes, and there was skin slippage and slippage of the scalp.

The amount of decomposition described pursuant to the internal examination of the body appears less advanced. The autopsy report reflects that internal organs were in their usual anatomic positions. Several of these organs, including the pancreas, the spleen and the liver, were dissected out, sectioned, examined for pre-existing pathology, photographed and described. Organ weights were near or within normal range.

Pancreas, spleen and liver tissues is known to autolyze quickly. At room temperature, it is not unusual for these organs to liquefy within days. In this case, the body was found exposed in relatively open, only partially shaded space. Temperatures data indicates and average temperature of approximately 50 degrees, with high temperatures occasionally reaching the mid-seventies. The presence of these organs in the condition described at autopsy supports a forensic opinion that the body of Ms. Trotter was not exposed in the Sam Houston National Forest until some time after December 12, 1998. These internal findings support a forensic opinion that the body had not been exposed more than two weeks in the forest environment.

The description of the gastrointestinal tract also supports the foregoing forensic opinion based on autopsy descriptions of the pancreas, spleen and liver in this case. Mild and moderate decompositional changes were noted in some regions; however, the gastrointestinal system was found intact. Furthermore, gastric mucosa, a fragile tissue which decomposes quickly, was still present and was rinsed and described.

Several other findings pursuant to the internal examination are consistent with a date of exposure in the Sam Houston National Forest within fourteen days of discovery,

and incompatible with exposure for a longer period of time. For example, the breast tissue was firm and intact, and the gallbladder mucosa is described as yellow-green and velvety in appearance.

The weight of the Trotter's corpse at autopsy increases the level of confidence that can be placed in the forensic conclusions drawn from findings made during the internal examination of the body. Whether the process of decomposition results in liquification or in desiccation of body tissues, substantial weight loss will normally occur in bodies left for a three week period in the type of environment in which Ms. Trotter's body was found. In this case, the weight of the body nude at autopsy (105 lbs) was only four pounds less than her weight at her doctor's office (109 lbs) two weeks before her appearance. (A newspaper account at the time of disappearance gives her weight alive as 105 pounds). This indicates that Ms. Trotter's body lost less than 4% of its weight from the time the body was left in the woods to the time it was autopsied, and supports a forensic opinion that Ms. Trotter's body was left in the woods within two weeks of the date of discovery on January 2, 1999.

Signed, _Joye M. Carter_
Joye M. Carter, M.D.

SUBSCRIBE and SWORN before me the undersigned authority on 31st day of October , 2007, to certify which witness my hand and seal of office.

_Connie M Fulp_
Notary Public

COUNTY OF MARION
STATE OF INDIANA

NOTARY PUBLIC
SEAL
INDIANA

CONNIE M. FULP
Commission # 514090
Res. of Marion Co.
Comm. Exp. 2-8-2010

3

EXHIBIT "B"

1          **REPORTER'S RECORD**

2          **NO. WR-53,613-04**

3

4      **EX PARTE LARRY RAY SWEARINGEN**

5      **ON APPLICATION FOR WRIT OF HABEAS CORPUS**
       **IN CAUSE NO. 99-11-06435 CR**
       **FROM THE 9TH DISTRICT COURT OF MONTGOMERY COUNTY**

6

7

8   A P P E A R A N C E S

9   ATTORNEY FOR THE STATE OF TEXAS

10  MARC BRUMBERGER
    SBN:  24001800
11  ASSISTANT DISTRICT ATTORNEYS
    207 W. PHILLIPS, 2ND FLOOR
12  CONROE, TX  77301
    936.756.7800

13

14  ATTORNEYS FOR DEFENDANT

15  JAMES RYTTING
    SBN: 24002883
16  PHILIP H. HILDER
    SBN:  09620050
17  819 LOVETT BLVD.
    HOUSTON, TX  77006
18  713.655.9111

19          BE IT REMEMBERED ON 2ND DAY OF JULY, 2007, the

20  following proceedings came on to be heard in the above-entitled

21  and numbered cause before the HONORABLE FRED EDWARDS, Judge

22  presiding, held in Conroe, Montgomery County, Texas.

23          Proceedings reported by machine shorthand and

24  computer-aided transcription.

25

Irene Beaupre, CSR
Official Court Reporter

FILE COPY

CHRONOLOGICAL INDEX

APPLICATION FOR WRIT OF HABEAS CORPUS

| July 2, 2007 – Morning Session | Page |
|---|---|
| Open court, all parties present, defendant present | 2 |
| Discussion regarding scope of preliminary hearing | 3 |
| Response by Mr. Brumberger | 6 |
| Defendant's Pro Se Motion to Recuse is withdrawn | 8 |

| DEFENSE WITNESSES | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|---|---|---|---|---|---|---|
| Dr. Luis Sanchez | 9 | | | | | 15 |
| | 17 | 22 | | | | 24 |
| | | | | 26 | | |
| Dr. James Arends | 27 | | | | | 47 |
| Noon recess is taken | | | | | | 49 |

| July 2, 2007 – Afternoon Session | |
|---|---|
| Open court, all parties present, defendant present | 49 |

| DEFENSE WITNESSES | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|---|---|---|---|---|---|---|
| Dr. James Arends – Continues | 49 | | | | | 50 |
| | 52 | | | | 55 | |
| | 63 | | | | | 71 |
| | 72 | 74 | 79 | 80 | | |
| | | | 81 | 83 | | |

| STATE WITNESSES | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|---|---|---|---|---|---|---|
| Dr. Jeffrey Tomberlin | 84 | 93 | 110 | 112 | | |

| Discussion between the Court and counsel regarding procedures | 114 |
|---|---|
| Hearing concluded, court adjourned | 114 |

## ALPHABETICAL WITNESS LIST

| Name | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|------|--------|-------|-----------|----------|-----------|--------------|
| **For the Defense** | | | | | | |
| Arends, Dr. James | 27 | | | | | 47 |
| | 49 | | | | | 50 |
| | 52 | | | | 55 | |
| | 63 | | | | | 71 |
| | 72 | 74 | 79 | 80 | | |
| | | | 81 | 83 | | |
| Sanchez, Dr. Luis | 9 | | | | | 15 |
| | 17 | 22 | | | | 24 |
| | | | | 26 | | |
| **For the State** | | | | | | |
| Tomberlin, Dr. Jeffrey | 84 | 93 | 110 | 112 | | |

## LIST OF EXHIBITS

| No. | Description | Offered | Admitted |
|-----|-------------|---------|----------|
| **For the Defense** | | | |
| 1 | Autopsy photo of vaginal wall | 10 | 11 |
| 2 | Autopsy photo of vaginal wall, close-up | 10 | 11 |
| 3 | Autopsy photo, back of body (unclothed) showing buttocks and backs of legs | 10 | 11 |
| 4 | Autopsy photo showing head and upper body | 10 | 11 |
| 5 | Autopsy photo, back view, showing tear in jeans with buttock exposed | 10 | 11 |
| 6 | Autopsy photo | 10 | 11 |
| 7 | Autopsy photo, back of legs, jeans and shoes | 10 | 11 |
| 8 | Autopsy photo, front view of clothing | 10 | 11 |

1          All right.  Take a seat.

2          Spell your first and last name, please.

3          THE WITNESS:  Dr. L-U-I-S, Sanchez,

4   S-A-N-C-H-E-Z.

5          THE COURT:  Go ahead.

6               DR. LUIS SANCHEZ,

7   having been first duly sworn, testified as follows,

8               DIRECT EXAMINATION

9   BY MR. RYTTING:

10      Q.    Dr. Sanchez, would you please tell the Court what

11  your current position is?

12      A.    Yes.  I am the Harris County Chief Medical

13  Examiner.

14      Q.    And --

15          THE COURT:  And you replaced?

16          THE WITNESS:  Dr. Joye Carter.

17      Q.    (BY MR. RYTTING)  And when did you replace Dr. Joye

18  Carter?

19      A.    I became the Chief Medical Examiner in January of

20  2003; however, I acted as an Interim Chief Medical Examiner

21  since October of 2002.

22      Q.    And that means that you were in the office when

23  Dr. Carter was; is that correct?

24      A.    Yes.  I was hired in 2001 as a Deputy Chief Medical

25  Examiner.

1    Q.    Okay.  Now, you were asked to review, by us,

2  material in this case pertaining to the autopsy of Melissa

3  Trotter; is that correct?

4    A.    Yes.

5    Q.    And that included autopsy photos, as well as an

6  autopsy report?

7    A.    Yes, that's correct.

8    Q.    And you also reviewed temperature data?

9    A.    Excuse me?

10    Q.    Temperature data?

11    A.    Yes.

12    Q.    I would like to -- and you brought with you today

13  several photos from the autopsy; is that correct?

14    A.    Yes.  I brought copies of the autopsies (sic) taken

15  during the post-mortem examination.

16          MR. RYTTING:  Your Honor, we would like to have

17  entered into evidence in this hearing, the photographs that were

18  taken at the autopsy while our witness is testifying.  And we

19  have -- there's a number of them.  It might expedite matters if

20  we have them entered all at once?

21          THE COURT:  All right.  We can do that, but

22  make sure the State is aware of it.

23          MR. BRUMBERGER:  The State would have no

24  objection to this, Your Honor.  There are at least two photos in

25  here that are of the victim's vagina after being removed at the

1   autopsy, and I don't believe that has any relevance to the

2   entomological evidence in this case, so the State would only

3   object to the photos of that.

4              MR. RYTTING:  May I reply?  It clearly does

5   have relevance to the entomological evidence.

6              THE COURT:  I'll let the exhibits in.

7              Let's proceed.

8              MR. RYTTING:  And the reason why is that it

9·  shows that there was no insect infestation of the vaginal

10  region.

11             THE COURT:  You have to stop talking so she can

12  hand them to me.  Hand them to her.

13             THE COURT REPORTER:  Are they marked?

14             MR. RYTTING:  They are not marked.  May we have

15  them marked as Group Exhibit 1?

16             THE COURT:  Get me an envelope and put these in

17  the envelope and mark these as Group Exhibit 1.

18             MR. RYTTING:  Your Honor, since he's going to

19  be referring to the individual photos, maybe we should have them

20  marked individually rather than a group exhibit.

21             THE COURT:  It's your exhibits.  I don't care.

22        Q.    (BY MR. RYTTING)  Dr. Sanchez, I'd like to show you

23  Exhibit No. 1.  And what is that?

24        A.    This is a photo of the vaginal wall after it was

25  dissected out of the body.

1    Q.    And is there anything -- does this photograph show

2 any sort of insect activity?

3    A.    No.

4    Q.    I show you Defendant's Exhibit No. 2.  And would

5 you identify that?

6    A.    This is a closeup photograph, also of the posterior

7 vaginal wall, including the cervical wall, which is the opening

8 into the cervix, which is into the uterus.

9    Q.    And there's several incisions.  What were those

10 for?

11           MR. BRUMBERGER:  Objection, Your Honor.  Again,

12 this is going into the pathology, not the entomological

13 evidence.

14           THE COURT:  What's your connection?

15           MR. RYTTING:  Well, there was an allegation of

16 vaginal bruising in this case.

17           THE COURT:  We heard all about that at the time

18 of trial.

19           MR. RYTTING:  Yes, Your Honor.  But we have --

20 one of our claims is that this has been retracted from the

21 M.E.'S Office.

22           THE COURT:  What's been retracted?

23           MR. RYTTING:  The diagnosis of vaginal bruising

24 occurring.  Our position is that that was erroneous.  That --

25           THE COURT:  Ask him.

1    Q.    (MR. RYTTING)  And what was the -- what were those

2  incisions to do?

3    A.    This was the incision made with a blade, looking

4  for evidence of bruising in the underlying tissues.

5    Q.    And you've reviewed that evidence, and what is

6  your -- what is your conclusion about what the evidence shows?

7    A.    It is my impression that what we are looking at

8  here is just discoloration, most likely the congestion of

9  vessels.

10    Q.    And --

11          THE COURT:  All right.  Well, Counselor, first

12  of all, we do our examination from counsel table.  Okay?

13          MR. RYTTING:  Yes, Your Honor.

14          I'll have to wait for the exhibits to be marked

15  and then I'll go back.

16          THE COURT:  Do you have any other exhibits

17  besides these?

18          MR. RYTTING:  Yes, Your Honor, we do.  We have,

19  we have an autopsy report, which -- we have an autopsy report

20  which Dr. Sanchez has brought a copy of.

21          THE COURT:  Get all your exhibits marked at the

22  same time so we don't have to waste time.  We'll take a quick

23  break while you do that.

24          (BRIEF RECESS)

25          THE COURT:  Let's continue.

1     Q.     (BY MR. RYTTING)   Dr. Sanchez, I'd like to ask you

2   a couple of questions about the protocol of doing autopsies as a

3   Harris County Medical Examiner.   Are these -- where is the

4   autopsy actually done, what type of room?

5     A.     They're done in what we call an autopsy suite, it's

6   almost like a surgical suite.

7     Q.     And do you have several bodies in there at once

8   when the autopsy is performed?

9     A.     We only have one body per work station.

10     Q.     Is there adequate ventilation, an air conditioning

11   or air system to prevent contamination in the Harris County

12   Medical Examiner's Office?

13     A.     Yes.

14     Q.     You've reviewed the autopsy report of Dr. Carter,

15   have you not?

16     A.     Yes.

17     Q.     Do you have any reason to suspect the integrity of

18   that autopsy report?   Did she follow protocol?

19     A.     She followed protocol.

20     Q.     And was any type of testing done, such as

21   sectioning, in this case?

22     A.     There was no microscopic evaluation done in this

23   case, but there was other analyses that were done, like a

24   toxicology analysis on the fluids.

25     Q.     In particular, I can show you the autopsy report.

1          I'm handing him an exhibit, I believe it's 41,

2   the autopsy report of Melissa Trotter.  Does it reflect that the

3   pancreas was sectioned in this case?

4          A.      Excuse me, counsel, does it reflect what?

5          Q.      That the pancreas was removed and sectioned in this

6   case?

7          A.      Yes.

8                  MR. BRUMBERGER:  I'm going to object to the

9   relevance to the entomological evidence in this case.

10                 THE COURT:  Again, I don't see the relevance.

11                 MR. RYTTING:  I was going to establish, Your

12  Honor, that the autopsy evidence is going to corroborate the

13  entomological, forensic entomological conclusion about when this

14  body was placed in the woods.  It would also rebut the State's

15  repeated argument --

16                 THE COURT:  I'm giving you a wide scope here,

17  so let's tie this up.

18                 MR. RYTTING:  Yes, Your Honor.

19                 MR. BRUMBERGER:  Your Honor, if they're going

20  to be getting into all the pathology that might corroborate the

21  entomological evidence, which is not new evidence and was not

22  raised in the Successor application, the State is unprepared to

23  respond to any of this.

24                 THE COURT:  I agree.  This hearing was supposed

25  to be about the evidence involving entomology and not about the

1  quality of the pathology report or about any kind of

2  inaccuracies of that report.  Now, if it leads to something, I

3  mean, simply, for instance, the deterioration of the body, I

4  mean, if this witness has an opinion about how long that body

5  was exposed to the elements, that might be relevant.

6                    Do you have such an opinion?

7                    THE WITNESS:  Yes.

8                    THE COURT:  What is your opinion?

9                    THE WITNESS:  My opinion is it shows that the

10 body was not in that environment for more than two weeks, in

11 that environment.

12                    THE COURT:  That environment being the outside?

13                    THE WITNESS:  Outside in the forest, yes.

14                    THE COURT:  What is the date of the pathology

15 report?

16                    THE WITNESS:  Well, the autopsy was done on

17 January the 3rd, 1999.  And the autopsy report was signed on

18 January 11th of 1999.

19                    THE COURT:  So the body was found when?

20                    THE WITNESS:  On the 2nd.

21                    THE COURT:  On January the 2nd?

22                    THE WITNESS:  Right.

23                    THE COURT:  So, you're saying the body was

24 definitely exposed for two to three weeks?

25                    THE WITNESS:  Well, my opinion is based on the

1 changes, on the post-mortem changes that we see on the body.

2 That body most likely was not in that forest for more than two

3 weeks. It probably was some place else before that, but not in

4 that forest.

5         THE COURT: Why do you say that?

6         THE WITNESS: Well, I would have expected the

7 changes of decomposition and break down of the body being a lot

8 more advanced than what was observed and documented during

9 autopsy. And again, by decomposition and breaking, again

10 breaking down of the tissue, we look at color changes in the

11 body, the production of gas, gases by bacteria, bloating, skin

12 slippage. Those are the types of changes that we look

13 physically on the body to help us determine the time of death.

14         THE COURT: So, do you have an opinion about

15 the time of death?

16         THE WITNESS: No. I mean, when the death

17 happened, I really don't know. You know, my opinion was -- my

18 opinion is that, based on the evidence that I have reviewed, it

19 is unlikely that the body was there in that field for over 10 to

20 15 days.

21         THE COURT: Okay. Go on.

22     Q. (BY MR. RYTTING) Particularly, the basis of that

23 opinion, if you look at the pancreas, what does it describe?

24     A. You know, the pathologist described the pancreas.

25 It gave the weight of the pancreas and also the description of

1    the morphological features of the pancreas.

2        Q.    And was she able to remove this pancreas for

3    observation and sectioning?

4        A.    Yes.

5        Q.    And in your experience, does the pancreas autolyze

6    virtually completely within a matter of days?

7        A.    Well, it really depends on the circumstances.  But

8    it's one of those, again, organs of the body that tends to

9    autolyze quite rapidly.

10       Q.    In fact, it may, under hostile conditions, autolyze

11   completely within, say, 48 hours?

12       A.    Well, I wouldn't say within 48 hours, but sometimes

13   quite quickly, yeah, within days.

14       Q.    What does it mean for it to be autolyzed?

15       A.    That means it's, it's the breakdown of the tissue

16   due to their own, again, enzymes and chemicals.  It's not due to

17   bacteria.  It's due to the breakdown of those cells that are

18   releasing enzymes that basically break down the tissue.

19       Q.    And once the organ is completely autolyzed, can the

20   pancreas be sectioned and examined for destruction?

21       A.    No.  If it's autolyzed, it's become like liquid,

22   liquefied.

23       Q.    Similarly, the autopsy report refers to the liver.

24   And what does it reflect Dr. Carter did in order to examine the

25   liver?

1     A.     Well, the liver was still there. She was able to

2 identify the liver. She was able to take the liver out of the

3 body and section the liver. And she was able to do an

4 evaluation of the architecture of that organ.

5     Q.     And in your experience, does the liver also

6 autolyze relatively quickly?

7     A.     Yes. I mean, all the organs eventually would break

8 down and will autolyze. The liver usually does not autolyze as

9 quickly as the pancreas or the adrenal glands.

10     Q.     Additionally, Dr. Carter examined the

11 gastrointestinal tract, did she not?

12     A.     Yes, she did.

13     Q.     And was she able to identify the mucosa lining?

14 Was it still present, according to the autopsy?

15     A.     Yes.

16     Q.     What type of tissues is the mucosa?

17     A.     It's the inside lining of those, of the intestine,

18 of the guts.

19     Q.     Is it a fragile tissue?

20     A.     Yes.

21     Q.     And does it also, like the pancreas, autolyze

22 completely within a fairly short period of time when it's

23 exposed, as this body was, in the forest?

24     A.     Yes. Like any other organs, it will break down and

25 autolyze.

1  Q.  If that body had been out in the woods for 25 days

2  in the temperature and conditions that are reflected in the

3  autopsy -- in the entomological report, would you expect that

4  mucosa to be present?

5  MR. BRUMBERGER:  Judge, the State's going to

6  object one last time on relevance, the entomology.  All this

7  pathological information has been available for the applicant to

8  contest at trial, in his initial application.  None of this was

9  raised in the Successor Application.

10  THE COURT:  I agree.  This is covering ground

11  that we've already used.  And you're not making any connection.

12  Make your point.

13  MR. RYTTING:  I'll make the connection with the

14  gastrointestinal tract right now.

15  Q.  (BY MR. RYTTING)  The gastrointestinal tract was

16  intact, was it not?

17  A.  Yes.

18  Q.  There was little to no insect infestation of the

19  gastrointestinal tract either, was there?

20  A.  There was no -- small evidence of the compositional

21  changes.

22  Q.  So, there was no insect activity at all, is that

23  correct, that is reflected by the autopsy?

24  A.  I would have to refer to the autopsy report.

25  No.  There was no evidence of post-mortem

Irene Beaupre, CSR
Official Court Reporter

1    animal activity in the gastrointestinal tract.

2        Q.    And by animal activity, you also would include

3    insects; is that correct?

4        A.    Yes.

5        Q.    And other parasites; is that correct?

6        A.    Yes.

7        Q.    I'll have to show you what's been marked as

8    Defendant's Exhibit 3.    What does that reflect?

9        A.    This is a photograph taken of the autopsy of the

10   back of the body, the lower extremity of the legs after the body

11   was undressed.

12       Q.    And is there evidence of insect activity around

13   the -- well, first of all, does it reflect the genital organs of

14   the victim?

15       A.    It shows the back of the buttocks and the, the

16   perianal region.

17       Q.    And does it reflect any insect activity or

18   infestation, particularly by maggots of these areas?

19       A.    No.    This, even though this is not a closeup, I can

20   only see just skin slippage and discoloration, but not fly

21   activity or maggot activity.

22       Q.    I'd like to show you Defendant's Exhibit No. 14.

23             And what does that depict?

24       A.    This is a photo of the body before the body was

25   undressed and shows the trunk with the chest and abdomen and the

1  front of the legs.

2      Q.    And in what state does it show the clothing,

3  particularly the pants the lower torso is in?

4      A.    Well, the torso is exposed and then the blue jeans

5  are actually, appears to be clean, at least the front of the

6  jeans.

7            MR. RYTTING:  Your Honor, I have no more

8  questions of the Doctor.

9                    CROSS-EXAMINATION

10 BY MR. BRUMBERGER:

11     Q.    Dr. Sanchez, when a body has been outside or

12 inside, regardless, for an extended period, two weeks or longer,

13 does forensic entomology, if it can be applied, tend to give

14 more accurate results than pathological findings as to the

15 actual time of death?

16     A.    Not really.  I mean, it really depends.  In some

17 cases, yes; in other cases, no.  Sometimes you have cases where

18 the animals, they do not have access to the body.  So, in that

19 particular case, then the changes that we see on the body are

20 more relevant and more important to the case when we talk about

21 post-mortem interval, so it really depends.

22     Q.    Okay.  In a case such as this where the body was

23 outside for some period of time, can entomology provide more

24 accurate results than what you can observe pathologically?

25     A.    It could provide -- again, this is another source

1    of information. I don't think it's more accurate, but it's

2    another piece of information that we should evaluate when

3    determining the post-mortem interval.

4         Q.    And you're not saying, based on your observations,

5    that it's impossible for Melissa Trotter to have been murdered

6    on December 8th of 1998, are you?

7         A.    Yes. I'm not saying that.

8               That is possible.

9         Q.    And with regard to the pancreas autolyzing quickly

10   and the liver autolyzing not as quickly, but autolyzing as well,

11   your opinion, as you've expressed, is that this body was

12   certainly out there more than just the 48 hours that counsel was

13   alluding to, correct?

14        A.    Yes. I think it was probably there more than 48

15   hours, yes.

16        Q.    And there were clothes on the body when it was

17   recovered, correct?

18        A.    Yes.

19        Q.    There were pants on, as well as a sweater and

20   underlying clothing that were pulled up on the chest?

21        A.    That's correct.

22        Q.    And that clothing would serve as a preventative

23   barrier to some degree to insects colonizing everywhere on the

24   body, correct?

25        A.    Yes. But not to the head or hands that were

1   exposed. And also, the abdominal area looks like it was exposed

2   also.

3       Q.    And on the exposed areas, there was some maggot

4   activity on some of the exposed areas of the body, was there

5   not?

6       A.    Only on the head, but not on the hands and not on

7   the abdominal region, just on the head area.

8               MR. BRUMBERGER: No further questions, Your

9   Honor.

10             MR. RYTTING: I have no other questions either

11   for this witness, Your Honor.

12             THE COURT: Does the degree of the temperature

13   preserve bodies longer if it's colder?

14             THE WITNESS: Yes. Yes.

15             THE COURT: So this body being discarded in the

16   middle of the winter --

17             THE WITNESS: Right.

18             THE COURT: -- December of the year would mean

19   what to you?

20             THE WITNESS: Well, that depends on the

21   temperature, Your Honor. I mean, if the temperature is low,

22   yes. Low temperatures can delay the process of decomposition.

23             THE COURT: Well, low temperatures would also

24   delay the activity of insects or maggots, so forth?

25             THE WITNESS: Yes. Of some animals, yes.

1          THE COURT:  But, so, what you're telling me is

2    that -- you still have the undigested food that was in the

3    stomach --

4          THE WITNESS:  Yes.

5          THE COURT:  -- purchased on the day of the

6    disappearance.  We still have the body having bruising to the

7    right side of the head.  Isn't that correct?  None of those

8    things are changing in your report?

9          Is there anything changing in your report?

10          THE WITNESS:  No.  I mean, I just -- again,

11    some of the -- I would expect for a body that was outside in the

12    elements --

13          THE COURT:  To have deteriorated a little bit

14    more rapidly?

15          THE WITNESS:  Right.

16          THE COURT:  Except for the fact that it might

17    have been very cold, and therefore, that would explain that.

18          THE WITNESS:  Right.  Except that if there were

19    changes in temperature.  We see sometimes even that that tends

20    to actually accelerate sometimes the decomposition.

21          THE COURT:  Are you saying anything different

22    in your testimony today that differs from Dr. Carter's testimony

23    of several years ago?

24          THE WITNESS:  Well, the fact that, again, I

25    don't think that the body was in that type of environment for

1   more than 10 to 15 days or out, two weeks.  And that the pattern

2   of the decomposition in this case is a little bit unusual.  It's

3   not what we tend to see in most of our cases, especially with

4   the mold that she saw all over her body.

5                   THE COURT:  Okay.

6                   THE WITNESS:  Yes.

7                   THE COURT:  All right.  Thank you, Doctor, for

8   appearing.

9                   MR. BRUMBERGER:  Your Honor, just a few final

10  questions from the State now?

11                  THE COURT:  If I have opened up a door, yes, go

12  right ahead.

13                        RECROSS-EXAMINATION

14  BY MR. BRUMBERGER:

15       Q.    I just want to clarify that the autopsy photos you

16  reviewed, those are photos from the M.E.'S file in this case?

17       A.    Yes.

18       Q.    And there was at least one photo in that file that

19  you were unable to review -- excuse me, one photo admitted in

20  evidence that you did not believe was in that file?

21       A.    That's right, from the posterior vaginal wall,

22  yeah.

23                  MR. BRUMBERGER:  No further questions, Your

24  Honor.

25                  MR. RYTTING:  Your Honor, I have two other

EXHIBIT "C"

| EX PARTE | ) | No. 99-11-06435-CR-2 |
| | ) | IN THE DISTRICT COURT |
| LARRY RAY SWEARINGEN | ) | 9TH JUDICIAL DISTRICT |
| (WR-53,613-04) | ) | MONTGOMERY COUNTY, TEXAS |

## STATEMENT OF LLOYD WHITE, M.D.

My name is Dr. Lloyd White. I am a physician licensed to practice medicine in the State of Texas. I am boarded in pathology and specialize in forensic pathology. I was the Chief Medical Examiner for Nueces County, Texas. I am presently a Deputy Medical Examiner for Tarrant County, Texas. I have conducted many hundreds of autopsies, including numerous autopsies on bodies recovered from Texas woods and fields. I have reviewed many hundreds more autopsy findings. I have testified for the defense and for the prosecution in numerous cases.

I have reviewed the report of the autopsy of the body of Melissa Trotter conducted on January 3, 1999, by then Harris County Medical Examiner, Joye M. Carter, M.D. I have reviewed autopsy and crime scene photos depicting the body of Ms. Trotter. These include photos depicting the body as it was found on January 2, 1999, in the Sam Houston National Forest, and depicting the condition in which it was received at the Harris County Medical Examiner's Office. Autopsy photos show the body after dissection and include photos of some individual organs. I have reviewed daily temperature data gathered for the National Oceanographic and Atmospheric Administration at the Conroe, Texas, airport for the period starting December 8, 1998 and ending January 2, 1999. I have also reviewed Ms. Trotter's Medical Records dated November 23, 1998, and the October 1, 2007, addendum report of Dr. Gerald Larkin, as well as the October 31, 2007 affidavit of Dr. Joye M. Carter regarding autopsy findings in Ms. Trotter's case. The following opinion is based on the foregoing information:

1.      I concur with the conclusions that Dr. Carter reached in her October 31, 2007 re-evaluation of her autopsy findings. As she indicates throughout her affidavit, findings made pursuant to her internal examination of the body support the forensic conclusion that Melissa Trotter's body was left in the woods within fourteen days of the discovery of the body on January 2, 1999, in the Sam Houston National Forest.

2.      I agree, as well, with Dr. Larkin's conclusion that the forensic evidence in this case indicates that the body was in the Sam Houston National Forest for a shorter period than fourteen days. For reasons set forth by Dr. Larkin in his October 1, 2007, addendum, the description of internal organs – the pancreas, liver, spleen, gall bladder and gastro-intestinal tract – indicate that the body was left in the woods at on or about December 23, 1998 at the soonest, and probably left there no sooner than December 27 or 28, 1999.

3. Again, for reasons that Dr. Larkin gives in his October 1, 2007 addendum, the external appearance of the body also supports the conclusion that Ms. Trotter's body was exposed in the wood for several days only, and not for two or three weeks; so does the remarkable fact that Trotter weighed 109 pounds at her doctor's office according to the November 23, 1998 record, while her clothed body weighed 113 pounds at autopsy and the nude weight was 105 pounds.

4. In addition to the written findings Dr. Carter made, autopsy photos of several organs deserve attention.

     a. Attached as exhibit 'A' is the photograph of the spleen Dr. Carter removed during autopsy. The spleen is an organ that contains many vascular spaces. The spleen can contract and enlarge, but is a relatively firm, spongy organ when living. It performs the important physiological function of removing red blood cells that are old or damaged and essentially worn out. After death the spleen autolyzes rapidly.

            The spleen removed from Trotter has been dissected and there is a longitudinal incision through the spleen's capsular surface and into the parenchyma. The capsular surface is smooth and glistening. The edges of the incision are sharp. Autolysis appears to be minimal. The photograph of the spleen has the appearance of splenic tissue taken from a recently deceased individual. The spleen obviously has not liquefied and disintegrated as is typical in individuals who have been dead for several days.

     b. Photographs of Trotter's heart show that the muscle is still red and relatively fresh looking. (See Exhibit B). There are several long incisions and several shorter ones. The edges of the incisions are sharp. Pericardial fat is seen in the upper left part of the photo surrounding the aorta. It is glistening and intact. The pericardium, except for the incisions, is otherwise intact and the surface is smooth and glistening. Again, the appearance of the heart is what one would expect to find upon autopsy of a recently deceased individual.

5. Autopsy photos of internal organs are consistent with the description of organs and the degree of decomposition found in the autopsy report. The photographic evidence strongly supports the conclusion that Ms. Trotter's body was left in the woods at least one week after Mr. Swearingen was incarcerated on December 11, 1998, and probably more than two weeks after.

Lloyd White, M.D., Ph.D.

Before me on this 12th day of December, 2007, appeared Lloyd White, who, being deposed on his oath, stated that the foregoing affidavit testimony was, to the best of his knowledge, true and correct.



Notary Public

My commission expires: _05/24/2008_

SHERRY E. THOMPSON
Notary Public
STATE OF TEXAS
My Comm. Exp. 05/24/2008



OC99-002



OC99-002

EXHIBIT "D"

G M LARKIN MD
3150 SHAMROCK DR
CHARLOTTE NC 28215

Forensic Pathology• Legal Medicine                    704-940-8512• nc15960@yahoo.com

## ADDENDUM TO MEDICAL REPORT

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY          / ss:

EX PARTE LARRY SWEARINGEN

I am a physician licensed to practice medicine in the State of North Carolina. I am board certified in Forensic Medicine by the American Board of Forensic Medicine and a Fellow of the American College of Forensic Examiners. Among my contributions to the field is the chapter on *TIME OF DEATH* in THE *FORENSIC SCIENCES*, edited by Cyril Wecht. I have personally performed in excess of two thousand autopsies, many of which were on bodies that were in various stages of decomposition. I am familiar with post-mortem changes. I have testified in over 100 cases in criminal and civil state and federal courts in five states.

I have reviewed the autopsy report of the body of Melissa Trotter made by Dr. Joye M. Carter (autopsy protocol). I have reviewed trial testimony and some of the photographs in *State v. Swearingen*, no. 00-11-06435-CR, in the 9th District Court, Montgomery County, Texas, including the testimony of Dr. Carter. I have already submitted a report in this matter. I add the following to clear up certain matters.

1) Because Mr. Swearingen was incarcerated on December 11,1998, and has remained in prison thereafter, the following forensic conclusion not only is supportable, it cannot be reasonably questioned: Someone else, not Mr. Swearingen, left the body of Ms. Trotter in the Sam Houston National Forest where it was found on January 2, 1999.

2) December 23, 2007, is the soonest that Trotter's body could have been left in the woods, which is to say 12 days after Mr. Swearingen was incarcerated. Furthermore, it is important to stress that forensic evidence strongly

supports the conclusion that the body in this case was deposited in the Sam Houston National Forest several days after December 23, 1998. Indeed, undisputed forensic evidence, namely, the external appearances and the description of the internal organs and tissues, and photographs of resected organs strongly support a date as late as December 30, 1998, which is to say nineteen days after Mr. Swearingen was incarcerated and three week later than the date the State maintains Trotter's body was left in the Sam Houston National Forest.

3) In arriving at the conclusions in paragraphs 1 and 2, supra, I have considered the weather changes from 9 December 1998 until 2 January 1999, specifically including the interval from 23 December 1998 until 2 January 1999. The temperature table and graph supplying the weather data on which I relied is attached.

4) All pathologic diagnoses are based on the fact that changes in death predictable, cumulative and irreversible. Changes are additive. The colder temperatures between December 21-26, 1998, would temporarily slows decomposition, but would not stop the process, let alone reverse it.

5) Importantly, even if temperature conditions were cooler in the Sam Houston National Forest than at the Conroe airport, e.g., on average five degrees cooler, the forensic evidence would still strongly support the dates of December 23, 1998, as an outer limit, and December 30, 1998, as a very likely date, on which the body was left in the Sam Houston National Forest. A temperature difference of this magnitude, or greater, would not change at all the conclusion to a medical certainty that the body of Trotter was left in the woods after Mr. Swearingen was incarcerated.

6) Dr. Carter's description of specific internal organs is sufficient to establish with certainty that Trotter's body was not left exposed in the woods until well after December 11, 1998, the date Swearingen was incarcerated.

7) If Trotter was killed in the woods or her body left in the woods near the time of death, the pancreas would not have

been present in the condition described by Dr. Carter unless exposure in the Sam Houston Forest occurred <u>after</u> December 28 or December 29, 1998.

8) Pancreatic cells produces digestive enzymes. Upon death, metabolic processes that prevent the enzymes from acting on the pancreas' own tissue cease. Liquefaction of the pancreas to the point it looses internal structure and becomes a sludge incapable of being sectioned consequently may occur within 24 to 48 hours even under hospital or morgue conditions where the environment and temperature are controlled.

9) The condition of Trotter's spleen at autopsy supports the conclusion that Trotter's body was not exposed in the forest until well after Mr. Swearingen was incarcerated. Like the pancreas, the spleen autolyzes relatively rapidly even under hospital and morgue conditions. The autopsy report's description of the spleen, however, fits that of tissue from a recently deceased person. The photograph of Trotter's spleen, attached here as Exhibit 'A', confirms the description; the organ has the appearance of tissue from a recently (3-4 days) deceased person.

10) Dr. Carter's examination of the liver is remarkable evidence that Trotter's body had not been in the woods for more than ten days and in all probability for far less time. The liver is large organ that loses integrity and autolyzes relatively rapidly, forming gas bubbles as it does, which makes it crepitant, a bit like bubble wrap. However, Dr. Carter was able to remove the liver and section it, using essentially the same methods used upon the pancreas. Microscopic examination failed to reveal perforations due to gas bubbles that would have formed relatively soon after exposure under conditions found in the Conroe area in December 1998 and January 1999.

11) Dr. Carter's examination of the gastrointestinal tract strongly confirms the conclusion that Trotter's body was exposed in the Sam Houston National Forest for ten days or less. Dr. Carter found the esophagus "intact". She dissected the stomach, and was able to rinse and examine the gastric mucosa. Dr. Carter also found both the large and small intestines intact and un-perforated. Further,

the mucosal lining of the intestines was still present at autopsy.

12)   Mucosa is a fragile tissue that readily decomposes under temperature conditions such as those reported for the Conroe area in December of 1998 and January of 1999.   The gastric mucosa and intestinal mucosa do not decompose in a living organism due to the protective enzymes that these tissues secret while functioning.   After death, these tissues quickly disintegrate.   In Trotter's case, the conditions in which the mucosa were preserved allowed Dr. Carter to identify them, examine them for pathology, and subject them to mechanical processes such as dissection and rinsing.   It is a medical certainty, that these tissues would not have retained the integrity seen at autopsy unless the body had been left in the Sam Houston National Forest <u>less</u> than ten days prior to the date of recovery.   Indeed, it is very unlikely, that Dr. Carter would have found these tissues in the condition described at autopsy unless the body had only been exposed in the woods for substantially less time – a matter of 3 to 4 day.   A similar conclusion follows from Dr. Carter's description of the mucosal lining of the gall bladder.

13)   Dr Carter found that the breast tissue was "firm and intact."   She was able to remove breast tissue, section it serially and examine it for pathology. The condition of this tissue corroborates conclusions that follow from Dr. Carter's description of internal organs.

14)   Dr. Carter's descriptions of, and photographs depicting the external appearance of, the body also supports the conclusion that Trotter's body was in the Sam Houston National Forest no more than ten days at the very longest. Although Trotters skin did exhibit slippage, it retained much of its natural color with only a small patch of green discoloration visible in photographs.

15)   Furthermore, crime scene reports indicate that the body did not have an odor even though daily high temperatures from December 29, 1998 through January 2, 1999 consistently approached 70 degrees Fahrenheit and average temperatures were near 60°.

15) Dr. Carter's impression was that the organs of the body retained their normal position. Furthermore, Dr. Carter reported that the weight of the body clothed was 113 lbs while the nude body was 105 lbs. Medical records show that approximately two weeks before December 8, 1998, Trotter weighed 109 pounds at her doctor's office. The weights are remarkable in that they demonstrate very insubstantial or no loss in body weight. Even if a corpse is not scavenged – and there was remarkably little scavenging in this case – a body will lose up to 90% of its weight, in less time than 25 days, when exposed under temperature conditions prevailing in the Conroe area between December 8, 1998 and January 2, 1999.

17) Dr. Carter states that the brain was in a "semiliquid" state, and states, further, that "upon removal" there was complete loss of normal tissue architecture. However, the report shows that the brain retained sufficient integrity even upon removal to enable Dr. Carter to make judgments regarding the presence or absence of subdural and subarachnoid hematomas. Dr. Carter was also able to examine the parenchyma and exclude preexisting lesions. Her report indicates, too, that the ventricles were discernable and normal in appearance.

18) Under conditions prevailing in the Conroe area were the body was found, the brain in this case would have completely liquefied in a matter of days. If Trotter's body had been placed in the woods as late as December 23 1998, Dr. Carter would not have been able to remove the brain for examination; it would have been a soup incapable of being examined for lesions or abnormalities. Dr. Carter's description of brain tissue, therefore, strongly confirms that Trotter's body was left in the woods at least two weeks after the date on which Mr. Swearingen was incarcerated.

17) Positive findings by autopsy establish that Trotter's body was not left exposed in the Sam Houston National Forest until December 23, 1998, at the very earliest. Besides positive findings, the absence of expected decompositional changes indicates exposure well after the date on which Mr. Swearingen was incarcerated. Bloating, for example, normally occurs after two or three days. It

distorts breast and genital tissues, causing them to inflate grossly out of proportion. It also causes perforation of the stomach and intestines. However, Trotter's body did not exhibit any of the distorting changes caused by bloating and her gut was intact.

18) In wilderness areas, such as the Sam Houston National Forest, considerably scavenging by birds and mammals take place, but the body from the neck down did not exhibit any insults that could clearly be attributable to animal activity even though crime scene photos show that the body was found with torso exposed, as were the upper extremities, which again, did not exhibit any scavenging at all.

19) The following forensic conclusion is therefore not reasonably debatable amongst competent forensic pathologists: Without question, Mr. Swearingen was **not** the person who left Ms. Trotter's body in the Sam Houston National Forest.

G M Larkin MD      /electronic signature/

G M Larkin  MD
01 October 2007

EXHIBIT "E"

# REPORTER'S RECORD

## NO. WR-53,613-04

### EX PARTE LARRY RAY SWEARINGEN

**ON APPLICATION FOR WRIT OF HABEAS CORPUS
IN CAUSE NO. 99-11-06435 CR
FROM THE 9TH DISTRICT COURT OF MONTGOMERY COUNTY**

A P P E A R A N C E S

ATTORNEY FOR THE STATE OF TEXAS

MARC BRUMBERGER
SBN: 24001800
ASSISTANT DISTRICT ATTORNEYS
207 W. PHILLIPS, 2ND FLOOR
CONROE, TX 77301
936.756.7800

ATTORNEYS FOR DEFENDANT

JAMES RYTTING
SBN: 24002883
PHILIP H. HILDER
SBN: 09620050
819 LOVETT BLVD.
HOUSTON, TX 77006
713.655.9111

BE IT REMEMBERED ON 2ND DAY OF JULY, 2007, the

following proceedings came on to be heard in the above-entitled

and numbered cause before the HONORABLE FRED EDWARDS, Judge

presiding, held in Conroe, Montgomery County, Texas.

Proceedings reported by machine shorthand and

computer-aided transcription.

FILE COPY

# CHRONOLOGICAL INDEX

## APPLICATION FOR WRIT OF HABEAS CORPUS

July 2, 2007 – Morning Session                                    Page

Open court, all parties present, defendant present                  2

Discussion regarding scope of preliminary hearing                   3

Response by Mr. Brumberger                                          6

Defendant's Pro Se Motion to Recuse is withdrawn                    8

| DEFENSE WITNESSES | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|---|---|---|---|---|---|---|
| Dr. Luis Sanchez | 9 | | | | | 15 |
| | 17 | 22 | | | | 24 |
| | | | | 26 | | |
| Dr. James Arends | 27 | | | | | 47 |

Noon recess is taken                                               49

July 2, 2007 – Afternoon Session

Open court, all parties present, defendant present                 49

| DEFENSE WITNESSES | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|---|---|---|---|---|---|---|
| Dr. James Arends – Continues | 49 | | | | | 50 |
| | 52 | | | | 55 | |
| | 63 | | | | | 71 |
| | 72 | 74 | 79 | 80 | | |
| | | | 81 | 83 | | |

## STATE WITNESSES

| | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|---|---|---|---|---|---|---|
| Dr. Jeffrey Tomberlin | 84 | 93 | 110 | 112 | | |

Discussion between the Court and counsel regarding procedures      114

Hearing concluded, court adjourned                                 114

## ALPHABETICAL WITNESS LIST

| Name | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|------|--------|-------|-----------|----------|-----------|--------------|
| **For the Defense** | | | | | | |
| Arends, Dr. James | 27 | | | | | 47 |
| | 49 | | | | | 50 |
| | 52 | | | | 55 | |
| | 63 | | | | | 71 |
| | 72 | 74 | 79 | 80 | | |
| | | | 81 | 83 | | |
| Sanchez, Dr. Luis | 9 | | | | | 15 |
| | 17 | 22 | | | | 24 |
| | | | | 26 | | |
| **For the State** | | | | | | |
| Tomberlin, Dr. Jeffrey | 84 | 93 | 110 | 112 | | |

## LIST OF EXHIBITS

| No. | Description | Offered | Admitted |
|-----|-------------|---------|----------|
| **For the Defense** | | | |
| 1 | Autopsy photo of vaginal wall | 10 | 11 |
| 2 | Autopsy photo of vaginal wall, close-up | 10 | 11 |
| 3 | Autopsy photo, back of body (unclothed) showing buttocks and backs of legs | 10 | 11 |
| 4 | Autopsy photo showing head and upper body | 10 | 11 |
| 5 | Autopsy photo, back view, showing tear in jeans with buttock exposed | 10 | 11 |
| 6 | Autopsy photo | 10 | 11 |
| 7 | Autopsy photo, back of legs, jeans and shoes | 10 | 11 |
| 8 | Autopsy photo, front view of clothing | 10 | 11 |

1  evidentiary matters, actually, that I did not get into evidence.

2              THE COURT:  With this witness?

3              MR. RYTTING:  This would be from this witness.

4              One is the report of Dael Morris, and the other

5  is the report of Jeff Wells.

6              Thank you, Your Honor.  I have no more

7  questions of the Doctor.

8              THE COURT:  Thank you, Doctor.

9              Call your next witness.

10             MR. RYTTING:  I would call Dr. James Arends.

11                  DR. JAMES ARENDS,

12  having been first duly sworn, testified as follows:

13                  DIRECT EXAMINATION

14  BY MR. RYTTING:

15     Q.    Dr. Arends, describe some of your educational

16  background and your present position for the Court.

17     A.    I have a Bachelor's Degree in Biology and Chemistry

18  and a Master's degree in Entomology, a Ph.D in Entomology with a

19  minor focus on Parasitology.  I spent 15 years on the faculty of

20  North Carolina State University where I taught veterinary

21  students second-year parasitology, as well as had graduate

22  students in the College of Ag and Life Sciences.

23             I was responsible for, at NC State, for the

24  development of integrated past management plans for combined

25  livestock operations.  I currently run an international

1  consulting business doing consulting with food animal medicine

2  production, as well as doing new animal drug research for

3  various drug companies.

4      Q.    And in the course of your training, particularly in

5  biology, did you have courses in human or mammalian anatomy?

6      A.    Yes.

7      Q.    And did you have courses and training in the

8  identification and behavior of external as well as internal

9  parasites and organs?

10     A.    Yes.

11     Q.    In order to -- and as part of your training, did

12 you develop an understanding of the process of decomposition of

13 animal and human bodies?

14     A.    Correct.  Yes, we did.

15     Q.    Is the information that you -- well, let me retract

16 that.  You said that you had training as a biologist; is that

17 correct?

18     A.    Correct.

19     Q.    And in fact, entomology is a field of biology.

20     A.    Yes.  It's one of the fields of biology.  My

21 specific training in forensic entomology actually comes out of

22 the fact that my background is entirely working with flies and

23 internal parasites.  And because of the involvement of

24 decomposition with basically large animal medicine, that is

25 where my involvement comes, specifically, with swines because

1  pigs happen to be one of my specialties.

2      Q.    All right.  Pigs, why are they particularly suited

3  for forensics because we're dealing with human remains?

4      A.    Yeah.   They're basically -- the generation of data

5  that's used in forensic entomology is, really comes about from

6  three areas; obviously, review of the cases, of active cases or

7  cases that are closed.  The generation of data, a lot of it

8  comes out of Knoxville, out of which is commonly called the

9  "body farm," which is the Institute of Forensic Anthropology.

10  Max Bass was the director there for many years.

11              And the third area, obviously, is from detailed

12  research that is conducted by universities.  And in most cases,

13  pigs are actually used as the cadaver.  Pigs and people have a

14  great deal in common from a physiology perspective.  So, they

15  are actually used as a model to study the succession of

16  decomposition, arthropods and insects that come to a particular

17  body in various weather environments, buried, half-buried, so on

18  and so forth.

19      Q.    Have you, yourself, done field work involving swine

20  and the rates of decomposition and the invasion of bodies by

21  insects?

22      A.    Yes.   I have trained the State Bureau of

23  Investigation personnel in North Carolina.  And as part of that

24  training, we do use pigs as an example, you know, as part of the

25  lab, if you will, the field lab to help orient crime scene

1   investigators in terms of, you know, what things look like, how

2   long does this really take, what's important in this scene,

3   what's not important in this scene.

4        Q.      Amongst the data that is important to drawing a

5   forensic entomological conclusion is, shall we say, ecosystem or

6   environmental data; is that correct?

7        A.      That is correct.

8        Q.      That would include the biology of the area, the

9   fauna and flora that is found in the area where, say, a body is

10  deposited; is that correct?

11       A.      Absolutely.

12       Q.      And as well as the type of scavengers, the

13  scavenger population --

14       A.      Absolutely.

15       Q.      -- in the area?

16               You've testified before in other cases, have

17  you not?

18       A.      Yes.

19       Q.      Have you testified for the prosecution as well as

20  for the defense?

21       A.      The primary supply of testifying is actually for

22  the prosecution.  This is actually only the second case that

23  I've ever worked for a defense.

24       Q.      What information have you reviewed in preparing for

25  your testimony in this case?

1    A.    I have had an opportunity to review the autopsy
2  results, the autopsy report, the crime scene videotape.  I have
3  reviewed the summary information put together by Dael Morris, as
4  well as the DNA extraction and arthropod identification done by
5  Dr. Jeff Wells.  I have also taken a look at all the weather
6  information, temperatures, daily highs and lows in or near as
7  close as one could get with the recording station to where the
8  body was found.

9    Q.    Have you reviewed information from, I believe it's
10 called the Texas Extension Service?

11   A.    Yes.  One of the requests I made was to Texas A & M
12 for their records on flies that had been sent in, specifically
13 blow flies, that had been sent in for identification.  Texas
14 A & M, being an Ag school, much like North Carolina State is, we
15 run a fairly -- each of these schools runs a fairly significant
16 outreach program, which provides an opportunity for residents of
17 the State, if they have a fly or have something they want to
18 identify, they can send it in, and it would be identified.  And
19 of course, there are records kept of those identifications.

20   Q.    Have you -- you've also reviewed, I think, the
21 crime scene photographs and the crime scene video in this case?

22   A.    Correct.

23   Q.    And you've reviewed as well the autopsy photos?

24   A.    Correct.

25   Q.    I would like to show you Defendant's Exhibit No.

1   10.   Will you identify what that is?

2       A.     It's one of the crime scene or autopsy photographs

3   of the head of the victim.

4       Q.     Is that the head of the victim in this case,

5   Melissa Trotter?

6       A.     Yes.

7       Q.     What does that picture show, as far as insect

8   activity?

9       A.     It shows some activity around the head.   There's

10  some, beginning of some skeletization, as well as other

11  decomposition taking place in the head area.

12      Q.     And is there a uniform pattern of decomposition in

13  this case?   Or how would you describe it?

14              THE COURT:   I don't believe this man's

15  qualified as a pathologist to be giving any kind of statement,

16  Counsel, or to answer that kind of question.

17              MR. RYTTING:   Your Honor, I think he's

18  specifically qualified to ask if there's a pattern of

19  decomposition, if the decomposition is the result of insect

20  activity.   It's his specialty.

21              THE COURT:   Then limit your question to that.

22  That wasn't what your question was.   You asked him to give a

23  pathological, forensic analysis of some sort.   I mean, let's

24  limit it to what his field of study is.

25      Q.     (BY MR. RYTTING)   Is there an even or uneven

1   distribution of insect activity reflected in that photograph?

2       A.      The insect activity in this photograph, as well as

3   some of the others that I've reviewed, is typical in terms of

4   insects or opportunists.  A body, whether it's human or

5   otherwise, only provides nourishment and a place for limited and

6   complete reproduction.  So the level or the location is strictly

7   an opportunity to the insect.  So there is no general order of

8   things, if you will.  It's wherever they happen to lay their

9   eggs first, and if that was the warmest and everything worked

10  out the way they would like to, that's where you would find the

11  largest amount of maggot activity, and therefore, the largest

12  amount of damage, skeletization, if you will.

13      Q.      And where do the flies ordinarily oviposit in the

14  head and neck area?

15      A.      Well, depending upon -- obviously, depending upon

16  which species of flies we're talking about.  We have some flies

17  that are strongly attracted to blood, for example.  So, if there

18  were a wound on the body and there's lots of blood, we would

19  expect a certain species to attack that first, in terms of

20  laying their eggs.  Outside of those kinds of issues, these

21  flies are going to be attracted to the, to the easiest orifices

22  on the body.  And those would include the mouth, the nares.  The

23  nose is usually one of the first places that the flies will

24  attack to lay eggs.  The eyes, obviously, are fairly easy for

25  them to get to.  And the other two places that, if they are

1  available, would be the anus, and in females, the vaginal area

2  as well.

3      Q.    Is there any indication in this case -- well, let

4  me put it differently.  Is there any indication that the -- in

5  your view, that the pattern of insect activity reflected in that

6  photograph could be explained by a bruise or a blow to the

7  head?

8      A.    To my knowledge, unless there is blood spilled

9  someplace, there really is no significant attraction.  A bruise

10  is not enough attraction, unless of course, there is some blood

11  leakage, then that would change things dramatically.  So, a

12  bruise, per se, is not going to be a more attractive

13  ovipositional site for a female fly than say, an open mouth or

14  nares or, you know, things draining from the nose, so on and so

15  forth.

16      Q.    In fact, have you ever heard of a diagnosis on an

17  incident of a bruise, based on insect activity such as the one

18  you see in this case?

19      A.    You mean the bruise being a contributory factor for

20  oviposition?

21      Q.    Yes.

22      A.    No.  That's not -- I've not run into that in the

23  50-plus cases that I've worked on.

24      Q.    I would like to show you -- I'm showing you

25  Defendant's Exhibit, what's been marked Defendant's Exhibit 46.

1          Would you check and see the number?

2     A.     16.

3     Q.     16.  Sorry.  What does that depict?

4     A.     It's the right lateral view, basically of the upper

5  chest and head of the, of the victim.

6     Q.     And does it reflect an insult or injury to the neck

7  region?

8     A.     Yes.  There definitely is some discoloration around

9  the neck.  In this particular photograph, I'm not able to -- I

10 was not able to see any large amount of fly activity or any

11 larval activity at all.  The only fly larval activity that was

12 easily viewed in these photographs were in the maxillary areas,

13 in the jaws and the head, itself.

14    Q.     What, in your experience, would account for an

15 injury or an insult like that?

16    A.     I'm sorry.  I don't specifically --

17    Q.     Was this the product of scavenging of some sort, in

18 your opinion?

19    A.     In my opinion?  It would be -- you're talking about

20 the neck injury?

21    Q.     Yes.

22    A.     No, that does not -- that does not appear to me to

23 be as part of animal scavenging that I would normally see if I

24 were evaluating a crime scene.

25    Q.     It's at least not reflected in that photograph; is

1    that correct?

2         A.    No.   That's correct.

3         Q.    In the photograph, it shows, I believe, a bra; is

4    that correct?

5         A.    Correct.

6         Q.    Does it show any sort of bleeding or blood stains

7    on that?

8         A.    No.   I did not -- I did not see any -- in the

9    photographs that I looked at, I did not see any wounds, or there

10   was no blood stain indicated.   And if my recollection is

11   correct, in the autopsy report, there were none mentioned in it

12   either.

13        Q.    So, in your opinion, would this injury, this insult

14   be a post-mortem injury?

15        A.    I am really not qualified to make that, to make

16   that determination.

17        Q.    Okay.   I'm handing you what's marked as Defendant's

18   Exhibit No. 5, as well as Defendant's Exhibit No. 22 and

19   Defendant's Exhibit No. 19.   What are those photographs of?

20        A.    Each of these photographs is a sequence of the

21   victim, backside up, showing a fairly significant tear of the

22   right side of the blue jeans and with fairly significant

23   exposure of the buttocks of the victim.

24        Q.    You say it showed a significant tear of the blue

25   jeans?

Irene Beaupre, CSR
Official Court Reporter

1    A.    Correct.

2    Q.    And underneath, you see a red panty?

3    A.    Correct.

4    Q.    And this was basically of the thong variety?

5    A.    Yes.  That's how it was described in the report,

6    correct.

7    Q.    Earlier you said that flies were attracted to anal

8    and vaginal openings; is that correct?

9    A.    That is correct.

10    Q.    Would this -- would the clothing that's, in the

11    state that it appeared in the photograph, be a barrier to fly

12    colonization of the anal and vaginal regions?

13    A.    Not in my opinion.  The blue jeans are fairly

14    loose-fitting.  Flies are fairly adept to getting to a place

15    that is in fact an attractive ovipositional area.  If -- I would

16    not think that these would have been much of a barrier at all,

17    particularly with the way the body was laying, which is in kind

18    of a slightly elevated status, if I remember correctly from the

19    report.  It was on some bushes, and so on and so forth, in the

20    field.

21    Q.    And if a body has been put out or laid out in the

22    woods, as the State surmised, for 25 days under conditions

23    present here, would you see bloating?

24    A.    I'm sorry?

25    Q.    Would you see bloating?

Irene Beaupre, CSR
Official Court Reporter

1    A.    I would have expected to see bloating, particularly

2  after reviewing the temperature differentials, which ranged from

3  rather warm to rather cold, and then warm again.  There was a

4  fairly significant fluctuation of temperatures over the time

5  period that was described.

6    Q.    What is bloating?

7    A.    Bloating is just simply the gases that are produced

8  by the decomposition.  In particular the gut area, you know, we

9  have a lot of bacteria.  We have a lot of digestive activity

10  going on there.  So, it does continue for some time after death.

11  And once the bacteria take over, then, of course, we then see

12  bloating and extension due to the gas function.

13    Q.    And the temperature data that you've observed

14  reflects that, I believe, on December 19th, temperatures got up

15  to at least 79 degrees in the Conroe area.

16    A.    Yes.

17    Q.    And then again, on the date of, I believe around

18  the 17th or the 18th, these -- the temperatures were up into

19  the -- up into the 70s; is that correct?

20    A.    Yes.  I believe that is correct.

21         It should be in the report.

22    Q.    Would you like to review the report?

23         THE COURT:  Which report are you referring to?

24         MR. RYTTING:  I will hand the witness

25  Defendant's Exhibit No. 46, which is the entomological report of

Irene Beaupre, CSR
Official Court Reporter

1  Dael Morris and it contains temperature data.

2        THE WITNESS:  Yes.  There's a period of time

3  from the 19th, 20th, 21st and 22nd of December when highs were

4  75 degrees Fahrenheit or above.  Then another period of time in

5  late December when we had 65, 62, 70 degrees, 62, 73 degrees on

6  the, on January 1st.

7        Q.    (BY MR. RYTTING)  In your experience, particularly

8  with big carcases, as a forensic entomologist investigating

9  cases of homicide, are those temperatures where virtually

10  invariably you would see bloating?

11        A.    Yeah.  With those kinds of temperatures and with

12  the length of time that we're talking about, one would have

13  expected to see more distension in the body than we saw in this

14  particular case.

15        Q.    I'm showing you Defendant's Exhibit 28 and

16  Defendant's Exhibit 29.  What do those -- what are those?

17        A.    Exhibit 28 is a left-handed view of the victim,

18  clothed.  Exhibit 29 is the posterior view at autopsy, showing

19  minor skin slippage, but no distension, no bloating.  And no

20  insect activity either of the -- in and around the buttocks

21  area.

22        Q.    What happens when bloating occurs to the contents

23  of the intestines?

24        A.    Well, normally as gas -- as bloating takes place

25  and the gas expansion, if you have -- if you have an active

1   infestation of blow flies, between the bloating and the blow

2   flies working on the carcass, if you will, normally you will

3   have a breakage of the skin. And so, at that point in time, the

4   abdominal cavity is totally exposed to the elements. Normally,

5   once bloating begins as well, if a body has been outside very

6   long, particularly in an area where there are any predators,

7   scavenging becomes very important and becomes very important

8   very fast. Much like the insects and anything that it is

9   looking for, it's looking for something to eat. A body left

10  outside, they're going to be scavenging those, those -- any

11  remains pretty actively and really pretty fast.

12      Q.    Getting back to the bloating, does bloating also

13  result in a discharge from a --

14      A.    Absolutely. And that's one of the other things in

15  this particular case that is rather interesting, in the Medical

16  Examiner's report is that there was no anal discharge.

17  Normally, upon death, within a few short, anywhere from hours to

18  a couple of days, one would expect at least some --

19          THE COURT: Again, why are we discussing this

20  outside of his expertise? This man is not a pathologist, and

21  he's rendering opinions left and right on matters on which you

22  have not qualified him on. Now, stick to the program. Okay?

23          MR. RYTTING: Yes, Your Honor.

24      Q.    (BY MR. RYTTING) Are flies attracted to the anal

25  discharge?

1    A.    Exactly.  Once -- normally, when a body relaxes, we

2  get a discharge of feces, as well as some discharge from the

3  vaginal areas.  Those are very attractive to flies.  One of the

4  reasons why, that's one of the entry points, and one of the

5  things that one would expect in a reasonably short amount of

6  time.

7    Q.    In this case, though, there was no fly activity

8  around the entry points.

9    A.    It was not reported in the Medical Examiner's, and

10  I did not observe it on the photographs that I was provided to

11  look at.

12    Q.    Furthermore, if the body had bloated, you said it

13  distends, sometimes as in the case of carcasses, it becomes, in

14  your studies, becomes even perhaps twice the size; is that

15  correct?

16    A.    That would also be correct.

17    Q.    Would that, in this case, distort the place -- you

18  would expect that to distort the placement of clothing and

19  perhaps even cause ruptures and rips in the clothing; is that

20  correct?

21    A.    That is correct.  And also, openings in the skin

22  where we would expect to see perhaps secondary colonization by

23  flies.

24    Q.    And none of that happened in this case?

25    A.    That was not indicated by the -- by any of the

1 photographs, nor was it indicated by the autopsy report.

2     Q.    In your opinion, as a forensic entomologist,

3 Dr. Arends, what would this say about the exposure of the body

4 in the forest?

5     A.    I think there are several things that I would look

6 at if I was evaluating this crime scene.  The first thing,

7 obviously, would be the rather pristine nature of the body, with

8 the exception of the head or the head capsule, where we did have

9 some significant larval activity.  The fact that there was no

10 larval activity really found in the, in either the anal or the

11 vaginal areas and the fact that the body seemed to be very

12 well-preserved.  And if I could draw on my own personal

13 experiences from being in the State of Texas a fair amount,

14 things usually left lying about in woods in the State of Texas

15 don't last very long because of the enormous amount of creatures

16 that are looking for something to eat.

17     My evaluation of this body would be that it

18 probably had not been in that environment for more than a few

19 days, five, maybe slightly longer.  That would surprise me just

20 because of the predator activity that I would have expected to

21 be around.  But certainly, from the entomological evidence,

22 doesn't indicate to me that it was out there more than that

23 length -- more than that length of time in this environment.

24     Q.    Part of your work when you do your forensic

25 examinations and make your forensic conclusions, do you

1    regularly consider the mammalian and avian scavenger populations

2    in a -- at the crime scene?

3         A.    Yes, absolutely.  Because they -- the scavenger

4    populations can actually destroy a great amount of the

5    entomological evidence prior to the time that we could actually

6    obtain it.  For example, areas where flies are quite active

7    generally are areas that may have openings in them.  If there

8    was a gunshot wound or some sort of bodily damage, if you will,

9    those are areas that are very attractive to carnivores to feed

10   on.  Of course, they will consume everything that is in the way.

11   So, yes, we always are interested in what kind of, other kind of

12   predators and other kind of decomposition could interfere with

13   the information that we're trying to obtain.

14        Q.    And have you obtained some information about the

15   scavenger population in the Sam Houston National Forest?

16        A.    Yeah.  In looking at what the National Forest

17   Service publishes in terms of what the forest is, they expect to

18   see populations very typical of East Texas:  Vultures, crows

19   from the bird perspective, as well as coyotes, and evidently a

20   fairly significant population of wild pigs, which is pretty much

21   all over Texas.

22        Q.    As a -- would you expect a body left in the woods

23   for 20 days or more to be disturbed by scavenging activity?

24             MR. BRUMBERGER:  Objection, Your Honor, as to

25   this witness' qualifications to discuss all these other

Irene Beaupre, CSR
Official Court Reporter

1  different types of animals outside of insects.

2                THE COURT:  Sustained.

3                MR. RYTTING:  Your Honor, I'll reply that --

4                THE COURT:  I sustained the objection.

5                MR. RYTTING:  I understand, Your Honor, but

6  he's a biologist, and he explained that he -- that as part of

7  his, as his work as an entomologist, that these types of -- this

8  type of information is important to making his forensic

9  conclusions.  And it's regularly done.

10                THE COURT:  Were you at the crime scene?

11                THE WITNESS:  No, sir.

12                THE COURT:  Sustained.

13       Q.    (BY MR. RYTTING)  I'd like to show you what has

14  been marked as Exhibit No. 42.  What is that?

15       A.    It's the videotape of the crime scene in the

16  investigation that took place, and it's dated 1-2-98 (sic).

17       Q.    Did you review that?

18       A.    Yes, I did.

19                MR. RYTTING:  Your Honor, I'd like to play it.

20                THE COURT:  I've seen it.

21                MR. RYTTING:  It will assist his testimony if

22  he's able to --

23                THE COURT:  Well --

24                MR. RYTTING:  -- view the crime scene.

25                THE COURT:  We have some other -- approach the

1 | Bench.

2 | (AT THE BENCH, ON THE RECORD)

3 | MR. BRUMBERGER: Your Honor, the State

4 | recognizes that a lot of these exhibits have been played and the

5 | State accepts them all as valid evidence. So, in terms of the

6 | Court or the witness already having seen it, I don't know that

7 | there is a need to go through it all.

8 | THE COURT: If you haven't noticed, there are

9 | family members present in the courtroom. This is fairly graphic

10 | film. Is this absolutely necessary for your testimony?

11 | MR. RYTTING: I'll try to do it without

12 | referring -- without playing the crime scene.

13 | MR. BRUMBERGER: The State would have no

14 | problem with him referencing what he saw in there without all of

15 | us sitting and viewing it.

16 | THE COURT: Let's do it that way.

17 | Is that okay?

18 | MR. RYTTING: Yes, Your Honor.

19 | (BENCH CONFERENCE ENDS, OPEN COURT)

20 | Q. (BY MR. RYTTING) According to the crime scene

21 | video that you just referred to, Defendant's Exhibit 42, was the

22 | body of Melissa Trotter exposed in an open area?

23 | A. Yeah, reasonably open. I think -- if I recall

24 | correctly, the footage was shot around the 2:00 o'clock time.

25 | The body was in, at that point in time, what appeared to be

1   significant sunlight at that point in time.

2       Q.      And why is that important?

3       A.      One of the reasons that's important is because

4   during the wintertime when we have temperatures fluctuating, the

5   warming up, if a body is exposed into sunlight, it warms up the

6   surface, obviously more than just to the temperature of the sun,

7   which can make it more attractive for oviposition from the

8   female fly's perspective.  Also, it could speed up the activity

9   of the development of the flies as they get started before they

10  get a very large maggot mass going, where they would produce

11  their own temperature.

12      Q.      And furthermore, was this accessible to other

13  scavengers -- the body accessible to other scavengers?

14      A.      As I recall the crime scene, the body was basically

15  placed out in the very typical East Texas, you know, pine

16  forest, not a tremendous amount of understorage.  So it was

17  pretty much out there, kind of in the wide open with not a lot

18  of protection.  I don't recall seeing specifically the exact

19  orientation of the body in terms of, you know, what level of

20  sunlight, so on, so forth, it might have had all day long.  But

21  it was not in a hilly area.  It wasn't stuck in a cave or

22  anything like that, so...

23      Q.      And would it be visible from the air?

24      A.      I'm sorry?

25      Q.      Given the amount of sunlight that you saw on the

1  body, did that indicate it was -- would have been visible, at

2  least at some point, from the air, the body, by, say, avian

3  means?

4      MR. BRUMBERGER:  Objection, relevance.

5      THE WITNESS:  I just can't answer that.

6      MR. BRUMBERGER:  Objection as to relevance to

7  this witness' particular specialty.

8      THE COURT:  He's already stated he doesn't

9  know.

10      All your assumptions, you're basing this upon

11  photographs and Ms. Morris' report; is that correct?

12      THE WITNESS:  DNA evidence, crime scene video,

13  crime scene photographs.

14      THE COURT:  And all that centers around when

15  did it get warm enough for the larvae to form; isn't that

16  correct?

17      THE WITNESS:  It would actually center upon

18  when was it warm enough for oviposition to take place.  And then

19  the next question is, what is actually there, why is it there.

20      THE COURT:  So, if it didn't get warm enough

21  until the 18th or 19th of December for this to occur, then Ms.

22  Morris' report is correct.  I mean, you're basing your opinion

23  upon her report that I thought says specifically that the

24  weather did not occur -- was not above 12 degrees Centigrade

25  until the 14th or 18th of December.  Isn't that correct?

1           THE WITNESS:  The 14th on this chart, she has

2  here.

3           THE COURT:  Yeah.  Correct or not?

4           THE WITNESS:  Yes.  That's what the report

5  says.

6           MR. RYTTING:  I didn't hear that.  Your Honor,

7  I didn't hear the answer or the preceding question clearly.

8           THE COURT:  He said that December 14th is the

9  earliest that the weather was warm enough for the -- what is the

10  correct word for it?

11          THE WITNESS:  The oviposition.  The data that

12  Dael had put in here, she had it 12 degrees or whatever.  And it

13  was 62 degrees on the 14th.  It was in the 40s prior to that.

14          I'm just looking at her data.

15          MR. RYTTING:  At her data.

16          May I approach and take a look at that data?

17          THE COURT:  You may.

18          Do you intend on calling Ms. Morris as a

19  witness?

20          MR. RYTTING:  I don't intend on calling

21  Ms. Morris as a witness.  We worked that out earlier, Judge,

22  when we talked about the expenses to the Court.

23          THE COURT:  Is this the only other witness that

24  you have?

25          MR. RYTTING:  Yes.  I believe I'll be

1  finished with this witness. And this is my entomological

2  expert, yes, Your Honor.

3              THE COURT: And how many witnesses do you have?

4              MR. BRUMBERGER: Just one, Your Honor.

5              THE COURT: Let's take a brief recess. And

6  let's adjourn until 1:00 o'clock, a very brief lunch. Okay.

7                    (LUNCH RECESS)

8              JULY 2ND, 2007 - AFTERNOON SESSION

9              (OPEN COURT, ALL PARTIES PRESENT, DEFENDANT

10             PRESENT)

11             WITNESS DR. JAMES ARENDS IS ON THE STAND

12                 DIRECT EXAMINATION (CONTINUING)

13 BY MR. RYTTING:

14     Q.     Dr. Arends, do you have the temperature data before

15 you?

16     A.     No, I believe you have it.

17     Q.     Dr. Arends -- I'm handing the witness Defendant's

18 Exhibit No. 46. Dr. Arends, would you look at the temperature

19 on December 8th, particularly the high temperature?

20     A.     The high temperature was reported as 79 that day.

21     Q.     And would there be -- is 79 a temperature at which

22 flies, blow flies, especially those commonly found in the Sam

23 Houston National Forest, for them to oviposit?

24     A.     Yes.  That would be more than warm enough for them

25 to oviposit.

1    Q.    In fact, they would be, at that temperature, highly

2  active; is that correct?

3    A.    Yes, that's correct, they would be active.

4    Q.    Was there any evidence that there was -- that

5  you've reviewed that indicated that the fly population may have

6  been called robust or increasing at this time?

7    A.    I'm sorry?

8    Q.    Was there any evidence that you reviewed that

9  showed the fly population would have been at least normal or

10  above normal at this time?

11    A.    The month prior to December was reported as being

12  warmer than average for East Texas.  These temperatures, while

13  fluctuating, stayed kind of right at the minimums of fly

14  activity after December 8th.  Once again, depending upon

15  sunlight on the body, sunlight on the flies, so on and so forth,

16  how close they might have been in the vicinity, certainly be

17  warm enough to possibly at least see some oviposition.

18                THE COURT:  What about the time of day?

19                THE WITNESS:  I'm sorry, Judge?

20                THE COURT:  What about the time of day?

21                THE WITNESS:  The time of day depends upon the

22  species.  Most species do not oviposit at night, although we do

23  have some that are pretty close to that.  The other thing is

24  that a fly's view of daylight and dawn or dusk, if you will, is

25  different than ours.  They actually work under much lower, or

1 can oviposit in lower light conditions than what we would see.

2         THE COURT: So, if the body was deposited at

3 night on December the 8th or early on December the 9th, would

4 that make a difference?

5         THE WITNESS: In terms of first oviposition?

6         THE COURT: Yes.

7         THE WITNESS: It could, yes.

8         THE COURT: Temperature being lower?

9         THE WITNESS: The temperature was -- it was

10 reported as a low of 48 on the 9th, which would have been early

11 morning.

12         THE COURT: Of course, these temperatures are

13 not accurate temperatures at the scene.

14         THE WITNESS: Absolutely.

15         THE COURT: You know, the only way to really

16 know what the temperature was was to have been there, right?

17         THE WITNESS: No. That's absolutely correct.

18 You don't know what the temperature actually was. It could have

19 been four or five degrees warmer or it could have been four or

20 five degrees colder. There's absolutely no way to know that.

21         THE COURT: So, the temperature is somewhat

22 speculative to say that it was actually 79 degrees at the place

23 where this body was located.

24         THE WITNESS: No. All we can do is use the

25 average air temperature of the closest reporting system.

1          THE COURT:  Which is the Montgomery County

2  Airport, right?

3          THE WITNESS:  I do not know.  I'm not familiar.

4          THE COURT:  Well, I think that's what the

5  report said.

6          THE WITNESS:  Well, if that's what the report

7  says, yes, I assume that is correct.

8          THE COURT:  All right.  Go on.

9      Q.    (BY MR. RYTTING)  When you read the Morris report,

10 you'll notice that there was a statistical comparison done.

11 What is that?

12     A.    I'm sorry, I don't understand.

13     Q.    That in coming up with her estimates, Ms. Morris

14 conducted what she called, I think a stepwise statistical

15 comparison of temperatures?

16     A.    Right.  She used a stepwise analysis, and basically

17 using the -- including some commonalities, if you will, maggot

18 mass temperature and so on and so forth.  She, based upon what

19 was identified with what was left over from the autopsy, she

20 backed up into a period of time when oviposition could have

21 first taken place.  Which, by the way, is a very common thing

22 that we, that we would do when we're trying to get a specific

23 point in time when first oviposition took place because that

24 then helps point to when the body may have been presented.

25     Q.    And we see, too, that in the, in the video, that

1  the body was exposed to the sunlight; is that correct?

2      A.    Correct.

3      Q.    So, what is the threshold for activity that is

4  generally accepted for flies?

5      A.    Normally for these flies to be active and oviposit,

6  we're looking at a temperature somewhere above 60 degrees.  And

7  then the higher it gets above 60 degrees, obviously, the more

8  activity one might expect.

9      Q.    What are the types of flies that are normally found

10 in the Sam Houston National Forest, that you would expect in the

11 Sam Houston National Forest?

12     A.    Well, the flies that I would have expected to see

13 in a body like this that was exposed for this length of time

14 would have been some of the more common flies that we see

15 outside, which would have been secondary screw worm, which is

16 Cochliomyia.  I would have expected to see some Phormia species,

17 some Phaenicia species.  These are both the green and blue

18 bottle flies, is the common name.  But these are very common,

19 carrion flies.  And those are the ones that one would expect to

20 see in nature, because they're normally some of the first ones

21 to a body or to a dead animal that could present itself for

22 oviposition.

23     Q.    You're aware that a DNA analysis was done on

24 samples in this case to identify flies; is that correct?

25     A.    That is correct.

1     Q.    And were any of these common species found?

2     A.    No.  The DNA analysis only identified two species

3 of flies, and none of the three that I mentioned, which were the

4 most common species of flies.  Certainly, I would have expected

5 to see some of those.  The report that I read indicated that

6 there were hundreds of maggots collected in various places, I

7 don't know the number that was, actually.  I think there were 17

8 or 18 sent in for identification.

9     Q.    Right.  So, it's highly unusual, given the samples,

10 not to have the more common blow flies.  Would you agree?

11     A.    Yes.  In my opinion, that would be -- that would be

12 very unusual.

13     Q.    And what did show up, pursuant to the analysis?

14     A.    There were two species of flies, C. Cadaverina,

15 which is one of the blow flies that is forensically important.

16 It's more of a northern species.  It's certainly found in Texas.

17 In my experience, while I've seen the fly, I have never seen it

18 in a forensic case.  It's not a fly that I'm very familiar with

19 because it's just, has never shown up in any of the cases that I

20 have worked up.  Once again, my experience has been mostly from

21 North Carolina, south, or Virginia, south in terms of working on

22 these cases.

23          The other fly that was identified was a

24 Hydrotaea, which is another more, what I would call a

25 cosmopolitan fly.  These are flies that are a little more

1  prevalent around places where humans are found.  Hydrotaea in

2  particular is sometimes called a -- it's usually around manures

3  or feces or garbage of some sort.  It tends to be a little more

4  common in those particular areas.  So, both of these two flies

5  indicate that the body may have, may have been more

6  cosmopolitanally located than out in the forest, or I would have

7  expected to see these other common flies.

8            MR. BRUMBERGER:  Your Honor, before we go any

9  further, the State would like to take this witness on voir dire

10  under Rule 705(b) concerning this area and the underlying facts

11  he's testifying to and the data concerning the species he's

12  talking about.

13            THE COURT:  All right.  You may.

14                 VOIR DIRE EXAMINATION

15  BY MR. BRUMBERGER:

16      Q.    You've already testified that you're basing this

17  on, everything here on Dael Morris' report, correct?

18      A.    Yeah, the identification of flies?

19      Q.    Yes.

20      A.    Yes.  That is the only information I have.  I've

21  not looked at any specimens nor done any identifications, so

22  strictly, it would be on Jeff Wells' DNA.

23            MR. BRUMBERGER:  What exhibit number is that?

24            MR. RYTTING:  No. 47.

25            MR. BRUMBERGER:  May I approach, Your Honor?

1           THE COURT:  You may.

2           Q.    (BY MR. BRUMBERGER)  This is Defendant's Exhibit

3    47, the DNA report.  Can you find anywhere in there where he

4    identified that second species you're referring to by DNA?

5           A.    The reference I was making to it was on this final

6    page, several common carrion species in the family of Muscidae.

7    One of these species, Hydrotaea Dentipes fits the general

8    appearance of this specimen, so -- I should say fits the general

9    appearance of.

10          Q.    So, it's physical characteristics that he's basing

11   it on, not any DNA findings.

12          A.    I think he was basing it on the general, the

13   general nature of the DNA, but not specific.

14          Q.    I'm going to read you a statement from that report

15   that you just looked at to see if this changes your opinion.  He

16   states:  "Therefore, I cannot identify these specimens based on

17   haplotype data, although I am confident that they are not

18   members of the forenscially important fly family Calliphoridae

19   or Sarcophagidae."

20                So, again, I'll show you this one more time, if

21   you would like.

22                MR. BRUMBERGER:  May I approach, Your Honor?

23                THE WITNESS:  No.  This is the Muscoid fly.

24   That would not be -- the Muscoid, Hydrotaea is a Muscoid fly,

25   and normally, most of the Muscoid flies are not considered

1 forensically important flies. That is a correct statement.

2     Q.    (BY MR. BRUMBERGER) I would just like to clarify

3 with you. They could not produce DNA results, as I understand

4 it, on that other fly species?

5     A.    No, he could not produce a true match.

6     Q.    Okay. That's all I wanted to clarify.

7     A.    No. What he had is his suspicions, based upon the

8 evidence that he had that that's what it is.

9          To be very honest with you, I trust Jeff Wells

10 on this much more than I would trust me trying to do this.

11     Q.    So, the primary species we're dealing with here is

12 Cynomyopsis Cadaverina; is that correct?

13     A.    That's the only one that was -- that was identified

14 by the DNA, that is correct.

15     Q.    Okay. And that is what Dael Morris based her

16 report on, that species?

17     A.    That is the only species that is in that report,

18 that is correct.

19     Q.    And you said that you did review the data she

20 worked with?

21     A.    The data in terms of?

22     Q.    In terms of the temperature data, the forensic

23 resources she cites in her report.

24     A.    Temperature data, correct.

25     Q.    Then you were familiar with her, I assume, having

1  cited this reference, it's the 1986 Edition of the *Manual of*

2  *Forensic Entomology* by Kenneth Smith?

3       A.    Correct.

4       Q.    And you think this was a reasonable reference for

5  her to rely on in her research in this case?

6       A.    I think it's one of more general broad references.

7  If you would like another copy, I have one in my luggage.

8       Q.    No, that is alright.  But is it a reliable

9  authority dealing with forensic entomology?

10      A.    I think it is one reference and it is reliable in

11 many cases.  One of the things one has to continually keep track

12 of is things do change.  We have new research all the time, and

13 so, there are -- obviously new information that comes up on

14 various species of flies from time to time.

15      Q.    Okay.  How about some more recent references

16 available, *The Forensic Entomology Utility of Arthropods in*

17 *Legal Investigations* by Jason Byrd and James Castner.  Are you

18 familiar with this?

19      A.    I'm familiar with it.

20      Q.    Is it a reliable authority in the field?

21      A.    Once again, it is one of the authorities in the

22 field.

23      Q.    Another one:  *Entomology and Death, a Procedural*

24 *Guide.*  Are you familiar with this?

25      A.    Very much so.

1     Q.    Is this a reliable authority -- one of the reliable

2 authorities in the field?

3     A.    It's one of the basic manuals written by Ted

4 Adkins, and certainly is one of the first hands-on, how-to

5 books, if you will.

6     Q.    Are these resources that you use yourself in

7 various cases?

8     A.    Those are resources that I also rely on, as well as

9 literature.

10     Q.    Did you happen to review any of these in this

11 case?

12     A.    I certainly consulted Smith, and of course, Ted's

13 book because I have it.

14     Q.    And in your second statement that you submitted in

15 this case -- you've submitted two, correct?

16     A.    That's correct.

17     Q.    In the second you reference, and I'll just quote:

18 "There is a succession of parasitical activity with certain

19 species colonizing corpses after others."

20               Is that accurate?

21     A.    That is a true statement.

22     Q.    Okay.  As far as that progression goes, there are

23 some insects that are attracted to fresh corpses, correct?

24     A.    That's correct.

25     Q.    And others that are not attracted until further

1  decomposition sets in, correct?

2      A.    That's also correct.

3      Q.    And with those that are attracted to fresh bodies,

4  are those typically referred to as first colonizers?

5      A.    Normally, that is true.

6      Q.    And those that would seek out a body after

7  decomposition has gotten further along are sometimes called late

8  colonizers?

9              MR. RYTTING:  I'm going to object, Your Honor.

10  I think that's going way beyond the purpose of voir dire, of

11  voir dire, which is to examine the underlying --

12              THE COURT:  I think you're outside of voir

13  dire.  Okay.

14              MR. BRUMBERGER:  Well, I'm going to connect it

15  in one second, Your Honor.

16              THE COURT:  You've got your one second.

17              MR. BRUMBERGER:  Okay.

18      Q..   (BY MR. BRUMBERGER)  Okay.  So, is it fair to say

19  that your opinion in this case has been based on the belief that

20  Cynomyopsis Cadaverina is a first colonizer?

21      A.    No.

22      Q.    Well, if it is not a first colonizer, how does the

23  calculation of the 18th matter?  If it's -- if the body would

24  have been decomposed for some time in the woods at that point,

25  why is the date of the 18th even relevant to determining time of

1  death?

2      A.    It's a good question.  Was the body in the -- I

3  thought the -- or was the body really in the woods from the 8th

4  on?

5      Q.    Well, my question is, Dael Morris did determine

6  that it was the 18th that the colonization took place,

7  correct?

8      A.    That was her opinion, based upon the facts that she

9  was given.

10      Q.    Did you disagree with that opinion?

11      A.    Yes.

12      Q.    Do you believe it was later or earlier?

13          The oviposition?

14      A.    I do not -- in my opinion, I do not believe it is

15  reasonable to expect that species of flies oviposited on that

16  body in the woods.

17      Q.    Okay.  So, your primary concern is whether the fly

18  would be in the woods or not?

19      A.    Correct.  Because obviously, the fly on the body

20  had to be in the same place at some point in time.  And one of

21  the things in this particular scientific use of --

22      Q.    Well, you've answered my question.

23      A.    Okay.

24      MR. BRUMBERGER:  May I approach, Your Honor?

25      THE COURT:  Yes, you may approach.

1          MR. RYTTING:  Your Honor, I'm going to object.

2   This has gone way beyond the purpose of voir dire, Rule 702,

3   he's now taking the witness on cross-examination.

4          THE COURT:  I've been giving you a lot of

5   leeway.  I'll let him have a little bit as well.  Go ahead.

6          MR. BRUMBERGER:  And Your Honor, I'm merely

7   establishing whether the parameters of this fly are being

8   accurately represented by the expert.

9          May I approach, Judge?

10         THE COURT:  You may.

11     Q.    (BY MR. BRUMBERGER)  This is one of these manuals

12  we've looked at, *Forensic Entomology* by Berg and Castner.

13         Do you see this entry here for this species

14  that we're dealing with, Cynomyopsis Cadaverina?

15     A.    Yes.

16     Q.    The second paragraph, the second sentence, tell me

17  if I'm reading this correctly or just correct me if I don't read

18  it correctly:  "They are most abundant during the spring and

19  fall months; and during the winter, the adults may enter houses

20  in large numbers."

21         Did I read that correctly?

22     A.    Uh-huh.

23     Q.    It does not say that they only live indoors, it

24  says they may enter houses?

25     A.    That's correct.

1    Q.    Okay.  And the last sentence in that section says:

2    "The larvae are typically found on carrion during the advanced

3    stages of decomposition; and the adults are not usually

4    attracted to fresh remains."  Is that correct?

5    A.    That is how it's reported in the literature.

6    Q.    And do you disagree with that literature?

7    A.    In some respects, yes.

8    Q.    Do you have a resource you can cite to that says

9    otherwise about C. Cadaverina?

10    A.    The --

11    Q.    I'm just asking if you have a resource you can cite

12    to.

13    A.    No, not offhand.

14         THE COURT:  All right.  Let's go back to direct

15    examination now.

16         DIRECT EXAMINATION (CONTINUING)

17    BY MR. RYTTING:

18    Q.    Dr. Arends, do you consider the presence of C.

19    Cadaverina to be anomalous in this case under the assumption

20    that that body was in the woods for 25 days; is that correct?

21    A.    I consider the appearance of this particular

22    species of fly in this case to be unusual for several reasons.

23    Number one is, I've not previously had an opportunity to see it

24    in very many cases.  Number two is its reported distribution,

25    both within the State of Texas, meaning its commonality;

1   secondly, based upon work by a graduate student in Florida which

2   had placed cadavers out into the woods over an entire period of

3   a year.  And this particular fly species did not show up a

4   single time in her research.  And that research would have been

5   at a very similar climate and in a very similar latitude or a

6   very similar area to what we're talking about here.  So, it

7   would seem to me that it would be rather unusual that this would

8   be the singular fly species that, you know, that is found.

9        Q.      In your opinion, what is important about the -- one

10  of the things that is crucial about the entomological evidence

11  is the absence of flies that you've identified before, the

12  common flies, or the blow flies that are common in the Sam

13  Houston National Forest; is that correct?

14       A.      If you have presented me with a theory that this

15  body was placed into the -- into the Forest on or about December

16  8th and we absolutely see none of these other flies present at

17  any point in time, you only see a singular fly, yes, I would

18  have problems with that.  I just don't think that's reasonable

19  to expect.

20       Q.      And there's been questions raised about -- getting

21  back to the temperatures, there's been questions raised about

22  whether the temperatures from December the 9th, certainly

23  through the 14th or to the 13th, actually, were warm enough at

24  any point for fly oviposition, correct?

25       A.      That's correct.

1     Q.     You observed the crime scene video, did you not?

2     A.     Correct.

3     Q.     Which it was taken on January, I believe January

4 the 2nd?

5     A.     Correct.

6     Q.     That's what it says.  The temperature there ranged

7 from a very cool 34 to 62; is that correct?

8     A.     That's what it says here.

9     Q.     And the -- and it may have been, even been cooler

10 in the woods, correct?

11     A.     I don't know.

12     Q.     In that video, did you see fly activity?

13     A.     Yeah.  Actually, we did see a blow fly flying

14 through the video.

15     Q.     And did you see -- it actually alighted on the

16 body?

17     A.     Which they were disturbed as they were working

18 around the body.

19     Q.     That would indicate that there was an opportunity

20 for -- that the flies were active in the Sam Houston Forest in

21 that micro-environment where the sun was on the body and had

22 temperatures that are at and even perhaps a little below 62

23 degrees; is that correct?

24     A.     At least in this one case, there was one fly that

25 was active.  That's all I can remark to you.

1    Q.    What other evidence -- when you make your forensic

2    conclusions, do you rely on other evidence to exclude hypotheses

3    besides the arthropological data or blow fly data?

4    A.    Yeah.    Absolutely.    I mean, we try to -- you try to

5    take in the entire picture, if you will, of the scene that

6    you're evaluating, in terms of looking at the temperatures,

7    looking at what does that really mean, looking at the

8    information given to me by the crime scene people in terms of

9    where the body was placed, how is the body placed, did they

10   think the body had been moved, did they think there's something

11   else.    I mean, all of those things have to calculate into what

12   you're really looking at, so your attempt is to ask the correct

13   question so that you might in fact get the correct answer.

14   Q.    And was your review of the autopsy report, did the

15   review of the autopsy report help you arrive at your forensic

16   conclusion which -- certain hypotheses are excluded?

17   A.    Yes.    My concern when I reviewed the autopsy

18   report, because of the -- and reviewed those photographs, my

19   concern was that, as I looked at those, at the sizes of those

20   organs normally, because we do -- I do extract things from

21   inside bodies and so I do spend a little bit of time there, is

22   that I did not think that there was enough decomposition or

23   anywhere near enough decomposition in that body to indicate that

24   it had been outside for that long.    So, that began to raise the

25   question about, well, what are other possible scenarios that

1  could possibly answer why this --

2             MR. BRUMBERGER:  Objection, narrative.

3             THE WITNESS:   -- why they are not there.

4             THE COURT:  Q and A, please.

5       Q.    (BY MR. RYTTING)  Were you able to -- so you viewed

6  the weights of the organs?

7       A.    Correct.

8       Q.    And they were within a, within 30 percent, you

9  calculated, of normal weight?

10      A.    I relied on a consultation with a forensic

11 pathologist, that is their bailiwick.  I just said, how close

12 are these to normal, and that's what they indicated to me,

13 yes.

14      Q.    And you also reviewed data about the weight of the

15 victim, have you not?

16      A.    Correct.

17      Q.    And I'll show you what's been marked as Exhibits

18 45, 44 and 43.  What are those?  What do those exhibits reflect

19 the weight of the victim was?

20      A.    Exhibit 45 dated 7-10-98, shows the weight at 109.

21 Exhibit 44 dated 7-22-98 shows the weight at 111.  Exhibit 43,

22 dated 11-23-98 shows the weight at 109.

23      Q.    And do you recall what the weight was given by the

24 autopsy?

25      A.    I don't recall that.

1    It was in the report.

2    Q.    I show you Defendant's Exhibit 41, external

3  appearance.

4    A.    It is an actual weight of 113 with clothes on.

5    Q.    And what was the weight of the nude body?

6    A.    105.

7    Q.    And a weight of 109 on November 23rd, the victim --

8  November 23rd, 1998 reasonably represents what, in your

9  opinion?

10    MR. BRUMBERGER:  Your Honor, the State's going

11  to object to the qualifications of this expert as to these kinds

12  of detailed medical findings as opposed to general observations.

13    THE COURT:  Sustained.  He's not a pathologist.

14    MR. RYTTING:  I would like to make an objection

15  for the Record.  And I'd also like to make a proffer by question

16  and answer, or alternatively, qualify the expert to make these

17  observations.  I take issue with the claim these are specialized

18  medical observations.  May I qualify him?

19    THE COURT:  You're going to try to qualify this

20  person as a pathologist?

21    MR. RYTTING:  I'm going to try to qualify him

22  as having the expertise to make forensic conclusions, based on

23  his experience and training as a biologist and as an

24  entomologist about the significance of dehydration and

25  hydrolysis in this case.

1          MR. BRUMBERGER:  The State is not objecting to

2    the witness' testimony concerning the significance of it, the

3    State's objecting to whether he has any basis for saying X

4    percentage of deterioration should occur over X period of time.

5          THE COURT:  Well, I don't really think he's

6    gotten to that question yet, but I'll allow him to see if he can

7    prove him up.

8          Q.    (BY MR. RYTTING)  You stated earlier that part of

9    your training was as a biologist; is that correct?

10         A.    Correct.

11         Q.    And you've also studied human anatomy; is that

12   correct?

13         A.    That is correct.

14         Q.    And part of your training as an entomologist is the

15   studies of pigs; is that correct?

16         A.    Correct.

17         Q.    That have been exposed to the environment.  And in

18   order to -- and for purposes of collecting flies for

19   assessing the rate of decomposition; is that correct?

20         A.    That's correct.

21         Q.    And in your experience, you've been able to see the

22   rates of decomposition when conducting these studies with

23   animals and human subjects; is that correct?

24         A.    Correct.

25         Q.    And have you testified about this on other

1 occasions about the deterioration and loss of body mass in other

2 cases?

3     A.    Correct.

4             MR. RYTTING: Your Honor, I think that, given

5 this is a basic matter of addition and subtraction of weights

6 and then a comment on the significance over time of the

7 evidence, he's well qualified, both by training and experience

8 to make an assessment as a forensic entomologist about what this

9 means.

10             MR. BRUMBERGER: The State won't object, Your

11 Honor.

12             THE COURT: I agree. Sustained.

13             Leave it in his area of his expertise, please.

14             MR. RYTTING: I would like to make a proffer of

15 what he would testify to, Your Honor.

16             THE COURT: You may do so.

17             MR. RYTTING: I'd like to do it by question and

18 answer.

19             MR. BRUMBERGER: Just for the Record, Your

20 Honor, the State did not object to him going ahead and

21 testifying to this. So, if Your Honor disagrees, Your Honor

22 disagrees.

23             THE COURT: Well, I mean, I think that you're

24 trying to get this guy to give an opinion about the unique

25 notion of the decomposition of the body and his opinion about

1  how long the body was out there.  Now, what part of his training

2  would give him the ability to do that?

3              MR. RYTTING:  I believe I've explained, Your

4  Honor, he's trained as a biologist.  He's a forensic scientist.

5              THE COURT:  Being a biologist doesn't mean that

6  you work with -- go ahead and ask the question.  Obviously, you

7  already have my opinion about its value.

8              Go ahead and ask the question.

9              MR. RYTTING:  Maybe I can clear it up.

10     Q.     (BY MR. RYTTING)  Would you please, Dr. Arends,

11  state what training qualifies you to make this type of

12  assessment?

13     A.     I think the rate of decomposition of a body,

14  whether it's human or something else, the impact that the

15  insects have on it is certainly all tied together.  And

16  obviously, one of the things that I would be interested in is I

17  would, given an overall view of a case like this, is the stage

18  the body was in when it was found.

19              THE COURT:  Did you see the body?

20              THE WITNESS:  Only the photographs.

21              THE COURT:  So your entire opinion is being

22  based upon the photographs?

23              THE WITNESS:  The photographs.

24              THE COURT:  You didn't see it, didn't touch it,

25  didn't smell it, didn't do any of that?

1          THE WITNESS:  No, sir.

2          THE COURT:  All right.

3     Q.    (BY MR. RYTTING)  So, just for the -- I guess if I

4  may make a proffer as to what the situation is here, Your Honor?

5          THE COURT:  It's your witness.  Ask your

6  question.

7          MR. RYTTING:  Certainly.

8     Q.    (BY MR. RYTTING)  So, given the body weight of 109

9  on November 23rd, 1998, which would be roughly 15 days before

10  disappearance, is that a reasonable estimate of what her body,

11  what her body weight would have been on the date of

12  disappearance?

13     A.    I would assume, yes.  I would assume that it would

14  have been.

15     Q.    And on the date that she was recovered, she had

16  lost only four pounds, basically, is what this evidence

17  indicates, of body fluids, loss of tissue mass, dehydration and

18  hydrolysis over this period, over that period; is that

19  correct?

20     A.    That's what the weight said, yes.

21     Q.    If the State's theory was correct and that body had

22  been in the woods for 25 days, is that consistent at all with

23  the State saying that the body was in the woods for 25 days?

24     A.    No.  I think that's the -- that's the only

25  important part about the differences in those weights, it is

1　another factor, along with, in my opinion, the species of fly

2　that was found, is another factor that would tend to lead me to

3　think that the body was not in the woods anywhere near that

4　length of time.

5　　　Q.　And getting back to the period between December the

6　8th and December 13th when allegations -- when questions have

7　been raised about the ability of the fly to oviposit, is there

8　evidence that, other evidence that you rely on as a forensic

9　entomologist that would exclude the possibility of that body

10　being in the woods for that period of time?

11　　　　　Specifically, the pathological findings that

12　you've heard from Dr. Sanchez and you reviewed by the autopsy

13　report.

14　　　A.　No.　I would just rely on the Medical Examiner's

15　issuance of what those organs looked like, what did they find.

16　Did they find everything?　What was missing?　Was everything

17　there?　And that is his area of expertise, and that's what I

18　would rely on.

19　　　Q.　　And he indicated that, you'll recollect, that the

20　body was not, from December 8th to December 15th, if you recall

21　his testimony?

22　　　　　Let me rephrase the question.

23　　　　　To sum up, what is your opinion about how long

24　this body was in the woods?

25　　　A.　In my opinion?

1    Q.    Yes.

2    A.    I do not think this body was in the woods probably

3 more than a week.

4    Q.    And what is that based upon?

5    A.    That's based upon the fact of the general nature of

6 the decomposition, the lack of not only primary colonizing

7 flies, but also of some secondary insects that may or may not

8 appear, if you want to know a body is in there, would have been

9 exposed outside for that length of time.  And the third thing

10 that it would be based on is the fact that my experience with,

11 with any kind of body outside that long, we, in general, would

12 have expected to see more degradation, especially one that is

13 not buried, it's not partially buried, it's just laying out

14 there.

15            MR. RYTTING:  I'll pass the witness.

16            CROSS-EXAMINATION

17 BY MR. BRUMBERGER:

18    Q.    Just to get back very briefly of the specifics of

19 this species, the original text that I showed you a portion of

20 it a few minutes ago does indicate that Cynomyopsis Cadaverina

21 is not a first colonizer, correct?

22    A.    That's what the text says.

23    Q.    And it also indicated that going into homes or

24 going into buildings is a seasonal trait, but it does not state

25 that it is its primary habitat, does it?

1    A.    No.    That is correct.    But it is most often
2  reported in the fall, if you will look at the reports.    And
3  interestingly enough, it's one that is most common --

4    Q.    You've answered my question, sir.    Thank you.

5    A.    Okay.

6                MR. BRUMBERGER:    If I may approach, Your Honor,
7  with the text that Dael Morris cited to in this report?

8                THE COURT:    You may.

9    Q.    (BY MR. BRUMBERGER)    Again, this is the manual
10  *Forensic Entomology* by Kenneth Smith that you said you were
11  familiar with?

12                It does say here that:    "The larvae are
13  normally found in carrion in an advanced state of decomposition,
14  and a number of cases of myiasis in man and animals has been
15  reported."    Is that correct?

16    A.    That's what it says.

17    Q.    So, this one would also indicate it's not a first
18  colonizer, later decomposition has usually set in?

19    A.    That's what those -- that's what those indicate.
20  It's also a fly that has not been studied a lot.    And I'll be
21  honest with you, I'm not that familiar with it, so...

22    Q.    Okay.    Just one other portion I'll read here.    It
23  says in the very last sentence:    "In early spring and late
24  autumn, in the warmer parts of its range, the adults of this
25  species may enter houses in considerable numbers."

1    A.    Correct.

2    Q.    So again, not primarily living indoors, it just has

3  a habit of going indoors?

4    A.    Indoor habitats, yes.

5    Q.    You testified a moment ago that you believe not

6  more than a week would have passed from the point of

7  colonization to the point the body was autopsied?

8    A.    No, that's not what I said.

9    Q.    Okay.  I must have misunderstood you.

10        Approximately how long do you think passed?

11    A.    They asked me the question:  How long did I think

12  the body had been in the woods.

13    Q.    Okay.  And you believe it had been no more than a

14  week?

15    A.    Yes.

16    Q.    So, you do not disagree with Dael Morris' finding

17  that colonization took place on the 18th, do you?

18    A.    Not necessarily.

19    Q.    You testified that you would have expected to see

20  other species on the body?

21    A.    If it had been in the woods in fact the entire

22  time.

23    Q.    And you mentioned Cochliomyia, Phaenicia as

24  families that you would expect?

25    A.    Phormia, Phaenicia, Cochliomyia.

1     Q.    Now, there were hundreds of unpreserved maggot

2 specimens in this case; correct?

3     A.    I only can talk about the few that got sent to

4 Wells.

5     Q.    Well, you read Dael Morris' report, have you not?

6     A.    Yes.  That's what she said, there were hundreds of

7 pieces.

8     Q.    Okay.  She said specimens, did she not?

9     A.    Yes.

10    Q.    Okay.  And of those hundreds of specimens, only how

11 many were submitted for DNA analysis?

12    A.    I don't have it in front of me.  All I have is

13 temperature data.

14           MR. BRUMBERGER:  May I approach, Your Honor?

15    Q.    (BY MR. BRUMERGER)  This is Defendant's Exhibit 47,

16 correct, the DNA Analysis?

17    A.    Seventeen.

18    Q.    Okay.  And how many of those were successfully

19 identified, if you would look that over?

20    A.    It says, based upon his work, he said he had nine

21 positive DNAs.

22    Q.    Okay.  And three of those were for Cadaverina,

23 correct?

24    A.    I think that is exactly what that says.

25    Q.    So, out of hundreds of specimens, only three were

1    specifically identified as this species?

2        A.    Yes, sir.

3        Q.    And you cannot say that the species that you

4    thought would be present weren't there, can you?  There are

5    hundreds of specimens that were never specifically identified.

6        A.    Not every one was identified, so, no, not with one

7    hundred percent certainty.

8        Q.    Do you belong to the North American Forensic

9    Entomological Association?

10       A.    No.

11       Q.    Or any other forensic entomological associations?

12       A.    No, I do not.

13       Q.    In your original written statement that you

14   submitted in this case, you had claimed that Dael Morris had not

15   found any other insect specimens other than Cadaverina; is that

16   correct?

17       A.    If you have it in front of you, that was written

18   while I was on the road, so I didn't have a lot to work with.

19   So, I'm sure you're correct, if you're reading from it.

20       Q.    So, in fact, at this point, you acknowledge that

21   her report did reference other specimens, both fly specimens and

22   ants and beetles?

23       A.    Yes.

24            MR. BRUMBERGER:  The State will pass the

25   witness, Your Honor.

1   THE COURT:  Redirect?

2   REDIRECT EXAMINATION

3  BY MR. RYTTING:

4   Q.   Are the DNA fingerprints, as it were, for the blow

5  flies that are common to the Sam Houston National Forest

6  established or well known?

7   A.   I think that the most common species that the DNA

8  imprints have been very well done:  the Phormias, the

9  Phaenicias, the Chrysomyas, the Cochliomyias, yes.

10   Q.   So, one explanation for the misidentification -- or

11  not misidentification, for the failure to identify or the

12  inability of Dr. Wells to identify species out of the sample

13  that he received, is that those species that are partial DNA and

14  those species may have been poorly studied or their DNA not

15  carefully worked out; is that correct?

16   A.   The --

17   Q.   Or their DNA sequence -- is actually not worked

18  out; is that correct?

19   A.   In terms of, are you talking about unknown

20  specimens, or are you talking about the medically important or

21  the forensically important findings?

22   Q.   One explanation for why there was hundreds of

23  specimens that weren't, that out of the hundreds of specimens,

24  many weren't identified is, that at the moment, there may not be

25  a DNA footprint for those species?

Irene Beaupre, CSR
Official Court Reporter

1     A.    Absolutely.  That could have been -- that could

2 have been part of it, or they were in pieces and there wasn't

3 enough physical material to even render for an analysis.  I

4 don't know.

5               MR. RYTTING:  I'll pass the witness.

6               MR. BRUMBERGER:  A few questions, Your Honor.

7                     RECROSS-EXAMINATION

8 BY MR. BRUMBERGER:

9     Q.    Just to clarify, only 17 of the hundreds of

10 specimens were actually submitted for DNA analysis, correct?

11     A.    That is what is in her report; yes, sir.

12     Q.    And you indicated that you could agree with Dael

13 Morris' finding of December 18th of 1998 as the date of

14 colonization?

15     A.    Under the right scenario, yes.

16     Q.    And if we accept that scenario, that it was on

17 December 18th, because C. Cadaverina, according to some texts --

18 and you could not cite any contrary authority -- because it

19 would be a later colonizer, that would indicate the body would

20 have had to have been decomposed already by December 18th for C.

21 Cadaverina to become active on it; is that correct?  Accepting

22 that December 18th is the colonization date?

23     A.    If you accept that date.

24     Q.    Then the body would have had to have been already

25 somewhat decomposed at that time for C. Cadaverina, according to

1  these texts at least?

2       A.     According to those texts, that would be correct.

3              MR. BRUMBERGER:  No further questions, Your

4  Honor.

5              THE COURT:  All right.  You're excused.

6              Thank you for appearing.

7              MR. RYTTING:  Pardon me, Your Honor, I'd like

8  to ask a couple more questions.

9              THE COURT:  It's direct, cross, redirect and

10 recross normally, and it's over with, but I'll allow you some

11 latitude here.

12             MR. RYTTING:  Thank you, Your Honor.

13             FURTHER REDIRECT EXAMINATION

14 BY MR RYTTING:

15      Q.     Counsel prefaced his remarks about the date of the

16 18th with the claim that "if you accept," and you said if you

17 accept certain conditions, then maybe the 18th is a plausible

18 date.  Are there -- are there conditions that definitely, that

19 you think definitely make the 18th not a qualified date in this

20 case?

21      A.     If the body was in the woods, I do not think the

22 18th is a plausible date.

23      Q.     What were those?  Why is that?

24      A.     Pardon me?

25      Q.     What again were those conditions that lead you to

1    exclude the 18th as being a plausible date?

2        A.    If the body was in the woods?

3        Q.    Yes.

4        A.    Because of the fact that the only place that there

5    was significant decomposition of this body was in the head and

6    head capsule.  And for it -- if we -- if we accept the fact that

7    this fly that we're discussing is only active when we have

8    significant levels of decomposition already taking place, this

9    is the only fly that we have.  And this is the only part of the

10   body that has any significant parts of decomposition.  That

11   seems really rather difficult to believe that only the head

12   would decompose when the entire body was laying in the woods the

13   entire time.

14       Q.    And reasonable minds -- so there is a discrepancy

15   between the rates that -- decomposition that you see?

16       A.    From one end of this body to the other,

17   absolutely.

18       Q.    What does that indicate?

19       A.    To me?

20       Q.    Yes.

21       A.    It indicates to me that this body was stored

22   someplace cold.  And the head got warm, or the head increased in

23   temperature, and at that point in time, did in fact begin to

24   decompose.  And once it did, the odors attracted this particular

25   fly, as well as some of the other flies that were there.  And

1  that's why we only see fly activity in this body at that point

2  in time.  And at some point in time, this body was in -- at some

3  later point in time, then transported to where it was eventually

4  discovered out in the Sam Houston Forest.

5           MR. RYTTING:  Pass the witness.

6           MR. BRUMBERGER:  May I have re-recross?

7           THE COURT:  Briefly.

8           MR. BRUMBERGER:  Just on what he's just

9  testified to.

10          FURTHER RECROSS-EXAMINATION

11 BY MR. BRUMBERGER:

12     Q.     So, your testimony is that you believe, in order

13 for the body to have been in the Forest on the 18th to be

14 colonized, that the body had to have been in some kind of

15 refrigeration prior to that?

16     A.     I didn't say the body was at the 18th.  You asked

17 me specifically, did I think that the flies, that the body could

18 have been colonized on the 18th.  I said under a certain

19 scenario, possibly.

20     Q.     So, under the scenario you just presented where

21 you're saying the body was cold and only the head line had been

22 exposed at first, you're suggesting this body was refrigerated

23 in some manner?

24     A.     I would suggest frozen.

25     Q.     Frozen.

1          MR. BRUMBERGER:  No further questions, Your

2    Honor.

3          THE COURT:  All right.  You're excused now.

4          Call your next witness.

5          MR. RYTTING:  Your Honor, that concludes our

6    witnesses in this case.

7          THE COURT:  All right.

8          What says the State?

9          MR. BRUMBERGER:  The State would call Jeffrey

10   Tomberlin.

11                    DR. JEFFERY TOMBERLIN,

12   having been first duly sworn, testified as follows:

13                    DIRECT EXAMINATION

14   BY MR. BRUMBERGER:

15        Q.   Dr. Tomberlin, how are you currently employed?

16        A.   I'm an Assistant Professor in the Department of

17   Entomology at Texas A & M University.

18        Q.   And you currently office at the Texas A & M's main

19   campus; is that correct?

20        A.   I do.

21        Q.   Do you specialize in any particular areas of

22   entomology?

23        A.   I do.  Forensic Entomology and Livestock

24   Entomology.

25        Q.   What particular study or training have you received

EXHIBIT "E.1"

# REPORTER'S RECORD

## NO. WR-53,613-04

### EX PARTE LARRY RAY SWEARINGEN

**ON APPLICATION FOR WRIT OF HABEAS CORPUS
IN CAUSE NO. 99-11-06435 CR
FROM THE 9TH DISTRICT COURT OF MONTGOMERY COUNTY**

A P P E A R A N C E S

ATTORNEY FOR THE STATE OF TEXAS

MARC BRUMBERGER
SBN: 24001800
ASSISTANT DISTRICT ATTORNEYS
207 W. PHILLIPS, 2ND FLOOR
CONROE, TX 77301
936.756.7800

ATTORNEYS FOR DEFENDANT

JAMES RYTTING
SBN: 24002883
PHILIP H. HILDER
SBN: 09620050
819 LOVETT BLVD.
HOUSTON, TX 77006
713.655.9111

        BE IT REMEMBERED ON 2ND DAY OF JULY, 2007, the

following proceedings came on to be heard in the above-entitled

and numbered cause before the HONORABLE FRED EDWARDS, Judge

presiding, held in Conroe, Montgomery County, Texas.

        Proceedings reported by machine shorthand and

computer-aided transcription.

Irene Beaupre, CSR
Official Court Reporter



CHRONOLOGICAL INDEX

APPLICATION FOR WRIT OF HABEAS CORPUS

| July 2, 2007 – Morning Session | Page |
|---|---|
| Open court, all parties present, defendant present | 2 |
| Discussion regarding scope of preliminary hearing | 3 |
| Response by Mr. Brumberger | 6 |
| Defendant's Pro Se Motion to Recuse is withdrawn | 8 |

| DEFENSE WITNESSES | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|---|---|---|---|---|---|---|
| Dr. Luis Sanchez | 9 | | | | | 15 |
| | 17 | 22 | | | | 24 |
| | | | | 26 | | |
| Dr. James Arends | 27 | | | | | 47 |

| Noon recess is taken | 49 |
|---|---|

July 2, 2007 – Afternoon Session

| Open court, all parties present, defendant present | 49 |
|---|---|

| DEFENSE WITNESSES | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|---|---|---|---|---|---|---|
| Dr. James Arends – Continues | 49 | | | | | 50 |
| | 52 | | | | 55 | |
| | 63 | | | | | 71 |
| | 72 | 74 | 79 | 80 | | |
| | | | 81 | 83 | | |

STATE WITNESSES

| Dr. Jeffrey Tomberlin | 84 | 93 | 110 | 112 | | |
|---|---|---|---|---|---|---|

| Discussion between the Court and counsel regarding procedures | 114 |
|---|---|
| Hearing concluded, court adjourned | 114 |

## ALPHABETICAL WITNESS LIST

| Name | Direct | Cross | Re-Direct | Re-Cross | Voir Dire | By the Court |
|------|--------|-------|-----------|----------|-----------|--------------|
| **For the Defense** | | | | | | |
| Arends, Dr. James | 27 | | | | | 47 |
| | 49 | | | | | 50 |
| | 52 | | | | 55 | |
| | 63 | | | | | 71 |
| | 72 | 74 | 79 | 80 | | |
| | | | 81 | 83 | | |
| Sanchez, Dr. Luis | 9 | | | | | 15 |
| | 17 | 22 | | | | 24 |
| | | | | 26 | | |
| **For the State** | | | | | | |
| Tomberlin, Dr. Jeffrey | 84 | 93 | 110 | 112 | | |

## LIST OF EXHIBITS

| No. | Description | Offered | Admitted |
|-----|-------------|---------|----------|
| **For the Defense** | | | |
| 1 | Autopsy photo of vaginal wall | 10 | 11 |
| 2 | Autopsy photo of vaginal wall, close-up | 10 | 11 |
| 3 | Autopsy photo, back of body (unclothed) showing buttocks and backs of legs | 10 | 11 |
| 4 | Autopsy photo showing head and upper body | 10 | 11 |
| 5 | Autopsy photo, back view, showing tear in jeans with buttock exposed | 10 | 11 |
| 6 | Autopsy photo | 10 | 11 |
| 7 | Autopsy photo, back of legs, jeans and shoes | 10 | 11 |
| 8 | Autopsy photo, front view of clothing | 10 | 11 |

1    MR. BRUMBERGER:  No further questions, Your

2  Honor.

3    THE COURT:  All right.  You're excused now.

4    Call your next witness.

5    MR. RYTTING:  Your Honor, that concludes our

6  witnesses in this case.

7    THE COURT:  All right.

8    What says the State?

9    MR. BRUMBERGER:  The State would call Jeffrey

10  Tomberlin.

11    DR. JEFFERY TOMBERLIN,

12  having been first duly sworn, testified as follows:

13    DIRECT EXAMINATION

14  BY MR. BRUMBERGER:

15    Q.    Dr. Tomberlin, how are you currently employed?

16    A.    I'm an Assistant Professor in the Department of

17  Entomology at Texas A & M University.

18    Q.    And you currently office at the Texas A & M's main

19  campus; is that correct?

20    A.    I do.

21    Q.    Do you specialize in any particular areas of

22  entomology?

23    A.    I do.  Forensic Entomology and Livestock

24  Entomology.

25    Q.    What particular study or training have you received

1 concerning the field of forensic entomology?

2     A.    I received my B.S. Degree in Biology from the

3 University of Georgia, a Master's of Science Degree in

4 Entomology from Clemson University, focusing on the

5 decomposition of carrion and its relationship to forensics.

6     I've worked with Dr. Lee Goff of the University

7 of Hawaii for two years.  Dr. Goff is considered one of the

8 world authorities in forensic entomology.  After that, I

9 completed my Ph.D from the University of Georgia in Entomology,

10 focusing on the black soldier fly, which is a common fly that

11 colonizes decomposing human remains.

12     Since then, I've become Board certified by the

13 American Board of Forensic Entomology.  I'm one of 15 people in

14 North America that has this certification.

15     I also have initiated the Northern American

16 Forensic Entomology Association, of which I served as president

17 last year.  And I am active within the American Academy of

18 Forensic Science and hold the position of Fellow.

19     Q.    Have you ever been involved in any cases where you

20 consulted regarding a human death as a forensic entomologist?

21     A.    I have.

22     Q.    And have you ever taught or conducted workshops for

23 any law enforcement groups concerning forensic entomology?

24     A.    Yes, I have.

25     Q.    Approximately how many times?

1    A.    A dozen or so.  In North Carolina, Georgia, South

2  Carolina, Texas.

3    Q.    And have you ever conducted any such workshops for

4  any medical examiner's offices?

5    A.    I have not for medical examiners.

6         MR. BRUMBERGER:  Your Honor, the State would

7  merely submit for the Court State's Exhibit 1, which is

8  Tomberlin's Curriculum Vitae.

9         MR. RYTTING:  No objection.

10         THE COURT:  Be admitted.

11         MR. BRUMBERGER:  Thank you, Your Honor.

12    Q.    (BY MR. BRUMBERGER)  Turning to the actual science

13  of Forensic Entomology, can you explain for the Court how a

14  forensic entomologist calculates the time of the initial

15  colonization when they identify a specific species of fly?

16    A.    Once specimens are collected from the remains and

17  preserved, basically what we do is we look at weather data from

18  the nearest weather station, and we collect weather data from

19  the body recovery site, and we try to correlate those two.  If

20  there is not a significant difference, such as in this case,

21  we're permitted to use weather data from the weather station and

22  work backwards.

23         Insects are ectothermic.  They depend on solar

24  heat to develop or external heat sources.  And what they do is

25  they have what we call a thermal bank.  As they accumulate

1   degrees, they develop and grow.  If it's below freezing, they

2   don't develop.  But if it's 80 degrees, they develop fast.  If

3   it's 40 degrees, they develop slow.  And we work backwards from

4   the time the insects are preserved to determine whether the

5   insects were laid on the body as either eggs or larva.

6        Q.    And do all the predatory insect species seek out a

7   body immediately upon the death of that human or organism?

8        A.    No.

9        Q.    Does it make a difference to a forensic

10  entomologist whether it is a first colonizer or a later

11  colonizer?

12       A.    Yes.

13       Q.    And can you explain to the Court why that makes a

14  difference?

15       A.    Because if it's a secondary colonizer, then we know

16  that the body was probably there longer.

17       Q.    Are you familiar with the resources I

18  discussed with Dr. Arends?  You were there for his testimony,

19  correct?

20       A.    Yes.

21       Q.    Are you familiar with those resources?

22       A.    I am.

23       Q.    Are you familiar with how they describe the

24  characteristics of Cynomyopsis Cadavarina?

25       A.    I am.  Cadaverina is a secondary colonizer.  I

1   conducted research in 1996, from '94 through '96, on the

2   decomposition of carrion. And what I found is that Cadaverina

3   is a secondary colonizer. We had other species that were

4   present in this carrion in an exposed environment, but

5   Cadaverina was coming in on carcasses in the wintertime, 20 to

6   40 days before.

7       Q.      And you heard Dr. Arends testify that he was not

8   personally that familiar with this species?

9       A.      I did.

10      Q.      And yet, you just testified that you've actually

11  conducted research on this species here in Texas?

12      A.      Actually, it was in South Carolina.

13      Q.      South Carolina. Okay.

14              Have you ever conducted any kind of

15  observational research on any blow fly species here in Texas?

16      A.      I have.

17      Q.      When was the most recent one?

18      A.      I have one going right now.

19      Q.      Okay. And prior to that, what was the most

20  recent?

21      A.      I had two pigs out last year.

22      Q.      Okay. Have you ever put out pigs and found that

23  you did not get colonization right away by any species?

24      A.      Sure. The pigs that we currently have in the

25  field, and we have four pigs out, and we did not get

1 colonization for five days. And this is during optimal

2 colonization time in terms of weather.

3 Q. So, no species, even first colonizers, came to

4 these pigs in the first four or five days?

5 A. Correct.

6 Q. Have you ever consulted in a case where a human

7 body was left at reasonably warm temperatures without having

8 colonization for several days?

9 A. I have.

10 Q. Can you just briefly describe the factual scenario

11 of that case?

12 A. The individual was found dead. The body was

13 exposed for four days in a room with a window open and no

14 colonization. And that was in October.

15 Q. And the temperatures were approximately what, if

16 you recall?

17 A. 70 degrees.

18 Q. The species in this case, Cynomyopsis Cadaverina,

19 is it uncommon in Texas?

20 A. No. It's not uncommon.

21 Q. Is it actually common or it's somewhere in between?

22 A. If they were found, it would not be unexpected.

23 Q. Okay. Are you familiar with the families that

24 Dr. Arends was discussing, the Cochliomyia and Phaenicia

25 families of flies?

1      A.      I am.

2      Q.      And you heard him testify that he would have

3  expected those to have already been on the body in this case?

4      A.      I did.

5      Q.      Are those fly species that you personally, in your

6  opinion, would expect to see in the conditions of December,

7  1998?

8      A.      No.

9      Q.      Why is that?

10     A.      Well, when you look at the family Calliphoridae,

11  there are two groups of flies, both blue bottle and green

12  bottle.  The green bottle are active during warm weather; blue

13  bottle are active during cold weather.  If you consider the

14  genera that Dr. Arends listed, several of those genera are not

15  active in the winter.  Cochliomyia is not a winter genus.  It's

16  just not active unless it's warm out.  It's a summer species.

17            Chrysomyas is not a winter species.  Lucilia,

18  which is the correct genus for Phaenicia, is not active in the

19  winter.  It's a spring species.

20            The other genera that were not listed that

21  could come in and potentially colonize a body are Calliphora.

22  That is the other genus that could come in and colonize.

23     Q.      So, would you find it at all surprising in this

24  case that the species he referred to weren't present on the

25  body?

1    A.    No.

2    Q.    So, from your earlier testimony, I take it that

3 even first colonizers, even in warm conditions, will not

4 necessarily seek out a body immediately?

5    A.    Correct.

6    Q.    And in this case, C. Cadaverina, you testified is a

7 late colonizer?

8    A.    Correct.

9    Q.    And so, it would not infest a body until that body

10 had actually decomposed to some extent; is that correct?

11    A.    Correct.

12    Q.    So, in your opinion, is there anything unexpected

13 in this case in the fact that C. Cadaverina is, according to

14 Dael Morris, is supposed to have colonized the body on the 18th,

15 where the State believes the body was deposited, in other words,

16 on the 8th.   Is there anything inconsistent about those two

17 dates?

18    A.    Not at all.   When one considers what a forensic

19 entomologist actually does, we estimate the PIA, Period of

20 Insect Activity, which is translated into a minimum post-mortem

21 interval.   Now, that could be expanded because if the body's

22 deposited and flies happen to deposit soon after the body is

23 placed in the field, there is potential with variation that

24 dreissena would encompass the actual PMI.

25              But what we actually estimate is the period of

1  insect colonization and activity which can be translated into a
2  minimum period of activity or a minimum post-mortem interval.
3           Now, to say that a body can lay out and not be
4  colonized? That's highly possible. We cannot do anything
5  beyond what we can do with the insect that is present. If we go
6  beyond that, we're outside of our scope.
7       Q.    And so, the testimony and statements that have been
8  submitted in this case showing that there were periods of time
9  during several days between the 8th and the 18th where it was
10  warm enough for C. Cadaverina to be active, that does not
11  necessitate that it would oviposit on the body, does it?
12      A.    Not at all.
13      Q.    And so, there's nothing odd about that if the body
14  was deposited in the Forest on the 8th and colonization did not
15  take place until the 18th under these facts?
16      A.    Not at all.
17      Q.    Are you familiar with James Arends?
18      A.    I am.
19      Q.    And how do you know him?
20      A.    I know him primarily through livestock
21  entomology.
22      Q.    Have you ever met him at any of the forensic
23  entomological conferences that you've attended?
24      A.    I have not.
25      Q.    Have you ever known him to be involved in that

1 field?

2     A.    I was not aware.

3     Q.    Is he a member of the North -- well, let me retract

4 that. He already testified to that.

5             In your experience, just very generally

6 speaking, observing bodies and in the course of your studies, is

7 it impossible for a body to sit in the woods for as long as the

8 State alleges in this case, from December 8th onward and not

9 experience bloating?

10     A.    You know, to me, that is outside of my area of

11 expertise.

12     Q.    And what about general scavenging by animals,

13 again, just generally, not specific animals?

14     A.    Again, once again, that's outside of my area of

15 expertise.

16             MR. BRUMBERGER:  We'll pass the witness, Your

17 Honor.

18                     CROSS-EXAMINATION

19 BY MR. RYTTING:

20     Q.    Did you read the autopsy report in this case?

21     A.    I did.

22     Q.    You did not?

23     A.    I did.

24     Q.    Okay.  And did you review the pathological report?

25 Is this routine as a forensic entomologist that you review

1  autopsy reports?

2       A.    Sure.

3       Q.    You asked for those from the Medical Examiner and

4  you reviewed them?

5       A.    I did.  That is correct.

6       Q.    And you have consulted with forensic pathologists

7  in the past; is that correct?

8       A.    I do.

9       Q.    That's routine when you're establishing and trying

10 to establish a date of death or time of death or exposures in.

11 one environment or another; is that correct?

12      A.    Correct.

13      Q.    That is part of your background to do so?

14      A.    It is.

15      Q.    And you also -- when you said that wildlife is not

16 an area of expertise?

17      A.    No.  I said it's not an area of my expertise.  I'm

18 an entomologist by trade.

19      Q.    That means -- does that mean you're unqualified to

20 testify in a trial that -- about -- about wildlife in a

21 particular area, about scavengers or the affect on a corpse?

22      A.    No.  It's just not my area of expertise to predict

23 when animals come in and prey on a body.  It's not my area of

24 expertise to tell you what animals came in and fed on a body.

25 And it's not my expertise to give you an idea of when they came

1  in and fed on a body.

2       Q.    Have you testified about animal activity -- have

3  you testified in any cases?

4       A.    Yes.

5       Q.    Have you testified about animal activity or

6  scavenging of a body in any of the cases that you were called as

7  an expert?

8       A.    No.

9       Q.    You have not testified about, say, bite marks or

10  movement of a body from one place to another by scavenging

11  animals?

12      A.    No.

13      Q.    When you read the autopsy report, did you review it

14  from -- did you review it thoroughly?

15      A.    I reviewed it from the perspective of an

16  entomologist.

17      Q.    So you read it?

18      A.    I did.

19      Q.    Okay.  And you said that there was nothing

20  inconsistent in the evidence that you reviewed, what evidence

21  you've heard in this hearing, I take it?

22      A.    As it pertains to Cynomyopsis Cadaverina.

23      Q.    With the -- did you hear anything inconsistent with

24  the -- inconsistent with the exposure of the body in the woods

25  25 days before recovery?

1    A.    No.    What I gathered from the reports that were

2    submitted is that if you look at the accumulated degree dates,

3    which are used to estimate the time of colonization of the

4    corpse by Cynomyopsis Cadaverina, that Dael was actually

5    accurate with predicting when the insects colonized the body.

6    Going beyond that is going beyond the field of entomology.

7    Q.    But you did say that one of the things that you

8    routinely rely on, routinely ask for is the autopsy reports; is

9    that correct?

10    A.    Yes.

11    Q.    And if an autopsy report, for example, this one,

12    indicates that the pancreas was present in the body, does that

13    have any significance to you?

14    A.    Not to me.

15    MR. BRUMBERGER:    Objection, Your Honor, this

16    witness has already said he is not an expert in anything other

17    than forensic entomology.

18    THE COURT:    That's what he said.

19    Q.    (BY MR. RYTTING)    So, you have -- you're telling me

20    that -- are you -- do you have any training in anatomy?

21    A.    Well, I've watch Judge Wapner, but I'm not a

22    lawyer.    I mean, I don't -- I took general anatomy in college,

23    but that's not going to qualify me, in my opinion, to sit here

24    and tell you about the decomposition of a human body as it

25    relates to what a medical examiner would give you.

1    Q.    You don't have any training or understanding of the
2  rate that bodies decompose from insect activity?  Is that what
3  you're telling me?

4    A.    As it relates to entomology, that's the extent.

5    Q.    You don't understand the rates at which they
6  decompose in the absence of insect activity?

7    A.    I'm an entomologist.

8    Q.    I mean, I'm asking.  I know you're an entomologist.
9  I'm asking you if you can sit here and say honestly that you
10 have no idea, even though you have a Ph.D in the subject, about
11 the general way that a body decomposes?

12   A.    Well, first of all, I don't have a Ph.D in that
13 area.  I have a Ph.D in entomology, which means if you ask me a
14 question about bugs, I probably can answer it.  But if you ask
15 me a question that a medical examiner should be answering, I'll
16 tell you I can't answer that question.  So, when we talk about
17 the decomposition of a human body, excluding insects, I'm not
18 going to be able to tell you very much.  It's going to take
19 Dr. Sanchez sitting up here or some other medical examiner to
20 tell you what's occurring within the body as it relates to the
21 pancreas, the liver or any other organ in the body.

22   Q.    So, you can't question at all Dr. Sanchez'
23 estimation, based on the autopsy?

24   A.    That's not what I'm here for.

25   Q.    That that body was not in the woods more than 15

1    days?

2         A.    Correct.

3         Q.    There's no way you can -- there is no entomological

4    evidence that suggests it was in the woods longer; is that

5    correct?

6         A.    There is nothing -- I can tell you that, based on

7    the insect evidence and based on the weather data and the way

8    Dael analyzed it, she was correct, that colonization occurred on

9    the 18th.

10              Can a body sit out in the woods and not be

11   colonized?  Yes.

12        Q.    How confident are you in Dael Morris' analysis?

13        A.    I think she did a fair job.

14        Q.    What is the basis for that opinion?

15        A.    It's based on the fact that I have a Ph.D in

16   entomology, and I'm Board certified.

17        Q.    Do you have what method she used?

18        A.    I do.

19        Q.    What she relied on?

20        A.    I do.

21        Q.    How often do you see Cadaverina in a forest setting

22   such as this?

23        A.    Well, I have only published one paper on the

24   subject with Cadaverina.

25        Q.    No.  How often have you seen it?

1    A.    Well, I haven't done any work in a forest setting

2 outside of that.

3    Q.    So, you don't know -- you haven't done any work in

4 a forest then?

5    A.    No.

6    Q.    But your testimony today has to do with a body that

7 was in the forest, correct?

8    A.    Correct.

9    Q.    What makes you qualified then to even comment on

10 it?

11    A.    Well, the fact that the literature supports the

12 idea that Cadaverina is a common species throughout the

13 southwest and southeast; the fact that in one of the studies

14 done in 1940 demonstrated this activity in the wintertime; the

15 fact that if you look at the blow flies in North America from

16 1948 and the description of Cynomyopsis Cadaverina for that

17 period, indicates that this fly is distributed throughout the

18 south and north.  It's a common species.  It's something to be

19 expected on a body.

20    Q.    Is it a species that is common in the forest?

21    A.    Sure.  You know, what I can tell you is this, there

22 are only about 14 or so species that we commonly encounter that

23 are blow flies.

24    Q.    What did that -- are you saying --

25    A.    There aren't many blow flies species that colonize

1  human remains.

2      Q.      That C. Cadaverina is a common forest species?

3      A.      I can't comment on that.

4      Q.      You said it was a secondary colonizer?

5      A.      Correct.

6      Q.      And that colonizer bonds with a significant degree

7  of decomposition?

8      A.      No, advanced degradation.

9      Q.      Advanced degree of decomposition?

10             What is advanced degree of decomposition?

11     A.      Once colonization has occurred by the primary blow

12 flies and degradation has occurred, we're talking after initial

13 colonization.

14     Q.      What is degradation?

15     A.      Break down of the body.

16     Q.      Okay.

17     A.      By the insects.

18     Q.      In particular, what is degradation?

19     A.      I'm sorry?

20     Q.      What is degradation?

21     A.      As it relates to what?

22     Q.      Of the body.

23     A.      Do you want me to give you from my perspective as

24 an entomologist?

25     Q.      I want you to tell me -- yes, from your perspective

1  as an entomologist.

2      A.      When we talk about decomposition of human remains

3  as we relate it to insect succession, if you look at the most

4  comprehensive studies that have been published on the

5  colonization of human remains, primarily we're taking about

6  obtaining 65 through 68.  What you find is that there is a

7  series of species that will come in.  There are those that are

8  initial colonizers.  Once those have come in, then you will have

9  secondary colonizers.  When you have the secondary colonizers,

10  which is Cynomyopsis in this case, it's considered an advanced

11  stage of decomposition.

12      Q.      Okay.  What were the primary colonizers in this

13  case?

14      A.      Be nice to know.

15      Q.      Why weren't there any found?

16      A.      Because only three were identified through DNA

17  analysis, and those were Cynomyopsis Cadaverina.  If the others

18  had been analyzed, maybe we would have come up with others.

19      Q.      Are you saying that there was no primary

20  colonization and C. Cadaverina is not one that colonized the

21  body?

22      A.      No.

23      Q.      In fact, what is the basis to have your claim

24  for -- you said you've done studies on it and you found there

25  was a secondary colonizer.  Was there any statistics -- what was

1    the size of the sample that was taken?

2         A.    Well, what we would do is we put -- I'm trying

3    to -- I have to add this up.  We put out a total of -- we put 12

4    animals and we pulled three animals per 20 days.

5         Q.    For 20 days.  And what type of setting was this?

6         A.    Open field.

7         Q.    Open.  And open field where?

8         A.    South Carolina.

9         Q.    What time of year?

10        A.    It started in, I believe it was January and went

11   through March, then we came back through the summertime and went

12   from June through August and then replicated another year's

13   worth of data that followed.

14        Q.    And the open field was different than what we see

15   where the body was placed in this case?

16        A.    Nature is wonderful for variation.

17        Q.    So that the long and short of that answer actually

18   is yes, it is quite significantly different?

19        A.    It is quite different.

20        Q.    Whether you would see the same sort of fly activity

21   in the forest as opposed to in the field is something that you

22   don't know, you haven't studied?

23        A.    I'm sorry?

24        Q.    You don't know whether the Cadaverina behavior

25   would be significantly different in the forest, do you?

1    A.    No.  But what I can tell you is that, based on the

2  development of the species, that it colonized on the 18th, if

3  you look at Dael's report.

4         That can't be that -- I mean, that is based on

5  a mathematical model.  If you look at degree dates of this fly,

6  I don't -- I can't comment on what happened before the 18th

7  because there were no insects that take colonization beyond that

8  point.

9    Q.    The 18th?

10   A.    Well, that's when colonization most likely

11 occurred, yes.

12   Q.    You said earlier that in one of your studies, you

13 saw a four-day interval between the date of death and

14 colonization by flies?

15   A.    That's correct.

16   Q.    And is that common in your experience or is that an

17 exception?

18   A.    It varies.  You know, I put a pig in a building in

19 the middle of summer, in June and July when temperatures were

20 over 90 degrees and I had a three-day delay.  I have put pigs

21 out and had initial colonization within two days after putting

22 them in the field.  It's highly variable.

23   Q.    When you put it out for four days, were you

24 surprised that you didn't find any specimens?

25   A.    I'd like to have found them sooner.

1    Q.    No.   I'm asking you.

2    A.    Was I surprised?

3    Q.    No.   I'm asking you, do you find this unusual or

4 surprising?

5    A.    No.   I think biology, what you find in nature, is

6 variability is part of it and you work with it.   And our job is

7 to try to figure out why the variability occurs, why are these

8 insects delayed in their colonization.   How can we become better

9 at our estimates in determining what that delay is.   And that's

10 what we're trying to work on now through our research.

11    Q.    What you're actually trying to find out in your

12 research are the common paths, as part of what you're looking

13 for in biology, you're looking to see if there's irregular

14 paths, correct?

15    A.    Correct.

16    Q.    You're looking to see if four days is an outline?

17    A.    Yeah.

18    Q.    As opposed to in the middle of the curve?

19    A.    I agree.   You're absolutely right.

20    Q.    So, the question is, is four days an outline or is

21 it in the middle of the curve?

22    A.    We don't know.

23    Q.    You have no idea?

24    A.    The field of forensic entomology is not able at

25 this time to predict what the average time after death

1    colonization occurs.  That is not available in the literature.

2    Of the 350 or so publications that have been in existence since

3    1983, going back to 1980, there's nothing out there that enables

4    us to predict the delay time in colonization.

5         Q.    But the longest you've ever seen is four days after

6    death; is that correct?

7         A.    Let me think about the work I've done over the

8    years.

9              You know, I'd actually -- I would recommend

10   looking up the reference *Tomberlin and Adler* in 1996 because

11   when we talk about colonization of carrion during the

12   wintertime, I wouldn't be surprised to see if colonization was

13   even later.  Because we were going 20-day intervals and at that

14   point, we didn't sample the first winter until we saw initial

15   colonization.  And that was 20 days after putting the carcasses

16   in the field.  So, to see variation like that, I suspect I've

17   seen longer.

18             MR. RYTTING:  I'd like to object, Your Honor.

19   I believe that testimony was unresponsive.  I asked about the

20   person's experience and what it's based on.

21             THE WITNESS:  Yes, I've seen longer.

22        Q.    (BY MR. RYTTING)  What is your personal experience?

23   What was this length of time that you saw?

24        A.    Well, I think if you look in -- if you want outside

25   of my experience, too, I can give you those references.

1    Q.    No, I was asking of your experience.

2    A.    Look up *Tomberlin and Adler*, 1996.  That is my

3  personal experience.  That's my research.  The *Journal of*

4  *Medical Entomology*.  And that talks about Cadaverina.

5    Q.    Does the environment in winter in which the body is

6  placed significantly influence the study of the colonization of

7  that body; is that correct?

8    A.    It does.

9    Q.    And if there's say, a dump nearby, that may make

10  your estimation -- that may change your estimation and your

11  hypothesis about, of the colonization of these insects,

12  correct?

13    A.    In which part, the development of Cadaverina or

14  what happened before colonization?

15    Q.    Or the speed of colonization?

16    A.    Yes.  It could influence speed of colonization, but

17  the fact that the body, or if you put a body out or a carcass

18  that wasn't colonized, I mean, it's not a guarantee that

19  colonization is going to occur immediately at the time you put

20  the body out.  I mean, that's what we're unable to do in our

21  field.  I think it's important to understand the boundaries in

22  which we work.  We have to have a set of boundaries.  And our

23  boundaries, my boundaries that I work within are within what's

24  provided, the entomological evidence provided.  Based on that,

25  colonization occurred around the 18th.  To assume that because

1  colonization occurred at the 18th, that the body could have been

2  out there longer, in my opinion, that's -- I'm trying to be

3  constructive how I say this -- to suggest that the body couldn't

4  have been out there longer, to me, is not a very well thought

5  out response.

6      Q.     Is it any well thought out response in view of

7  Dr. Sanchez' testimony?

8      A.     I have no comment on Dr. Sanchez' testimony.

9             I mean, I'm not a pathologist.  I can't -- I

10 can't discuss pathology because that's not what I do.

11     Q.     I know you don't do it, but you did get the autopsy

12 report?

13     A.     Yeah, but I was looking for information related to

14 entomology.

15     Q.     And you do consult with pathologists?

16     A.     About entomology.

17     Q.     Well, but, the decomposition of the body, for

18 example, is something that you would consult a pathologist

19 about?

20     A.     But that is what Dr. Sanchez was here for, not me.

21 I'm here to talk about the bugs, and that's just not --

22            THE COURT:  I think we've gone over this.  It's

23 repetitious.  Move on to something new.

24     Q.     (BY MR. RYTTING)  You mentioned you've done

25 studies, pig studies, right?

Irene Beaupre, CSR
Official Court Reporter

1     A.     Yes.

2     Q.     For the purpose of using a pig, part of the reason

3 is that they're anatomically similar in certain respects to

4 human beings?

5     A.     Correct.

6     Q.     And have you ever put a specimen out and not

7 observed significant bloating of that body over time?

8     A.     I guess it comes down to how would you define

9 significant.

10     Q.     How about doubling of the circumference, or one and

11 a half times the circumference, distortion of and the swelling

12 of the genital region, for example?

13     A.     How would you -- I mean, I need parameters for you

14 to help me.   What do you mean by -- How would you define

15 swelling of the genital area?

16     Q.     It's a layman's term.   What is the problem?

17            I guess I don't understand the problem with the

18 question.

19     A.     I guess because you're using qualitative terms.

20 And what I say is blue may be different from what you say is

21 blue.   What you say is swelling, I may not interpret as

22 swelling.   What you may say is bloated, I may say, it's not

23 bloated.   I need you to tell me what parameters do you want me

24 to work with.

25     Q.     With your calling, you talk about, and in your

1   work, you see what's called bloating; is that correct?

2       A.      Yes.

3       Q.      What do you define bloating as?

4       A.      What would I define it as, I would say swelling of

5   the abdominal section.

6       Q.      Have you ever seen a carcass put out where you

7   didn't see swelling?

8       A.      Sure.

9       Q.      In temperatures, ambient temperatures that were

10  similar to what was represented in the National Forest?

11      A.      Great point.  I'm glad you led up with that,

12  because, yes, I have.

13      Q.      When did you see this?

14      A.      Look at the study from 1996 that I mentioned.  When

15  we were putting carcasses out and we were watching them

16  decompose, because what we found is that there was delayed

17  colonization.  And based on the entomological evidence and the

18  stages of decomposition as defined by Payne, 1967, which are

19  defined, based on the insect evidence, that the final stage

20  wasn't reached until 80 days post-mortem.

21      Q.      Final stage of what?

22      A.      Of decomposition as defined by an entomologist.

23      Q.      I was talking about bloating.  I'm talking about

24  your experience in the field.  You've seen -- you put out

25  pigs?

1      A.    Yes.

2      Q.    They swell?

3      A.    Sometimes.

4      Q.    And you've seen cases where they don't, under

5  conditions similar to the ones that are represented in the data

6  here?

7      A.    Sure.

8      Q.    You've seen that?

9      A.    Yeah.

10     Q.    Why might not you have a body bloat?  Why might not

11 you see that?

12     A.    Why wouldn't a body -- I don't know.  I'm not a

13 pathologist.

14               MR. RYTTING:  Pass the witness.

15               MR. BRUMBERGER:  Just a few brief questions.

16                    REDIRECT EXAMINATION

17 BY MR. BRUMBERGER:

18     Q.    So you are familiar with the pathological issues

19 like bloating and other decompositional issues, you just don't

20 have the expertise to give actual scientific opinions on this;

21 is that correct?

22     A.    That's correct.

23     Q.    And in this case, you did look over the autopsy

24 report?

25     A.    I did.

1     Q.    And in that autopsy report, do you recall the

2 pathologist finding that the body had probably been in the woods

3 approximately 25 days?

4     A.    I do.

5     Q.    And the entomological evidence, in your opinion, is

6 not inconsistent with that?

7     A.    All I can say is that colonization was around the

8 18th, which is a shorter interval than what was estimated by the

9 M.E.  But I can't comment on what the M.E. estimated.

10    Q.    But in other words, the entomological evidence of

11 colonization on the 18th doesn't, per se, conflict with the

12 finding that the body had been in the woods 25 days, does it?

13    A.    Not at all.

14    Q.    Just to clarify the observational research you were

15 discussing where you had pigs in the field that were not

16 colonized for four or five days --

17    A.    Yes.

18    Q.    -- most recently.  That was here in Texas?

19    A.    That was.

20    Q.    What part of Texas?

21    A.    Up near Fort Worth.

22    Q.    And finally, just regarding the, Dr. Arends'

23 testimony that he believed this case would be consistent with a

24 body being frozen for some period of time and left in the woods,

25 nothing about the entomological evidence would require that,

1  would it?

2      A.    Repeat the question one more time, please?

3      Q.    Do you believe the body had been, based on the

4  facts that you observed and read about in this case, do you

5  believe the body had to have been frozen for C. Cadaverina to

6  have colonized in the manner it did?

7      A.    No.

8          MR. BRUMBERGER:  No further questions, Your

9  Honor.

10          MR. RYTTING:  Just a couple briefly.

11              RECROSS-EXAMINATION

12  BY MR. RYTTING:

13      Q.    You were asked, as I recall, that you didn't think

14  that the entomological evidence conflicted with the pathological

15  evidence in this case?

16      A.    No, I don't.

17      Q.    And you believe that the pathological evidence is

18  consistent then with the 18th of -- colonization of the 18th?

19      A.    All I can comment on is the fact that this insect

20  probably colonized that body on the 18th.  I can tell you, as I

21  mentioned in the beginning, I can talk about periods of insect

22  activity, when these insects were found on the body, when were

23  they deposited on the body.  That's what I can comment.  When

24  you get beyond the insect evidence, I can't comment on that.

25  So, the fact that the pathologist was discussing 25 days as the

1    time interval since death, I can't conflict with that because,

2    one, I can't go past the 18th, based on the insect evidence.

3         Q.    You didn't see the 25 days' estimation in that

4    report?  Let's be clear about that, correct?

5         A.    I thought it was in there.  It's in her report.

6         Q.    I can show you the report.

7               That was the trial testimony.

8         A.    Oh, okay.  I'm sorry.  I apologize.

9         Q.    Her report contains no estimate at all.

10        A.    I apologize.

11        Q.    Once again, the date of the 18th, you're not saying

12   the date of the 18th does not conflict with Dr. Sanchez'

13   testimony?

14               MR. BRUMBERGER:  Asked and answered.

15               THE COURT:  Repetitious.

16               MR. RYTTING:  We'll pass the witness.

17               MR. BRUMBERGER:  Nothing further from the

18   State, Your Honor.

19               THE COURT:  Thank you for appearing.

20               Anything else from the State?

21               MR. BRUMBERGER:  Nothing from the State, Your

22   Honor.

23               THE COURT:  All right.  If there's nothing

24   else, let's stand adjourned.

25               You're not asking for a specific ruling on

EXHIBIT "F"

Joye M. Carter, M.D., FCAP
Chief Medical Examiner



(713) 796-9292
(713) 796-6815
FAX: (713) 796-6842

OFFICE OF THE MEDICAL EXAMINER OF HARRIS COUNTY
JOSEPH A. JACHIMCZYK FORENSIC CENTER
1885 OLD SPANISH TRAIL
HOUSTON, TEXAS 77054-2098

AUTOPSY REPORT

OC 99 - 2

January 3, 1999

ON THE BODY OF

Melissa Trotter
7201 F.M. 3081
Willis, Texas

CAUSE OF DEATH:   Asphyxia due to ligature
                 strangulation.

MANNER OF DEATH:   Homicide.

Reviewed and signed by:

Joye M. Carter, M.D., FCAP          Date
Chief Medical Examiner

POSTMORTEM EXAMINATION ON THE BODY OF

Melissa Trotter
7201 F.M. 3081
Willis, Texas

HISTORY: The body of an unidentified Caucasian female, subsequently identified as that of 19 year old Melissa Trotter, was found January 2, 1999, in the National Forest of Montgomery County, Texas. The body was received at the Harris County Medical Examiners Office for postmortem examination and identification. The sealed body bag was opened at 12:35 p.m. on January 3, 1999, by Mr. Reynolds, Harris County Medical Examiner's Forensic Scientist, in the presence of Dr. Joye M. Carter, Chief Medical Examiner. Prior to autopsy examination, trace evidence was collected and the missing persons report filed on behalf of Melissa Trotter was reviewed, dental records of Melissa Trotter were reviewed, and medical records of Melissa Trotter were reviewed. Total body X-rays were obtained and reviewed. A sexual assault kit was performed.

IN ATTENDANCE AT THE AUTOPSY: Mr. David Tanner and Detective Brian M. DuBose, Montgomery County Sheriff's Office; Mr. Mike McDougal, District Attorney's Office, Montgomery County; Dr. DeLattre and Dr. Stimson; Autopsy Assistant, Mr. Michael Jones; and Forensic Photographer, Ms. Marlene Suarez.

AUTOPSY: The autopsy was performed in the Joseph A. Jachimczyk Forensic Center of Harris County by Chief Medical Examiner Joye M. Carter, M.D., at the request and upon the written authorization of The Honorable John R. Kleimann, Justice of the Peace, Precinct 1, Montgomery County, Texas, beginning at 2:15 p.m., on January 3, 1999.

CLOTHING: The body was received clad in blue denim jeans, white socks, one black and white gym shoe on the left foot. The sole of the gym shoe, with treads, was clean with minimal debris noted. There was no caked mud or grass observed on the bottom of the shoe. On the top of the body was a green, long-sleeved, oversweater which zipped in front with burgundy and white stripes at the elbows. Beneath this sweater was a long-sleeved black sweater and a bra which had been pushed up over the breasts. Beneath the blue denim jeans were red underpants. No personal effects were received with the body. Prior to examination, fingernail scrapings were performed and fingerprints were taken. During fingerprinting, the skin and nails of the right hand removed in a glove formation secondary to decomposition. The outer green sweater and black sweater underneath were cut open with evidence tape along the cut edges marked for further examination. The body was then undressed for further examination. Removed from the front

right pocket was a piece of lined paper with the number
409-524-3008 and the name "Nicole" handwritten. This information
was retrieved for evidence collection. The socks were removed by
cutting and removal from the feet which revealed an unusual
patterned red and green nail polish. The denim jeans were cut in
the front to ease removal. The cut edges were marked with "HC"
(Harris County) in red permanent ink. Upon removal, the denim
jeans label on the inside read size 5, tapered leg, slim fit,
medium length, Number 10912 Levi's. The rear pockets of the jeans
contained no paper or other objects. The right rear pocket area
was remarkable for an irregular rip which was 11 by 6 by 5-1/2
inches, encompassing the right rear pocket. The long-sleeved black
sweater's inside label read "Sweater Exchange, 100% cotton, size
small." The overtop, which was green and long sleeved, had an
inside label which read "Energie, size medium." The undergarments
consisted of a white bra which was fastened in the back; and red,
thong-type underpants. The inside label of the bra read "Fruit of
the Loom, size 36B." The inside label of the underpants read "size
6."

EVIDENCE OF MEDICAL INTERVENTION:   None.

EXTERNAL APPEARANCE:   The body received was that of a young
Caucasian female whose facial appearance was distorted due to
decompositional change characterized by skin slipping, greenish-
black discoloration of the facial skin, and marbling of the skin of
the legs, arms, chest, and back. The body was damp due to external
weather conditions. The body had a length of 63 inches and a
weight of 113 pounds with clothes on. The nude body had a weight
of 105 pounds. At the time of autopsy examination, rigor had
passed and livor was obscured due to decompositional change. The
body was cool and damp to the touch. The head was normocephalic
and covered by long reddish-brown hair, approximately 12 to 15
inches in length. The scalp hair was slipping due to
decompositional change. There were no palpable skull or facial
bone fractures. The scalp skin was intact with no evidence of
laceration. The ocular globes were liquefied. Iride color was not
discernible. The facial skin appeared to have been removed due to
decompositional change and postmortem insect and animal activity.
Upon reflecting the residual soft tissue around the right eye,
rodent teeth impressions were identified. The nasal cartilage was
intact. Soft tissue was absent from the nose and midfacial areas.
Dentition was natural and in good condition. There were 28 teeth
present. The tongue was protruding and dark black in color due to
decompositional change. The oral cavity contained fly larvae. The
buccal mucosa was not present. The alveolar ridges were not
hypertrophic. Both ears were markedly discolored due to
decompositional change. There was a single pierced hole of each
earlobe. The neck was remarkable for a brown stocking ligature
which was tied in the back in a simple knot. There was a 3 by

2-3/4 inch defect on the anterior neck with liquefaction of tissue,
maggot activity, and blood present.    The anterior chest with
breasts and the abdominal contour were remarkable only for
decompositional change.    There were no palpable masses or scars
appreciated.    There were no tattoos present.    The external
genitalia were those of an adult female.    The body hair was female
in distribution.    The upper extremities were symmetrical and well
formed and were remarkable for decompositional change.    There were
no tattoos, venous track marks, or unusual scars of the upper
extremities.    The fingernails were remarkable for a green-and-red-
striped fingernail polish.    There was marked skin slippage of the
skin of the right hand with only the fingernail remaining on the
2nd digit.    The skin of the left hand was intact but was too moist
for fingerprinting.    The lower extremities were symmetrical, well
formed, and remarkable for decompositional change.    The dorsum of
the left foot was remarkable for a 3 inch curvilinear,
hyperpigmented scar which was well healed.    The toenails of both
feet were remarkable for the same patterned red and green nail
polish.    The posterior surface was remarkable for plant vegetation
adherent to the body.    There was no discreet pattern of livor
mortis.    The anal and vaginal orifices were unremarkable with the
exception of decompositional changes.    The skin of the body
diffusely showed splotchy areas of red, green, and gray
discoloration secondary to postmortem mold growth.    There was
generalized skin slippage with discoloration and marbling over the
entire body surface.

INTERNAL EXAMINATION:    Section:    The thoracoabdominal region was
explored using an H-shaped incision.    The sternum and rib cage were
intact.    The midline fatty subcutaneous tissue at the level of the
umbilicus was 1/2 inch in depth.    The right hemithoracic cavity
contained approximately 150 cubic centimeters of sanguineous fluid.
The left hemithoracic cavity contained approximately 100 cubic
centimeters of sanguineous fluid.    The pericardial sac was intact
and contained approximately 10 cubic centimeters of sanguineous
fluid.    The peritoneal cavity contained a minimal amount of
sanguineous fluid.    All organs maintained their usual anatomic
relationships.    The appendix was observed, as was the gallbladder.
There appeared to be no previous intervening surgical procedure
through the skin of the abdominal or chest wall.    The breast tissue
was firm and intact.    There were no appreciable masses upon serial
sectioning of the fibrofatty tissue of the breasts.

HEART:    The heart was intact with a residual weight of 175 grams.
The external epicardial surface was dull tan-brown.    The heart had
a normal configuration and a flabby consistency.    There was minimal
subepicardial fatty tissue deposition noted on both anterior and
posterior surfaces.    The coronary arteries arose normally in the
aortic root.    The vessels were widely patent and contained no
evidence of narrowing due to atheromatous plaque buildup.    The

aorta was intact with a smooth intimal surface and had minimal fatty streaking along its entire length. The myocardium was red-brown in appearance, dull, and homogeneous with noted decompositional change. There was extreme laxity of the consistency due to decompositional change. The heart valves were dark in color and thin with no evidence of malformation. the endocardial surface was dull and tan-gray. The aorta was intact and remarkable for decompositional change.

LUNGS: The right lung weighed a residual 325 grams while the left weighed 450 grams. The pleural aspects were red-brown, somewhat mottled, and glistening in appearance. Upon sectioning, the pulmonary arterial tree bilaterally was patent with no evidence of thromboemboli. There was no evidence of vascular malformation. The bronchial tree was dissected bilaterally. There was no obstruction by mucus plug, foreign body, or insect activity. The pulmonary parenchyma bilaterally was markedly congested. There were no palpable areas of consolidation. There was no apparent anthracotic pigment deposition due to the decompositional state and the dark burgundy-purple discoloration of the parenchyma.

LIVER: The liver had a residual weight of 775 grams. The capsular surface was intact and dull gray-brown. The anterior margin was sharp and the parenchyma had a soft consistency. Upon sectioning, the parenchyma was red-brown and dull in appearance. It appeared to be homogeneous with no evidence of preexisting tumor mass or infectious disease process. There was no nodularity upon serial sectioning of the hepatic parenchyma. The gallbladder bed was intact and contained approximately 5 cubic centimeters of thin brown bile. The bile passages were patent. There was no evidence of cholelithiasis. The gallbladder mucosa was yellow-green and velvety in appearance.

Pancreas: The pancreas was intact with a residual weight of 100 grams. The external surface was dark red-brown and dull due to decomposition and autolysis. There was loss of the normal tissue architecture with very limited lobulation noted. Upon sectioning, the duct was patent. The cut surface was yellow-red and autolyzed.

Adrenals: The left and right adrenal glands were markedly autolyzed.

SPLEEN: The spleen was intact with a weight of 100 grams. The capsular surface was red-brown, dull, and smooth. There were no defects noted to the hilar region. The entire spleen was retained for toxicological analysis. There were no areas of lymphadenopathy observed.

GENITOURINARY TRACT: The right and left kidneys each weighed 50 grams. The renal capsules stripped with ease to reveal dull red-brown, smooth cortical surfaces. Both kidneys had a flabby consistency. Upon sectioning, normal tissue architectural change was obscured due to decompositional change. The medullary regions were demarcated and appeared darker in coloration. The collecting systems were unremarkable. The proximal ureters were not dilated or obstructed. The urinary bladder was void of urine. The vaginal tract was lined by a thick tan-brown material. The approximate amount was 5 to 8 cubic centimeters. Upon rinsing, the vaginal wall displayed focal areas of pink-red discoloration. The internal genitalia were remarkable for mild decomposition change. The cervical os was examined and was circular with focal areas consistent with preexisting surgical manipulation of the endocervical surface. The uterus was nongravid and measured 2-3/4 by 2 inches in area. Both right and left ovaries were observed with their respective fallopian tubes. The left ovary contained a hemorrhagic cyst. The right ovary was unremarkable upon sectioning. Upon sectioning the uterus, the endometrial contents were a small amount of tan mucoid material.

GASTROINTESTINAL TRACT: The esophagus was intact and remarkable for decompositional change. The esophageal mucosa was purple-tan. The esophageal gastric junction was free of laceration. The gastric contents were approximately 200 cubic centimeters of poorly-masticated tan liquid in which large pieces of white meat, consistent with chicken, and pieces of potato, consistent with french fries, were observed. There were small portions of what appeared to be yellow and green vegetables, as well. There was no tablet or pill residue observed in the gastric contents. The pyloric region was patent. The first part of the duodenum contained a moderate amount of pink-tan chyme material. There was no evidence of ulceration of the proximal duodenum. The gastric mucosa, upon rinsing, displayed no evidence of ulceration. The rugal folds were normal in appearance. Decompositional changes were noted to the mucosal surface of the stomach. The remainder of the small and large intestine was intact and displayed mild to moderate decompositional change characterized by bubbling and transparency of the serosal surfaces. There were no foreign bodies within the rectal vault. The appendix was in its normal anatomic location and was unremarkable upon sectioning.

NECK: The neck region was explored initially. The skin was reflected laterally to reveal markedly decomposed anterior neck structures. There appeared to be a clean separation between the portion of larynx on the posterior aspect of the neck organs. The tongue was intact and was remarkable for a 1/2 inch intramuscular contusion on the right anterior aspect of the tip. The hyoid bone was palpated. It was flexible and was not fractured. The proximal portion of the thyroid cartilage was palpated and was intact. The

anterior edge of the thyroid cartilage appeared to be gnawed and irregular. The posterior segment of the larynx remnant was 3/4 inch in length by 7/8 inch. The inferior portion was smooth and dark brown. The remnants of the thyroid cartilage horns were irregular and appeared to be gnawed. The lower segment of the larynx measured 3/4 by 3/4 inch. The surface of the superior margin was remarkable for fine ridges. Opening the inferior segment of larynx revealed the left vocal fold to be intact. The right vocal fold was not identified. Upon reexamination, the inferior remnant of the larynx was irregular in the midline and there were tiny notched ridges from postmortem gnawing. The trachea was intact and the rings were not collapsed. There was no unusual material within the trachea. There was no foreign body or mucus plug. There were scattered maggots within the neck organs upon dissection. The aortic arch was dissected in proximity to the neck organs. The great vessels were given off normally. The great vessels in the proximate transection of the trachea had apparent teeth and gnaw marks. The thyroid gland was absent. The midportion of the larynx was absent. The cricoid cartilage was absent. The underlying cervical spine was intact with no palpable ridges from sharp force injury.

HEAD: The scalp was reflected forward via a bimastoid incision revealing no evidence of galeal or subgaleal hematoma. The calvarium was intact and free of fracture line. Upon removal of the calvarium, the dura mater was intact with no evidence of epidural hematoma formation. Upon removing the dura mater, there was no evidence of subdural hematoma formation. The brain had a residual weight of 1100 grams. There was no evidence of subarachnoid hematoma formation. Upon removal of the brain from the cranial cavity, the tissue was semiliquid and pink-green in color. There was complete loss of normal tissue architecture upon removing the brain tissue. There was no evidence of preexisting lesion or mass defect in the parenchyma. There was no evidence of ventricular abnormality. The vessels forming the circle of Willis were thin walled. The pituitary gland was markedly autolyzed. The basilar skull was free of fracture line. After examining the head, the jaws were incised and dental examination was obtained.

Total body X-rays revealed two metal screws in the metatarsal area of the left foot. There were no fractures to the skeletal system observed. Examination of the lower alveolar ridge revealed a retention appliance for orthodontic procedure.

EVIDENCE OF INJURY: Ligature Around the Neck: The ligature consisted of a piece of brown hosiery. The toe was intact on one limb of the ligature and it appeared to be a sandal-foot-type toe. The second limb appeared to be cut irregularly. The ligature was tied around the posterior surface of the neck. There was a single simple knot. The ligature was removed from around the neck by

cutting. The cut edges were marked with red identifying tape. The diameter of the ligature was 3-1/4 inches. The ligature appeared to be a cut leg of pantyhose. There was a 1/4 to 1/2 inch remnant of the panty portion on the cut end. The cut ends were slightly rolled. There was a run going through the entire length of the hosiery. The ligature imprint was poorly discernible due to the decompositional change of the neck. There was a dark purple, 2-1/2 inch, raised mark on the posterior surface of the neck. Upon inspection of the anterior neck wound, there appeared to be a transection of the larynx. The edges of the severed larynx were irregular due to postmortem animal activity. The surrounding tissue appeared to be hemorrhagic and dark secondary to postmortem insect and animal degradation. This was not discernible completely due to decompositional change.

TOXICOLOGY: Samples of heart fluid, chest fluid, bile, liver, gastric contents, and the entire spleen were retained for toxicological analysis. Also retained were samples of lung, kidney, brain tissue, and heart.

HISTOLOGY: Representative sections of all major organs were retained in formalin.

## PATHOLOGICAL FINDINGS

1. Ligature around neck.
2. Decompositional change with maggot activity.

# OFFICE OF THE MEDICAL EXAMINER OF HARRIS COUNTY
## JOSEPH A. JACHIMCZYK FORENSIC CENTER
## 1885 OLD SPANISH TRAIL
## HOUSTON, TEXAS 77054-2098

### REPORT OF ANALYSIS
January 13, 1999

**TO:**     Joye M. Carter, M.D.                    **CASE#:** OC99-002
            Chief Medical Examiner

Evidence submitted on 01/04/99.

RESULTS:

**Blood:**     Ethanol- 0.06 g/dL
               Methanol, Acetone, Isopropanol- Not Detected.
               Norcarboxytetrahydrocannabinol- Not Detected.
               Delta-9-tetrahydrocannabinol- Not Detected.
               Standard Basic Drug Screen- Not Detected.
               Cocaine Metabolite, Amphetamine/Methamphetamine,
               Phencyclidine, Opiate- Not Detected.

**Bile:**      Ethanol- 0.03 g/dL
               Methanol, Acetone, Isopropanol- Not Detected.

**Liver:**     Ethanol- 0.02 g/g
               Methanol, Acetone, Isopropanol- Not Detected.

Unless otherwise requested, specimens will be discarded one year after date of receipt.

Patricia L. Small, B.S., MT, ASCP          Ashraf Mozayani, Ph.D., DABFT
Assistant Toxicologist                      Chief Toxicologist

Medical Examiner's Initial_____

# PERINEUM, FEMALE

Name _Melissa Trotter_  M.E. Case No. _OC99-002_



light tan discharge
No gross lesions externally.



Head, Left Lateral (1)

# EXTERNAL VIEWS
## OF THE HEAD



Head, Right Lateral (2)



Head, Anterior (3)

Postmortem insect activity
with defect in anterior neck organ.



Head, Posterior (4)



Head, Superior (5)



skull: lateral, anterior, and posterior views.

Name _____ Melissa Trotter _____ Medical Examiner Case Number _____
OC-99-002

Age _____ Race _____ Sex _____ Date 01, 03, 99
M   D   YR

No fractures
Slight gnawing
marks from
rodent activity

BCME

CASE NO. _OC 99 002_ NAME _Melissa Trotter_

AGE_____ RACE_____ SEX_____ HEIGHT_____ WEIGHT_____

Striped red and green
nail polish

Scar on left
foot
2 screws viewed
via X ray

EXHIBIT "G"

### ENTOMOLOGY REPORT PRESENTED TO JAMES RYTTING IN THE TEXAS CASE OF *SWEARINGEN VS DRETKE* (CAUSE NO. 05-70039, UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT)

By Dael E. Morris

## SUMMARY

The results of a 2004 entomology report regarding time of death of Melissa Trotter cannot be relied upon because of erroneous hourly temperature data. This case has been reworked here using reliable daily data, and using the same methodology with degree days instead of degree hours. Results indicate that first oviposition leading to colonizing by blow flies (translating to near to time of death) occurred December 18th, 1998.

## INTRODUCTION

Blow flies (Calliphoridae) initiate colonizing of human remains by laying eggs on bodies soon after death, sometimes within minutes, depending on environmental conditions. Blow flies are therefore good indicators of time of death in cases of abandoned decomposing remains, long after the science of pathology can no longer apply (about 72 hours). Accurate knowledge of climate conditions, especially temperature, is critical in quantitatively determining the time when colonizing by blow flies begins since insect development is driven by temperature.

July 2004 I prepared an entomology report as to the time when blow flies first colonized the remains of Melissa Trotter. This report was based on examination of information obtained from a number of sources including death scene and autopsy photographs, pathology documentation, court testimony, insect specimens and DNA analyses thereof, classical taxonomy, biology data and hourly climatolgical data. It has recently come to my attention that some of the hourly temperature data I used in working the entomology of the Melissa Trotter case is, in fact, erroneous.

Climate data used in the 2004 report included hourly temperatures out of the Montgomery County Airport climatological station in Conroe. Hourly unedited data for December 22nd 1998 indicate there were no temperatures exceeding 35°F. However, daily edited temperature data out of Conroe indicate a maximum temperature of 75°F for the same day. The high of 75° F is consistent with nearby Huntsville, almost equidistance from the death scene as Conroe, where there is a daily high of 74°F for the same time. I have reworked the case with the edited daily data out of Montgomery County Airport, Conroe. Analyses is exactly the same except degree days are used instead of degree hours. Edited hourly climatology data was not available.

## METHODOLOGY AND RESULTS

**Exhibits**:

Exhibits were received through the Montgomery County District Attorney's Office, Conroe, Texas. Exhibits were officially sealed within a large sturdy box and included exhibit 218, the ligature, the articles of clothing recovered from Melissa Trotter's remains and the catch papers (white sheets) on which they had been placed for previous forensics examinations. All exhibits were enclosed in individual zip-lock plastic bags. Exhibits were resealed and returned to sender by UPS after minute examination.

Exhibit 218 consisted of 11, 3 ½" standard plastic petri dishes loosely containing "scrapings" collected from Melissa's articles of clothing during autopsy and subsequent forensic examinations. It appears that insect material from each item of clothing was dislodged onto the catch papers and subsequently funneled into the petris. As expected, the contents of each petri largely consisted of a dried hodge-podge of dehydrated insect larvae and other insects and insect parts, fibres and other non-insect materials. I examined all of the exhibits for insect evidence, including the articles of clothing, inside and out, and sorted through the insect material contained in the petris. Representative insect samples were submitted to the University of West Virginia laboratory for DNA analysis in order to determine species. Species determination is critical in the final analyses since developmental periods vary between different species of calliphorids.

Exhibit 218 petri dishes contained dried remains of insects including many dehydrated fly larvae (maggots) of various ages. The plastic petris were of the variety that cannot hold preservative fluids. Indeed, the plastic petris are the variety designed to allow air to enter to facilitate the growth of microbiological organisms. Live insect specimens placed in them would have continued to develop until they were either eaten by the predatory insects, ants and beetles, also collected into the same containers, or until they eventually succumbed to suffocation once exhibits were sealed into plastic bags. Continued development in the containers was expected since there was no indication in any of the documentation read in advance, especially the pathology report, that any insect specimens had been killed and preserved.

Hundreds of dehydrated maggots were sorted in exhibit 218, including Calliphoridae, Piophilidae and Spaeroceridae. There were few signs of fly development beyond the third instar larval stage. A single blow fly adult had evidently emerged in the petris to be partially consumed by insect predators. Seen in three fragments, the head, a partial thorax and a partial abdomen it was identified as *Cynomyopsis cadaverina* (Diptera: Calliphoridae) through classic taxonomic treatment of what was left of the head. The fragmented remains of a single calliphorid pupal case from which the adult fly evidently emerged was also seen. This was not a surprise since a single newly formed calliphorid pupa was observed in the photographic evidence. There were no other signs of pupae. This newly formed pupa was the key specimen in determining the age of first colonizing flies.

The representative oldest calliphorid, *C.cadaverina,* had reached the end of the prepupal stage or the onset of pupation and this was the age used in the final analysis.

**DNA Analysis:**

Fourteen dehydrated larvae ranging in age from third instar to prepupa were selected for DNA analysis. Mitochondrial DNA analysis was successful for 9 of the specimens submitted. Three of these specimens were positive for *Cynomyopsis cadaverina* (Diptera: Calliphoridae); two of these specimens were postfeeding prepupae while one may have still been in the third instar larval feeding stage.

The remaining specimens successfully analyzed through DNA testing were third instar larvae that were not calliphorid species. Since the DNA test was designed only for the Family Calliphoridae, these larvae could not be further determined. It is the Calliphoridae species, however, that are critical in helping to determine time of death since they are the first colonizers of remains in such cases of abandoned remains.

**Climate data:**

Montgomery County Airport daily temperature data from December 1998 to January 1999 was used in these analyses. Daily data was obtained from a summary of edited daily temperature data for climatology obtained from the National Oceanic and Atmospheric Administration (NOAA) covering all climatology stations in Texas. The temperature data reported in this summary is consistent with other local stations such as Huntsville, equidistant from the death scene, and has been certified by NOAA.

Montgomery hourly climate data was used for the months of December 2003 and January 2004. It was at this time that two programmable climate dataloggers (ACR JR-1000) were placed at the death scene in the National Forest recording temperature every 15 minutes, 24 hrs per day at both ground level and 4 feet above ground (ambient). This recent data was collected to use as a tool in determining the feasibility of applying the 1998-1999 Montgomery airport data to this entomology case:

A statistical pairwise comparison test (Wilcoxin signed-ranks) compared hourly 2003 to 2004 death scene temperatures to airport temperature data for the same times to determine if there were any significant differences in temperatures between the two locations and between ground level and ambient temperatures at the death scene. Approximately 1000 hours of temperature data points for identical times from each data set were employed.

Results indicated there were no significant differences between any of the 3 temperature data sets collected during the end of 2003 to early 2004 using the placed datalogger recorders compared to Montgomery temperatures at the same time. Indeed, the correlations between the data sets was quite high and the probabilities of error in these correlations were extremely low indicating a high degree of confidence (*Figure 1*):

4

| Figure 1. | | |
|---|---|---|
| Temperature data comparisons | Correlation coefficient (r) | p-value |
| Montgomery and Ground level | 0.8739 | <0.0001 |
| Montgomery and Ambient | 0.8886 | <0.0001 |
| Ground level and Ambient | 0.9448 | <0.0001 |

Thus, Montgomery airport temperature data for 1998 and 1999 was deemed valid in the raw data form and was subsequently applied in the insect data analyses.

**Insect data analyses:**

A bionomics model of degree days development was extracted from a peer reviewed published source (Kamal 1958) and applied to the edited daily Montgomery County Airport, Conroe, temperature data of December 1998 to January 1999 (NOAA 1998, 1999).

A maggot mass temperature of 41°C was applied in the analysis. This value was obtained from Deonier's (1940) decomposition studies on sheep and goat carcasses in Texas and Arizona. The value of 41°C was used in this case because Deonier's studies were conducted in the same region of the USA, during the winter, as in this case, and this temperature was obtained from maggot masses located in the nasal sinuses within the skull cavity, as in this case. Deonier reported maggot mass temperatures as high as 48.9°C+ (sic) in his paper. This is not an unusual phenomenon; maggot mass temperatures of much greater than 41°C have been reported elsewhere (Early and Goff 1985, Greenberg 1991).

Maggot mass temperature is the heat produced by masses of actively feeding larvae during development from the last half of the second instar larva into the end of the third instar larva. Photographs of the death scene and postmortem indicate that there was, in fact, a maggot mass temperature: The head is skeletonized compared with the relative freshness of the rest of the remains and the ground at the death scene where the head had lain wears the black soot-like signature of a maggot mass.

Fly development parameters obtained from the bionomics model were applied to the accumulated degree-day (ADD) method of analysis (Catts and Goff 1992, Greenberg 1991). The C. cadaverina model using minimum developmental time requires about 185 accumulated degree days (ADD) from egg to the onset of pupation. Minimum developmental time is when the first individual fly reaches a given stage of development, in this case, the onset of pupation. In this case, first oviposition time by C.cadaverina therefore occurs between December 17th and 18th 1998 (Table 1).

Egg laying activity by calliphorid flies does not generally occur at temperatures less than 12°C (Smith 1986; pers. obs.). Although atmospheric conditions were clear and

favourable from the 14th of December, temperatures were not actually warm enough for egg laying until December 18th.


## CONCLUSIONS

Results of DNA analysis, taxonomic examinations and autopsy and death scene photographic evidence indicate that *Cynomyopsis cadaverina* was the first fly species to colonize Melissa Trotter's remains.

The age of *Cynomyopsis cadaverina* was determined to be the end of the prepupal or postfeeding stage (equals the onset of pupation) based on analysis of insect specimens seen in Exhibit 218 combined with the photographic evidence.

Reworking this entomology case using certified edited daily NOAA temperature data, results are quite different than reported in 2004 when unedited and erroneous hourly data was used. Blow flies probably first began to colonize remains December 18th 1998. Temperatures were never warm enough for first egg laying by blow flies until December 18th.

The minimum temperature threshold for egg laying activity by calliphorid flies is 12°C. Melissa Trotter was reportedly last seen at around 1500 hrs, December 8th. At this time temperatures had already dipped below 12°C. In fact, death scene temperatures were not favourable for blow fly egg laying until December 18th and this date is consistent with the stage of development of *C.cadaverina* in this case.


## REFERENCES

Catts, E.P. and M.L. Goff. 1992. Forensic entomology in criminal investigations., *Ann. Rev. Entomol.*, 37: 253-272.

Deonier, C.C. 1940. Carcass temperatures and their relation to winter blowfly populations and activity in the southwest, *J. Econ. Entomol.*, 33(1): 166-170.

Early, M. and M.L. Goff. 1986. Arthropod succession patterns in exposed carrion on the island of O'ahu, Hawaiian Islands, USA, *J. Med. Entomol.*, 23(5): 520-531.

Greenberg, B. 1991. Flies as forensic indicators, *J. Med. Entomol.*, 28(5): 565-577.

Kamal, A. 1958. Comparative study of thirteen species of sarcosaprophagous Calliphoridae and Sarcophagidae (Diptera) I. Bionomics, *Ann. Entomol. Soc. Amer.*, 51: 261-270.

National Oceanic and Atmospheric Administration (NOAA), National Climatic Data Center. Climatological data: Texas: December 1998, 103(12): 42-43.

National Oceanic and Atmospheric Administration (NOAA), National Climatic Data Center. Climatological data: Texas: January 1999, 104(01): 42-43.


Smith, Kenneth. 1986. Manual of forensic entomology. British Museum of Natural History, UK, 205 pp.

EXHIBIT "H"

| | | |
|---|---|---|
| EX PARTE | ) | No. 99-11-06435-CR |
| | ) | |
| | ) | IN THE DISTRICT COURT |
| | ) | |
| LARRY RAY SWEARINGEN | ) | 9TH JUDICIAL DISTRICT |
| | ) | |
| | ) | MONTGOMERY COUNTY, TEXAS |

## STATEMENT OF DR. JAMES J. ARENDS

My name is James J. Arends Ph.D, consulting Entomologist. I have been asked to provide an opinion in this case based on the following: The pathological examination of Melissa Trotter's body ("Autopsy"), conducted by former Chief Harris County, Texas, Medical Examiner, Joye M. Carter; and the entomological report provided to Mr. Swearingen's counsel by Dael Morris, and temperature data derived, according to the report, by the National Oceanic and Atmospheric Administration (NOAA) for Conroe, Texas covering the period December 8, 1998, to January 2, 1998. I have also conferred with federal habeas counsel for Mr. Swearingen regarding basic circumstances of the offense, including the date the State maintains Ms. Trotter disappeared, and the testimony provided by Dr. Carter, based on her gross observations of fungal growth and insect activity, dating Ms. Trotter's death and exposure in the San Jacinto National Forest at 25 days before autopsy. From counsel, I also learned that Mr. Swearingen was incarcerated beginning on December 11, 1998, and has been continuously confined since that time.

Melissa Trotter's body according to the autopsy was recovered in January 2, 1999, from the San Jacinto National Forest, located in Southeast Texas, near Conroe, Texas. Dr. Carter did not provide a date of death in her autopsy report, but apparently testified that fungal growth and insect activity, in her opinion, indicated that Ms. Trotter had been dead for 25 days, which put her death exactly on the December 8, 1998, the date she was last scene by state witnesses.

The autopsy report contains several remarkable observations that indicate a date of death later than December 11, 1998. Dr. Carter description of internal organs indicates substantially less autolyzation than would be expected if Ms. Trotter had been dead under temperature conditions indicated by the Conroe, TX data. The weight in grams for internal organs in Dr. Carter's reports indicate only a reduction in weight due to dehydration of only 30 percent, which again indicates exposure in the San Jacinto Forest

after December 11, 1998. By autopsy, there is also a remarkable absence of animal activity, which is unlikely in a corpse exposed for 22 days in the environment where it was found. Finally, Ms. Morris identified a single species of blow fly, C. Cadeverina, from the insect material collected from the evidence in this case, whereas a body exposed outdoors for the length of time that the State maintains would in all probability exhibit colonization by several species.

The entomological report identifies *C. Cadeverina* as the blow fly specie in all samples Ms. Morris subjected to DNA testing. Review of the scientific literature on this species shows it is primarily a northern species, but its range extends throughout the area in which the body was found. It is also active and prevalent in the under fall conditions such as those represented in the Conroe temperature data for December 1998.

It is my forensic entomological opinion, based on the information that I have been presented, that the temperature conditions for December 1998, and the developmental stages of fly larvae and pupae reported by Ms. Morris that Ms. Trotter's body was exposed and colonized by blow flies after December 11, 1998. It is also my opinion, based on the information that I have been presented, that if death occurred before December 11, 1998, the body would have to have been covered and stored in such a way as to prevent fly colonization and inhibit autolization.

Signed this 19th day of January 19, 2007.

By:_____

James J. Arends

EXHIBIT "T"

| EX PARTE | ) | No. 99-11-06435-CR-2 |
|---|---|---|
| | ) | IN THE DISTRICT COURT |
| LARRY RAY SWEARINGEN | ) | 9TH JUDICIAL DISTRICT |
| (WR-53,613-04) | ) | MONTGOMERY COUNTY, TEXAS |

EX PARTE ) No. 99-11-06435-CR-2

) IN THE DISTRICT COURT

LARRY RAY SWEARINGEN ) 9TH JUDICIAL DISTRICT

(WR-53,613-04) ) MONTGOMERY COUNTY, TEXAS

## STATEMENT OF LLOYD WHITE, M.D.

1.  My name is Dr. Lloyd White. I am a physician licensed to practice medicine in the State of Texas. I am certified by the American Board of Pathology in Anatomical, Clinical and Forensic Pathology. I have served as the State Medical Examiner for Mississippi and the Chief Medical Examiner of Nueces County, Texas. I am presently a Deputy Medical Examiner for Tarrant County Texas. I have testified for the defense and for the prosecution in numerous cases.

2.  I have reviewed the autopsy report on the body of Melissa Trotter by Dr. Joye M. Carter. I have reviewed several autopsy and crime scene photos depicting the body of Ms. Trotter. I have also reviewed Dr. Carter's trial testimony in *State v. Swearingen*. I am also aware of Dr. Emilio Sanchez's criticism and revision of Dr. Carter's testimony regarding vaginal bruising in this case.

3.  At several critical junctures, Dr. Carter's testimony is not only questionable, it is without support in the medical literature. In fact, it is contrary to what is taught and should be practiced in forensic pathology.

4.  In the first place, Dr. Carter testified that the date of death in this case was 25 days prior to recovery of the body. She based her opinion on the "appearance" of the body during autopsy, primarily on evidence of faunal and floral activity and growth, but also on the degree of decomposition of internal organs. Pathologists cannot accurately estimate a post mortem interval with the precision that Dr. Carter indicated she was capable of. Pathological estimates of the time of death, using the type of evidence on which Dr. Carter relied, cannot be made with confidence after a body has been left unprotected for far less time than 25 days. A pathologist could only estimate a relatively broad range of weeks or even months during which Ms. Trotter died.

5.  Moreover, Dr. Carter's description of internal organs conflicts remarkably with the post mortem interval of 25 days she estimated, and suggests a date of death much closer to the January 2, 1999 date on which the body was recovered. For example, the pancreas, due to digestive enzymes which it produces, liquefies almost entirely within a day or so of death, sometimes within hours. However, Dr. Carter reports that the pancreas was intact. Autolysis of the spleen occurs relatively quickly, well before 25 days after death absent refrigeration. However, Dr. Carter also reports that the spleen was intact. Indeed, she describes the capsular surface as "red brown, dull and smooth," which is a description appropriate to a recently deceased individual.

6. In the second place, Dr. Carter's diagnosis of bruises antedating death is without foundation. Dr. Emilio Sanchez's determination that the evidence did not support even a tentative diagnosis of vaginal bruising in my view is correct.

7. Dr. Carter's testimony that a diagnosis of a bruise to Ms. Trotter's face due to trauma could not be ruled out based on differences of decomposition caused by insect activity is misleading. First, the insects in question are attracted to wounds – cuts and abrasions – not to bruising. Second, the insects lay their eggs in oral cavities and the maggots migrate as they grow and feed. Given these circumstances, a pathologist cannot suggest with any integrity that a bruise anteceding death could be responsible for the pattern of decomposition seen in photos of Ms. Trotter's head and neck region. Even a tentative diagnosis of bruising is not warranted under these conditions.

8. Dr. Carter also testified that vaginal bruising would resolve within three days of death. (Here it appears that Dr. Carter – and the Court, apparently – simply assumed a vaginal bruise was present.) However, it is simply not true that bruises generally resolve so quickly. It is well known that they may take weeks to resolve and that specific colors may disappear then reappear without intervening trauma.

9. My understanding is that the forensic pathological evidence in this case played an important role in the conviction for murder, and particularly in the conviction for felony rape and kidnapping that resulted in this crime being charged as a capital case.

10. Unfortunately, the conviction in this case rests upon misleading forensic pathological testimony.



Lloyd White, M.D.

Before me appeared Lloyd White, who being deposed on his oath, stated on this 29th Day of March, 2007, that the foregoing affidavit testimony was, to the best of his knowledge, true and correct.

Notary Public

My commission expires: _05/24/08_

SHERRY E. THOMPSON
Notary Public
STATE OF TEXAS
My Comm. Exp. 05/24/2008

EXHIBIT "J"

EX PARTE                    )    No. 99-11-06435-CR-2

                                  )    **IN THE DISTRICT COURT**

**LARRY RAY SWEARINGEN**    )    **9TH JUDICIAL DISTRICT**

(WR-53,613-04)             )    **MONTGOMERY COUNTY TEXAS,**


## REPORT OF DR. GLENN M. LARKIN


1.       My names is Dr.Glenn Larkin. I am a physician licensed to practice medicine in the State of North Carolina. I am board certified in Forensic Medicine by the American Board of Forensic Medicine and a Fellow of the American College of Forensic Examiners. Among my publications is "Time of Death," In Wecht, C H, *The Forensic Sciences*, Matthew Bender, New York (1997). I have reviewed the autopsy protocol of the body of Melissa Trotter made by Dr. Joye M. Carter (autopsy report). I have reviewed some of the trial testimony and some of the photographs in *State v. Swearingen*, no. 00-11-06435-CR, in the 9th District Court, Montgomery County, Texas, including the testimony of Dr. Carter.

2.       It is my professional opinion to a reasonable medical and scientific certainty that Melissa Trotter was dead for far less than the twenty-five (25) days opined by Dr Carter. The reasons for this opinion follow.

3.       Decomposition can be divided into related two phases- liquefaction and shrinkage. although there is some overlap. Ms. Trotter's body was in the liquefaction phase, but not far into it, judging by the weights and descriptions of organs given by Dr Carter. In the abdomen and chest, liquefaction was progressing but was not yet completed. Dr Carter reported an "intact" pancreas. But this organ is quick to decompose, and should be entirely liquefied in a body exposed for twenty-five days unprotected in the forest.

4. Importantly, the liquefaction phase usually ends before, the start of the third week into the PMI under temperature conditions existing in the Conroe, Texas area at the time of Ms. Trotter's disappearance. After death, the skin undergoes a programmed set of changes to eventually turns green or black. Organs drain and dehydrate, resulting in loss of mass. Organs such as the intestines distend and perforate, during this period resulting in organ shrinkage, so that organ weights are considerably less than the weight when the person was alive. Weights of spleen, liver, heart, and pancreas, as reported by autopsy were all in the reference range for a living person. The weight of the heart was within the reference range for a healthy female of Ms. Trotter's stature. The only organs that, by report, fell below the reference range were the kidneys. The kidneys, as reported by Dr. Carter, weigh 30% less than average. However, the reported figure is not unusual given Ms. Trotter's relatively small size. The absence of significant shrinkage due to dehydration, autolysis and subsequent drainage strongly indicates a date of death well after December 11, 1998.

5.    .Along with aforementioned gross anatomical changes, one would expect certain findings on examining the remains of a cadaver dead twenty-five days prior discovery. The gastro-intestinal track, with many inter-cellular enzymes and a few hormones, first distends because of both autolysis (the auto-digestion by its own enzymes) and putrefaction by the intestinal flora resulting in an anal discharge called purge. In Ms. Trotter's case, there was no purge staining by feces urine, or other liquid reported on Trotter's bright red thong panties or blue jeans, which suggests that no purging took place, and therefore a PMI far less than 25 days.

6.    Indeed, if Ms Trotter were to have been deposited in the woods more than three weeks prior to discovery, one would expect that to find her abdomen or distended with gas, or ruptured due to the increased gas pressure. The lack of perforation of the gut and the lack of significant bloating seriously refutes a 25 day post mortem interval, and strongly indicates a substantially shorter period of time after death.

7.    The pancreas is reported intact which is unheard of in cases where bodies have decomposed over a period of 25 days under conditions present in the area from which Ms. Trotter's corpse was recovered in January of 1999. The pancreas starts to liquefy within hours under hospital conditions, yet Dr. Carter reported she was able to identify structural features, The description of the spleen also strongly indicates a far shorter post mortem interval than twenty-five days,

8      Therefore, it is my opinion as a forensic pathologist to a reasonable medical and scientific certainty that the post-mortem interval is less than twenty-five days.


Signed this 29th _____ day of March, 2007.


G.M. Larkin    MD
Glenn M. Larkin MD

State of North Carolina
Mecklenburg County/ss:

I swear under penalty of perjury that the statements and opinions above are true and correct to the best of my knowledge and belief.

G M Larkin MD  02/29/07
G M Larkin MD
3700 Shamrock Dr
Charlotte NC 28215
704-940-8818
nc15960@yahoo.com

EXHIBIT "K"

EX PARTE

LARRY RAY SWEARINGEN

(WR-53,613-04)

No. 99-11-06435-CR-2

IN THE DISTRICT COURT

9TH JUDICIAL DISTRICT

MONTGOMERY COUNTY, TEXAS

RECEIVED AND FILED
FOR RECORD

At_____O'clock_____M.

JUN 0 1 2007

## APPLICANT'S PROPOSED DESIGNATION OF UNRESOLVED ISSUES OF FACT AND LAW MATERIAL TO THE LEGALITY OF HIS CONFINEMENT

TO THE HONORABLE FRED EDWARDS, JUDGE:

On January 22, 2007, Mr. Swearingen filed a successor application for writ of habeas corpus. On January 23, 2007, the Court of Criminal Appeals found that the following six claims in Mr. Swearingen's successor petition met requirements of Tex. Code Crim. Proc., art. 11.071 § 5, and remanded these claims to this Court for proceedings under art. 11.071 §§ 7-10. Exh. 'A', *Order*.

Claim 1: THE STATE WITHHELD FAVORABLE, MATERIAL EVIDENCE SHOWING THAT MR. SWEARINGEN DID NOT COMMIT MURDER.

Claim 2: IN VOILATION OF DUE PROCESS THE STATE WITHHELD FAVORABLE, MATERIAL EVIDENCE EXCULPATING HIM OF THE KIDNAPPING AND AGGRAVATED SEXUAL ASSAULT CHARGES UNDERLYING HIS CAPITAL CONVICTION.

Claim 3: THE STATE PREVENTED MR. SWEARINGEN FROM ESTABLISHING THAT HE WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY DUE PROCESS AND THE SIXTH AMENDMENT. *STRICKLAND v. WASHINGTON*, 466 U.S. 688 (1984).

Claim 4: ENTOMOLOGICAL EVIDENCE SHOWS THAT MR. SWEARINGEN IS ACTUALLY INNOCENT OF CAPITAL MURDER.

Claim 5: ENTOMOLOGICAL EVIDENCE SHOWS THAT MR. SWEARINGEN IS ACTUALLY INNOCENT OF AGGRAVATING FELONY CHARGES.

Claim 6:    FORENSIC OPINION OF HARRIS COUNTY MEDICAL EXAMINER IS CLEAR AND CONVINCING EVIDENCE THAT MR. SWEARINGEN DID NOT COMMIT AGGRAVATING FELONIES UNDERLYING HIS CAPITAL CONVICTION.

On February 23, 2007, the State answered and requested dismissal of Mr. Swearingen's successor application. On March 30, 2007, *per* this Court's order, Mr. Swearingen filed a reply. On May 10, 2007, the State requested an evidentiary hearing, stating that "Applicant filed a reply to the state's answer to which he attached additional evidence that was not presented with his initial application. That evidence counters the State's argument within its answer in opposition to Applicant's application." Exh. 'B' at 1. The State also submitted a designation of controverted issues of fact listing three issues of fact that should be resolved as follows:

> 1.    Whether the entomological evidence is favorable and material evidence showing that the Applicant did not commit murder?
>
> 2.    Whether the entomological evidence shows that the Applicant is actually innocent of capital murder?
>
> 3.    Whether the entomological evidence shows that Applicant is actually innocent of aggravating felony charges?

*Id.* at 2. On May 14, 2007, the Court ordered a hearing convened on July 2, 2007. *Id.*

To assist this Court in adjudicating the several claims that the TCCA ordered considered Mr. Swearingen would point out the following: **First**, the State's proposed issues pertain only to claims for relief from the murder conviction. However, the TCCA also remanded claims related to convictions on kidnapping and aggravated sexual assault. **Second**, while it is clear that the issues the Court designated for a hearing are

controverted, several addition issues remain unresolved either because they are controverted or because the Court has not rule upon them. In particular issues remain unresolved regarding Mr. Swearingen's ineffectiveness of counsel claim and his claim that the present Harris County Medical Examiner, Dr. Emilio Sanchez's, re-evaluation of forensic evidence showed Mr. Swearingen did not commit the aggravated felonies of robbery and sexual assault underlying his capital conviction. **Third**, the proposed findings of fact do not acknowledge the pathological evidence at issue in these successor proceedings.

Factual development of the full range of evidence that Mr. Swearingen has presented in support of his successor claims is in order. The need for an evidentiary hearing to resolve material issues raised by Mr. Swearingen's successor pleadings makes this clear. Furthermore, in these successor proceedings, the State has sought to counter Mr. Swearingen's allegations that entomological evidence is material under *Brady*, that failure to present it is prejudicial under *Strickland*, and that the evidence is highly probative of actual innocence on the ground that there is "overwhelming evidence of guilt."[1] The State has relied on pathological testimony and reports presented at trial to contest the significance or Mr. Swearingen's claims regarding the materiality of this evidence.[2] To counter Mr. Swearingen's arguments for relief from his conviction for murder, the State has emphasized critical testimony by former Harris County Medical Examiner, Joye M. Carter, regarding the decomposition of Ms. Trotter's body and the

---

[1] *State's Answer in Opposition to Applicant's Second Application for Writ of Habeas Corpus*, ("SAO") at 40.
[2] *Id.* at 43.

significance of these observations in dating death.[3]   In contesting Mr. Swearingen's

arguments that his convictions on underlying felonies of kidnapping and sexual assault

are unlawful, the State has insisted that forensic evidence demonstrates vaginal bruising,

bruises to the face and lacerations to the neck.[4]   As the TCCA clearly implied when it

remanded Mr. Swearingen' successive causes of action, the entomological evidence he

presented calls into serious question these pillars of the State's capital murder case.  Mr.

Swearingen is clearly entitled to demonstrate by way of rebuttal that the evidence the

State continue to present in support of the convictions in this case is completely without

scientific foundation, is wildly inaccurate, and is likely based on outright fabrications by

the former Harris County Medical Examiner.

In order to fairly adjudicate the serious claims in this case, the following

controverted, previously unresolved issues of material fact should, therefore, be

considered at the July 2, 2007, hearing in this case:

1a.   Whether the entomological evidence presented in these successor
proceedings is favorable and material evidence showing that the
Applicant did not commit or attempt to commit kidnapping.[5]

2a.   Whether the entomological evidence presented in these successor
proceedings is favorable and material evidence showing that the
Applicant did not commit or attempt to commit aggravated sexual
assault.

---

[3] *Id.*

[4] *Id.*

[5] The favorable and material standards pertain to successor claims one and two, which Mr. Swearingen
brought under Brady v. Maryland, 373 U.S. 83 (1963).  On Tuesday, May 22, 2007, undersigned counsel
conferred with Assistant District Attorney Marc Brumberger.  The parties agreed that a finding that the
entomological evidence was favorable and material would also shows that failure to sponsor this evidence
at trial prejudiced Mr. Swearingen defense to capital murder and to the aggravated felony charges.
Conversely, a finding that the evidence was not material under Brady would show that its absence from
trial did not prejudice Mr. Swearingen.

3a. Whether prior to trial defense expert, Dr. Raul Lede, confirmed the findings of Dr. Carter that the date and time of death of Melissa Trotter took place on December 8, 1998, twenty-five days before the body was recovered form the Sam Houston National Forest.[6]

4a. Whether the entomological evidence provided in these successor proceedings shows that Mr. Swearingen is actually innocent of murder.

5a. Whether pathological evidence provided in these successor proceedings confirms that Mr. Swearingen is actually innocent of murder.

6a. Whether the entomological evidence provided in these successor proceedings shows that Mr. Swearingen is actually innocent of kidnapping.

7a. Whether the pathological evidence provided in these successor proceedings confirms that Mr. Swearingen is actually innocent of kidnapping.

8a. Whether the entomological evidence provided in these successor proceedings shows that Mr. Swearingen is actually innocent of aggravated sexual assault.

9a. Whether the pathological evidence provided in these successor proceedings confirms that Mr. Swearingen is actually innocent of aggravated sexual assault.

10a. Whether pathological evidence provided in these successor proceedings regarding blunt trauma injuries (bruising) to Ms. Trotter's vagina shows that Mr. Swearingen is not guilty of kidnapping.

11a. Whether pathological evidence provided in these successor proceedings regarding blunt trauma injuries shows that Mr. Swearingen is not guilty of aggravated sexual assault.

---

[6] This issue may not need to be litigated in that undersigned counsel and Mr. Brumberger in conferencing this pleading that if the court finds that the entomological evidence is material (and, therefore, prejudicial under *Stricklandi*), that will establish deficiency based, inter alia, on representations by trial counsel in affidavits submitted in 2001 and during present proceedings showing that at trial he was not aware in the least of the potential usefulness of forensic entomology for Mr. Swearingen's case.

Respectfully Submitted,

HILDER & ASSOCIATES, P.C.
819 Lovett Boulevard
Houston, Texas 77006
(713) 655- 9111 - Telephone
(713) 655- 9112 - Fax

by: _____
      James G. Rytting
      Tx. Bar No. 24002883

## CERTIFICATE OF SERVICE

     I, the undersigned attorney, hereby certify that a true and correct copy of the above and foregoing proposed designation of facts has been delivered to the Montgomery County District Attorney by mail/or facsimile on this 30th Day of May, 2007.

_____
James G. Rytting

EXHIBIT "L"

No. 99-11-06435-CR-(2)

| | § | IN THE DISTRICT COURT OF |
| EX PARTE | § | MONTGOMERY COUNTY, TEXAS |
| LARRY RAY SWEARINGEN | § | 9TH JUDICIAL DISTRICT |

## DESIGNATION OF CONTROVERTED,
## PREVIOUSLY UNRESOLVED ISSUES OF FACT MATERIAL
## TO THE LEGALITY OF APPLICANT'S CONFINEMENT

Applicant, Larry Ray Swearingen filed his second application for writ of habeas corpus in the above styled and numbered cause on January 22, 2007. On January 23, 2007, the Court of Criminal Appeals found that Applicant's Claims One through Six met the requirements of Tex. Code Crim. Proc. art. 11.071, § 5, for consideration of subsequent claims. The Court remanded Issues One through Six to this Court to resolve as set out in Tex. Code Crim. Proc art. 11.071, §§ 7-10. Applicant's execution, scheduled for January 24, 2007, was stayed until the Court of Criminal Appeals issues its ruling on the merits of the case.

On February 23, 2007, the State filed its answer in opposition to Applicant's application. On March 30, 2007, Applicant filed a reply to the State's answer to which he attached additional evidence that was not presented with his initial application. That additional evidence counters the State's argument within its answer in opposition to Applicant's application.

RECEIVED AND FILED
FOR RECORD

At _____ O'clock _____ M.

MAY 1 0 2007

BARBARA GLADDEN ADAMICK
District Clerk
MONTGOMERY COUNTY, TEXAS
By_____Deputy

1

Therefore, in accordance with the Court of Criminal Appeal's order, the following issues of fact should be resolved:

1. Whether the entomological evidence is favorable and material evidence showing that Applicant did not commit murder?

2. Whether the entomological evidence shows that Applicant is actually innocent of capital murder?

3. Whether the entomological evidence shows that Applicant is actually innocent of the aggravating felony charges?

In order to resolve these issues, the Court will hold an evidentiary hearing by _July 2,_ @ 10:30 AM, 2007, the 30th day from the date of this order designating issues, as provided by article 11.071, § 9(b).

It is ORDERED that the Clerk of this Court send a copy of this order designating issues of fact material to the legality of Applicant's confinement to Mr. Philip H. Hilder and Mr. James Rytting, Attorneys for Applicant, 819 Lovett Blvd, Houston, TX 77006; and to the State.

The Clerk of this Court is further ORDERED to forward a copy of this designation of issues to the Court of Criminal Appeals and not to forward any other documents unless specifically ordered by this Court or by the Court of Criminal Appeals.

SIGNED ON THIS THE ___/ Y___ day of _____ 2007.

_____
Judge Presiding
9th District Court
Montgomery County, Texas

EXHIBIT "M"

EX PARTE ) No. 99-11-06435-CR-2

) IN THE DISTRICT COURT

LARRY RAY SWEARINGEN ) 9TH JUDICIAL DISTRICT

(WR-53,613-04) ) MONTGOMERY COUNTY, TEXAS

## AFFIDAVIT OF LISA ROBERTS

My name is Lisa Roberts. I swear that, to the best of my knowledge, the following is true and correct:

1. In 1998, I was employed at League Line Marina & Resort on Lake Conroe, Conroe, Texas. I was working in the phone room or call center. My job was to try to call possible customers to get them interested in the resort. About ten people worked in the phone room at this time, including Melissa Trotter. Robert Graham was our supervisor.

2. Around November of 1998, Melissa began receiving phone calls that seemed to upset her. At first, she would just hang up real abruptly. I'd ask her during a break what was going on, and she'd say something like, "men." I was pretty sure the problem wasn't customers, but Melissa did not say who was bothering her.

3. As I recall, it was not too long before the time Melissa disappeared, she got phone calls that really upset her. Cora, who also worked in the call center, would patch the phone calls through to Melissa. Melissa broke down and started crying. She said "he won't quit calling." Cora patched another call through, and I picked up Melissa's phone.

4. The caller thought Melissa was on the line and started saying completely foul things. He said, "You're a fucking bitch," and swore that he was "going to choke the life out of me," meaning Melissa. He went on, saying that he was going to get her back for what she did to him. I remember him saying, "I'll strangle you; I'll choke the life out of you; I'm going to fuck you while you die." I started yelling back and he realized Melissa was not on the phone. That was the first phone call I took.

5. The caller phoned again, and I picked up the phone again. He told me that he was going to "lick" Melissa's cheek, and "right before she took her last breadth," he said, "I'm going to kiss her lips for the last time."

6. That night the calls kept coming for an hour and a half until it was time to quit work. Everyone's numbers were down in the phone room because the calls took all our attention, except for one girl who did not want to make it her business. When he'd call, we would try to "star-69" the phone calls in order to I.D. the caller but he was using a private line.

7.     As I remember, Mrs. Trotter came out and picked Melissa up after work. I believe Melissa's own car was still in the parking lot when I returned to work the next day. That previous night was the last time Melissa worked at League Line Resort. She may have come out to pick up her check. I heard Melissa started working at Academy a few days later, but I didn't see her again after that night.

8.     While Melissa was working at League Line, this one guy picked her up three times, as I remember. The first time Melissa seemed O.K about it. The second time he came to get her, Melissa said "Oh god, oh god." Nickie Mains and I confronted her as the guy was pulling up. I said she did not have to get in the car with anyone she did not want to. I told her I'd get my boyfriend. Melissa said, "You don't know what that will do; that'll cause problems."

9.     The night guard would not let the guy past, so he parked on the side of the road outside the entrance. The first two times he came to get Melissa he parked in the dark. The third time he came to get Melissa, she was scared to death. We told her not to go, and when she insisted she had to, we made her promise to call us when she got home. She called forty-five minutes later. On this third occasion, the man parked in the light and I was able to see him and his car. He was driving a pick-up, full size, an older model, light blue in color. I did not know who the person was, and Melissa did not tell us his name.

10.    I do know who Larry Swearingen is. I went to school with him. I had at least five classes in junior high and high school with him, including auto repair and a math class. The man who picked Melissa up was not Larry Swearingen. The voice on the phone was not Larry Swearingen's voice.

11.    I learned that Melissa had disappeared from Cora. She came into work and plopped down the paper, the Courier Journal, which carried the story. At first, we thought that Melissa had left home because she was tired of her mother running her life. Melissa used to complain about her mother's interference. For example, Amber Mains, who also worked in the call room, and Melissa decided to try out with a modeling agency. The agency chose Melissa, but her mother would not let her work for the agency. Melissa said her mother told she had to get her education first, and then she could make a decision about a career in job like that.

12.    Cora asked me if we should call the police. At first, we did not want to get involved. However, that night or the night after, Cora telephoned Montgomery County Sheriff's Department and told them that she worked with Melissa and said Melissa had received some life threatening phone calls. The following day two detectives came out, one was tall and chunky. The other was shorter. Both officers had dark hair and appeared to be 30-40.

13. The first question the detectives asked us was, did we know Melissa? We said, Yes. The very next thing they said was, "Tell us about the phone calls." I told them what the caller said. I told the detectives that the calls started about a week ahead of the night on which Melissa broke down, and I told them about that Melissa broke down crying one night and that I took the call meant for her. I told the detectives what the caller said: that he threatened to strangle and choke the life out of Melissa, and that he threatened to rape her and watch her die. I remember telling them exactly that the caller said he was going to lick her cheek and kiss her lips just before she died. I also told them the detectives about the man Melissa was so scared of, who had picked her up those three times at League Line Resort.

14. I also told the detectives that Melissa was dating Larry Swearingen, and that he might know where she was. I knew Melissa was dating Larry because she told me. At first, I thought, now way, and used to kid her about dating him. Melissa said that she liked him because he made her feel herself and was easy to talk to.

15. Melissa had a number of boyfriends during the time I knew her.

16. We followed the papers and the searches they reported, and thought nothing about her being dumped in the Sam Houston National Forest. That is, we didn't think that was where her body would turn up. I went to five mile point, where the body was eventually found, a couple times in between the time Melissa disappeared and before her body turned up. It was a very popular place to go, even in the winter. In fact, I went to five mile point on December 31, 1998, New Years Eve, with a group of friends. There was another group from, I believe, Huntsville, already partying. We did not see a dead human body at any time.

SIGNED _Lisa Roberts_
Lisa Roberts


SUBSCRIBED and SWORN before me the undersigned authority on this ___14___ day of _December_, 2007.


_signature_
Notary Public of and
for the State of Texas

VILMA E. STANDEFORD
Notary Public
STATE OF TEXAS
My Comm. Exp. Dec. 30, 2008

EXHIBIT "M.1"

[FILED UNDER SEAL]

| | | |
|---|---|---|
| **EX PARTE** | ) | **No. 99-11-06435-CR-2** |
| | ) | **IN THE DISTRICT COURT** |
| **LARRY RAY SWEARINGEN** | ) | **9ᵗʰ JUDICIAL DISTRICT** |
| **(WR-53,613-04)** | ) | **MONTGOMERY COUNTY, TEXAS** |

## <u>AFFIDAVIT OF LISA ROBERTS</u>

My name is Lisa Roberts. I swear that, to the best of my knowledge, the following is true and correct:

1.    In 1998, I was employed at League Line Marina & Resort on Lake Conroe, Conroe, Texas. I was working in the phone room or call center. My job was to try to call possible customers to get them interested in the resort. About ten people worked in the phone room at this time, including Melissa Trotter. Robert Graham was our supervisor.

2.    Around November of 1998, Melissa began receiving phone calls that seemed to upset her. At first, she would just hang up real abruptly. I'd ask her during a break what was going on, and she'd say something like, "men." I was pretty sure the problem wasn't customers, but Melissa did not say who was bothering her.

3.    As I recall, it was not too long before the time Melissa disappeared, she got phone calls that really upset her. Cora, who also worked in the call center, would patch the phone calls through to Melissa. Melissa broke down and started crying. She said "he won't quit calling." Cora patched another call through, and I picked up Melissa's phone.

4.    The caller thought Melissa was on the line and started saying completely foul things. He said, "You're a fucking bitch," and swore that he was "going to choke the life out of me," meaning Melissa. He went on, saying that he was going to get her back for what she did to him. I remember him saying, "I'll strangle you; I'll choke the life out of you; I'm going to fuck you while you die." I started yelling back and he realized Melissa was not on the phone. That was the first phone call I took.

5.    The caller phoned again, and I picked up the phone again. He told me that he was going to "lick" Melissa's cheek, and "right before she took her last breadth," he said, "I'm going to kiss her lips for the last time."

6.    That night the calls kept coming for an hour and a half until it was time to quit work. Everyone's numbers were down in the phone room because the calls took all

our attention, except for one girl who did not want to make it her business. When he'd call, we would try to "star-69" the phone calls in order to I.D. the caller but he was using a private line.

7.      As I remember, Mrs. Trotter came out and picked Melissa up after work. I believe Melissa's own car was still in the parking lot when I returned to work the next day. That previous night was the last time Melissa worked at League Line Resort. She may have come out to pick up her check. I heard Melissa started working at Academy a few days later, but I didn't see her again after that night.

8.      While Melissa was working at League Line, this one guy picked her up three times, as I remember. The first time Melissa seemed O.K about it. The second time he came to get her, Melissa said "Oh god, oh god." Nickie Mains and I confronted her as the guy was pulling up. I said she did not have to get in the car with anyone she did not want to. I told her I'd get my boyfriend. Melissa said, "You don't know what that will do; that'll cause problems."

9.      The night guard would not let the guy past, so he parked on the side of the road outside the entrance. The first two times he came to get Melissa he parked in the dark. The third time he came to get Melissa, she was scared to death. We told her not to go, and when she insisted she had to, we made her promise to call us when she got home. She called forty-five minutes later. On this third occasion, the man parked in the light and I was able to see him and his car. He was driving a pick-up, full size, an older model, light blue in color. I did not know who the person was, and Melissa did not tell us his name.

10.      I have reviewed a photograph of an individual who appear to be the person who came to the resort to pick up Melissa. I have since learned that the name of this person is Robbie Grove.

SIGNED *Lisa Roberts*
           Lisa Roberts


SUBSCRIBED and SWORN before me the undersigned authority on this ___14___
day of __December__ , 2007.

*Lisa O Standefer for*
Notary Public of and
for the State of Texas

VILMA E. STANDEFORD
Notary Public
STATE OF TEXAS
My Comm. Exp. Dec. 30, 2008



EXHIBIT "N"



EXHIBIT "O"



EXHIBIT "P"











EXHIBIT "Q"

MONTGOMERY COUNTY SHERIFF'S DEPARTMENT

FOLLOWUP REPORT

DATE: 02/11/99
TIME: 09:45

CASE NO: 98A017441/58

CAD NATURE:

REPORTING OFFICER:                                    UNIT:

SYNOPSIS:

PROCESSED:        BY:                          PHOTOS:        PRINTS:

ADMINISTRATION

CLR. OFC:                          #:                DATE:
ROUTE    :              SAO:          DATE:                DIV:
CLEARANCE    :                        EXCEPTION:
SUPERVISOR :                        #:
APPROVED BY:                        #:
ATTACHMENTS:

NARRATIVE

98A017441/58

REPORT BY B.W. EMMONS

SUBJECT: RECOVERY OF BODY

ON 1-2-99, I, CRIME SCENE INVESTIGATOR B.W. EMMONS, MCSO UNIT 6504, RECIEVED A
CALL AT HOME AT APPROXIMATELY 1015 HOURS FROM SGT. P. FRANKHOUSER THAT A BODY
MATCHING THE DESCRIPTION OF MELISSA TROTTER HAD BEEN FOUND IN THE WOODS IN
NORTH MONTGOMERY COUNTY, OFF FM 1375 AND FORREST SERVICE ROAD 204-A. I
RESPONDED TO THE SCENE AND ARRIVED ON LOCATION AT APPROXIMATELY 1115 HOURS.

NUMEROUS OFFICERS WERE AT THE SCENE ON MY ARRIVAL. SEE ORGINAL REPORT FOR
DETAILS.
CRIME SCENE PERSONNEL AT THE SCENE;
SGT. P. FRANKHOUSER, MCSO UNIT 650
CSI I. CEGIELSKI, MCSO UNIT 6501
CSI D. LAFFERTY, MCSO UNIT 6505

LT. D. NORRIS, MCSO UNIT 51, WAS ON THE SCENE WHEN I ARRIVED AND STATED THAT
THE BODY APPEARED TO BE THAT OF MELISSA TROTTER; THAT THE BODY WAS FOUND BY
CITIZENS LOOKING FOR TWO GUNS AFTER AN ATTEMPTED SUICIDE OF A FAMILY MEMBER.
LT. NORRIS STATED THAT GAME WARDENS RELATED THAT THERE HAD BEEN NUMEROUS DEER
AND DUCK HUNTERS IN THE AREA IN THE LAST FEW DAYS AND THAT THREE DEER HAD BEEN
SHOT AND CLEANED IN THE AREA NEAR WHERE THE BODY WAS FOUND.
THE AREA WAS SECURED WITH CRIME SCENE BARRIER TAPE ACROSS FS ROAD 204-A WHEN I
ARRIVED.

SCENE DESCRIPTION:
FS (FIRE SERVICE) 204-A IS AN IMPROVED DIRT ROAD THAT RUNS IN AN EASTERLY
DIRECTION OFF FS ROAD 204. FS 204 IS AN IMPROVED DIRT ROAD THAT RUNS IN A

SOUTHERLY DIRECTION OFF FM 1375.
\_\_\_\_EAGE TO THE SCENE:
1\_ MILES NORTH ON INTERSTATE 45 FROM LOOP 336 TO FM 1375
9.5 MILES WEST ON FM 1375 FROM INTERSTATE 45
1.5 MILES SOUTH ON FS 204 TO FS 204-A
2.2 MILES EAST ON FS 204-A
THE BODY WAS LOCATED IN THE WOODS 115' DIRECTLY SOUTH (190 DEGREES) FROM FS
204-A. KEY MAP 72-T.
AN UNIMPROVED DIRT ROAD USED BY HUNTERS WAS ON THE WEST SIDE OF THE AREA WHERE
THE BODY WAS FOUND. THE BODY WAS LOCATED 77'EAST OF THIS ROAD. BOTH THIS
UNIMPROVED DIRT ROAD AND FS 204-A DEAD END AT LAKE CONROE. SEE DIAGRAM AND MAPS
FOR DETAILS OF THE LOCATION.

I NOTED NUMEROUS SIGNS OF HUNTERS IN THE AREA, SUCH AS FIRED SHOTGUN SHELLS AND
OTHER TYPES OF FIRED CASINGS AS WELLS THE REMAINS OF DEER HIDES.

THE BODY WAS LYING FACE UP IN THE BRUSH. HER HEAD WAS TOWARD THE NORTH AND HER
FEET TOWARD THE SOUTH. I COULD NOT SEE THE BODY FROM THE UNIMPROVED DIRT ROAD.
THERE WERE DEAD TREES AND BRUSH THAT KEEP IT CONCEALED UNTIL I WALKED UP TO
WITHIN A FEW FEET OF THE LOCATION.
THE VICTIM WAS FULLY DRESSED IN BLUE JEANS, BLACK COLORED SHIRT, GREEN COLORED
SWEATER, WHITE COLORED BRA, RED COLORED PANTIES AND WHITE SOCKS. SHE HAD A
SHOE ON HER LEFT FOOT. THE RIGHT SHOE WAS ON THE GROUND NEAR HER FEET.
HER RIGHT ARM WAS ABOVE HER HEAD. HER LEFT ARM WAS ALONG HER LEFT SIDE.
THE SHIRT AND SWEATER WERE PULLED ABOVE HER BRA, CONSISTENT WITH BEING DRUG BY
SOMEONE HOLDING HER AROUND THE CHEST AREA. HER BLUE JEANS HAD A DOWNWARD
RIP/TEAR AT THE RIGHT POCKET AREA CONSISTENT WITH DRAGGING THE BODY FROM THE
\_ST AREA.

DECOMPOSITION APPEARED TO MINIMAL. THERE WAS NO NOTICEABLE ODOR FROM THE BODY.
THE TEMPERATURE WAS JUST ABOVE FREEZING AT THIS TIME AND HAD BEEN BELOW
FREEZING.
THE FRONT AND RIGHT PORTION OF HER FACE WAS PARTIALLY SKELETONIZED FROM WHAT
APPEARED TO BE ANIMAL ACTIVITY. NO OTHER AREA APPEARED TO BE DAMAGED BY ANIMALS
OR HAD ANY VISIBLE WOUNDS.
THERE WAS NO APPARENT SWELLING OR DISTORTION OF THE BODY.
THE ONLY INSECT ACTIVITY I NOTED WAS AROUND THE NECK. MAGGOTS WERE VISIBLE IN
THIS AREA AFTER CLOSER INSPECTION.
JUDGE J. KLEIMANN, JP-1, RESPONDED TO THE SCENE AND ORDERED AN AUTOPSY AT THE
HARRIS COUNTY MEDICAL EXAMINER.
CASHNER FUNERAL HOME TRANSPORTED THE BODY TO THE HARRIS COUNTY MORGUE.
WE TOOK SIX ROLLS OF 24 EXPOSURE 35MM FILM OF THE SCENE AND SEVERAL POLAROIDS.
THE NEGATIVES ARE LOGGED UNDER PHOTO LOG NUMBERS 7298 THROUGH 7303.
WE CONDUCTED A SEARCH OF THE IMMEDIATE AREA AND FOUND FOUR CIGARETTE BUTTS IN
THE AREA NEAR THE BODY. THE CIGARETTE BUTTS WERE COLLECTED AS POSSIBLE
EVIDENCE.
I SEARCHED THE AREA AROUND THE BODY WITH A METAL DETECTOR AND RECOVERED A
ZIPPER ASSEMBLY WITH A LEATHER PULL ATTACHED, NEAR THE AREA WHERE HER LEFT
SHOULDER WAS SITUATED.
LT. NORRIS STATED THAT HE WAS GOING TO SEARCH THE ENTIRE AREA WITH THE HELP OF
THE MONTGOMERY SEARCH AND RESCUE TEAM ON 1-3-98.
IT WILL BE NOTED THAT THERE WERE SEVERAL UNCLEAR TIRE IMPRESSIONS ON THE
\_ \_MPROVED DIRT ROAD IN THE AREA OF WHERE THE BODY WAS FOUND. I PHOTOGRAPHED
\_ \_ OF THESE AND TOOK SOIL SAMPLES FROM EACH ONE.

WE CLEARED THE SCENE AT APPROXIMATELY 1610 HOURS.

B.W. EMMONS   CRIME SCENE INVESTIGATOR

EXHIBIT "R"



OUT OF COUNTY

9     0 0 2 0 1 0 3

DR. JC

EXHIBIT "S"

MEMORANDUM

TO:        Dr. Jose M. Carter

FROM:      J. Rytting

RE:        Ex Parte Larry Ray Swearingen

Date:      October 11, 2007

---

The data below are daily highs, lows and average temperatures (1998-1999) recorded at the Conroe, Texas airport near the crime scene from which the body of Melissa Trotter was recovered.  The data is from the National Oceanographic and Atmospheric Administration (NOAA).

USING CERTIFIED CLIMATOLOGICAL DATA, CONROE, TEXAS.

| Date | Temperature Max | Min | Average | |
|------|------|------|------|------|
| Jan. 3 | | | fridge | January 2, 1999, Melissa Trotter's body is discovered and removed from the Sam Houston National Forest. |
| Jan. 2 | 62 | 34 | 48 | |
| Jan. 1 | 73 | 60 | 66.5 | |
| Dec. 31 | 62 | 53 | 57.5 | |
| Dec. 30 | 70 | 43 | 56.5 | |
| Dec. 29 | 62 | 36 | 49 | |
| Dec. 28 | 65 | 40 | 52.5 | |
| Dec. 27 | 57 | 45 | 51 | |
| Dec. 26 | 42 | 29 | 35.5 | Average temperature for December 8, 1998-January 2, 1999 = 51.8°; average high temperature = 62.4°; average low temperature = 40° |
| Dec. 25 | 36 | 26 | 31 | |
| Dec. 24 | 34 | 29 | 31.5 | |
| Dec. 23 | 35 | 32 | 33.5 | |
| Dec. 22 | 75 | 32 | 53.5 | |
| Dec. 21 | 77 | 32 | 54.5 | |
| Dec. 20 | 75 | 49 | 62 | |
| Dec. 19 | 75 | 49 | 62 | |
| Dec. 18 | 64 | 49 | 56.5 | |
| Dec. 17 | 66 | 40 | 53 | |
| Dec. 16 | 63 | 41 | 52 | |
| Dec. 15 | 63 | 33 | 48 | |
| Dec. 14 | 62 | 33 | 47.5 | December 11, 1998, Larry Swearingen is incarcerated. |
| Dec. 13 | 46 | 36 | 41 | |
| Dec. 12 | 46 | 32 | 39 | |
| Dec. 11 | 56 | 43 | 49.5 | December 8, 1998, Melissa Trotter disappears from the Montgomery County Community College. |
| Dec. 10 | 58 | 44 | 51 | |
| Dec. 9 | 57 | 48 | 52.5 | |
| Dec. 8 | 79 | 44 | 61.5 | |

EXHIBIT "T"

)RM CD-64
EVISED)
RESCRIBED BY
A.O. 201-17

## U. S. DEPARTMENT OF COMMERCE

### Asheville, N.C.

I CERTIFY that the attached are authentic and true copies of meteorological records on file in the NATIONAL CLIMATIC DATA CENTER, ASHEVILLE, NORTH CAROLINA.

AUGUST L. SHUMBERA
RECORDS CUSTODIAN
DATA ADMINISTRATOR
(Official Title)

. . . . . . . . . . . . . . . . . .

I HEREBY CERTIFY that AUGUST L. SHUMBERA RECORDS CUSTODIAN, who signed the foregoing certificate, is now, and was at the time of signing, DATA ADMINISTRATOR, NATIONAL CLIMATIC DATA CENTER, and that full faith and credit should be given his certificate as such. I further state that I am the person to whom the said custodian reports.

IN WITNESS WHEREOF, I have hereunto subscribed my name and caused the seal of the Department of Commerce to be affixed on this date: OCT 1 6 2006

For the SECRETARY OF COMMERCE:

THOMAS R. KARL
DIRECTOR
NATIONAL CLIMATIC DATA CENTER
(Certifying Officer)

TEXAS
DECEMBER 1998

# DAILY TEMPERATURES (°F)

| STATION | OB TIME | MAX/MIN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TEMPLE | 07 | MAX | 74 | 72 | 76 | 75 | 80 | 79 | 76 | 57 | 54 | 50 | 46 | 42 | 53 | 64 | 60 |
|  |  | OBS | 72 | 76 | 75 | 80 | 79 | 76 | 57 | 54 | 50 | 46 | 42 | 53 | 64 | 60 | 61 |
|  |  | MIN | 52 | 56 | 63 | 60 | 66 | 67 | 53 | 39 | 42 | 40 | 40 | 37 | 38 | 35 | 35 |
|  |  | OBS |  |  |  |  | 51 |  |  |  |  |  |  |  |  |  |  |
| THROCKMORTON | 07 | MAX | 73 | 72 | 76 | 65 | 75 | 77 | 69 | 44 | 50 | 50 | 45 | 41 | 56 | 63 | 61 |
|  |  | MIN | 42 | 42 | 55 | 47 | 46 | 55 | 41 | 29 | 27 | 27 | 40 | 34 | 33 | 33 | 33 |
| WACO | 07 | MAX | 73 | 77 | 72 | 76 | 74 | 79 | 78 | 75 | 54 | 54 | 50 | 50 | 50 | 52 | 62 |
|  |  | OBS | 77 | 72 | 76 | 74 | 79 | 78 | 75 | 54 | 54 | 50 | 50 | 50 | 52 | 62 | 60 |
|  |  | MIN | 50 | 50 | 50 | 64 | 65 | 67 | 50 | 43 | 39 | 43 | 40 | 39 | 37 | 37 | 37 |
|  |  | OBS |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| WACO DAM | 08 | MAX | 76 | 74 | 77 | 76 |  |  |  | 81 | 57 | 56 | 56 | 47 |  | 66 | 63 |
|  |  | MIN | 49 | 47 | 52 | 62 |  |  |  | 47 | 38 | 31 | 38 | 37 |  | 31 | 30 |
| WACO REGIONAL AP | MID | MAX | 71 | 75 | 75 | 79 | 78 | 76 | 56 | 55 | 51 | 49 | 44 | 53 | 64 | 62 | 61 |
|  |  | MIN | 48 | 51 | 64 | 64 | 63 | 52 | 45 | 35 | 33 | 44 | 41 | 38 | 34 | 36 | 33 |
| WAXAHACHIE | 17 | MAX | 70 | 74 | 74 | 78 | 77 | 75 | 68 | 54 | 50 | 49 | 45 | 52 | 61 | 61 | 61 |
|  |  | OBS |  |  |  |  |  |  |  |  | 68 |  |  |  |  |  |  |
|  |  | MIN | 49 | 53 | 62 | 62 | 68 | 64 | 45 | 43 | 36 | 42 | 40 | 40 | 34 | 38 | 35 |
| WEATHERFORD | 07 | MAX | 74 | 70 | 74 | 69 | 76 | 77 | 74 | 47 | 53 | 49 | 43 | 43 | 53 | 62 | 62 |
|  |  | MIN | 40 | 43 | 57 | 49 | 51 | 60 | 44 | 37 | 26 | 27 | 40 | 37 | 27 | 28 | 28 |
| WHITNEY DAM | 08 | MAX | 78 | 75 | 77 | 74 | 81 | 80 | 61 | 57 | 56 | 51 | 50 | 44 | 55 | 68 | 66 |
|  |  | OBS |  |  |  |  |  |  | 78 |  |  |  |  |  |  |  |  |
|  |  | MIN | 52 | 49 | 50 | 63 | 62 | 61 | 52 | 47 | 37 | 34 | 43 | 41 | 38 | 34 | 39 |
| EAST TEXAS  04 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| ATHENS | 08 | MAX | 73 | 72 | 72 | 77 | 78 | 77 | 74 | 59 | 55 | 52 | 45 | 42 | 53 | 58 | 61 |
|  |  | MIN | 49 | 51 | 57 | 68 | 65 | 67 | 51 | 46 | 36 | 44 | 40 | 40 | 31 | 33 | 34 |
| ATLANTA | 08 | MAX | 85 | 74 | 75 | 76 | 79 | 80 | 79 | 61 | 56 | 56 | 44 | 43 | 47 | 61 | 60 |
|  |  | MIN | 43 | 43 | 47 | 62 | 59 | 59 | 39 | 46 | 33 | 34 | 40 | 40 | 34 | 30 | 27 |
| CARTHAGE | 08 | MAX | 76 | 74 | 75 | 76 | 76 | 79 | 79 | 62 | 54 | 56 | 46 | 44 | 46 | 60 | 60 |
|  |  | OBS |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  | MIN | 47 | 47 | 57 | 64 | 69 | 66 | 56 | 46 | 37 | 40 | 40 | 40 | 33 | 32 | 30 |
| CENTER | 07 | MAX | 81 | 75 | 78 | 78 | 78 | 81 | 81 | 66 | 52 | 60 | 46 | 45 | 48 | 62 | 63 |
|  |  | MIN | 51 | 49 | 52 | 64 | 67 | 68 | 59 | 47 | 40 | 40 | 41 | 41 | 35 | 35 | 32 |
| CENTERVILLE | 08 | MAX | 79 | 75 | 75 | 80 | 82 | 81 | 81 | 62 | 56 | 53 | 45 | 46 | 46 | 62 | 64 |
|  |  | OBS |  |  |  |  |  |  |  |  |  |  |  |  |  | 35 |  |
|  |  | MIN | 48 | 50 | 50 | 66 | 68 | 67 | 53 | 47 | 36 | 42 | 41 | 30 | 30 | 31 | 31 |
| CLARKSVILLE 2 NE | 07 | MAX | 72 | 75 | 76 | 77 | 78 | 75 | 75 | 58 | 53 | 44 | 44 | 44 | 60 | 62 | 60 |
|  |  | OBS |  |  |  |  |  |  |  | 58 |  |  |  |  |  |  |  |
|  |  | MIN | 47 | 49 | 50 | 61 | 61 | 64 | 47 | 43 | 33 | 33 | 41 | 41 | 32 | 33 | 32 |
|  |  | OBS | 49 | 50 | 61 | 61 | 64 | 47 | 43 | 33 | 33 | 41 | 41 | 32 | 33 | 32 | 31 |
| COLDSPRING 5 SSW | 07 | MAX | 81 | 81 | 77 | 79 | 80 | 83 | 80 | 78 | 57 | 58 | 50 | 48 | 48 | 65 | 67 |
|  |  | OBS |  |  |  |  |  |  |  |  | 78 |  |  |  |  |  |  |
|  |  | MIN | 52 | 53 | 58 | 67 | 67 | 67 | 62 | 48 | 45 | 47 | 45 | 44 | 36 | 36 | 36 |
| COLLEGE STATION FAA AP | MID | MAX |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  | MIN |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| CONROE | 08 | MAX | 76 | 78 | 76 | 81 | 80 | 83 | 79 | 79 | 57 | 58 |  | 46 | 46 | 62 | 63 |
|  |  | OBS | 78 | 76 | 81 | 80 | 83 | 79 | 79 | 57 | 58 | *** | 46 | 46 | 62 | 63 | 63 |
|  |  | MIN | 57 | 64 | 67 | 70 | 65 | 65 | 47 | 44 | 48 | 44 | 43 | 32 | 36 | 33 | 33 |
| CROCKETT | 07 | MAX | 78 | 74 | 70 | 77 | 79 | 80 | 76 | 64 | 53 | 53 | 46 | 47 | 46 | 60 | 62 |
|  |  | MIN | 53 | 53 | 56 | 66 | 67 | 68 | 57 | 47 | 40 | 43 | 42 | 42 | 37 | 36 | 35 |
| DAINGERFIELD 9 S | 07 | MAX | 73 | 74 | 77 | 77 | 80 | 80 | 77 | 60 | 57 | 57 | 46 | 44 | 47 | 61 | 61 |
|  |  | MIN | 50 | 50 | 52 | 63 | 67 | 57 | 49 | 46 | 38 | 38 | 39 | 38 | 36 | 39 | 33 |
| DEKALB | 18 | MAX | 73 | 75 | 76 | 72 | 80 | 75 | 65 | 55 | 54 | 51 | 43 | 44 | 59 | 60 | 59 |
|  |  | MIN | 50 | 50 | 59 | 60 | 64 | 64 | 49 | 44 | 35 | 41 | 40 | 39 | 34 | 36 | 32 |
| DOUGLASS 1 E | 12 | MAX | 82 | 82 | 69 | 76 | 80 | 81 | 81 | 68 | 50 | 55 | 47 | 46 | 47 | 65 | 66 |
|  |  | MIN | 48 | 47 | 55 | 66 | 67 | 65 | 55 | 46 | 33 | 40 | 40 | 41 | 31 | 30 | 29 |
| EMORY | 08 | MAX | 73 | 70 | 74 | 74 | 76 | 76 | 75 | 54 | 53 | 51 | 44 | 43 | 46 | 58 | 60 |
|  |  | OBS |  |  |  |  |  |  |  |  |  |  |  |  | 56 |  |  |
|  |  | MIN | 47 | 48 | 56 | 61 | 61 | 66 | 49 | 43 | 33 | 43 | 40 | 40 | 30 | 32 | 31 |
| FAIRFIELD 3 W | 17 | MAX | 72 | 74 | 77 | 78 | 80 | 75 | 68 | 55 | 52 | 51 | 44 | 55 | 60 | 60 | 60 |
|  |  | MIN | 47 | 52 | 63 | 67 | 68 | 68 | 50 | 46 | 35 | 44 | 40 | 41 | 31 | 33 | 31 |
| FRANKLIN | 17 | MAX | 72 | 75 | 76 | 79 | 77 | 72 | 72 | 53 | 50 | 50 | 45 | 46 | 59 | 61 | 64 |
|  |  | MIN | 50 | 54 | 64 | 69 | 69 | 68 | 51 | 43 | 37 | 45 | 40 | 41 | 33 | 37 | 35 |
|  |  | OBS |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| GILMER 2 W | 07 | MAX | 73 | 75 | 74 | 74 | 78 | 77 | 76 | 61 | 56 | 56 | 45 | 42 | 46 | 60 | 60 |
|  |  | OBS |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  | MIN | 46 | 45 | 45 | 60 | 63 | 64 | 54 | 43 | 31 | 31 | 41 | 42 | 30 | 30 | 29 |
| GROVETON | 18 | MAX | 77 | 78 | 79 | 79 | 79 | 80 | 72 | 65 | 55 | 52 | 46 | 46 | 60 | 63 | 62 |
|  |  | MIN | 56 | 52 | 60 | 66 | 66 | 66 | 58 | 45 | 39 | 45 | 42 | 39 | 33 | 36 | 34 |
| HALLSVILLE 1 W | 18 | MAX | 72 | 75 | 75 | 78 | 78 | 78 | 69 | 54 | 55 | 51 | 42 | 45 | 59 | 59 | 59 |
|  |  | OBS |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  | MIN | 48 | 50 | 57 | 63 | 64 | 66 | 51 | 45 | 35 | 41 | 38 | 39 | 33 | 33 | 30 |
| HENDERSON | 08 | MAX | 76 | 74 | 73 | 76 | 79 | 79 | 80 | 64 | 53 | 56 | 44 | 42 | 47 | 62 | 60 |
|  |  | OBS | 65 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  |  | MIN | 48 | 48 | 54 | 65 | 68 | 66 | 54 | 45 | 34 | 34 | 39 | 39 | 32 | 31 | 30 |
| HUNTSVILLE | 07 | MAX | 72 | 77 | 76 | 80 | 80 | 82 | 73 | 67 | 53 | 56 | 46 | 43 | 45 | 61 | 62 |

# DAILY TEMPERATURES (°F)

| STATION | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | AVERAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TEMPLE | 61 68 37 | 59 61 43 | 61 61 45 | 52 52 46 | 53 53 46 | 59 74 46 | 74 74 24 | 29 29 26 | 30 30 25 | 30 41 22 | 41 41 22 | 52 62 37 | 46 49 37 | 49 49 34 | 66 66 31 | 61 61 35 | 58.4 |
| THROCKMORTON | | | | | | | | | | | | | | | | | 41.2 |
| WACO | 65 65 40 | 65 33 66 | 64 39 66 43 | 36 38 58 52 | 65 45 52 62 45 | 64 33 62 70 45 | 33 13 70 27 | 30 12 29 25 | 19 29 21 36 | 13 15 31 40 26 | 13 15 41 26 | 61 01 49 | 65 63 33 | 28 63 33 | 63 64 33 | 33 64 35 | 55.9 / 31.5 / 58.5 |
| WACO DAM | | | | | | | | | | | | | | | | | 40.5 |
| WACO REGIONAL AP | 65 32 66 34 67 | 70 33 61 37 62 | 65 38 54 37 56 | 53 48 53 | 52 48 52 | 57 58 68 35 | 69 28 65 30 | 31 20 31 33 | 33 33 28 20 | 41 34 40 | 51 30 49 | 63 63 49 | 64 52 52 | 56 64 | 66 60 56 | 67 29 55 | M / M / 57.5 / 39.3 |
| WAXAHACHIE | | | | | | | | | | | | | | | | | 57.2 |
| WEATHERFORD | 38 63 30 69 26 | 49 65 30 69 | 49 62 37 60 | 42 62 53 53 | 43 49 56 | 30 57 51 52 | 21 52 16 26 67 | 25 26 24 20 | 20 30 30 20 | 21 24 15 44 | 24 41 45 | 36 13 53 | 29 26 60 | 42 37 58 | 29 25 59 | 41 59 28 61 55 | 40.3 / 56.3 / 32.6 / 57.8 |
| WHITNEY DAM | 35 | 30 | 39 | 48 | 40 | 23 45 | 36 | 23 | 25 | 27 | 24 | 38 20 | 37 | 36 | 34 | 28 | 39.0 |

## EAST TEXAS 04

| STATION | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | AVERAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ATHENS | 61 30 60 65 42 | 66 32 67 65 | 61 39 64 34 | 58 45 47 40 | 55 48 67 57 | 63 58 68 69 | 74 25 71 73 | 31 33 33 35 | 31 28 33 31 | 31 21 31 29 | 39 29 39 37 | 57 24 49 49 | 58 46 45 52 | 56 34 51 51 | 63 31 63 63 | 55 32 52 56 | 58.5 / 40.2 / 59.1 / 58.0 / 58.8 |
| ATLANTA | | | | | | | | | | | | | | | | | |
| CARTHAGE | | | | | | | | | | | | | | | | | |
| CENTER | 29 61 63 | 35 67 67 | 37 64 34 | 42 63 62 | 48 63 56 | 53 55 69 | 38 67 77 | 26 33 32 | 26 32 31 | 23 23 33 | 20 32 43 | 22 24 54 | 39 39 39 | 37 44 59 | 24 33 66 | 22 33 61 | 39.8 / 61.1 / 61.2 |
| CENTERVILLE | 29 | 37 | 37 | 39 56 | 52 | 53 | 28 | 28 | 23 | 26 | 21 | 41 51 | 41 24 51 | 24 | 23 | 40 | 39.5 |
| CLARKSVILLE 2 NE | 65 | 61 | 55 | 56 | 52 | 53 | 28 | 29 | 36 | 41 | 42 | 41 | 61 | 61 | 50 | 58 | 57.8 |
| COLDSPRING 5 SSW | 31 32 66 | 32 36 67 | 36 38 66 | 42 46 66 | 46 57 78 | 51 18 76 | 09 25 76 | 21 37 | 25 36 | 21 38 | 22 45 | 22 42 | 32 62 | 28 64 | 25 73 | 25 64 | 36.7 / 64.9 |
| COLLEGE STATION FAA AP | 33 | 33 | 38 | 48 | 55 | 56 | 36 | 33 | 34 | 30 | 26 | 26 | 45 | 41 | 37 | 36 | 44.2 |
| CONROE | 63 66 41 | 66 40 41 | 64 49 49 | 75 51 75 | 75 57 70 | 77 52 32 | 75 32 56 | 35 36 35 | 34 33 33 | 36 42 42 | 42 52 41 | 57 45 52 | 65 41 53 | 62 76 56 | 70 63 52 | 62 73 50 | M / M / 64.1 / 44.3 |
| CROCKETT | 41 35 33 62 | 40 55 58 62 | 40 49 37 59 | 49 60 44 55 | 49 55 56 50 | 32 67 61 54 | 35 32 70 79 | 35 33 25 27 | 35 33 29 29 | 28 32 30 23 | 31 24 30 40 | 25 43 41 48 | 53 31 49 53 | 34 33 30 33 | 30 62 63 60 | 35 33 36 53 | 60.4 / 60.3 / 59.2 / 39.5 / 56.9 |
| DAINGERFIELD 9 S | | | | | | | | | | | | | | | | | |
| DEKALB | | | | | | | | | | | | | | | | | 39.1 / 61.4 |
| DOUGLASS 1 E | 64 60 | 62 64 | 58 64 | 44 62 | 51 71 | 46 80 | 30 82 | 29 30 | 28 29 | 33 30 | 49 41 | 11 48 | 38 ·· | 64 ·· 33 | 30 60 | 38 ·· | 39.8 / 56.7 |
| EMORY | | | | | | | | | | | | | | | | | |
| FAIRFIELD 3 W | 30 66 35 | 32 62 35 | 37 61 43 | 46 64 51 | 44 54 48 | 43 47 42 | 35 21 28 | 21 28 | 26 29 | 21 25 | 20 21 | 28 28 39 | 38 56 41 | 33 33 35 | 28 59 29 | 35 35 43 | 38.1 / 58.9 / 41.5 |
| FRANKLIN | 66 38 59 57 | 65 36 62 | 64 41 51 | 63 48 51 | 76 49 51 | 61 45 73 | 41 27 22 | 39 30 32 | 30 33 32 | 43 48 32 | 34 34 36 | 65 48 26 | 61 43 54 | 49 40 54 | 67 34 64 | 65 59 59 | 60.1 / 43.1 / 57.5 |
| GILMER 2 W | 29 | 29 | 38 | 39 | 39 | 46 73 | 26 | 26 | 26 | 20 | 20 | 20 | 32 | 28 | 27 | 27 | 36.2 |
| GROVETON | 64 30 64 | 63 30 61 | 65 31 59 | 73 52 59 | 70 47 58 | 62 47 73 | 47 30 31 | 34 27 29 | 34 27 29 | 43 37 | 55 49 | 61 52 | 59 61 | 67 64 ··· | 67 57 49 | 68 60 | 62.4 / 43.0 / 58.5 |
| HALLSVILLE 1 W | | | | | | | | | | | | | | | | | |
| HENDERSON | 30 37 | 64 37 | 37 | 52 | 47 | 61 | 26 | 31 | 29 | 29 | 40 | 57 | 36 | 33 | 29 | 36 | 39.5 |
| HUNTSVILLE | 59 | 59 | 36 64 | 44 63 | 49 74 | 53 74 | 27 74 | 26 35 | 26 32 | 23 34 | 22 41 | 21 57 | 42 64 | 33 59 | 31 66 | 31 61 | 59.4 / 39.2 / 61.2 |

RM CD-64
(ISED)
SCRIBED BY
.O. 201-17

## U. S. DEPARTMENT OF COMMERCE

### Asheville, N.C.

I CERTIFY that the attached are authentic and true copies of
meteorological records on file in the NATIONAL CLIMATIC DATA
CENTER, ASHEVILLE, NORTH CAROLINA.

*August O. Shumbera*

AUGUST L. SHUMBERA
RECORDS CUSTODIAN
DATA ADMINISTRATOR
(Official Title)

. . . . . . . . . . . . . . . . . .

I HEREBY CERTIFY that AUGUST L. SHUMBERA RECORDS CUSTODIAN, who
signed the foregoing certificate, is now, and was at the time of
signing, DATA ADMINISTRATOR, NATIONAL CLIMATIC DATA CENTER, and
that full faith and credit should be given his certificate as such.
I further state that I am the person to whom the said custodian
reports.

IN WITNESS WHEREOF, I have hereunto
subscribed my name and caused the
seal of the Department of Commerce
to be affixed
on this date:    OCT 1 6 2006

For the SECRETARY OF COMMERCE:

*Thomas R. Karl*

THOMAS R. KARL
DIRECTOR
NATIONAL CLIMATIC DATA CENTER
(Certifying Officer)

# DAILY TEMPERATURES (°F)

**EAST TEXAS**

| STATION | OB. TIME | MAX/MIN | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ATHENS | 08 | MAX | 57 | 67 | 24 | 47 | 36 | 60 | 57 | 52 | 24 | 45 | 54 | 65 | 71 | 64 | 39 |
|  |  | MIN | 47 | 36 | 24 | 17 | 38 | 39 | 48 | 38 | 23 | 23 | 33 | 35 | 49 | 36 | 24 |
| ATLANTA | 08 | MAX | 60 | 62 | 49 | 34 | 42 | 51 | 49 | 58 | 73 | 47 | 55 | 69 | 72 | 60 | 43 |
|  |  | MIN | 34 | 39 | 20 | 15 | 37 | 30 | 39 | 38 | 31 | 28 | 35 | 26 | 24 | 36 | 30 |
| CARTHAGE | 07 | MAX | 48 | 37 | 22 | 33 | 42 | 54 | 57 | 57 | 76 | 48 | 46 | 64 | 69 | 61 | 39 |
|  |  | MIN | 49 | 22 | 20 | 11 | 42 | 31 | 57 | 38 | 29 | 28 | 34 | 26 | 24 | 36 | 34 |
| CENTER | 07 | MAX | 49 | 37 | 23 | 32 | 41 | 53 | 55 | 52 | 72 | 51 | 54 | 65 | 71 | 64 | 43 |
|  |  | MIN | 34 | 20 | 22 | 15 | 39 | 30 | 39 | 27 | 33 | 29 | 35 | 26 | 24 | 36 | 31 |
| CENTERVILLE | 08 | MAX | 45 | 39 | 35 | 32 | 50 | 58 | 49 | 77 | 56 | 47 | 63 | 69 | 69 | 50 | 49 |
|  |  | MIN | 38 | 27 | 21 | 32 | 41 | 39 | 27 | 41 | 30 | 21 | 30 | 38 | 33 | 37 | 24 |
| CLARKSVILLE 2 NE | 07 | MAX | 45 | 39 | 30 | 16 | 41 | 54 | 47 | 58 | 36 | 38 | 41 | 59 | 66 | 49 | 24 |
|  |  | MIN | 30 | 30 | 54 | 12 | 50 | 29 | 41 | 52 | 33 | 24 | 26 | 43 | 39 | 42 | 43 |
| COLDSPRING 5 SSW | 07 | MAX | 75 | 74 | 18 | 26 | 19 | 68 | 68 | 75 | 77 | 58 |  | 72 | 70 | 70 | 61 |
|  |  | MIN | 43 | 47 | 30 | 16 | 67 | 34 | 49 | 57 | 33 | 22 | 51 | 72 | 66 | 49 | 31 |
| COLLEGE STATION FAA AP | MID | MAX |  | 76 | 55 | 24 | 21 | 28 | 72 | 36 | 24 | 38 | 63 | 72 | 44 | 49 | 56 |
|  |  | MIN |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| CONROE | 08 | MAX |  | 54 | 37 | 25 | 26 | 65 | 69 | 60 | 72 | 24 | 65 | 45 | 79 | 57 | 66 |
|  |  | MIN |  | 38 | 39 | 28 | 35 | 48 | 56 | 74 | 35 | 21 | 28 | 65 | 79 | 34 | 64 |
| CROCKETT | 07 | MAX | 55 | 68 | 55 | 32 | 41 | 54 | 52 | 54 | 32 | 22 | 57 | 65 | 64 | 62 | 64 |
|  |  | MIN | 29 | 29 | 21 | 31 | 25 | 27 | 57 | 67 | 30 | 22 | 28 | 67 | 79 | 37 | 29 |
| DAINGERFIELD 9 S | 07 | MAX | 54 | 54 | 49 | 26 | 31 | 56 | 51 | 47 | 33 | 24 | 55 | 51 | 73 | 37 | 48 |
|  |  | MIN | 40 | 38 | 20 | 20 | 33 | 24 | 39 | 36 | 26 | 24 | 26 | 40 | 31 | 48 | 21 |
| DEKALB | 18 | MAX | 49 | 54 | 21 | 28 | 21 | 54 | 45 | 56 | 34 | 47 | 36 | 55 | 45 | 52 | 49 |
|  |  | MIN | 35 | 38 | 49 | 25 | 43 | 56 | 47 | 60 | 29 | 48 | 29 | 58 | 39 | 49 | 60 |
| DOUGLASS 1 E | 12 | MAX | 38 | 66 | 18 | 34 | 21 | 58 | 51 | 50 | 52 | 20 | 57 | 49 | 52 | 27 | 26 |
|  |  | MIN |  | 32 | 35 | 16 | 15 | 54 | 48 | 74 | 35 | 38 | 21 | 70 | 71 | 44 | 48 |
| EMORY | 08 | MAX | 57 | 50 | 24 | 20 | 15 | 19 | 42 | 36 | 33 | 38 | 26 | 66 | 78 | 57 | 24 |
|  |  | MIN |  | 66 | 40 | 30 | 15 | 29 | 76 | 81 | 76 | 24 | 30 | 48 | 44 | 34 | 60 |
| FAIRFIELD 3 W | 17 | MAX | 70 | 70 | 46 | 39 | 53 | 28 | 51 | 49 | 24 | 56 | 65 | 72 | 49 | 53 | 55 |
|  |  | MIN | 41 | 33 | 26 | 25 | 33 | 72 | 75 | 74 | 75 | 51 | 30 | 50 | 49 | 34 | 26 |
| FRANKLIN | 17 | MAX | 70 | 75 | 43 | 39 | 26 | 28 | 76 | 60 | 33 | 47 | 57 | 64 | 49 | 57 | 59 |
|  |  | MIN | 59 | 31 | 25 | 15 | 35 | 47 | 50 | 74 | 77 | 51 | 30 | 47 | 47 | 34 | 32 |
| GILMER 2 W | 07 | MAX | 59 | 65 | 22 | 39 | 49 | 54 | 52 | 55 | 54 | 56 | 56 | 59 | 55 | 53 | 39 |
|  |  | MIN | 58 | 41 | 24 | 33 | 23 | 30 | 56 | 71 | 31 | 21 | 30 | 62 | 72 | 37 | 60 |
| GROVETON | 18 | MAX | 68 | 63 | 24 | 17 | 35 | 74 | 62 | 63 | 18 | 26 | 16 | 65 | 65 | 34 | 65 |
|  |  | MIN | 53 | 58 | 49 | 42 | 25 | 38 | 56 | 57 | 24 | 38 | 25 | 66 | 72 | 36 | 35 |
| HALLSVILLE 1 W | 18 | MAX | 60 | 57 | 26 | 39 | 16 | 51 | 62 | 52 | 24 | 18 | 20 | 72 | 53 | 30 | 64 |
|  |  | MIN | 51 | 40 | 22 | 31 | 16 | 28 | 46 | 50 | 27 | 27 | 25 | 60 | 72 | 48 | 27 |
| HENDERSON | 07 | MAX | 42 | 61 | 22 | 37 | 36 | 51 | 51 | 70 | 74 | 34 | 56 | 62 | 54 | 46 | 42 |
|  |  | MIN | 42 | 42 | 25 | 34 | 41 | 54 | 54 | 73 | 73 | 56 | 21 | 39 | 56 | 48 | 40 |
| HUNTSVILLE | 07 | MAX | 43 | 41 | 26 | 32 | 21 | 58 | 51 | 65 | 76 | 49 | 64 | 65 | 70 | 48 | 69 |
|  |  | MIN | 54 | 53 | 23 | 35 | 41 | 54 | 56 | 63 | 30 | 21 | 26 | 60 | 55 | 48 | 59 |
| JACKSONVILLE | 08 | MAX | 50 | 61 | 26 | 41 | 35 | 72 | 55 | 53 | 24 | 38 | 36 | 66 | 65 | 57 | 40 |
|  |  | MIN | 42 | 54 | 46 | 24 | 25 | 28 | 46 | 50 | 24 | 38 | 25 | 64 | 72 | 44 | 26 |
| JEFFERSON | 07 | MAX | 49 | 54 | 20 | 21 | 24 | 28 | 45 | 50 | 27 | 24 | 30 | 64 | 45 | 27 | 24 |
|  |  | MIN | 63 | 41 | 21 | 41 | 29 | 58 | 50 | 74 | 71 | 53 | 30 | 69 | 71 | 34 | 69 |
| LAKE FORK RESERVOIR | 08 | MAX | 63 | 40 | 21 | 16 | 25 | 28 | 46 | 50 | 27 | 16 | 25 | 65 | 69 | 66 | 40 |
|  |  | MIN | 51 | 60 | 44 | 31 | 25 | 54 | 51 | 64 | 70 | 38 | 30 | 64 | 44 | 48 | 60 |
| LAKE TAWAKONI | 07 | MAX | 43 | 30 | 25 | 11 | 16 | 19 | 56 | 64 | 62 | 16 | 21 | 68 | 44 | 38 | 40 |
|  |  | MIN | 58 | 60 | 44 | 39 | 36 | 49 | 58 | 63 | 26 | 38 | 53 | 68 | 76 | 48 | 63 |
| LIVINGSTON 2 NNE | 06 | MAX | 71 | 73 | 22 | 39 | 38 | 54 | 58 | 63 | 18 | 19 | 39 | 64 | 74 | 70 | 62 |
|  |  | MIN | 59 | 63 | 49 | 18 | 29 | 52 | 56 | 57 | 27 | 30 | 21 | 68 | 79 | 48 | 40 |
| LONGVIEW | 07 | MAX | 62 | 73 | 22 | 38 | 36 | 54 | 55 | 76 | 28 | 38 | 56 | 64 | 59 | 70 | 28 |
|  |  | MIN | 63 | 42 | 22 | 13 | 29 | 52 | 62 | 62 | 28 | 24 | 21 | 63 | 73 | 36 | 63 |
| LONGVIEW 11 SE | 07 | MAX | 71 | 73 | 29 | 12 | 20 | 54 | 56 | 77 | 60 | 39 | 34 | 56 | 59 | 48 | 40 |
|  |  | MIN | 70 | 73 | 46 | 11 | 19 | 49 | 58 | 78 | 72 | 16 | 56 | 56 | 42 | 54 | 28 |
| LONGVIEW | 07 | MAX | 63 | 65 | 46 | 39 | 38 | 48 | 45 | 73 | 28 | 38 | 56 | 72 | 71 | 30 | 42 |
|  |  | MIN | 65 | 58 | 24 | 15 | 36 | 50 | 54 | 70 | 28 | 24 | 30 | 71 | 73 | 80 | 45 |
| LUFKIN | 06 | MAX | 39 | 38 | 22 | 34 | 36 | 63 | 64 | 47 | 73 | 49 | 54 | 61 | 69 | 63 | 43 |
|  |  | MIN | 60 | 41 | 24 | 19 | 42 | 53 | 65 | 78 | 76 | 24 | 26 | 24 | 24 | 36 | 28 |
| LUFKIN 11 NW | 07 | MAX | 38 | 45 | 30 | 36 | 40 | 53 | 65 | 47 | 77 | 49 | 26 | 58 | 62 | 63 | 45 |
|  |  | MIN | 59 | 34 | 22 | 17 | 42 | 53 | 58 | 55 | 31 | 21 | 26 | 24 | 21 | 63 | 28 |
| LUFKIN FCWOS | 08 | MAX | 52 | 73 | 50 | 26 | 44 | 53 | 65 | 71 | 31 | 34 | 24 | 71 | 71 | 63 | 48 |
|  |  | MIN | 53 | 42 | 28 | 36 | 21 | 55 | 65 | 46 | 31 | 29 | 58 | 26 | 24 | 61 | 28 |
| MADISONVILLE | 08 | MAX | 53 | 46 | 28 | 30 | 21 | 55 | 54 | 45 | 31 | 30 | 52 | 71 | 51 | 59 | 49 |
|  |  | MIN | 58 | 60 | 50 | 36 | 44 | 53 | 55 | 74 | 71 | 69 | 58 | 72 | 42 | 63 | 48 |
| MARSHALL | 08 | MAX | 48 | 46 | 22 | 35 | 17 | 26 | 46 | 55 | 28 | 22 | 25 | 55 | 52 | 36 | 28 |
|  |  | MIN | 58 | 49 | 28 | 19 | 37 | 51 | 49 | 47 | 31 | 49 | 25 | 52 | 51 | 59 | 35 |

42

# DAILY TEMPERATURES (°F)

TEXAS
JANUARY 1999

| STATION | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | AVERAGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EAST TEXAS 04 | | | | | | | | | | | | | | | | | |
| ATHENS | 57 | 73 | 69 | 66 | 71 | 75 | 77 | 66 | 68 | 71 | 78 | 70 | 64 | 55 | 54 | 52 | 61.7 |
| ATLANTA | 51 | 65 | 77 | 68 | 48 | 72 | 54 | 65 | 65 | 65 | 55 | 76 | 73 | 59 | 43 | 66 | 61.2 |
| CARTHAGE | | | | | | | | | | | | | | | | | |
| CENTER | | | | | | | | | | | | | | | | | |
| CENTERVILLE | | | | | | | | | | | | | | | | | 44.8 |
| CLARKSVILLE 2 NE | 27 | 51 | 37 | 37 | 51 | 65 | 71 | 43 | 32 | 40 | 42 | 60 | 72 | 44 | 44 | 40 | |
| COLDSPRING 5 SSW | | | | | | | | | | | | | | | | | |
| COLLEGE STATION FAA AP | 75 | 74 | 75 | 78 | 78 | 75 | 71 | 74 | 77 | 77 | 77 | 78 | 72 | 75 | 70 | 75 | 70.0 |
| CONROE | | | | | | | | | | | | | | | | | |
| CROCKETT | | | | | | | | | | | | | | | | | |
| DAINGERFIELD 9 S | | | | | | | | | | | | | | | | | 60.4 |
| DEKALB | | | | | | | | | | | | | | | | | |
| DOUGLASS 1 E | | 55 | 82 | 41 | 78 | 61 | 78 | 61 | 61 | 74 | 72 | 54 | 76 | 75 | 47 | 44 | 55.7 |
| EMORY | 59 | 66 | 70 | 58 | 74 | 76 | 54 | 38 | 59 | 71 | 43 | 54 | 55 | 68 | 59 | 44 | 38.9 |
| FAIRFIELD 3 NW | 71 | 51 | 32 | 35 | 72 | 79 | 54 | 33 | 36 | 34 | 57 | 57 | 63 | 60 | 47 | 54 | 37.2 |
| FRANKLIN | 74 | 60 | 46 | 46 | 59 | 79 | 73 | 33 | 38 | 70 | 43 | 46 | 70 | 57 | 51 | 50 | 42.6 |
| GILMER 2 W | 49 | 63 | 42 | 41 | 72 | 76 | 69 | 65 | 52 | 76 | 70 | 55 | 49 | 59 | 46 | 59 | 35.8 |
| GROVETON | 70 | 77 | 71 | 73 | 76 | 76 | 76 | 63 | 61 | 74 | 74 | 74 | 78 | 74 | 71 | 75 | 56.1 |
| HALLSVILLE 1 W | 63 | 50 | 40 | 45 | 54 | 76 | 59 | 37 | 37 | 36 | 57 | 63 | 63 | 48 | 57 | 44 | 34.5 |
| HENDERSON | 61 | 70 | 39 | 73 | 75 | 61 | 51 | 55 | 55 | 72 | 73 | 71 | 71 | 60 | 47 | 58 | 63.1 |
| HUNTSVILLE | 66 | 72 | 72 | 75 | 76 | 75 | 76 | 68 | 67 | 73 | 76 | 74 | 70 | 66 | 54 | 50 | 39.1 |
| JACKSONVILLE | 69 | 74 | 76 | 76 | 75 | | | | | | 77 | 75 | 71 | 75 | 70 | 75 | 56.1 |
| JEFFERSON | 38 | 59 | 42 | 35 | 44 | 36 | 41 | 44 | 32 | 42 | 46 | 50 | 52 | 47 | 50 | 44 | 66.1 |
| LAKE FORK RESERVOIR | 60 | 55 | 42 | 67 | 66 | 76 | 72 | 62 | 68 | 70 | 70 | 69 | 69 | 58 | 60 | 59 | 36.7 |
| LAKE TAWAKONI | 26 | 60 | 34 | 33 | 40 | 64 | 69 | 41 | 32 | 32 | 42 | 50 | 63 | 55 | 51 | 45 | 37.5 |
| LIVINGSTON 2 NNE | 62 | 72 | 77 | 69 | 53 | 76 | 76 | 63 | 54 | 70 | 45 | 45 | 72 | 74 | 57 | 59 | 35.4 |
| LONGVIEW | 62 | 69 | 41 | 59 | 55 | 57 | 69 | 65 | 55 | 32 | 70 | 50 | 69 | 76 | 51 | 58 | 34.5 |
| LONGVIEW 11 SE | 30 | 53 | 42 | 42 | 52 | 64 | 57 | 43 | 37 | 38 | 48 | 53 | 62 | 58 | 48 | 45 | 61.1 |
| LUFKIN 11 SW | 62 | 71 | 72 | 69 | 77 | 77 | 69 | 36 | 54 | 76 | 76 | 75 | 76 | 56 | 44 | 54 | 46.1 |
| LUFKIN FCWOS | 58 | 73 | 74 | 74 | 74 | 74 | 58 | 62 | 72 | 73 | 76 | 76 | 70 | 71 | 44 | 56 | 62.2 |
| MADISONVILLE | 52 | 73 | 61 | 65 | 72 | 74 | 54 | 63 | 69 | 69 | 71 | 62 | 65 | 65 | 63 | 56 | 40.7 |
| MARSHALL | 28 | 60 | 60 | 59 | 63 | 63 | 54 | 60 | 35 | 35 | 42 | 44 | 61 | 58 | 49 | 45 | 38.8 |

EXHIBIT "U"

# Search/From 1A

Saturday. Many searched through the woods, creeks and rivers, where temperatures were in the low fifties and high forties.

Ron Irvin of Conroe joined the search effort at about 2 a.m. Wednesday. He has since donated about 20 hours on every day. His wife and three children are also volunteers.

"If it's anybody's kid, I'm going to volunteer," said Irvin, who has known Trotter since she was 5 years old. "We have to keep this community going with what we have. If we don't have this, what would we have?"

Irvin has helped design the web page of the recovery center. He also coordinated search grids and developed search patterns for the volunteers.

Irvin thanked everyone for their time and effort.

"On their day off, they're looking for someone they don't even know," he said. "Tell everyone we need their prayers."

State Senator Jerry Patterson has known Trotter all of her life. "When she was little she always wanted a hug," said Patterson, whom Trotter calls "uncle."

Patterson thanked all of the businesses, volunteers and groups that have helped the search effort. "They have responded tremendously."

At the recovery center, tables were packed with cups, drinks, snacks and sandwiches donated by local grocery stores, and the community. Department stores and have donated ponchos and other equipment for the volunteers.

Trotter was last seen alone at the Montgomery College cafeteria at about 2:30 p.m.

Authorities had located the young man who was seen with Trotter hours before she disappeared, but it has shed no new light on the teen's whereabouts.

Authorities have also contacted Trotter's boyfriend, who they said had nothing to do with her disappearance.

Her 1997 emerald-green Pontiac Sunfire was found in the parking lot of the school about 2 a.m. Wednesday.

Her cellular telephone and school books were inside, but Trotter's Winnie the Pooh backpack, with books she was using for final exams, is missing with her.

Rumors that her backpack was found and that she was seen with a young man late Wednesday were denied by volunteers at the recovery center.

On Wednesday Trotter missed a 1:30 p.m. history final and a 5 p.m. workshift at Conroe's Academy store.

Trotter, 5 feet 4 inches tall and 105 pounds. was last seen wearing a dark green sweatshirt, jeans and tennis shoes.

# Search for missing student expanded

By Al Greenwood
Courier staff

Authorities have developed no new leads for a 19-year-old Willis student who has been missing since Tuesday.

Meanwhile, family members — including a state senator — continue donating countless hours to find Melissa Trotter, who was last seen at Montgomery College at about Tuesday.

"It's like everyone else," said state Senator Jerry Patterson, who is a

**COUNTY** cousin of the missing teen. "You never think it would happen to you, but it can."

Investigators from the Montgomery County Sheriff's Department have turned up no new leads as far as finding Trotter, said Lt. Dan Norris. Officers continue to interview friends, students and other acquaintances, he said. They are using these accounts to develop a history of Trotter's whereabouts prior to Tuesday, he said.

This comes after volunteers have

cleared a five-mile radius around Montgomery College, said Richard Sublett, director of operations for the Melissa Recovery Center. He is also a sergeant 1st class of the Texas Army National Guard.

This search radius was extended another five miles on Saturday, he said.

As the search effort continues to intensify, the recovery center gave its first press conference about Trotter on Saturday. Child Watch also joined the search effort Saturday.

This national group helps coordinate communications among the family, investigators and the media, said Lori Racanelli Coleman, regional director of Child Watch of North America.

Child Watch will help distribute flyers about Trotter throughout the state and the country this week, Coleman said.

Sublett said about 100 volunteers poured through the recovery center

EXHIBIT "V"

## ALEXANDER B. KLEIN, JR., M.D., F.A.C.O.G.
### OBSTETRICS & GYNECOLOGY

DATE 11·23·98   NAME Melissa Trotter

repeat
pap 7-98)

| WT | AGE | BP | LMP | BC | M/S URINALYSIS |
|---|---|---|---|---|---|
| 109 | 18 | 110/60 | 9/Gu10 | not active | |

MAMMOGRAM          Barton Cryo B5

MEDS   (quit BCP's Aug. 98)

(ex-boyfriend recently told pt - she was exposed to chlamydia when they were together)

Pt reports no discharge but relates
Regular menses on BCP till
At times cramps c̄ me

abd
vag    7 as pg vul clear
         c̄ perl per & clear
         u normal/avg per MC
                Av & sy        Pt to call u

Imp ① PS (Endo top & Brush) ②
      ② Chlamydia Culture
      ③ Urinanalysis - PS̄ of R per champ on

EXHIBIT "W"



OC99-002

EXHIBIT "X"



OC99-002

EXHIBIT "Y"

No. 99-11-06435-CR-(2)

EX PARTE § IN THE DISTRICT COURT OF

§ MONTGOMERY COUNTY, TEXAS

LARRY RAY SWEARINGEN § 9TH JUDICIAL DISTRICT

## AFFIDAVIT OF JERALD D. CROW

My name is Jerald D. Crow. I am over the age of 18 and have personal knowledge of the facts stated herein.

I have been ordered by the Court to provide an affidavit addressing the following question:

> **WHAT OTHER EVIDENCE WAS KNOWN TO TRIAL COUNSEL THAT WOULD HAVE DISSUADED COUNSEL FROM ALLOCATING RESOURCES TO THE INVESTIGATION OF ENTOMOLOGICAL EVIDENCE?**

Contrary to Appellant's contention, my co-counsel and I interviewed Dr. Joye Carter regarding facts revealed in the autopsy. That interview took place on or about December 9, 1999 in Dr. Carter's office in Houston, Texas. Time and date of death were discussed with Dr. Carter. Dr. Carter opined that Melissa Trotter had died on the date of her disappearance. Dr. Carter further opined that Ms. Trotter had died within about 4 hours of having eaten her last meal due the state of the digestion of the food removed from Ms. Trotter's stomach during the autopsy. Jonathan Lavergne, an employee of the school cafeteria, had provided a written statement during the investigation which identified food consumed by Ms. Trotter at about 2:00 p.m. on the day of her disappearance. Some of the contents of Ms. Trotter's stomach removed during the autopsy matched the food that she ate in the school cafeteria.

Dr. Lede, our pathologist, confirmed the findings of Dr. Carter regarding the date and time of death. Neither pathologist mentioned nor suggested that entomological evidence be considered as a means of establishing date and time of death because there was no dispute as to date and time of death.

As I have previously stated, I was not familiar with science of entomology at the time of the preparation and trial of Mr. Swearingen's case. The existence of entomological evidence in Mr. Swearingen's case was not recognized by me nor

called to my attention by the State or any other expert or professional.

My review of the state's evidence revealed a strong circumstantial case against Mr. Swearingen for the homicide of Ms. Trotter. Strategically speaking, I believed that the best plan of attack was to challenge the evidence of the underlying felonies of sexual assault and kidnaping.

_Jerald D. Crow_

SUBSCRIBED AND SWORN to before me on _Feb 8_, 2007, by Jerald D. Crow.

_Elenia Keith_
Notary Public/State of Texas

ELENIA KEITH
Notary Public
STATE OF TEXAS
My Comm. Exp. 9-10-2009

EXHIBIT "Z"

CAD NATURE: HOMICIDE

REPORTING OFFICER: DUBOSE, BRYAN M          01003586   UNIT: 6002

SYNOPSIS:
AUTOPSY RESULTS RECEIVED 011599

PERSONS

RELATIONSHIP: VICTIM            TYPE: ADULT
NAME:  TROTTER, MELISSA ALINE        RACE:  WHITE SEX: F DOB: 11/26/79  AGE: 19

ADDRESS: 7201 F.M. 3081          APT:       CITY: WILLIS
STATE: TEXAS          ZIP: 77378   HOME PHONE:   409-767-4771
EMPLOYER: ACADEMY (CONROE)        WORK PHONE:
OCCUPATION: SALES
TO SUSPECT: ACQUAINTANCE      INJURY: OTHER         EXTENT: FATAL
SYNOPSIS: HOMICIDE

PROCESSED:    BY:                    PHOTOS:     PRINTS:

ADMINISTRATION

CLR. OFC: DUBOSE, BRYAN M        #: 01003586     DATE:
ROUTE   : LT NORRIS      SAO:        DATE:             DIV: D
CLEARANCE  : OPEN              EXCEPTION:
SUPERVISOR : NORRIS, DANIEL Q        #: 01003
APPROVED BY:                  #:
ATTACHMENTS: NONE

NARRATIVE

98A017441
HOMICIDE

C:  TROTTER, MELISSA A.

PROGRESS REPORT:
ON SUNDAY 01-03-98 THIS DETECTIVE, BRYAN DUBOSE RESPONDED TO "OFFICE OF THE
MEDICAL EXAMINER OF HARRIS COUNTY JOSEPH A. JACHIMCZYK FORENSIC CENTER" 1885
OLD SPANISH TRAIL HOUSTON, TEXAS 77054-2098.  ONCE ON LOCATION I MEET WITH
CRIME SCENE INVESTIGATOR DAVID TANNER.

AT APPROXIMATELY 12:05PM WE MEET WITH DR JOYE M. CARTER, I PROVIDED HER WITH
MELISSA'S MEDICAL AND DENTAL RECORDS, ALONG WITH A COPY OF THE ORIGINAL MISSING
PERSONS REPORT.

C.I. TANNER WAS THEN ALLOWED TO ATTEND THE GATHERING OF THE TRACE EVIDENCE
PRIOR TO AUTOPSY.  SEVERAL ITEMS OF TRACE EVIDENCE WAS COLLECTED SEE CSI
TANNERS SUPPLEMENT FOR EXACT DETAILS.

THE AUTOPSY BEGIN AT 2:15PM, IT WAS CONDUCTED BY DR JOYE CARTER, WITH DR.
DELATTRE AND DR. STIMSON IN ATTENDANCE FOR THE DENTAL COMPARRISSON.

THE BODY HAD BLUE DENIM JEANS, WHITE SOCKS, ON BLK AND WHITE GYM SHOE ON THE LEFT FOOT, THE SOLE OF THE SHOE WAS CLEAN WITH MINIMAL DEBRIS NOTED. THE BODY HAD A GREEN SWEATER WITH LONG SLEEVES AND A ZIPPER FRONT ON IT, WITH PURPLE STRIPES ON THE ELBOWS. BENEATH THE SWEATER WAS A BLACK LONG SLEEVE PULLOVER TYPE SHIRT, WITH A WHITE BRA UNDER IT. AS NOTED AT THE ORIGINAL SCENE THE SWEATER, SHIRT AND BRA HAD BEEN PUSHED UP ABOVE THE BREASTS. BENEATH THE JEANS WERE RED THONG TYPE PANTIES. THE SHIRT AND SWEATER WAS THEN CUT OPEN, EVIDENCE TAPE WAS PLACED ALONG THE CUTS MADE BY DR CARTER.

UPON CHECKING THE RIGHT FRONT POCKET OF THE JEANS, A PIECE OF RULED NOTE BOOK PAPER WAS FOUND WITH THE NAME NICOLE AND THE PHONE NUMBER OF 409-524-3008, WROTE ON IT. THE JEANS ALSO HAD A TRIANGLE SHAPED TEAR IN THE RIGHT REAR POCKET AREA, THE TEAR MEASURED 11" BY 6" BY 5 1/2".

THE CLOTHING WAS REMOVED AND COLLECTED AS EVIDENCE. THE BODY WAS IN A DECOMPOSED STATE, WITH MARBLING OF THE LEGS, ARMS, CHEST AND BACK. THERE WAS ALSO SKIN SLIPPING AND BLACK DISCOLORATION OF THE FACIAL SKIN. IT WAS NOTED THAT THE FACIAL SKIN WAS DAMAGED DUE TO DECOMPOSITION ALONG WITH POSTMORTEM INSECT AND ANIMAL ACTIVITY. DR. CARTER ALSO NOTED MAGGOT ACTIVITY AND OBSERVED FLY LARVAE IN THE ORAL CAVITY. DR. CARTER STATED DUE TO THE LARVAE, MAGGOTS, AND DEGREE OF DECOMPOSITION, AND THE BODY WAS DRESSED SIMILAR TO THE MISSING PERSON REPORT, SHE FELT THE VICTIM HAD PROBABLY BEEN DECEASED, 24 TO 25 DAYS, CONSISTENT WITH THE TIME MELISSA DISAPPEARED.

OTHER THAN THE DAMAGE TO THE BODYS NECK CAUSED BY THE LIGATURE, DR CARTER DID NOT FIND ANY OTHER INJURIES EXCEPT, SHE NOTED THE VICTIM HAD BITE THROUGH HER TONGUE.

THE LIGATURE WAS WHAT APPEARED TO BE A CUT LEG FROM A PAIR OF PANTY HOSE. THERE WAS A RUN RUNNING THE ENTIRE LENGTH OF THE HOSE. THERE WAS A 1/4 TO 1/2" PIECE OF THE PANTY ON THE CUT END. THE LIGATURE WAS COLLECTED TO BE TRANSPORTED TO THE AUSTIN DPS LAB AS EVIDENCE.

DR. DELATTRE AND DR. STIMSON CONDUCTED THE DENTAL COMPARISON, AND AFTER CONSULTING WITH DR CARTER, THEY AGREED THAT THERE WAS A POSITIVE ID, THE BODY WAS THAT OF MELISSA A TROTTER. DR CARTER STATED THE CAUSE OF DEATH WOULD BE ASPHYXIA DUE TO LIGATURE STRANGULATION. MANNER OF DEATH WOULD BE RULED HOMICIDE.

WHEN THE ORIGINAL AUTOPSY REPORT IS RECEIVED IT WILL BE PLACED INTO THE RECORDS DIVISION TO BECOME A PART OF THIS CASE FILE. SEE ORIGINAL AUTOPSY FOR EXACT DETAILS OF THE AUTOPSY. SEE CSI TANNERS SUPPLEMENT FOR THE DEATILED EVIDENCE COLLECTED AND THE PHOTOS TAKEN. THE AUTOPSY CONCLUDED AT APPROXIMATELY 7PM.

DR CARTER DID NOT ADVISE OF ANY EVIDENCE OF FACIAL FRACTURES, BUT DID LOCATE A LIGATURE AROUND THE BODYS NECK. THE LIGATURE WAS TIED IN THE BACK OF THE NECK WITH A SIMPLE KNOT. THE LIGATURE WAS CUT AWAY, THEN LAID BACK ON THE FLAT SURFACE, WITH THE ENDS TOUCHING, IT SHOWED TO HAVE A DIAMETER OF APPROX: 3 1/2".

DISPOSITION:  INVESTIGATION TO CONTINUE

DETECTIVE BRYAN DUBOSE

# APPENDIX "II"

RM CD-64
VISED)
ESCRIBED BY
L.O. 201-17

# U. S. DEPARTMENT OF COMMERCE

## Asheville, N.C.

I CERTIFY that the attached are authentic and true copies of meteorological records on file in the NATIONAL CLIMATIC DATA CENTER, ASHEVILLE, NORTH CAROLINA.

*August D. Shumbera*
_____

AUGUST L. SHUMBERA
RECORDS CUSTODIAN
DATA ADMINISTRATOR
(Official Title)

. . . . . . . . . . . . . . . . . . .

I HEREBY CERTIFY that AUGUST L. SHUMBERA RECORDS CUSTODIAN, who signed the foregoing certificate, is now, and was at the time of signing, DATA ADMINISTRATOR, NATIONAL CLIMATIC DATA CENTER, and that full faith and credit should be given his certificate as such. I further state that I am the person to whom the said custodian reports.

IN WITNESS WHEREOF, I have hereunto
subscribed my name and caused the
seal of the Department of Commerce
to be affixed     AUG 3 0 2006
on this date:

For the SECRETARY OF COMMERCE:

*Thomas R. Karl*
_____

Climatological
City of Conroe *(River Station, if different)*

MONTH December 19 98

WS FORM B-91 (7-89)

U.S. DEPARTMENT OF COMMERCE
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
NATIONAL WEATHER SERVICE

**RECORD OF RIVER AND CLIMATOLOGICAL OBSERVATIONS**

DATE TX0
COUNTY Montgomery
RIVER

TIME (local) OF OBSERVATION RIVER 9:00 Am
TEMP 8:00 Am
PRECIPITATION 8:00 Am
STANDARD TIME IN USE CST

TYPE OF RIVER GAGE
ELEVATION OF RIVER GAGE ZERO ___ Ft.
FLOOD STAGE ___ Ft.
NORMAL POOL STAGE ___ Ft.

| DATE | TEMPERATURE F. 24 HRS. ENDING AT OBSERVATION MAX. | MIN. | AT OBSN. | 24-HR AMOUNTS Rain, melted snow, etc. (ins. and hundredths) | Snow, Ice pellets (ins. and tenths) | Snow, Ice pellets, hail, on ground (ins.) At Ob. | WEATHER Fog | Ice Pellets | Glaze | Thunder | Hail | Damaging Winds | RIVER STAGE GAGE READING AT A.M. | TENDENCY | REMARKS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 78 | 57 | 64 | 0 | | | | | | | | | | | |
| 2 | 76 | 64 | 70 | 0 | | | | | | | | | | | |
| 3 | 81 | 61 | 73 | 0 | | | | | | | | | | | |
| 4 | 80 | 70 | 71 | .05 | | | | | | | | | | | |
| 5 | 83 | 65 | 68 | 0 | | | | | | | | | | | |
| 6 | 79 | 65 | 70 | 0 | | | | | | | | | | | |
| 7 | 79 | 47 | 80 | 1.35 | | | | | | | | | | | |
| 8 | 57 | 44 | 51 | 0 | | | | | | | | | | | |
| 9 | 58 | 48 | 48 | .33 | | | | | | | | | | | |
| 10 | HELP | | 44 | 1.03 | | | | | | | | | | | |
| 11 | 46 | 43 | 44 | .56 | | | | | | | | | | | |
| 12 | 46 | 32 | 40 | 0 | | | | | | | | | | | |
| 13 | 62 | 36 | 51 | 0 | | | | | | | | | | | |
| 14 | 63 | 33 | 47 | 0 | | | | | | | | | | | |
| 15 | 63 | 33 | 47 | 0 | | | | | | | | | | | |
| 16 | 66 | 41 | 47 | 0 | | | | | | | | | | | |
| 17 | 64 | 40 | 49 | 0 | | | | | | | | | | | |
| 18 | 75 | 50 | 65 | 0 | | | | | | | | | | | |
| 19 | 75 | 49 | 70 | 0 | | | | | | | | | | | |
| 20 | 79 | 49 | 71 | 0 | | | | | | | | | | | |
| 21 | 55 | 32 | 32 | .30 | | | | | | | | | | | |
| 22 | 35 | 32 | 32 | 0 | | | | | | | | | | | |
| 23 | 34 | 32 | 33 | 0 | | | | | | | | | | | |
| 24 | 36 | 29 | 29 | 0 | | | | | | | | | | | |
| 25 | 42 | 26 | 29 | 0 | | | | | | | | | | | |
| 26 | 57 | 29 | 46 | 0 | | | | | | | | | | | |
| 27 | 65 | 45 | 48 | 0 | | | | | | | | | | | |
| 28 | 62 | 40 | 50 | 0 | | | | | | | | | | | |
| 29 | 70 | 36 | 44 | 0 | | | | | | | | | | | |
| 30 | 62 | 43 | 53 | | | | | | | | | | | | |
| 31 | 73 | 53 | 63 | | | | | | | | | | | | |
| SUM | | | | 3.64 | | | | | | | | | | | |

CHECK BAR *(For wire-weight)* NORMAL CK. BAR
READING ___ DATE ___

CONDITION OF RIVER AT GAGE
A. Obstructed by rough ice.
B. Frozen, but open at gage.
C. Upper surface of smooth ice.
D. Ice gorge above gage.
E. Ice gorge below gage.
F. Shore ice.
G. Floating ice.
H. Pool stage.

OBSERVER Paul Morton

SUPERVISING OFFICE NWSO HGX

STATION INDEX NO. 41-1956-4

BEST AVAILABLE COPY

CONROE 41-1956-04 TX

**(Climatological)** CONROE (River Station, if different) MONTH JAN 19 99

WS FORM B-91 (7-89)

U.S. DEPARTMENT OF COMMERCE
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
NATIONAL WEATHER SERVICE

STATE Texas  COUNTY Montgomery  RIVER

TIME (local) OF OBSERVATION RIVER 8:00 AM  PRECIPITATION 8:00 AM  STANDARD TIME IN USE CST

## RECORD OF RIVER AND CLIMATOLOGICAL OBSERVATIONS

TYPE OF RIVER GAGE  ELEVATION OF RIVER GAGE ZERO ___ Ft.  FLOOD STAGE ___ Ft.  NORMAL POOL STAGE ___ Ft.

| DATE | TEMPERATURE F. MAX. | MIN. | AT OBSN. | Rain, melted snow, etc. (ins. and hundredths) |
|---|---|---|---|---|
| 1 | 75 | 45 | 45 | 0 |
| 2 | 50 | 29 | 30 | 0 |
| 3 | 39 | 25 | 32 | 0 |
| 4 | 53 | 26 | 54 | 0 |
| 5 | 55 | 41 | 54 | 0 |
| 6 | 68 | 54 | 64 | 0 |
| 7 | 68 | 54 | 63 | 0 |
| 8 | 75 | 63 | 69 | 0 |
| 9 | 57 | 28 | 35 | 0 |
| 10 | 58 | 28 | 55 | 0 |
| 11 | 71 | 24 | 73 | 0 |
| 12 | 72 | 56 | 63 | 0 |
| 13 | 70 | 39 | 40 | 0 |
| 14 | 70 | 31 | 43 | 0 |
| 15 | 61 | 32 | 47 | 0 |
| 16 | 75 | 32 | 67 | 0 |
| 17 | 78 | 46 | 63 | 0 |
| 18 | 75 | 44 | 61 | 0 |
| 19 | 75 | 61 | 69 | 0 |
| 20 | 78 | 69 | 71 | 0 |
| 21 | 75 | 60 | 58 | 0 |
| 22 | 71 | 43 | 47 | 0 |
| 23 | 59 | 36 | 52 | 0 |
| 24 | 73 | 42 | 62 | 0 |
| 25 | 77 | 47 | 59 | 0 |
| 26 | 77 | 59 | 68 | 0 |
| 27 | 78 | 59 | 69 | 0 |
| 28 | 72 | 68 | 70 | 0.30 |
| 29 | 75 | 48 | 50 | 0 |
| 30 | 70 | 44 | 49 | 0 |
| 31 | 75 | 39 | 53 | 0 |
| | | | SUM | .30 |

CONDITION OF RIVER AT GAGE

A. Obstructed by rough ice.
B. Frozen, but open at gage.
C. Upper surface of smooth ice.
D. Ice gorge above gage.
E. Ice gorge below gage
F. Shore ice:
G. Floating ice:
H. Pool stage.

CHECK BAR (For wire-weight) NORMAL CK. BAR  READING ___ DATE ___

OBSERVER Paul Marly

SUPERVISING OFFICE  NWSO HGX

STATION INDEX NO. 41-195 6 4

CONROE 41-1956-04  TX

BEST AVAILABLE COPY

# APPENDIX "III"

| EX PARTE | ) | No. 99-11-06435-CR(2) |
|---|---|---|
| | ) | IN THE DISTRICT COURT |
| LARRY RAY SWEARINGEN | ) | 9TH JUDICIAL DISTRICT |
| (WR-53,613-04) | ) | MONTGOMERY COUNTY, |
| | ) | TEXAS |

---

## AFFIDAVIT OF JANE FABER

---

I, Jane Faber, a legal assistant with the law firm of Hilder & Associates, P.C., Houston, Texas, received a fax on December 14, 2007, at 11:27 a.m. from Lisa Roberts. Said fax consisted of a document entitled *Affidavit of Lisa Roberts*. This *Affidavit* was signed by Ms. Roberts and was dated and notarized December 14, 2007. I gave the *Affidavit* directly to James G. Rytting, the attorney working on the *Swearingen* matter.

A copy of the aforementioned *Affidavit of Lisa Roberts* is attached hereto.

_____
JANE FABER

STATE OF TEXAS
COUNTY OF HARRIS

This Affidavit was acknowledged before me on the 18th day of June, 2008, by Jane Faber.

ANN M HINRICHS
My Commission Expires
February 10, 2009

_____
Notary Public's signature

| | | |
|---|---|---|
| EX PARTE | ) | No. 99-11-06435-CR-2 |
| | ) | IN THE DISTRICT COURT |
| LARRY RAY SWEARINGEN | ) | 9TH JUDICIAL DISTRICT |
| (WR-53,613-04) | ) | MONTGOMERY COUNTY, TEXAS |

### AFFIDAVIT OF LISA ROBERTS

    My name is Lisa Roberts. I swear that, to the best of my knowledge, the following is true and correct:

    1.    In 1998, I was employed at League Line Marina & Resort on Lake Conroe, Conroe, Texas. I was working in the phone room or call center. My job was to try to call possible customers to get them interested in the resort. About ten people worked in the phone room at this time, including Melissa Trotter. Robert Graham was our supervisor.

    2.    Around November of 1998, Melissa began receiving phone calls that seemed to upset her. At first, she would just hang up real abruptly. I'd ask her during a break what was going on, and she'd say something like, "men." I was pretty sure the problem wasn't customers, but Melissa did not say who was bothering her.

    3.    As I recall, it was not too long before the time Melissa disappeared, she got phone calls that really upset her. Cora, who also worked in the call center, would patch the phone calls through to Melissa. Melissa broke down and started crying. She said "he won't quit calling." Cora patched another call through, and I picked up Melissa's phone.

    4.    The caller thought Melissa was on the line and started saying completely foul things. He said, "You're a fucking bitch," and swore that he was "going to choke the life out of me," meaning Melissa. He went on, saying that he was going to get her back for what she did to him. I remember him saying, "I'll strangle you; I'll choke the life out of you; I'm going to fuck you while you die." I started yelling back and he realized Melissa was not on the phone. That was the first phone call I took.

    5.    The caller phoned again, and I picked up the phone again. He told me that he was going to "lick" Melissa's cheek, and "right before she took her last breadth," he said, "I'm going to kiss her lips for the last time."

    6.    That night the calls kept coming for an hour and a half until it was time to quit work. Everyone's numbers were down in the phone room because the calls took all our attention, except for one girl who did not want to make it her business. When he'd call, we would try to "star-69" the phone calls in order to I.D. the caller but he was using a private line.

7.      As I remember, Mrs. Trotter came out and picked Melissa up after work. I believe Melissa's own car was still in the parking lot when I returned to work the next day. That previous night was the last time Melissa worked at League Line Resort. She may have come out to pick up her check. I heard Melissa started working at Academy a few days later, but I didn't see her again after that night.

8.      While Melissa was working at League Line, this one guy picked her up three times, as I remember. The first time Melissa seemed O.K about it. The second time he came to get her, Melissa said "Oh god, oh god." Nickie Mains and I confronted her as the guy was pulling up. I said she did not have to get in the car with anyone she did not want to. I told her I'd get my boyfriend. Melissa said, "You don't know what that will do; that'll cause problems."

9.      The night guard would not let the guy past, so he parked on the side of the road outside the entrance. The first two times he came to get Melissa he parked in the dark. The third time he came to get Melissa, she was scared to death. We told her not to go, and when she insisted she had to, we made her promise to call us when she got home. She called forty-five minutes later. On this third occasion, the man parked in the light and I was able to see him and his car. He was driving a pick-up, full size, an older model, light blue in color. I did not know who the person was, and Melissa did not tell us his name.

10.     I do know who Larry Swearingen is. I went to school with him. I had at least five classes in junior high and high school with him, including auto repair and a math class. The man who picked Melissa up was not Larry Swearingen. The voice on the phone was not Larry Swearingen's voice.

11.     I learned that Melissa had disappeared from Cora. She came into work and plopped down the paper, the Courier Journal, which carried the story. At first, we thought that Melissa had left home because she was tired of her mother running her life. Melissa used to complain about her mother's interference. For example, Amber Mains, who also worked in the call room, and Melissa decided to try out with a modeling agency. The agency chose Melissa, but her mother would not let her work for the agency. Melissa said her mother told she had to get her education first, and then she could make a decision about a career in job like that.

12.     Cora asked me if we should call the police. At first, we did not want to get involved. However, that night or the night after, Cora telephoned Montgomery County Sheriff's Department and told them that she worked with Melissa and said Melissa had received some life threatening phone calls. The following day two detectives came out, one was tall and chunky. The other was shorter. Both officers had dark hair and appeared to be 30-40.

13.     The first question the detectives asked us was, did we know Melissa? We said, Yes. The very next thing they said was, "Tell us about the phone calls." I told them what the caller said. I told the detectives that the calls started about a week ahead of the night on which Melissa broke down, and I told them about that Melissa broke down crying one night and that I took the call meant for her. I told the detectives what the caller said: that he threatened to strangle and choke the life out of Melissa, and that he threatened to rape her and watch her die. I remember telling them exactly that the caller said he was going to lick her cheek and kiss her lips just before she died. I also told them the detectives about the man Melissa was so scared of, who had picked her up those three times at League Line Resort.

14.     I also told the detectives that Melissa was dating Larry Swearingen, and that he might know where she was. I knew Melissa was dating Larry because she told me. At first, I thought, now way, and used to kid her about dating him. Melissa said that she liked him because he made her feel herself and was easy to talk to.

15.     Melissa had a number of boyfriends during the time I knew her.

16.     We followed the papers and the searches they reported, and thought nothing about her being dumped in the Sam Houston National Forest. That is, we didn't think that was where her body would turn up. I went to five mile point, where the body was eventually found, a couple times in between the time Melissa disappeared and before her body turned up. It was a very popular place to go, even in the winter. In fact, I went to five mile point on December 31, 1998, New Years Eve, with a group of friends. There was another group from, I believe, Huntsville, already partying. We did not see a dead human body at any time.

SIGNED _Lisa A. Roberts_
Lisa Roberts


SUBSCRIBED and SWORN before me the undersigned authority on this ___14___ day of _December_, 2007.


_Vilma E. Standeford_
Notary Public of and
for the State of Texas

VILMA E. STANDEFORD
Notary Public
STATE OF TEXAS
My Comm. Exp. Dec. 30, 2008

**[FILED UNDER SEAL]**

| | | |
|---|---|---|
| EX PARTE | ) | No. 99-11-06435-CR-2 |
| | ) | IN THE DISTRICT COURT |
| LARRY RAY SWEARINGEN | ) | 9TH JUDICIAL DISTRICT |
| (WR-53,613-04) | ) | MONTGOMERY COUNTY, TEXAS |

### AFFIDAVIT OF LISA ROBERTS

My name is Lisa Roberts. I swear that, to the best of my knowledge, the following is true and correct:

1.    In 1998, I was employed at League Line Marina & Resort on Lake Conroe, Conroe, Texas. I was working in the phone room or call center. My job was to try to call possible customers to get them interested in the resort. About ten people worked in the phone room at this time, including Melissa Trotter. Robert Graham was our supervisor.

2.    Around November of 1998, Melissa began receiving phone calls that seemed to upset her. At first, she would just hang up real abruptly. I'd ask her during a break what was going on, and she'd say something like, "men." I was pretty sure the problem wasn't customers, but Melissa did not say who was bothering her.

3.    As I recall, it was not too long before the time Melissa disappeared, she got phone calls that really upset her. Cora, who also worked in the call center, would patch the phone calls through to Melissa. Melissa broke down and started crying. She said "he won't quit calling." Cora patched another call through, and I picked up Melissa's phone.

4.    The caller thought Melissa was on the line and started saying completely foul things. He said, "You're a fucking bitch," and swore that he was "going to choke the life out of me," meaning Melissa. He went on, saying that he was going to get her back for what she did to him. I remember him saying, "I'll strangle you; I'll choke the life out of you; I'm going to fuck you while you die." I started yelling back and he realized Melissa was not on the phone. That was the first phone call I took.

5.    The caller phoned again, and I picked up the phone again. He told me that he was going to "lick" Melissa's cheek, and "right before she took her last breadth," he said, "I'm going to kiss her lips for the last time."

6.    That night the calls kept coming for an hour and a half until it was time to quit work. Everyone's numbers were down in the phone room because the calls took all

our attention, except for one girl who did not want to make it her business. When he'd call, we would try to "star-69" the phone calls in order to I.D. the caller but he was using a private line.

7.     As I remember, Mrs. Trotter came out and picked Melissa up after work. I believe Melissa's own car was still in the parking lot when I returned to work the next day. That previous night was the last time Melissa worked at League Line Resort. She may have come out to pick up her check. I heard Melissa started working at Academy a few days later, but I didn't see her again after that night.

8.     While Melissa was working at League Line, this one guy picked her up three times, as I remember. The first time Melissa seemed O.K about it. The second time he came to get her, Melissa said "Oh god, oh god." Nickie Mains and I confronted her as the guy was pulling up. I said she did not have to get in the car with anyone she did not want to. I told her I'd get my boyfriend. Melissa said, "You don't know what that will do; that'll cause problems."

9.     The night guard would not let the guy past, so he parked on the side of the road outside the entrance. The first two times he came to get Melissa he parked in the dark. The third time he came to get Melissa, she was scared to death. We told her not to go, and when she insisted she had to, we made her promise to call us when she got home. She called forty-five minutes later. On this third occasion, the man parked in the light and I was able to see him and his car. He was driving a pick-up, full size, an older model, light blue in color. I did not know who the person was, and Melissa did not tell us his name.

10.    I have reviewed a photograph of an individual who appear to be the person who came to the resort to pick up Melissa. I have since learned that the name of this person is Robbie Grove.

SIGNED _Lisa Roberts_
Lisa Roberts

SUBSCRIBED and SWORN before me the undersigned authority on this __14__ day of _December_ , 2007.

_Notary signature_
Notary Public of and
for the State of Texas

VILMA E. STANDEFORD
Notary Public
STATE OF TEXAS
My Comm. Exp. Dec. 30, 2008

# APPENDIX "IV"



FEB - 1 2008

Writ No. WR-53,613-05



|                      |   |                          |
|----------------------|---|--------------------------|
| EX PARTE             | § | IN THE                   |
|                      | § | COURT OF CRIMINAL APPEALS OF |
| LARRY RAY SWEARINGEN  | § |                          |
|                      | § | AUSTIN, TEXAS            |

## STATE'S MOTION TO DISMISS APPLICANT'S THIRD APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

On January 16, 2008, the Court denied Applicant's second application for writ of habeas corpus. Applicant filed his third application for writ of habeas corpus the same day, suggesting that he has found the "real" killer and that the medical examiner who testified at his trial now says that the victim could not have been laying out in the woods where she was found prior to Applicant's arrest on December 11, 1998.

In accordance with Tex. Code Crim. Proc. art. 11.071, § 5(b), the clerk has transmitted the application to this Court.

For the reasons set out below, the State, acting through its District Attorney, moves the Court to dismiss this third and subsequent application because the facts stated therein are not new evidence and do not satisfy the requirements of article 11.071, § 5(a), and there is no violation of the United States Constitution presented.

1

I.

## Applicant's knows that the supposed "real killer" was eliminated as a suspect in this case.

Applicant presents the affidavit of "Lisa Roberts," a one-time co-worker of the deceased, Melissa Trotter, who spontaneously called Applicant's attorney in December 2007. [App. at 46] Ms. Roberts claims that a person named "Robbie Grove" picked up Melissa from work, and that Melissa "was scared to death" of this person. [Sealed Aff at ¶ 9 & 10, a copy of which is attached hereto as Exhibit 1] Attached to the affidavit is a photograph of "Robbie Grove."

Mr. Grove is Applicant's cousin. [Exhibit 2, being the affidavit of Scott Davis and the copy of video-recorded interview of Robbie Grove] In the State's file, viewed by Applicant's attorney, is a file folder labeled "Robbie Grove." [A copy of which is attached hereto as Exhibit 3] The file folder contains a polygraph waiver signed by Mr. Grove and questions about Melissa Trotter and her disappearance, death, and the location of her body. [Exhibit 4] The file folder also contains a consent to search for blood, and an evidence sheet reflecting that the blood was sent to the Department of Public Safety Laboratory in Austin for DNA analysis and comparison with the blood found under Melissa's fingernails. [Exhibit 5] A section in the offense report book prepared by the Sheriff's Office has a tab marked "Robbie Grove." [Exhibit 6] Behind that tab is the DPS Laboratory report and in a supplemental report dated December 10, 1999, provided to Applicant's attorney, "The DNA profile from

2

the nail scrapings (item 13) is inconsistent with the victim, the suspect and Robbie Lynn Grove. Ms. Trotter, Mr. Swearingen and Mr. Grove can be excluded as being contributors of this stain." [Exhibit 7]   The State's file folder also contains a complete personal history data report. [Exhibit 8]  The State's file also contains a video-recorded interview with Mr. Grove, in which Mr. Grove and his uncle defend Applicant. [Exhibit 2]

Mr. Grove was eliminated as a suspect in this case, and Applicant knows that fact.

Further, Lisa Roberts is not credible. Ms. Roberts mentions only Nickie Mains and a "Cora" as co-workers at the League Line Marina.  It is Amber Maines and Jamie Irvin who were close to Melissa. [Exhibit 9 and 3rd App Exhibit CC]  Although Amber Maines mentions Melissa was "getting telephone herasments [sic] by a man who knew where she worked & her name & where she went to school," Amber states "It happend [sic] a couple of times, then it stopped." [Ex 9]  Neither Amber, nor Jamie  mention that Melissa had been picked up from work by someone she was deathly afraid of. See Exhibit 9 and 3rd App Exhibit CC.

In addition, Lisa Roberts claims to have gone to school with Applicant and had "at least five classes in junior high and high school with him." [App. Ex H ¶ 10] However, Applicant's stepfather, Joe Martinez, states in his affidavit, which was also made available to Applicant, that Applicant did not move back to the Conroe area until 1987 and then attended Willis High School. [Ex 10 at 1, Affidavit of Joe

3

Martinez]

In addition, Applicant has a motive for framing Mr. Grove. In the State's file viewed by Applicant's habeas attorney, is a file folder marked "Frankie Paskett," containing his written statement. [Exhibit 11] Mr. Paskett was working at Corbin's Texaco in Willis, Texas, and on December 11, 1998, had known Applicant for about seven years. [Ex 11] On December 11th, Applicant came into the store to pay for the gas he put in his truck and "offered that he had lost his job, because of Robbie Grove, & had been making good money. Larry said that he believed that Robbie had called his job & told them about him (Larry) being in trouble in the past." [Ex 11] In fact, Mr. Grove begins his video-recorded interview explaining that he thought he was asked to come to the Sheriff's Office to talk about Larry's being fired from his job. [Ex 2]

II.

**Applicant seriously misstates the record. The pubic hair found on the vaginal swab is Melissa's, and Melissa's body was found in the brush of a heavily wooded area not an open field.**

1.    The pubic hair found on Melissa's vaginal swab is hers.

In his application Applicant states, "Motivating the repetitive investigation was the fact that biological evidence recovered from Ms. Trotter's vaginal cavity proved that she was sexually involved with another man right before her disappearance. Tr. Transc., vol 30, at 77-78." [App. at 46]

The Reporter's Record reflects the testimony on cross-examination of Sandy

4

Musialowski, Criminalist, Texas Department of Public Safety, Crime Laboratory-Austin Division [RR-30 22, 62]:

> Q: Regarding pubic hairs that were recovered from the victim's vaginal swab that would have been performed during the autopsy, did you compare those to known pubic hair samples from the victim--I'm sorry, did you compare that to the suspect's known pubic hair?
>
> A: Yes.
>
> Q: And what was your findings there?
>
> A: They were different than the suspect's pubic hairs.

[RR-30 77-78]

Applicant's habeas attorney reviewed the State's file in this case. Page 3 of the supplemental report dated October 25, 1999, reflects, "Pubic hairs were recovered from the victim's vaginal swab (01-04-99, #4). These hairs are macroscopically different than the suspect's pubic hair and appears visually similar to the victim's pubic hair sample." [Ex 7, emphasis added] No further testing was conducted on the pubic hair because the hair was visually similar to the victim's. Applicant goes too far in suggesting that Melissa "was sexually involved with another man" on the basis of this evidence.

2.   Melissa's body was found in the brush protected by a canopy of trees.

Applicant also goes too far in stating that crime scene videos show that Melissa's "body was left [in] a relatively open, sunlight space in the forest." [App. at

5

38] As shown in the photos attached as Exhibit 12, Melissa's body was found in the brush of a heavily wooded forest. Lieutenant Dan Norris, who managed the crime scene where Melissa's body was found, describes the area as "a heavily wooded area with a heavy tree canopy over the body and over the entire surrounding areas. The body was near a narrow dirt road leading down to Lake Conroe. It did not appear that there had been any large gatherings or young people's parties in or near the area." [Ex 12 Det. Norris also states that the location where Melissa's body was found is "well north of Conroe and, generally, temperatures are colder in the area where the body was found than they are in Conroe.

Applicant's representation of the area in which Melissa was found could have misled the experts he engaged in his cause. More importantly, Dr. Carter's affidavit is not new evidence.

### III.

**Dr. Joye Carter's affidavit is not "new evidence" and was readily available to Applicant at the time he filed his second application.**

Article 11.071, § 5(a)(1), requires that an applicant show "the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application." Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a)(1) (Vernon Supp. 2007). "[A] factual basis of a claim is unavailable . . . if the factual basis was not ascertainable through the exercise of reasonable diligence on or before that date." Tex. Code Crim. Proc. Ann. art. 11.071, § 5(e) (Vernon Supp. 2007). In his second

6

application, Applicant presented the affidavit of Dr. Luis A. Sanchez, reviewing and criticizing the opinions of Dr. Joye Carter. [2nd App. Exhibit H] Dr. Sanchez expanded on his affidavit during his testimony at trial to include his opinion that the condition of Melissa's organs were not consistent with her body being in the woods for 25 days. [3rd App Exhibit E at 14-19] Applicant states no facts showing that he could not obtain the affidavit of Dr. Carter or testimony about these matters at the same time.

Even if the Court were to consider Dr. Carter's affidavit, Dr. Carter's affidavit is based on whatever information Applicant provided her. At trial, Dr. Carter testified that there was "[j]ust decompositional change" in the liver, pancreas, and spleen. [RR-29 43] Dr. Carter further testified that the condition of Melissa's body was consistent with a body being in the woods for about 25 days. [RR-29 44]

Q: Based on the evidence that you saw and the evidence you've since gathered, do you have an opinion as to how long that body had been there?

The rate of decomposition and all that, do you have an opinion as to time of death?

A: Yes, I did form an opinion.

Q: What is that?

A: I arrived at the opinion of the body being dead for approximately 25 days or so, based upon the appearance.

Q: So if a person disappeared on December the 8th of 1998 and the body was recovered on January 2nd of 1999, that would be consistent with your findings?

7

A:    Yes, it would.

[RR-29 45]

Dr. Carter does not explain in her affidavit how she, the Chief Medical Examiner, Harris County, could have been so dead wrong in her testimony at trial.

## IV.

### Applicant has abused the Great Writ.

By failing to reveal critical evidence that was made available to him and misstating the record evidence to obtain expert opinions in his favor, Applicant has abused the Great Writ.

Wherefore, the State prays that Applicant's third application for writ of habeas corpus be dismissed.

Respectfully submitted,

Michael A. McDougal
District Attorney
SBOT # 13570000

*Gail Kikawa McConnell*

Gail Kikawa McConnell[1]
Assistant District Attorney
SBOT # 11395400
Montgomery County, Texas
207 W. Phillips, Second Floor
Conroe, Texas 77301
Phone: (936) 539-7800
Fax: (936) 788-8395

## Certificate of Service

This filing was completed after 5:00 p.m. on January 30, 2008. I hereby certify that a copy of the foregoing State's motion to dismiss without attachments was served by facsimile transmission to Mr. James Rytting, (713) 655-9112, on January 30, 2008, after 5:00 p.m., and will be served by first class mail with attachments on January 31, 2008, to Mr. James Rytting, attorney for Applicant, 819 Lovett Blvd., Houston, TX 77006; and by first class mail to Tom Jones, Asst. Attorney General.

*Gail Kikawa McConnell*

Gail Kikawa McConnell

---

[1]     The lead prosecutor in this case on post-conviction writ is Marc Brumberger who is on a pre-planned, pre-paid vacation and family leave.

9